```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
     - - - - - - - - - - - - - - X
     UNITED STATES OF AMERICA,    :    20-CR-00549(AMD)
                                  :
                                  :
                                  :    United States Courthouse
          -against-               :    Brooklyn, New York
                                  :
                                  :
                                  :    August 14, 2023
                                  :    12:00 p.m.
     COREY MARTIN,                :
                                  :
          Defendant.              :
     - - - - - - - - - - - - - - X

        TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
              BEFORE THE HONORABLE ANN M. DONNELLY
                  UNITED STATES DISTRICT JUDGE


                       A P P E A R A N C E S:

For the Government:       BREON PEACE, ESQ.
                          United States Attorney
                          Eastern District of New York
                          271 Cadman Plaza East
                          Brooklyn, New York 11201

                          BY:  EMILY DEAN, ESQ.
                               ANDRES PALACIO, ESQ.
                               Assistant United States Attorneys

For the Defendant:        LAW OFFICE OF ANTHONY CECUTTI
                          217 Broadway, Suite 707
                          New York, NY 10007

                          BY:  ANTHONY CECUTTI, ESQ.
                               KESTINE THIELE, ESQ.

Court Reporter:           DENISE PARISI, RPR, CRR
                          225 Cadman Plaza East
                          Brooklyn, New York 11201
                          Telephone: (718) 613-2605
                          E-mail: DeniseParisi72@gmail.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.
```

1             (In open court.)
2             THE COURTROOM DEPUTY: All rise.
3             THE COURT: Hi. Everybody can have a seat.
4             THE COURTROOM DEPUTY: This is criminal cause for a
5    status conference, docket number 20-CR-549, USA versus Corey
6    Martin.
7             Counsel, state your appearance, Government first.
8             MS. DEAN: Good morning, Your Honor.
9             Good morning, everyone.
10            Emily Dean and Andres Palacio for the Government.
11            THE COURT: Good morning. It's actually afternoon,
12   I think.
13            MR. CECUTTI: Good afternoon, Your Honor.
14            Anthony Cecutti and Kestine Thiele for Corey Martin,
15   who is present seated to -- standing to Ms. Thiele's left.
16            THE COURT: Good afternoon.
17            Good afternoon, Mr. Martin.
18            Everybody can have a seat.
19            So I'm looking here because I got distracted from
20   why we actually had this conference given the recent letter
21   from defense counsel, which I've read, and I know the
22   Government hasn't had an opportunity to respond. We were just
23   going to discuss a couple of outstanding, sort of, pretrial
24   things, but defense counsel has filed a letter saying that
25   they just received -- and forgive me, I don't know from

1  gigabytes, so I don't know how many pages we're talking about
2  here, but could you give a senior citizen a break?
3        MR. CECUTTI:  We can, Your Honor.  And to share in
4  your lack of understanding, so do I --
5        THE COURT:  Okay.
6        MR. CECUTTI:  -- but Ms. Thiele knows what that
7  amounts to, so I'm going to turn the mic over to her to
8  explain what the 52 gigabytes means in terms of size.
9        THE COURT:  I recognize most of it is from the NYPD,
10  that's why I take it some of it is Dd5s and things like that.
11  And there's surveillance, so I guess in terms of number of --
12  let's start with number of pages, first of all, and then I'll
13  hear from the Government in a minute.  But number of pages of
14  Dd5s, and then there's, I think, extractions from different
15  electronic devices, and then there's some fingerprint reports.
16  Give me an approximate page number.  Let's start with the
17  reports.
18        MS. THIELE:  I think the Government would be in a
19  better position --
20        THE COURT:  Okay.
21        MS. THIELE:  -- to respond specifically to the
22  number of pages, but from our cursory review, it seems as
23  though there are NYPD reports or pages related to the
24  investigation in the amount of 500 roughly.
25        THE COURT:  Okay.  Five hundred.

1           MS. THIELE:  And for the 26 electronic devices, what
2    we have are summaries of the forensic extractions, which have
3    come in PDF form.
4           THE COURT:  Okay.
5           MS. THIELE:  And some of those are hundreds of
6    pages --
7           THE COURT:  All right.
8           MS. THIELE:  -- so it's voluminous, from our
9    perspective.
10          THE COURT:  All right.
11          What do you have to say about this?
12          MS. DEAN:  Sure.
13          And, Your Honor, if I can respond in brief, and then
14   if I can give more detail.
15          THE COURT:  Just make sure you don't speak too
16   quickly.
17          MS. DEAN:  Sure.
18          With respect to the Dd5s, there was a recent
19   different request for a number of Dd5s that were not disclosed
20   as part of your Rule 16 discovery.  The Government's position
21   on those is, for example, there are Dd5s that are not Rule 16
22   material that say NYPD lab report attached to the case, or
23   certain things like that.  Or the Dd5s themselves are not
24   Rule 16 material, but the underlying lab report for the phone
25   records or the OCME report was disclosed.

