TH/EJD/AP
F. #2020R00708

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                        Docket No. 20-CR-549 (S-1) (AMD)

CORY MARTIN,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

THE GOVERNMENT'S MEMORANDUM OF LAW IN
RESPONSE TO MARTIN'S PRETRIAL MOTIONS

                                  BREON PEACE
                                  United States Attorney
                                  Eastern District of New York
                                  271 Cadman Plaza East
                                  Brooklyn, New York 11201

Tanya Hajjar
Emily J. Dean
Andy Palacio
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 2

    A. Relationship Between Defendant, CW-1 and Odom and Defendant's Role in
       Commercial Sex Work ........................................................................................ 3

    B. Defendant's Physical and Sexual Abuse of CW-1 ............................................ 5

    C. Life Insurance Fraud Scheme and Murder of Odom ..................................... 6

ARGUMENT ................................................................................................................... 7

II. EVIDENCE CONCERNING THE DEFENDANT'S INVOLVEMENT IN THE
    VICTIM'S COMMERCIAL SEX WORK, HIS PHYSICAL AND SEXUAL ABUSE OF
    CW-1, AND HIS PARTICIPATION IN FINANCIAL FRAUD IS ADMISSIBLE ......... 7

    A. Applicable Law ................................................................................................. 7

    B. Evidence of the Defendant's Involvement in the Victim's Commercial Sex Work and
       the Defendant's Physical and Sexual Abuse of CW-1 Is Relevant and Admissible... 13

    C. Witness-1's Testimony Regarding the Defendant's Participation in Past Financial
       Crimes Is Relevant and Admissible ............................................................ 18

III. PHOTOGRAPHIC EVIDENCE OF THE CRIME SCENES AND AUTOPSY IS
    RELEVANT AND ADMISSIBLE.................................................................... 19

IV. THE DEFENDANT SHOULD NOT BE PERMITTED TO MENTION
    CONSEQUENCES ATTENDANT TO HIS CONVICTION ......................................... 20

V. THE DEFENDANT SHOULD BE ORDERED TO DISCLOSE HIS RULE 16(b)
    DISCOVERY AND TRIAL EXHIBITS TO BE INTRODUCED DURING THE
    GOVERNMENT'S CASE............................................................................ 23

CONCLUSION.......................................................................................... 26

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum of law in support of its motions <u>in limine</u> in advance of trial in this matter, currently scheduled to commence on February 12, 2024.  First, the government moves to admit at trial evidence of certain acts committed by the defendant Cory Martin.  As set forth below, the evidence is admissible as direct proof of the charged crimes.  In the alternative, the evidence is admissible as "other crimes, wrongs or acts" under Rule 404(b) of the Federal Rules of Evidence because it tends to establish the defendant's knowledge, intent, motive, plan, lack of accident and absence of mistake with respect to the charged crimes, and would be offered for other permissible purposes such as to explain the development of the relationship between the defendant and a cooperating witness and to corroborate the cooperating witness.  Second, the government moves to admit a select number of autopsy photographs and crime scene photographs that depict the crime scene, to show the nature and extent of the injuries to the victim, to corroborate the testimony of witnesses, and to assist the jury in understanding witness testimony.  Third, the government moves to preclude the defendant from mentioning at trial, including during jury addresses, cross-examination and direct examination of witnesses, any consequences attendant to the defendant's conviction.  Finally, the government respectfully requests that the Court order the defendant to disclose his Rule 16(b) discovery and any trial exhibits to be introduced during the government's case.  For the following reasons, the Court should grant the government's motions <u>in limine</u>.[1]

---

[1]     The government reserves its right to supplement this motion and to file additional motions <u>in limine</u> in advance of trial.

STATEMENT OF FACTS

This case arises out of the defendant's scheme to fraudulently obtain life insurance policies in the name of Brandy Odom, murder her, and then claim benefits under the life insurance policies.  Starting in approximately March 2017, the defendant and a co-conspirator ("CW-1") fraudulently purchased life insurance policies in Odom's name, naming CW-1 as the beneficiary on the policies.  At this time and until her murder, Odom lived at 249-45 148th Road, Queens, New York ("the Residence") with the defendant, CW-1 and CW-1's children.  After the defendant and CW-1 obtained the life insurance policies in Odom's name, they arranged for premium payments to the life insurance companies to be made by Western Union money order and by using a debit card in Odom's name.

In early April 2018, the defendant strangled Odom to death inside the Residence and severed her corpse into numerous pieces with a saw.  In the early morning hours of April 8 and April 9, 2018, the defendant and CW-1 disposed of Odom's body and evidence of Odom's murder at the Residence.  As reflected on video surveillance from outside the Residence, the defendant and CW-1 made multiple trips to and from the Residence in the process of disposing of evidence related to Odom's murder.

On April 9, 2018, the New York City Police Department ("NYPD") responded to a 911 call reporting a human body inside of Canarsie Park.[2]  Upon arriving at the scene of the crime, NYPD officers discovered Odom's dismembered torso and head inside the park.  On April 10, 2018, NYPD officers located garbage bags containing Odom's arms, legs,

---

[2]     The government intends to introduce the 911 call into evidence at trial.

hands and feet in another area of the same park.  After Odom's body was discovered, CW-1 made several unsuccessful attempts to claim benefits under the life insurance policies.

