

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

TH/EJD/AP
F. #2020R00708

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 6, 2024

By ECF

The Honorable Ann M. Donnelly
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: United States v. Cory Martin
Criminal Docket No. 20-549 (S-1) (AMD)

Dear Judge Donnelly:

The government respectfully submits this letter to supplement its prior motion in limine to offer certain testimony and evidence in its case-in-chief at trial.

I. CW-1 Should Be Permitted to Testify Regarding a Limited Number of Instances of Physical and Sexual Abuse

CW-1 has been in an on-and-off intimate relationship with the defendant involving physical and sexual abuse for the majority of her life. For some time leading up to Odom's murder, the defendant subjected CW-1 to physical and/or sexual abuse nearly every day.

The government does not intend to elicit from CW-1 each and every instance of abuse. Rather, the government intends to elicit testimony from CW-1 that, in general, the relationship between CW-1 and the defendant was marked by instances of physical and sexual abuse. This abuse began in high school and became more significant during the time period of the murder-for-hire scheme, spanning approximately 2016 through 2018. The government intends to elicit the following specific examples of abuse, which are not exhaustive but are illustrative of the nature of the relationship between CW-1 and the defendant:

(1) in high school, the defendant punched CW-1, choked CW-1 and, at times, forced CW-1 to have sex without her consent;

(2) the defendant's physical abuse of the CW-1 between late 2016 and April 2018 caused damage to the home they shared, including holes in the walls of the house, which are reflected in photographs of the residence that were taken by law enforcement in 2018;

(3) the defendant's physical abuse of CW-1 resulted in her being hospitalized in February and July of 2017, during the pendency of the charged murder-for-hire conspiracy;[1]

(4) the defendant threatened CW-1 and her oldest son ("Child-1") with a firearm during 2017;

(5) the defendant was abusive to her sons in that he physically assaulted Child-1 by punching him on more than one occasion and that he attempted to throw her younger son ("Child-2") out of a first-floor window and punched Child-1 during the same incident in early 2017;

(6) the defendant routinely sexually abused CW-1, raped CW-1 and used objects, including a hammer, to sexually assault her in order to "punish" her;

(7) the defendant assaulted and threatened to kill CW-1 on January 27, 2018 (which the Court has already ruled is admissible.)

Each of the above-described examples of the defendant's abuse took place within the time period of the charged murder-for-hire scheme, with the exception of the physical abuse that took place in high school. CW-1 will explain that her relationship with the defendant was abusive starting when they were in high school, and this fact is critical to understanding the dynamic between the defendant and CW-1.

---

[1] The Court ruled today that evidence of the defendant's July 2017 assault on CW-1 resulting in a broken leg and treatment at Jamaica Hospital was admissible at trial. The Court should similarly rule that evidence of the defendant's February 2017 assault on CW-1, which took place the month before CW-1 signed the first life insurance policy in Brandy Odom's name, is admissible. This assault also resulted in CW-1 having to go to the hospital to be treated for injuries to her face and eye, and is corroborated by text messages between the defendant and CW-1.

The government seeks to elicit this evidence because it is necessary for the jury to understand how and why CW-1 agreed to participate in the charged murder-for-hire scheme, as well as how and why the defendant trusted her and believed that she would not report the crime to law enforcement. Specifically, CW-1 is expected to testify that she and the defendant initially decided to murder the father of one of her children ("Victim 1") and to take a life insurance policy out on him in order to profit from his death. In approximately August 2016, at the defendant's direction, CW-1 took out an insurance policy on Victim 1. CW-1 is further expected to testify that the defendant also pressed CW-1 to take out life insurance policies on her children, and that after two insurance policies were taken out on Brandy Odom, CW-1 ultimately agreed to take out an insurance policy on her own child, Child-2.

The government expects that CW-1 will testify that she agreed to participate in the defendant's insurance schemes because of the nature of their relationship, and because of the defendant's escalating control over and abuse of CW-1. Evidence of the nature and extent of his physical and sexual abuse of CW-1, and the defendant's hostility towards and abuse of CW-1's children is therefore necessary to complete the story of the charged crime. The government will offer evidence in the form of text messages corroborating the defendant's anger and hostility towards CW-1's children, including text messages in which the defendant berates CW-1 for having Child-2 with another man, referring to Child-2 as that "fucking baby" and admonishing CW-1 for "hav[ing] a baby wit[h] the mothafucka[.]"