1               THE COURT:  OCME?

2               MS. DEAN:  Yes.

3               Now, however, because they asked for these Dd5s and

4       there is just no reason to not let them see what they didn't

5       have and why it wasn't Rule 16, we turned it over.  So when

6       you hear about that volume of pages, it sounds like a lot, but

7       these are reports that are non-substantive, non-Rule 16

8       material.

9               THE COURT:  Just so I understand -- and, you know,

10      Dd5s come in all shapes and sizes; sometimes they're

11      significant and sometimes they aren't.  But is what you're

12      telling me that some of this material, simply the cover sheet,

13      the equivalent of a cover sheet that attaches some kind of a

14      lab report that has already been turned over?

15              MS. DEAN:  Yes.  Or -- if I can give another

16      example -- or, for instance, it's a cover sheet where the NYPD

17      ran a DAS report on an individual, and the Government's

18      position is a DAS report is not Rule 16 or 3500 material.

19              THE COURT:  D-O-C-S?

20              MS. DEAN:  D-A-S.

21              THE COURT:  Oh, okay.

22              MS. DEAN:  So, for instance, that's just an example

23      where a report is not discoverable and was not turned over.

24      But where the report was discoverable, the lab report was

25      turned over.

1       And if I can add, not only was the lab report turned
2  over, the entire lab file, even including the handwritten
3  notes of the analyst, the chain of custody reports, everything
4  we could obtain from the lab, was turned over well in advance
5  of the 3500 disclosures that will come later, so we tried to
6  be more inclusive rather than less inclusive.
7       THE COURT:  To what extent is any of -- and, again,
8  I'm going to give you a chance to respond in writing because
9  obviously I can't make a decision today on this, but to what
10 extent is any of this new, what's been turned over?  Because
11 in terms of percentages, I don't know what the volume is that
12 you are talking about of things that is just a duplicate or
13 another copy of the same report, and maybe that's something
14 that you can include in your submission.  But what is new in
15 this?  For example, the letter says that counsel had requested
16 information from other devices that were in the premises and
17 now this is included in some of the material that was turned
18 over.
19      MS. DEAN:  Yes.  So this -- the devices are new.
20      THE COURT:  Okay.
21      MS. DEAN:  So the Government was under the
22 misimpression that those devices had not been extracted.
23      THE COURT:  Okay.  How much material is that?
24      MS. DEAN:  So there's 26 devices, and if I could
25 categorize them for you, I think it might be helpful.

1           THE COURT:  Slowly.

2           MS. DEAN:  There's 26 devices.  Twenty-four of those
3   are cell phones and two are computers.

4           THE COURT:  Okay.

5           MS. DEAN:  Of those 26 devices, nine of the devices,
6   there was no extraction because the phone was either locked,
7   disabled, or empty.  So those reports are about two to three
8   pages.

9           THE COURT:  And do we know to whom these devices
10  belong?

11          MS. DEAN:  Many of them seem to be either the
12  defendant's or Adelle Anderson's.  One appears to be Adelle
13  Anderson's child.  We did turn them all over.  It's not our
14  belief that they would all constitute Rule 16 material, but we
15  did, upon finding out that these have been extracted,
16  immediately turn them all over.

17          THE COURT:  Okay.  So nine of the devices -- these
18  are cell phones; right?  Nine cell phones?

19          MS. DEAN:  Yes.

20          THE COURT:  So there's nothing on those.

21          What are the other -- is it 15?

22          MS. DEAN:  Yes.  I will keep going through the
23  categories.

24          So that's the first nine.

25          So then an additional five devices, there was an

1 extraction done, but those extractions were nearly empty.  The
2 phones were nearly empty.  So the extractions were extremely
3 small, a very small amount of data.  For example, 21 pages.
4 Or the 90-page extraction of a phone that appeared to belong
5 to Adelle Anderson's child.  There were small extractions from
6 five additional devices, so that brings us to a total of 14
7 devices.
8 　　　　　An additional four devices that we turned over were
9 well outside the relevant time frame for this case:  Phones
10 from 2012, 2013, 2014, and 2015.  Years prior to Ms. Anderson
11 and Ms. Odom living with Corey Martin, let alone the murder in
12 this case.
13 　　　　　THE COURT:  Is it correct that they just haven't
14 been used since well before the homicide?
15 　　　　　MS. DEAN:  That's how it appears, yes.  That group
16 of four devices, I grouped them together because they appear
17 to be from 2012, 2013, '14, and '15.
18 　　　　　And then there was an additional device ranging from
19 a timeline of 2014 to April of 2017, which appears to have no
20 calls or texts or messages, and several music installations
21 had to be removed -- I guess removed for the phone to be
22 extracted at all, so it appeared to have some kind of musical
23 installation on it and not communications; however, that
24 extraction is turned over as well.
25 　　　　　So that brings me to the two computer extractions,