The defendant is charged by indictment with murder-for-hire and conspiracy to commit murder-for-hire, in violation of Title 18, United States Code, Section 1958; conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349; aggravated identity theft, in violation of Title 18, United States Code, Section 1028A; and fraudulent use of identification, in violation of Title 18, United States Code, Section 1028(a)(7).

At trial, the government anticipates that CW-1 will testify about, among other things, her relationship with the defendant and their relationship with Odom, as well as their participation in commercial sex work, and the origin of the life insurance fraud scheme and the plot to murder Odom.  The government further anticipates that a friend of the defendant's ("Witness-1"), who has participated in "scamming," or financial fraud, with the defendant in the past, will testify that the defendant solicited Witness-1 to join in the murder conspiracy and offered Witness-1 a portion of the life insurance policy proceeds.

A.    Relationship Between Defendant, CW-1 and Odom and Defendant's Role in Commercial Sex Work

The government expects the evidence at trial to demonstrate that while Odom was living with the defendant and CW-1 at the Residence, Odom and CW-1 were engaged in commercial sex work and the defendant operated as their pimp.  In that role, the defendant set rates that CW-1 and Odom charged for sexual services, brought Odom to clubs to find customers, and acted as "protection" for Odom and CW-1 by observing their sexual encounters with customers, including by hiding in a closet.  Eventually, the defendant

demanded that CW-1 no longer engage in sex work herself but manage Odom's sex work by posting advertisements for Odom's services, screening her clients, and coordinating sexual encounters with customers.

CW-1 and Odom were required to call the defendant "daddy," a common term used by those involved in prostitution, and they were not permitted to wear clothing inside the Residence. The defendant controlled whether and when CW-1 and Odom were permitted to shower or bathe, and what they ate. Neither CW-1 nor Odom was permitted to look at another man's face without the defendant's permission. The defendant required access to CW-1 and Odom's cellular phones and other electronic devices, and, for many, set their passwords to "1257," which was the street number of the defendant's childhood home in Canarsie.

The defendant controlled all the money earned by CW-1 and Odom through commercial sex services, and they were required to obtain permission from the defendant to make any purchases. On one occasion, the defendant took over a thousand dollars from CW-1's bank account and required that she report it to the bank as fraud. The defendant also arranged for Odom to marry an individual who wanted to obtain a green card for money, which he kept. The defendant also encouraged CW-1 to recruit other women to perform commercial sex for the defendant's profit, including members of CW-1's family.

During this period of time, the defendant used and sold narcotics, and at times required that CW-1 and Odom use cocaine, ecstasy and MDMA. CW-1 occasionally drove the defendant to complete drug sales, including for cocaine. The defendant permitted certain drug dealers to trade drugs for sex with CW-1 or Odom.

Messages recovered from cellular phones belonging to the defendant and CW-1 contain messages exchanged between the defendant, Odom, and CW-1 regarding their participation in commercial sexual services in the months before Odom's death.  For example, text messages sent from the defendant to Odom detailed the sexual acts requested by a potential customer, and both Odom and CW-1 refer to the defendant as "daddy" in dozens of text messages.

B.     Defendant's Physical and Sexual Abuse of CW-1

The government expects that at trial, CW-1 will testify that her relationship with the defendant involved significant physical and sexual abuse.  During the time that CW-1 lived with the defendant, the defendant physically abused CW-1, CW-1's children, and assaulted Odom.  For example, on one occasion in 2017, CW-1 hid money from the defendant in order to buy a birthday present for her son.  When the defendant found the money, he handcuffed CW-1 and raped her with a hammer.  On another occasion, the defendant slammed CW-1 into a refrigerator and fractured her leg, which required medical attention.  The defendant took CW-1 to the hospital, where, at the defendant's direction, CW-1 lied about the cause of her injuries.

On January 27, 2018, after an argument about the murder-for-hire scheme, the defendant choked CW-1, slammed her head into a wall, pulled a knife on her, and threatened to kill CW-1 and her son.  CW-1 ran outside the Residence in her robe and called 911. CW-1 described the assault to responding police officers and explained that the defendant had a

knife and told her that he would "slit [CW-1's] throat."[3]  The defendant was arrested but subsequently released.

CW-1 also witnessed the defendant's physical and verbal threats to Odom and CW-1's minor children.   The defendant repeatedly threatened CW-1 and Odom with a firearm, and once put the firearm in CW-1's mouth during an argument.  CW-1 also observed the defendant punch her oldest son, who was approximately 8 years old, and point a gun at him.

C.    Life Insurance Fraud Scheme and Murder of Odom

CW-1 is expected to testify that the defendant first began discussing a plan to murder others in order to obtain the proceeds of life insurance policies in early 2017.  The defendant proposed a plan in which CW-1 would take out life insurance policies on CW-1's own child and the child's father, after which the defendant would murder them for the proceeds of the policies.  CW-1 refused, which enraged the defendant.

The defendant then told CW-1 that they would take an insurance policy out on Odom instead.  In 2017, CW-1 and the defendant fraudulently obtained two life insurance policies in Brandy Odom's name, with CW-1 listed as the sole beneficiary.  In order to obtain the policies, CW-1 falsely represented that she was Odom's sister.  After the life insurance policies were secured, the defendant began to plan Odom's murder.