If this evidence were excluded, the jury would not understand why CW-1 agreed to take a life insurance policy on her own child with the knowledge that the defendant wanted to murder her child—an unthinkable prospect for any parent—and, without crucial context, will not understand the relationship between CW-1 and the defendant. They will not understand why CW-1 remained loyal to the defendant throughout the events leading up to and during the murder of Brandy Odom. Indeed, the government expects that CW-1 will testify that she preferred that Odom, not her family members, was ultimately the target of the murder-for-hire scheme. Evidence that "adds context and dimension to the government's proof of the charges" are routinely admitted by courts in order to demonstrate "the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997) (quoting United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991)); see Old Chief, 519 U.S. at 183 (explaining that the prosecution, as the party with the burden of proof, has a "need for evidentiary richness and narrative integrity in presenting case); see, e.g., United States v. Williams, 647 F. App'x 144, 149 (3d Cir. 2016) (affirming admission at trial, where defendant was charged with conspiring to murder his ex-wife, defendant's threats and verbal and physical abuse of his girlfriend, including a domestic violence incident, as it was "directly probative of, or is concerned with contemporaneous acts which facilitated, the conspiracy to commit murder-for-hire"); United States v. Holt, 460 F.3d 934, 938 (7th Cir. 2006) (affirming admission of evidence of defendant's abusive sexual relationship at witness intimidation trial because it "explained the hold [the defendant] had over a woman twenty years or so his junior" and provided background for the jury); United States v. Gartmon, 146 F.3d 1015, 1019-20 (D.C. Cir. 1998) (finding no abuse of discretion in admission of

evidence that defendant placed a gun in a witness's vagina and told her to do as he said, since "it went a long way toward explaining why a woman who did not benefit monetarily would have entered into and continued in the [fraud and money laundering] scheme charged in the indictment").

CW-1's testimony is "central to the government's case at trial," United States v. Santos, 541 F.3d 63, 65 (2d Cir. 2008), and the government expects that CW-1's credibility will be a critical issue at trial. The evidence of CW-1's participation in other crimes with the defendant, as well as the nature and scope of the defendant's relationship with her, therefore provides an essential part of the story of how CW-1 came to conspire with the defendant in the charged conduct and his reasons for trusting that she would assist him and not report him to law enforcement. See Pitre, 960 F.2d at 1119 ("Prior act evidence may be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed."). Here, the defendant trusted that CW-1 would follow the defendant's directions because she was made to follow his other orders, and he ensured her compliance through significant physical and sexual abuse, including the abuse of her children. In fact, it was in part as a result of the abuse of her children and the threats on their life that CW-1 agreed to murder Odom for the insurance policy proceeds. The evidence also provides crucial background regarding why CW-1 would participate in a scheme that, at one point, targeted her own children. Evidence of the defendant's physical and sexual abuse of CW-1 and her children is necessary for the jury to understand why the defendant chose Odom as the target of the murder-for-hire scheme, and why CW-1 readily agreed to assist the defendant and participate in the murder. To exclude such evidence would require CW-1, and, in turn, the government, to present a false and incoherent account of these events to the jury.

It is also likely that the defendant will wish to cross-examine CW-1 about her own involvement in the murder-for-hire conspiracy, including filling out a policy application for Child-2, pursuant to Giglio v. United States, 405 U.S. 150 (1972). CW-1's anticipated testimony regarding the nature of her relationship with the defendant and the victim provides critical background and context to understanding her participation in the charged crime.