1 those were located -- and let me just back up one moment
2 before I go into those.
3 　　　　　The Government became aware of this because of
4 finally receiving hardcopy boxes that had been in storage that
5 we had not been able to obtain before just recently.  In
6 reviewing a hard drive from one of the hardcopy boxes, the
7 Government became aware that the devices had been extracted,
8 and that's -- we absolutely believe we should have known about
9 this.  We are not saying that as an excuse; we're just
10 explaining how we became aware of this.
11 　　　　　Once we became aware of it, the hard drive itself
12 actually contained the two computer extractions.  Those are
13 not -- we've looked at the Dd5s from Computer Crimes.  We've
14 produced those as well.  Those Dd5s from Computer Crimes were
15 newly produced to the defense.  Those do not memorialize the
16 extraction of these computers.  The software that was used to
17 extract them, we can't open yet.  We are going to have to get
18 that open, so I just can't make representations about what's
19 in the computer extractions.
20 　　　　　THE COURT:  Do we know whose they are?
21 　　　　　MS. DEAN:  I know there's a laptop from the Martin
22 Anderson home and what appears to be another computer, but I
23 couldn't tell you who they were belonging to.  There's no
24 reports on these extractions that we have been able to locate.
25 　　　　　THE COURT:  I'm just curious, in terms of the actual

1  devices themselves, you said they were in physical storage,
2  but why didn't you have access to them?
3          MS. DEAN: So the devices themselves, it was the
4  hardcopy boxes that we've recently obtained from the NYPD that
5  we -- there was a hard drive in the hardcopy boxes that we
6  located and determined that there were these extractions done.
7  Why couldn't we obtain them, Your Honor? It's a really good
8  question. We've asked for -- if there was any outstanding
9  video for hardcopy files. We've contacted every homicide
10 detective who has been assigned to this case, the case
11 detective who's retired who has been assigned to this case.
12 We have contacted supervisors in the NYPD in the Homicide Unit
13 and asked for these materials if any exist. We should have
14 been given these materials earlier.
15         THE COURT: Where were they? Were they at the
16 property clerk at one of those desolate places out on Long
17 Island or in Queens? Where were they?
18         MS. DEAN: They were in the 69th Precinct and they
19 were in Brooklyn South Homicide.
20         THE COURT: Okay.
21         MS. DEAN: And just, frankly, we should have had
22 these earlier, we have asked for them, and we only recently
23 received them, which led to this discovery.
24         THE COURT: All right. What else are we talking
25 about here, then, in terms of -- is that it for electronics?

1         MS. DEAN: So that's just bringing me to the two
2 computer extractions.
3         THE COURT: Okay.
4         MS. DEAN: So what that leaves us with is, what I
5 haven't spoken about yet, is five cellular phone extractions;
6 two phones belonging to the defendant, three phones belonging
7 to Ms. Anderson. Those are the phones -- the only phones with
8 overlapping dates for the time period of the crime where those
9 phones -- where those phones overlap with dates in 2017 and
10 some in 2018, so that's five extractions.
11         THE COURT: My recollection, just from the motion
12 practice, is that Mr. Martin gave detectives two cell phones
13 during the execution of the search warrant. Are these in
14 addition to those cell phones?
15         MS. DEAN: Yes. These are additional electronics
16 that were recovered from the home that were searched pursuant
17 to the Kings County state court search warrant from April of
18 2018. These are additional devices. There were a number --
19 so the parties -- and the reason the parties discussed this is
20 that we always knew that there were these additional devices
21 recovered from the home. The Government had even sought to
22 have these devices identified for potential additional search
23 warrants. We just simply didn't know that they had been
24 extracted by NYPD's Computer Crimes.
25         THE COURT: All right.