In April 2018, CW-1 left the Residence to stay with her mother.  CW-1 was aware that the defendant intended to murder Odom while she was away.  Several days later,

---

[3]    At trial, the government intends to admit CW-1's 911 call and the statements made by CW-1 to the responding police officer.

the defendant picked up CW-1 from CW-1's mother's house and returned to the Residence. The defendant told CW-1 that he had strangled Odom to death and then penetrated Odom's body vaginally with an object to make it seem as though she had engaged in sexual intercourse prior to her death.  The defendant told CW-1 that choking someone to death was more personal than shooting them.[4]  The defendant then dismembered Odom over a period of days and the defendant and CW-1 disposed of Odom's body parts in Canarsie Park in the early morning hours of April 8 and April 9, 2018.

<u>ARGUMENT</u>

II.   <u>EVIDENCE CONCERNING THE DEFENDANT'S INVOLVEMENT IN THE VICTIM'S COMMERCIAL SEX WORK, HIS PHYSICAL AND SEXUAL ABUSE OF CW-1, AND HIS PARTICIPATION IN FINANCIAL FRAUD IS ADMISSIBLE</u>

Evidence of the full scope of the relationship between the defendant, CW-1, and Brandy Odom, including the defendant's role in profiting from their commercial sex work and his physical and sexual abuse, as well as his past participation in financial crimes with Witness-1, is admissible as direct evidence of the charged crimes.  This evidence is necessary to complete the story of the crime charged, and also independently admissible under Rule 404(b).

A.   <u>Applicable Law</u>

Evidence of uncharged acts, even uncharged acts that amount to criminal activity, is admissible as direct evidence of the crimes charged in the indictment.  <u>See</u> <u>United</u>

---

[4]   The defendant once told CW-1 that he had shot and killed a grandmother in Brownsville, Brooklyn, in retaliation for another individual having kidnapped his family member.  The government does not intend to elicit the defendant's statement to CW-1 concerning this murder in its case-in-chief.

States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000); United States v. Thai, 29 F.3d 785, 812

(2d Cir. 1994); United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989).  In Towne, the

Second Circuit specifically identified three categories of uncharged criminal activity that

constitute direct evidence of the charged offense:

> Evidence of uncharged criminal activity is not considered 'other
> crimes' evidence under Fed. R. Evid. 404(b) if it 'arose out of the
> same transaction or series of transactions as the charged offense,
> if it [is] inextricably intertwined with the evidence regarding the
> charged offense, or if it is necessary to complete the story of the
> crime [on] trial.'

Towne, 870 F.2d at 886 (quoting United States v. Weeks, 716 F.2d 830, 832 (11th Cir.

1983)); see also Carboni, 204 F.3d at 44; United States v. Gonzalez, 110 F.3d 936, 942 (2d

Cir. 1997); United States v. Khan, 591 F. Supp.2d 202, 205 (E.D.N.Y. 2008) (quoting

Carboni).  The Second Circuit has interpreted this category of evidence to include acts that

provide necessary background or context for the charged crimes.  See Gonzalez, 110 F.3d at

941-42 (uncharged burglary admissible in trial for felon in possession of a firearm because,

inter alia, it provided "crucial background evidence that gave coherence to the basic

sequence of events that occurred on the night" of defendants' arrest); United States v.

Inserra, 34 F.3d 83, 89 (2d Cir. 1994) (noting that evidence of other "bad acts" may be

admitted "to provide the jury with the complete story of the crimes charged by demonstrating

the context of certain events relevant to the charged offense"); United States v. Langford,

990 F.2d 65 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts

committed prior to the time charged in the indictment to prove the existence of the alleged

conspiracy as well as to show its background and history."); United States v. Coonan, 938

F.2d 1553, 1561 (2d Cir. 1991) ("The trial court may admit evidence that does not directly

establish an element of the offense charged, in order to provide background for the events alleged in the indictment.  Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.") (quoting United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988)).

It is "well settled in the Second Circuit that where an indictment contains a conspiracy charge, '[a]n act that is alleged to have been done in furtherance of the alleged conspiracy' is considered to be 'part of the very act charged.'"  United States v. Barret, No. 10-CR-809 (S-3) KAM, 2011 WL 6704862, at *4 (E.D.N.Y. Dec. 21, 2011) (quoting United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999)); see also Diaz, 176 F.3d at 80 (other bad acts evidence admitted to show how "drug conspirac[y] evolved, and how illegal relationships and mutual trust developed between co-conspirators"); Thai, 29 F.3d at 812 (stating that, in conspiracy cases, "uncharged acts may be admissible as direct evidence of the conspiracy itself").  Such acts are therefore inextricably intertwined with, and direct evidence of, the charged conspiracies and not subject to Rule 404(b).  See United States v. Matera, 489 F.3d 115 (2d Cir. 2007) (upholding admission of evidence of uncharged murders); Barret, 2011 WL 6704862, at *4, *6-*7 (concluding that evidence of, inter alia, uncharged attempted murder and contract for murder was "direct evidence" of drug distribution conspiracy).