The probative value of the evidence relating to the defendant's conduct, as described above, is not substantially outweighed by any unfairly prejudicial effect. The uncharged acts are not more prejudicial than the murder-for-hire charges with which the defendant is charged. See, e.g., United States v. Delligatti, No. 15 CR. 491 (KBF), 2018 WL 1033242, at *7 (S.D.N.Y. Feb. 23, 2018) (finding the defendant's participation in a prostitution business with a cooperating witness to be "probative of the nature of the conspiracy and relationships within the conspiracy" and no more prejudicial than the murder with which the defendant was charged); see also Holt, 460 F.3d at 938 (finding no abuse of discretion in district court's finding that probative value of evidence of defendant's abusive sexual relationship with minor child at witness intimidation trial outweighed prejudicial impact); United States v. Ulbricht, 79 F.Supp.3d 466, 487 (S.D.N.Y. Jan. 7, 2015) (admitting evidence of a murder for hire scheme in a narcotics conspiracy case and finding that despite

"introducing an element of violence" into the case, its probative value outweighed the danger of unfair prejudice). Given the gruesome nature of the crimes charged in this case, the admission of such evidence does not result in any unfair prejudice, let alone unfair prejudice that substantially outweighs the probative value of the evidence.

## II. Evidence of Fraud Is Admissible

In March of 2017, the same month that the first life insurance policy was taken out in Brandy Odom's name, the defendant engaged in another scheme to fraudulently obtain money with CW-1. The defendant removed over a thousand dollars from CW-1's MCU bank account and had CW-1 report the activity as fraud. The defendant and CW-1 expected that the bank would replenish CW-1's money, however the bank did not.[2] This scheme underscores the defendant's financial woes during the time period of the murder-for-hire scheme and demonstrate that the defendant was willing to go to illegal lengths to make money alongside CW-1. Further, the MCU scheme further demonstrates how the defendant and CW-1 joined together in their illegal activities—it establishes the relationship of trust between the defendant and CW-1 and helps to explain the evolution of the relationship leading to the murder that they committed and covered up together. See, e.g., Pipola, 83 F.3d at 565-66 (evidence that the defendant and his coconspirators committed uncharged crimes admissible to explain the evolution of the defendant's relationship with his coconspirators in robbery conspiracy trial). The probative value of the MCU scheme is not substantially outweighed by any unfairly prejudicial effect. The uncharged act is not more prejudicial than the murder-for-hire with which the defendant is charged and is also substantially similar to evidence that the Court has already deemed admissible (evidence of the defendant's "scamming" with Witness-1).

## III. Evidence that the Defendant Supplied Drugs to CW-1 and Odom is Admissible

The government expects that the evidence will show that during the time period relevant to the charged crimes, CW-1 and Odom were drug users and the defendant provided them with drugs. CW-1 will testify that the defendant facilitated her drug use, providing both she and Odom with cocaine, ecstasy and molly. CW-1 will further testify that she was high on cocaine provided by the defendant at the time she took certain actions relevant to the murder-for-hire conspiracy. Text messages between CW-1 and the defendant corroborate CW-1's account of the defendant as her drug source. The risk of unfair prejudice to the defendant here is minimal, and the defendant will surely wish to cross-examine CW-1 on her extensive drug use during the relevant time period, which cannot be discussed without CW-1's explanation of the defendant's role in her drug use.

---

[2] CW-1 is corroborated by a police report that she made alleging fraud on her MCU account, as well as a still image provided by MCU to the police depicting the defendant at the ATM at the time of one of the transactions relevant to the claim of fraud.

IV. Recruitment of Others

The government intends to offer testimony that the defendant asked CW-1 to recruit others to become sex workers. This testimony is relevant to (1) explain the roles that both the defendant and CW-1 played in their business; and (2) explain the content of text messages between the two about the work in which the defendant, CW-1 and Brandy Odom engaged. The government does not intend to elicit testimony regarding the specifics of other women (besides Odom) who were being recruited to join their business. However, if the defendant intends to cross-examine on additional, specific recruiting efforts by CW-1, beyond recruiting Odom, the government should be permitted to elicit such testimony on direct examination so as to avoid the appearance that the government is concealing evidence from the jury. See, e.g., United States v. Guerrero, 882 F. Supp. 2d 463, 492 (S.D.N.Y. 2011).

V. Conclusion

For the foregoing reasons, the government's motions should be granted.

Respectfully submitted,

BREON PEACE
United States Attorney

By: /s/
Tanya Hajjar
Emily J. Dean
Andy Palacio
Assistant U.S. Attorneys
(718) 254-7000

cc: Counsel of record (by ECF)
Clerk of Court (AMD) (by ECF)