1          So when you say they've been extracted, do you know
2  what's on them?
3          MS. DEAN:  So, well, the report -- I guess -- it's
4  kind of -- because -- it's hard to answer that question.  So
5  the reports that we turned over -- I think that the parameters
6  of what I was trying to, kind of, go through, those are the
7  parameters that I think were helpful parameters as far as most
8  of these phones -- the vast majority of these phones either
9  nothing, almost nothing, or dates that are years outside the
10 realm of the case we're talking about.
11         For the remainder -- so that's why I said it, kind
12 of, brings us to these five cellar extractions; two belong to
13 the defendant and three, we believe, belong to Adelle
14 Anderson, and those are the five extractions that we believe
15 are the most salient for review, and that's a review that can
16 take place in a number of days.
17         THE COURT:  And then are there Dd5s that are -- I
18 mean, I would imagine that this was a case that was
19 investigated by the precinct, by the Homicide Task Force,
20 Missing Persons.  I'm just trying to think of the multiple
21 units that get, sort of, tangentially involved.
22         Is there anything new in any of those things?
23         MS. DEAN:  So the -- separate from the Computer
24 Crimes file which has now been turned over, the Dd5s that were
25 raised that are addressed in the letter, those come from

1  the -- those come from, like, the main case, Your Honor, the
2  main case, which includes both of the -- the task force Dd5s,
3  the homicide Dd5s, those are all together on the main case,
4  and those Dd5s that were requested are the ones that I started
5  out describing.
6              THE COURT:  Oh.
7              MS. DEAN:  The only ones we hadn't turned over,
8  separate from the ones that constitute 3500, were those Dd5s
9  that the Government believes were not Rule 16, were not
10 discoverable, but when we received the request from the
11 defense saying -- looking at the pagination of the 5s and
12 saying, we're missing these pages, and we just looked back, we
13 decided, because of their request, to just give them those 5s
14 regardless of the fact that those are not discoverable
15 pursuant to Rule 16.  So those are new Dd5s, but they are
16 non-substantive Dd5s that are not Rule 16 material.
17             THE COURT:  What about the surveillance tapes?
18             MS. DEAN:  Okay.  So --
19             THE COURT:  I keep interrupting you when you are
20 trying to do your ordered presentation, but --
21             MS. DEAN:  Well, Your Honor, there's a lot of
22 topics, and we don't relish being in this position.  We agree
23 that we should have known about some of this material, and
24 this -- some of this is on -- it falls on us, especially these
25 devices, so I understand there's a lot to get through.

1     THE COURT:  So let's do this instead.  It's easier
2 for me if you file a written response to the submission by the
3 defense, and if you want to reply to it, you can.
4     How long do you think it will take you?
5     MS. DEAN:  I would like to get it in very quickly.
6 By tomorrow, Your Honor.
7     THE COURT:  That's perfect.
8     And then how long do you think you would need to
9 respond?
10    MR. CECUTTI:  Your Honor, Friday, would that work?
11    THE COURT:  Sure.
12    And then I think what we should probably do -- what
13 I will do -- I have to look at my calendar to just pick
14 another date to reconvene about it.  I mean, it will just
15 depend on what it is because I know there was a reference that
16 additional experts are going to be needed.  We're still a ways
17 off from that October trial date, but it is not quite as far
18 as it once seemed.  But then I think just to -- you know, not
19 to -- I guess, spoiler alert -- I think we probably will have
20 to adjourn the case for some period.  I can't say how long
21 that will be, but it sounds to me like at least sometime in
22 2024, depending on what it is, but maybe we should just deal
23 with that when we have a better grasp of what the material is.
24    At this point, I'm not prepared to entertain a bail
25 application, but I don't understand you to be making one

1 today.

2         MR. CECUTTI:  Not today, Your Honor.

3         THE COURT:  I would like to get a clearer idea of

4 the nature of the materials that we are talking about and the

5 extent to which it is going to require massive amounts of

6 investigation or not, and then we'll figure out what to do

7 after that.

8         So once I get your letter, we'll pick a time.

9         Are you both available most of next week?

10        MR. CECUTTI:  Yes.

11        MS. DEAN:  Yes.

12        THE COURT:  Okay.  So we'll pick a time for that.

13        Is there anything else we have to resolve today?

14        MS. DEAN:  I think, Your Honor, just -- I appreciate

15 that you are allowing us the time to write on this, but from

16 the Government's perspective -- and we'll spell this out in

17 the letter -- this is just simply not the massive volume of

18 relevant materials painted in the defense letter, which we

19 will explain.  The Government's position is, with two months

20 prior to trial, there's not a need to move the trial date, and

21 we'll try to explain that in the letter by detailing

22 everything that has been turned over, especially the

23 appearance of the volume of the devices is somewhat misleading

24 because of the swaths of devices that are not relevant or not

25 able to be extracted.