Alternatively, under Rule 404(b), evidence of a defendant's "other crimes, wrongs, or acts" is admissible when it is offered for any purpose other than the defendant's criminal propensity.  See United States v. Germosen, 139 F.3d 120, 127 (2d Cir. 1998); United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984).  Rule 404(b) itself contains a non-exhaustive list of proper purposes for which "other act or crime" evidence may be admitted,

including "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b); see also Levy, 731 F.2d at 1002.  Such evidence is also admissible to corroborate the testimony of cooperating witnesses.  See United States v. Everett, 825 F.2d 658, 660-61 (2d Cir. 1987).

The Second Circuit has emphasized that Rule 404(b) is a rule of broad reach and liberal application, and applies an "inclusionary or positive approach" to admitting "other acts" evidence.  See United States v. Garcia, 291 F.3d 127, 136 (2d Cir. 2002) (citing United States v. Pitre, 960 F.2d 1112, 1118 (2d Cir. 1992)); see also Levy, 731 F.2d at 1002 ("We have adopted the inclusionary or positive approach to [404(b)]; as long as the evidence is not offered to prove propensity, it is admissible.").  A party must satisfy three requirements in order for evidence of "other crimes, wrongs or acts" to be admitted under the rule.  First, the evidence must be offered for a purpose other than to prove a defendant's bad character or criminal propensity.  United States v. Mickens, 926 F.2d 1323, 1328 (2d Cir. 1991); United States v. Colon, 880 F.2d 650, 656 (2d Cir. 1989).  Second, the evidence must be relevant under Rules 401 and 402 and not run afoul of Rule 403.  See Mickens, 926 F.2d at 1328; United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988); Levy, 731 F.2d at 1002.  Third, if the defendant requests that the jury be instructed as to the limited purpose for which the government's evidence is being admitted, the court must furnish such an instruction.  See Mickens, 926 F.2d at 1328-29; Levy, 731 F.2d at 1002.

The Second Circuit repeatedly has held that evidence of uncharged crimes may be admitted at trial to establish the existence and evolution of a relationship of trust between coconspirators.  See, e.g., United States v. Williams, 205 F.3d 23, 33-34 (2d Cir. 2000) (upholding admission of evidence relating to the defendant's prior criminal activities

with coconspirators in charged drug conspiracy as relevant evidence to inform jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed); United States v. Pipola, 83 F.3d 556, 565-66 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case.");[5] United States v. Rosa, 11 F.3d 315, 333-34 (2d Cir. 1993) (holding that co-defendants' relationship over a 14-year period, during which stolen property and narcotics crimes were committed, "was properly admitted to explain how the illegal relationship between the two [defendants] developed and to explain why [one defendant] . . . appointed [the other defendant] . . . to a leading position in the Organization"); United States v. Harris, 733 F.2d 994, 1006-07 (2d Cir. 1984) (upholding admission of evidence of defendant's previous narcotics transactions with informant who posed as prospective narcotics customer

---

[5]     Several Second Circuit decisions appear to analyze other acts evidence pertaining to the relationship of trust among coconspirators under the rubric of Rule 404(b). Others, however, have suggested that relationship of trust evidence, at least in conspiracy cases, is synonymous with direct proof of a charged conspiracy or evidence that completes the story of or provides crucial background to the charged offenses, and thus may be admitted without regard to Rule 404(b).  See, e.g., United States v. Moten, 564 F.2d 620, 628 (2d Cir. 1977) ("[P]roof of prior drug dealing by individual defendants with Brown at a time previous to commencement of the conspiracy charged was clearly admissible to show the basis for the existence of the conspiracy charged and the mutual trust which existed between Brown and his customers.  It was therefore admissible against all the defendants to show the nature and existence of the conspiracy charged."); United States v. Morillo-Vidal, 547 Fed. App'x 29, 30-31 (2d Cir. 2013) (testimony regarding other crimes was admissible because it was "relevant background information" that, inter alia, "explained [a co-conspirator's] relationship to his co-conspirator [] and his knowledge of [the co-conspirator's] role in a national drug conspiracy," evidence that qualifies as "highly probative when the charged conduct covers a conspiracy") (unpublished decision).

in connection with charged conspiracy, even though informant was not a member of the charged conspiracy, because the evidence "tended to show the basis for Harris's trust of [the informant]").

Additional bases for admitting other acts evidence under Rule 404(b) include "corroborat[ing] crucial prosecution testimony," such as the testimony of cooperating witnesses, if the corroboration is "direct and the matter corroborated is significant," Everett, 825 F.2d at 660 (internal quotation marks omitted), and, where extensive cross-examination into a government witness's criminal history for impeachment purposes is anticipated, allowing the government to elicit the witness's testimony about such acts on direct examination so as to avoid the appearance that the government is concealing such purported impeachment evidence from the jury, see, e.g., United States v. Guerrero, 882 F. Supp. 2d 463, 492 (S.D.N.Y. 2011).