1     In addition, the video surveillance is extremely,
2 extremely limited that was discovered in the hardcopy file,
3 and some of the reports raised by the defense, such as that
4 canine report, that's two pages of paper from the NYPD.
5     THE COURT: I probably should not ask this question,
6 but what did the canine do? Just for the cadaver? Was it a
7 cadaver dog?
8     MS. DEAN: It searched. It came to the search
9 warrant executed on the defendant's home.
10     THE COURT: Did it alert?
11     MS. DEAN: It alerted in the trunk of the
12 defendant's vehicle.
13     THE COURT: Okay.
14     Well, like I said, I probably spoke too soon about
15 adjourning the trial, but I want you to be aware of it as a
16 possibility, but --
17     MR. CECUTTI: Your Honor, if I can just briefly
18 respond?
19     THE COURT: Sure.
20     MR. CECUTTI: We will certainly write on this in our
21 reply, but I'm at a loss -- we are at a loss to understand why
22 we are here because this material was material that we asked
23 for initially two -- almost two years ago. We specifically
24 made a demand to the Government in November 2021 for
25 electronic devices.

1      THE COURT:  I think they are, kind of, falling on
2 their sword about at least a portion of it.
3      MR. CECUTTI:  Right.
4      THE COURT:  I don't think you are making the claim
5 that it is intentional.
6      MR. CECUTTI:  We are just at a loss to understand
7 why this happened.  We made the demand, we've made repeated
8 demands, and it went nowhere.  Essentially we were told that
9 they understand the Rule 16 obligations, and that was that,
10 and here we are.
11      We don't even know exactly what are in the cell
12 phones.  We appreciate the Government's update today, but even
13 if there were a couple of cell phones that had information
14 that was relevant, that's still -- that can still be a
15 time-consuming task.
16      THE COURT:  I still think we have to figure out what
17 we're talking about first.  I mean, I'm assuming that if some
18 of these things were recovered in the search warrant, there
19 was a search warrant returned that detailed what was
20 recovered, which is probably why you asked for the actual
21 phones themselves; is that right?
22      MR. CECUTTI:  There were property vouchers that were
23 produced as part of discovery back in 2021.
24      THE COURT:  Which reflected the seizure of these
25 items; correct?

1         MR. CECUTTI: Correct.

2         THE COURT: I think the Government and these two
3 prosecutors probably have better experience with the NYPD than
4 a lot of AUSAs, but I think the mysteries of getting things
5 sometimes from the NYPD -- I mean, well, let's say it's not
6 always an easy task, but I think it requires, just in future
7 cases, sometimes even going to the place where you think the
8 things are, including the property clerk's office, because it
9 happens sometimes.

10         But I don't think that it's especially useful at
11 this point to talk about what we're going to do. I don't know
12 if -- I said maybe we would have to adjourn. Maybe it will
13 turn out that this doesn't require that, but I think we have
14 to get a better handle on what we're talking about, give the
15 Government an opportunity to explain, give you an opportunity
16 to respond, and then to see what we have.

17         Let's just see what we have. I mean, it may come to
18 a point where I have to look at some of it and see what it is,
19 but I think we are just kind of talking in a vacuum right now.

20         Is there any day that's bad next week for you?

21         And, Donna, can we look at our calendar, too?

22         MS. DEAN: Your Honor, is Tuesday available?

23         THE COURT: We're having technical difficulties.

24         THE COURTROOM DEPUTY: Tuesday at 2:30.

25         MR. CECUTTI: That's fine.

1     Thank you.
2             MS. DEAN:  That's fine.
3             Thank you.
4             THE COURT:  Okay.  So Tuesday at 2:30.  I guess I'll
5  see you then.
6             Anything else anybody wants to put on the record?
7             MS. DEAN:  Nothing from the Government.
8             Thank you, Your Honor.
9             MR. CECUTTI:  No, thank you, Your Honor.
10            THE COURT:  Thanks so much.
11            Thanks to the marshals.
12            MS. DEAN:  I'm sorry, Your Honor, I do have one more
13 thing.  I apologize.  I forgot to request the exclusion of
14 time for the parties to deal with the --
15            THE COURT:  I think I excluded the time until the
16 trial.
17            MS. DEAN:  You already alerted me to that.
18            Thank you.  Sorry.
19            THE COURT:  That's all right.  That's okay.  Belt
20 and suspenders.
21            (Matter concluded.)
22
23
24
25

Denise Paris, RPR, CRR
I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.
/s/ Denise Paris, August 15, 2023