Under Federal Rule of Evidence 403, otherwise admissible evidence may be excluded only where its "probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. The fact that evidence is highly probative of guilt does not mean it is unfairly prejudicial. See, e.g., United States v. Gelzer, 50 F.3d 1133, 1139 (2d Cir. 1995) ("Generally speaking, any proof highly probative of guilt is prejudicial to the interests of that defendant."). Rather, evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence" or "unfairly . . . excite[s] emotions against the defendant." United States v. Quattrone, 441 F.3d 153, 186 (2d Cir. 2006) (internal quotation marks omitted); see Old Chief v. United States, 519 U.S. 172, 180 (1997) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant

12

evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.").  In balancing the probative value of evidence and the danger of unfair prejudice, a court should "make these calculations with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case, and the mere fact that two pieces of evidence might go to the same point would not, of course, necessarily mean that only one of them might come in."  Old Chief, 519 U.S. at 183.  As the Supreme Court has instructed, "[w]hile an important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence, a fair trial does not include the right to exclude relevant and competent evidence."  Zafiro v. United States, 506 U.S. 534, 540 (1993) (internal brackets, citations, and emphasis removed).

     B.     Evidence of the Defendant's Involvement in the Victim's Commercial Sex Work and the Defendant's Physical and Sexual Abuse of CW-1 Is Relevant and Admissible

Evidence of the nature and scope of the relationship between the defendant, CW-1, and Odom is direct evidence of the murder-for-hire scheme and necessary to complete the story of the charged crime.  Such evidence is "plainly admissible" when it "explain[s] the development of the illegal relationship between the defendants and their co-conspirators and explains the mutual trust that existed between the coconspirators (including the cooperating Government Witnesses)."  United States v. Guerrero, 882 F. Supp. 2d 463, 492 (S.D.N.Y. 2011), aff'd, 560 F. App'x 110 (2d Cir. 2014); see, e.g., United States v. Delligatti, No. 15 CR. 491 (KBF), 2018 WL 1033242, at *7 (S.D.N.Y. Feb. 23, 2018) (admitting evidence of defendant's involvement with a cooperating witness in a prostitution business in order to demonstrate their bond leading to the defendant turning to the witness

"for help in carrying out a murder"), aff'd sub nom. United States v. Pastore, No. 18-2482, 2022 WL 2068434 (2d Cir. June 8, 2022).

The government expects that CW-1 will testify at trial that the defendant initially proposed murdering CW-1's child and the child's father for life insurance proceeds and proposed murdering Brandy Odom only after CW-1 refused to take part in a plot against her child. The government expects that CW-1 will testify that she agreed to the defendant's scheme because of the nature of their relationship, and because of the defendant's control and abuse of CW-1. Evidence of the defendant's prior threats to CW-1 and Odom, and the nature and extent of his physical and sexual abuse of CW-1, is therefore necessary to complete the story of the charged crime. Further, CW-1 is expected to testify that, as part of the murder-for-hire scheme, the defendant expected CW-1 to collect and turn over to him the proceeds from the life insurance policies after Odom's murder. CW-1's testimony that the defendant controlled CW-1 and Odom, and, in turn, all the money earned or possessed by CW-1, is relevant to establish that the defendant expected to profit from Odom's murder, which is an element of the charged crime.

Courts have routinely admitted evidence "that adds context and dimension to the government's proof of the charges" in order to demonstrate "the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997) (quoting United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991)); see Old Chief, 519 U.S. at 183 (explaining that the prosecution, as the party with the burden of proof, has a "need for evidentiary richness and narrative integrity in presenting case); see, e.g., United States v. Williams, 647 F. App'x 144, 149 (3d Cir. 2016) (affirming admission at trial, where

14

defendant was charged with conspiring to murder his ex-wife, defendant's threats and verbal and physical abuse of his girlfriend, including a domestic violence incident, as it was "directly probative of, or is concerned with contemporaneous acts which facilitated, the conspiracy to commit murder-for-hire"); United States v. Holt, 460 F.3d 934, 938 (7th Cir. 2006) (affirming admission of evidence of defendant's abusive sexual relationship at witness intimidation trial because it "explained the hold [the defendant] had over a woman twenty years or so his junior" and provided background for the jury); United States v. Gartmon, 146 F.3d 1015, 1019-20 (D.C. Cir. 1998) (finding no abuse of discretion in admission of evidence that defendant placed a gun in a witness's vagina and told her to do as he said, since "it went a long way toward explaining why a woman who did not benefit monetarily would have entered into and continued in the [fraud and money laundering] scheme charged in the indictment").

The evidence is admissible to explain the relationship between the defendant and CW-1 such that the defendant trusted CW-1 and conspired with her in the charged murder-for-hire scheme. CW-1's testimony is "central to the government's case at trial," United States v. Santos, 541 F.3d 63, 65 (2d Cir. 2008), and the government expects that CW-1's credibility will be a critical issue at trial. The evidence of CW-1's participation in other crimes with the defendant, as well as the nature and scope of the defendant's relationship with her, therefore provides an essential part of the story of how CW-1 came to conspire with the defendant in the charged conduct and his reasons for trusting that she would assist him and not report him to law enforcement. See Pitre, 960 F.2d at 1119 ("Prior act evidence may be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the

15

illegal relationship between participants in the crime developed.").  Here, the defendant trusted that CW-1 would follow the defendant's directions because she was made to follow his other orders, and he ensured her compliance through significant physical and sexual abuse.

The evidence also provides crucial background regarding the relationships between and among the defendant, CW-1, and their victim Brandy Odom.  Evidence of the defendant's involvement in the victim's commercial sex work and his physical and sexual abuse of CW-1 and her children is necessary for the jury to understand why the defendant chose the victim as the target of the murder-for-hire scheme, and why CW-1 readily agreed to assist the defendant and participate in the murder.  To exclude such evidence would require CW-1, and, in turn, the government, to present a false and incoherent account of these events to the jury.

The evidence is also admissible under Rule 404(b) to establish the development of the relationships of trust among the coconspirators and the credibility of CW-1.  See, e.g., Pipola, 83 F.3d at 565-66 (evidence that the defendant and his coconspirators committed uncharged crimes admissible to explain the evolution of the defendant's relationship with his coconspirators in robbery conspiracy trial); United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987) (other crimes evidence directly corroborating testimony on an important matter of cooperating witness whose credibility was under attack admissible); United States v. Mejia-Velez, 855 F. Supp. 607, 611 (E.D.N.Y. 1994); United States v. Basciano, No. 03-CR-929 (NGG), 2006 WL 385325, at *4 (E.D.N.Y. Feb. 17, 2006) (admitting evidence of uncharged crimes – including, gambling,

loansharking/extortion, murder, conspiracy/attempted murder, and solicitation to murder – to corroborate the testimony of cooperating witnesses).

This evidence is further admissible under Rule 404(b) for the permissible purposes of establishing the defendant's knowledge, intent, motive, opportunity, lack of accident and absence of mistake with respect to the charged offenses.  For example, evidence of the defendant's active participation in Odom's commercial sex work proves his knowledge, intent, opportunity, lack of accident and absence of mistake as to the charges relating to the fraudulent use of her identification.  And evidence that the defendant previously proposed murdering CW-1's son for insurance proceeds proves his knowledge and intent with respect to the charged murder-for-hire conspiracy since the evidence is part of the same scheme or plan as the charged crime.  See United States v. Smith, 727 F.2d 214, 220 (2d Cir. 1984) (similar act evidence was admissible under Rule 404(b) both to show defendant's "knowledge of, and intent to, commit the frauds charged in the indictment" and to show a "common scheme or general plan," by "shed[ding] light upon important elements of [the defendant's] scheme" (internal quotation marks omitted)).

It is also likely that the defendant will wish to cross-examine CW-1 about her own involvement in the murder-for-hire conspiracy and her involvement in the victim's commercial sex work, pursuant to Giglio v. United States, 405 U.S. 150 (1972).  CW-1's anticipated testimony regarding the nature of her relationship with the defendant and the victim provides critical background and context to understanding her participation in the charged crime.  If the government is not permitted to question the cooperating witness about these events during direct examination, the jury will be left with the misimpression that the government was attempting to conceal significant information from the jury.

17

The probative value of the evidence relating to the defendant's conduct, as described above, is not substantially outweighed by any unfairly prejudicial effect.  The uncharged acts are not more prejudicial than the murder-for-hire charges with which the defendant is charged.  See, e.g., Delligatti, 2018 WL 1033242, at *7 (finding the defendant's participation in a prostitution business with a cooperating witness to be "probative of the nature of the conspiracy and relationships within the conspiracy" and no more prejudicial than the murder with which the defendant was charged); see also Holt, 460 F.3d at 938 (finding no abuse of discretion in district court's finding that probative value of evidence of defendant's abusive sexual relationship with minor child at witness intimidation trial outweighed prejudicial impact).

C.    Witness-1's Testimony Regarding the Defendant's Participation in Past Financial Crimes Is Relevant and Admissible

For the same reasons, Witness-1 should be permitted to testify about the nature of his relationship with the defendant, including their past participation in financial fraud, that led to the defendant's attempt to solicit Witness-1 to participate in the murder-for-hire of Brandy Odom.  Witness-1 is expected to testify that he and the defendant had previously engaged in financial fraud, or "scamming," which led Witness-1 to approach the defendant in 2017 about any crimes in which Witness-1 could take part.  Witness-1 will explain that the defendant then solicited Witness-1's involvement in the murder-for-hire plot.

For the same reasons set forth above, the evidence of the defendant and Witness-1's prior history of engaging in financial fraud together is relevant and admissible to explain their mutual trust, such that Witness-1 asked the defendant about any criminal activity the defendant was engaged in and the defendant solicited Witness-1's involvement in

18

the crime.  Such evidence is also necessary to assess Witness-1's credibility.  <u>Diaz</u>, 176 F.3d at 80; <u>Pitre</u>, 960 F.2d at 1119.

III.   <u>PHOTOGRAPHIC EVIDENCE OF THE CRIME SCENES AND AUTOPSY IS RELEVANT AND ADMISSIBLE</u>

      The government intends to introduce a limited number of photographs depicting the victim's severed body parts at the two locations in Canarsie Park where the defendant discarded them, as well as autopsy photographs depicting the victim's wounds and injuries.

      The Second Circuit has made clear that the graphic nature of crime scene or autopsy photographs does alone render them inadmissible.  <u>See</u> <u>United States v. Salim</u>, 189 F. Supp. 2d 93, 98 (S.D.N.Y. 2002) (collecting cases).  The analysis of admissibility "hinges upon whether the photograph is relevant to the resolution of some disputed point in a trial or otherwise aids a jury in a factual determination."  <u>Id.</u>  Courts have routinely admitted crime scene and autopsy photographs where the jury must make factual determinations about a death.  <u>See</u> <u>United States v. Velazquez</u>, 246 F.3d 204, 211 (2d Cir. 2001) (admission of autopsy photographs showing extent of bruising were "relevant to the conduct constituting the offenses committed"); <u>United States v. Osborne</u>, 739 F. App'x 11, 18 (2d Cir. 2018) (affirming admission of crime scene and autopsy photographs and concluding that the "fact that the photos might have been graphic does not render them unfairly prejudicial"); <u>United States v. Chen Kuo</u>, 10-CR-671 (KAM), 2011 WL 704235 (E.D.N.Y. Jan. 18, 2011) (admitting photographs of physical injuries sustained during assault as relevant to demonstrate the severity of the beating and to corroborate witness testimony); <u>see also</u> <u>United States v. Frappier</u>, 807 F.2d 257, 262 (1st Cir. 1986) (noting that autopsy photographs

"were not egregious shocking; most if not all of them bore reference to medical testimony and corroborated [witness's] account of the murder.").

In this case, the subset of crime scene and autopsy photographs the government intends to introduce demonstrate where the victim's body parts were discovered. These photographs corroborate anticipated witness testimony regarding how the victim was killed, as well as anticipated testimony and evidence that the defendant placed the victim's body parts in a location where he intended them to be discovered in order to collect the life insurance policy proceeds. These photographs will assist the jury in understanding witness testimony regarding the victim's death. They are an essential part of this case and proof of the charges.

The government has substantially limited the number of autopsy and crime scene photographs it intends to offer in order to minimize any potential prejudice and ensure that the photographs are not cumulative of one another or other evidence. These photographs, even where other pieces of evidence may corroborate or establish certain facts, are squarely admissible in criminal cases. See generally Old Chief, 519 U.S. at 182-83.

IV.    THE DEFENDANT SHOULD NOT BE PERMITTED TO MENTION CONSEQUENCES ATTENDANT TO HIS CONVICTION

The Court should preclude the defendant from referencing at trial any consequences of his conviction. While the defense has not suggested that it intends to introduce any discussion of these consequences at trial, out of an abundance of caution, the government moves to preclude at trial any discussion of the defendant's possible punishments or collateral consequences of conviction.

Evidence regarding possible consequences the defendant may face if convicted should be precluded because it is not relevant.  Pursuant to Rule 401 of the Federal Rules of Evidence, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Generally, relevant evidence is admissible and "[i]rrelevant evidence is not admissible."  See Fed. R. Evid. 402.  "[T]he district court has broad discretion to exclude evidence that is irrelevant . . . ."  United States v. Edwards, 631 F.2d 1049, 1051 (2d Cir. 1980); see also Fed. R. Evid. 403.  The defendant's punishment is not a fact "of consequence" to be determined at trial.  Therefore, any evidence of those issues is not relevant.  See Shannon v. United States, 512 U.S. 573, 579 (1994) ("Information regarding the consequences of a verdict is . . . irrelevant to the jury's task.").

Such evidence is not only irrelevant, but "invites [jurors] to ponder matters that are not within their province, distracts them from their fact finding responsibilities, and creates a strong possibility of confusion."  Id.  Indeed, jurors are routinely instructed not to consider a defendant's punishment in determining a defendant's guilt.  See generally Sand, et al., Modern Federal Jury Instructions, Instruction 9-1 (2017 ed.); see also Shannon, 512 U.S. at 579 (a jury "should be admonished to reach its verdict without regard to what sentence might be imposed [and] not to consider the consequences of their verdicts . . . ." (internal citation omitted)); United States v. Watts, 934 F. Supp. 2d 451, 464-65 (E.D.N.Y. 2013) ("[I]t is well-established precedent that jurors should not be informed about the possible consequences of their verdict due to the likelihood that prejudice, unfairness, and confusion that would result.").

Courts have repeatedly precluded evidence of the potential sentences defendants face on the grounds that such evidence is irrelevant, unfairly prejudicial and outside the province of the jury.  See, e.g., United States v. Blume, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences"); United States v. Lewis, 110 F.3d 417, 422 (7th Cir. 1997) (holding that district court correctly refused to permit defendant to argue about the severity of his possible punishment); United States v. DiMarzo, 80 F.3d 656, 660 (1st Cir. 1996) (district court "soundly excluded" evidence of a potentially harsh sentence because such evidence "would have necessitated an unwarranted departure from the fundamental division of responsibilities between judge and jury.").  In short, guilt should determine punishment, not the other way around.  See United States v. Thomas, 116 F.3d 606, 614 (2d Cir. 1997) ("Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court . . . .  We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that the courts may permit it to occur when it is within their authority to prevent.").  Courts have consistently recognized that juries have no right to nullify, and "trial courts have the duty to forestall or prevent such conduct."  Id. at 616.  Therefore, the Court

should preclude the defendant from referencing potential punishment and collateral consequences at trial.[6]

## V.  THE DEFENDANT SHOULD BE ORDERED TO DISCLOSE HIS RULE 16(b) DISCOVERY AND TRIAL EXHIBITS TO BE INTRODUCED DURING THE GOVERNMENT'S CASE

Rule 16(b) of the Federal Rules of Criminal Procedure governs a defendant's disclosures in a criminal case.  In relevant part, it requires the defendant to provide the government with documents and records that the defendant "intends to use . . . in the defendant's case-in-chief at trial."  Fed. R. Crim. P. 16(b)(1)(A).

Rule 16 does not require a defendant to disclose documents he intends to use for purposes of cross-examining a government witness.  However, to the extent that a defendant seeks to admit into evidence a document while cross-examining a witness during the government's case-in-chief in order to affirmatively support the defendant's theory of the case, such a document falls within the ambit of Rule 16.  As explained in United States v. Hsia, No.  98-CR-0057 (PLF), 2000 WL 195067, at *2 (D.D.C. Jan. 21, 2000):

A "case-in-chief" is defined as "[t]he part of a trial in which a party presents evidence to support its claim or defense." Black's Law Dictionary 207 (7th ed. 1999). Defendant's cross-examination of government witnesses, and the evidence introduced during

_____

[6]     Nevertheless, to the extent that defendant exercises his right to testify, the government should be permitted to cross-examine him regarding the potential consequences of conviction that he faces because, under those circumstances, it is relevant to the defendant's credibility as a witness.  See Davis v. Alaska, 415 U.S. 308, 316 (1974) (discussing use of cross-examination to reveal "possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues . . . in the case at hand.  The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony." (internal quotation omitted)).

that cross-examination, certainly may be used to support her defense . . . . The cross-examination of these and other government witnesses therefore is properly seen as part of defendant's case-in-chief if it buttresses his theory of the case.  Id.  The Hsia court distinguished documents introduced by a defendant via a government witness — which do fall within Rule 16 and should be disclosed — from documents used by a defendant "merely to impeach a government witness, and not as affirmative evidence in furtherance of [the defendant's] theory of the case, it is not part of [the defendant's] case-in-chief."  Id. at *2 n.1.

Courts in this district have repeatedly held that the defense must produce in advance any "exhibit that will not be used solely for impeachment purposes," even if the defense intends to introduce such exhibit during cross-examination of a government witness. United States v. Smothers, No. 20-CR-213 (KAM), 2023 WL 348870, at *22 (E.D.N.Y. Jan. 20, 2023); see also United States v. Napout, No. 15-CR-252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017) (holding that "Rule 16 requires Defendants to identify all non-impeachment exhibits they intend to use in their defense at trial, whether the exhibits will be introduced through a government witness or a witness called by a Defendant."); United States v. Laquan Warren, No. 22-CR-231 (DLI), ECF Order, dated Sept. 6, 2023.  That obligation extends to material produced by the government in discovery that the defense intends to use as an exhibit.  See Smothers, 2023 WL 348870, at *22 (requiring advance production of defense exhibits "regardless of whether such an exhibit is in the defense's sole custody").  Numerous other district courts have interpreted Rule 16(b) similarly.  See United States v. Swenson, 298 F.R.D. 474, 477 (D. Idaho 2014) ("Defendants have a duty to produce any exhibits they intend to use at trial during cross examination of a government witness other than for impeachment purposes."); United States v. Holden, No. 13-CR-444,

2015 WL 1514569, at *4 (D. Or. Mar. 19, 2015) (holding, based on Swenson and Hsia, that a defendant must disclose non-impeachment substantive evidence that the defendant seeks to use in examination of government or defense witnesses); United States v. Larkin, No. 2:12-CR-319 (GWF), 2015 WL 4415506, at *5 (D. Nev. July 20, 2015) (stating that the approach adopted in Holden, Swenson, and Hsia is "consistent with the structure and integrity of Rule 16(b) as a whole"); United States v. Aiyaswamy, No. 15-CR-568 (LHK), 2017 WL 1365228, at *5 (N.D. Cal. Apr. 14, 2017) (same); United States v. Huntress, No. 13-CV-199S, 2015 WL 631976, at *33 (W.D.N.Y. Feb. 13, 2015) (observing that "it is not clear that defendants' case-in-chief would be limited to any case they may present after the government rests").

Here, to date, the defendant has not disclosed any document he intends to introduce at trial.  Accordingly, to avoid gamesmanship and unfair surprise, the government respectfully requests that the Court order the defendant to identify any exhibits he intends to introduce during the government's case (i.e., not those documents to be used for impeachment purposes only) or any defense case no later than two weeks prior to the start of the trial.

Finally, the government respectfully submits that, to avoid delay in the upcoming trial, the Court should set a schedule for disclosure of the statements of any defense witnesses other than the defendant himself.  See Fed. R. Crim. P. 26.2.  The government proposes that Rule 26.2 material should be provided no later than two days before a witness testifies.

## CONCLUSION

For the foregoing reasons, the government's motions should be granted.


Dated:      Brooklyn, New York
            January 15, 2024

                                   Respectfully submitted,


                                   BREON PEACE
                                   UNITED STATES ATTORNEY
                                   Eastern District of New York
                                   Attorney for Plaintiff
                                   271 Cadman Plaza East
                                   Brooklyn, New York 11201


                         By:     /s/_____
                                   Tanya Hajjar
                                   Emily J. Dean
                                   Andy Palacio
                                   Assistant United States Attorneys
                                   (718) 254-7000

26