1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                        20-CR-549(AMD)
3   UNITED STATES OF AMERICA,
                                        United States Courthouse
4           Plaintiff,                  Brooklyn, New York

5           -against-                   February 26, 2024
                                        9:30 a.m.
6   CORY MARTIN,

7           Defendant.

8   ------------------------------x

9           TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
              BEFORE THE HONORABLE ANN M. DONNELLY
10                 UNITED STATES DISTRICT JUDGE

11  APPEARANCES

12  For the Government:        UNITED STATES ATTORNEY'S OFFICE
                               Eastern District of New York
13                             271 Cadman Plaza East
                               Brooklyn, New York 11201
14                             BY:  EMILY J. DEAN
                                    TANYA HAJJAR
15                                  ANDRES PALACIO
                               Assistants United States Attorney
16

17  For the Defendant:         LAW OFFICE OF ANTHONY CECUTTI
                               217 Broadway - Suite 707
18                             New York, New York 10007
                               BY:  ANTHONY CECUTTI, ESQ.
19

20                             THE LAW FIRM OF KESTINE M. THIELE
                                    305 Broadway - Suite 700
21                             New York, New York 10007
                               BY:  KESTINE THIELE, ESQ.
22

23  Court Reporter:            LINDA A. MARINO
                               Phone:  718-613-2484
24                             Email:  lindacsr@aol.com
    Proceedings recorded by mechanical stenography.  Transcript
25  produced by computer-aided transcription.

1          (In open court; jury not present.)

2          THE COURT:  Alternate No. 2 is possibly sick and is

3     going to the doctor.  And so, I think we should get her back

4     here if we can, just given that we'd be down to one alternate.

5          So, she's at the doctor.  We told her to be prepared

6     to come in this afternoon.  So, I don't know if anybody has

7     anything they want to say about that.

8          Off the record.

9          (Discussion off the record.)

10         THE COURT:  I don't know if you have an issue with a

11    witness or something that you have to press ahead.

12         Thoughts?

13         You want to talk about it for a minute?

14         MS. DEAN:  May we?

15         THE COURT:  Yes.

16         (Pause in proceedings.)

17         THE COURT:  Did you have any feelings about this?

18         MS. DEAN:  Yes.

19         From the Government's perspective, we'd like to move

20    forward.  Obviously, we understand that leaves us with just

21    one alternate.

22         But right now, we are on track to rest on Thursday.

23    We also had a witness picked up this morning on a material

24    witness warrant.  We have a very full day.  And we think we

25    can rest on Thursday, maybe even a half-today Thursday.

1          We'd like to press on.

2          MR. CECUTTI:  Your Honor, from our perspective, we

3  would like to wait.

4          In addition, we were just given a RAP sheet from a

5  witness that we are now told is going to be testifying today,

6  along with -- and I haven't looked at it yet -- additional

7  3500 related to this witness.

8          We need time to review this.  We have no idea what

9  this is.  We were expecting this witness to be testifying in a

10  few days and not --

11          THE COURT:  So, you knew about the witness.

12          MR. CECUTTI:  We knew about the witness, but there's

13  been additional information that seems to be probative and we

14  need to be able to look at it.

15          THE COURT:  How much 3500 material is there?

16          MS. DEAN:  Your Honor, it's just the 3500 material

17  from the warrants searching for and arresting the witness on

18  the material witness warrant.  So, that would not have been

19  turned over in advance.

20          THE COURT:  Because it didn't exist.

21          MR. CECUTTI:  And we just got a RAP sheet.  It's a

22  RAP sheet of 19 pages.  I haven't even looked at it yet.

23          I mean, this is something that could have been

24  produced before today, notwithstanding the material witness

25  order.

1    MS. DEAN:  Your Honor, this witness' criminal

2  history amounts to six disorderly conduct violations and three

3  A misdemeanors, some of which date back to 1994.

4         THE COURT:  What time are you planning to call him?

5         MS. DEAN:  I haven't met with him yet, your Honor.

6  So, at some point today.  But either if we have a longer

7  morning break or the lunch break, it would be after that.

8         MR. CECUTTI:  Your Honor, we would like an

9  opportunity to review this.  Just getting *Giglio* material this

10  morning on a witness who is testifying today, we need some

11  time to look at this.

12         THE COURT:  You don't need that much time, though.

13  How much 3500 --

14         You had that, right, the 3500 material for the

15  witness?

16         MR. CECUTTI:  We did.

17         THE COURT:  Okay.

18         MR. CECUTTI:  And, look, I'm not asking for an

19  extended amount of time.  We would like to be able to review

20  it, think about it, absorb it, some time to do that.

21         MS. DEAN:  Your Honor, it's one paragraph.

22         THE COURT:  Hold on for just a second.  I'm just

23  trying to think, maybe we'll be able to do both things, get

24  the juror and let them review the material.

25         Hold on one second.

1          (Pause in proceedings.)

2          THE COURT:  I'm just going to see if we can satisfy

3     everyone.  Donna is going to check with our juror to see if

4     there's been a recovery.

5          MS. DEAN:  Your Honor, just for the record, the new

6     3500 material is that we called this witness and he didn't

7     want to come in and meet with the U.S. Attorney's Office.

8          THE COURT:  I think he's talking about the RAP sheet

9     more than that.  I take your point about the discons, but I

10    don't know what the --

11         What are the misdemeanors for?

12         MS. DEAN:  Two misdemeanors for criminal possession

13    of a controlled substance in the second degree and one

14    misdemeanor for reckless endangerment two in 1994.

15         THE COURT:  And what do the discons arise out of.

16         MS. DEAN:  The majority arise out of --

17         THE COURT:  Can I just see the RAP sheet.

18         MS. DEAN:  Yes.

19         (Pause in proceedings.)

20         THE COURT:  Ms. Dean, I'll give you this back.

21         Ms. Green didn't get an answer from the juror, and I

22    think what we'll do is we'll go ahead.  She's an alternate, so

23    we don't have to replace anybody.

24         We'll go ahead and then, Mr. Cecutti, I'll give you

25    a little extra time at lunch to review some of these

1   materials.

2              So, let's get the jurors.

3              Oh, we have the witness.  Let's go get him on the

4   stand.

5              (Witness resumes the stand.)

6              MS. DEAN:  Your Honor, I'm not sure if you want to

7   wait and talk about the schedule, but we hope to rest

8   Thursday.  We were hoping today to talk through the schedule

9   for the rest of the week and whether we can sum up on Friday.

10             THE COURT:  You want to sum up on Friday?

11             MS. DEAN:  Yes.

12             MR. CECUTTI:  Your Honor, obviously I think we have

13   a different view of that.

14             THE COURT:  They may put on a case, right?

15             MR. CECUTTI:  Yes.

16             THE COURT:  We can talk about whether you still want

17   to call those witnesses.

18             MR. CECUTTI:  Yes.

19             THE COURT:  When did I tell you to let me know, give

20   me more information?

21             MR. CECUTTI:  By today.  And we are --

22             THE COURT:  Not midnight today.

23             MR. CECUTTI:  No, not midnight.  We are finalizing

24   our response.

25             MS. DEAN:  Your Honor, before the jury comes in, can

1  we move to vacate the warrant for the material witness?

2               THE COURT:  Yes.

3               MS. DEAN:  The Government moves to vacate the

4  warrant.  The marshals will release the witness from custody,

5  but they mentioned some kind of paperwork.

6               THE COURT:  I'll mention it to Donna when she comes

7  in.

8               MS. DEAN:  Thank you.

9               (Jury enters.)

10              THE COURT:  Good morning, everybody.  Sorry for the

11 holdup.  We've lost another one.

12              So, we're going to continue.  In all seriousness, I

13 am urging you to stay healthy.  We're moving along ahead of

14 pace, so you don't have to worry about things dragging or

15 anything.  We're ahead of schedule.

16              But we are ready to continue with the direct

17 examination of the witness.

18              THE COURTROOM DEPUTY:  The witness is reminded he is

19 still under oath.

20              THE COURT:  Go ahead, Mr. Palacio.

21              MR. PALACIO:  Thank you, your Honor.

22              (The witness resumes the stand.)

23              MR. PALACIO:  Your Honor, may we have the lights?

24              THE COURTROOM DEPUTY:  Are you using your laptop up

25 there?

1          MR. PALACIO:  I am.

2          (Exhibit published to the jury.)

3   **OMAR SANTIAGO,** called as a witness, having been previously

4   first duly sworn/affirmed, was examined and testified further

5   as follows:

6   DIRECT EXAMINATION (Continued)

7   Q     Good morning, Detective Santiago.  How are you?

8   A     Good morning.

9   Q     Detective Santiago, before we broke, we were looking at

10  video from 249-45 148th Road and I want to back up a few

11  minutes to reorient the jury.  I'm at timestamp 1:31:22.

12          Can you give us the converted time?

13  A     The converted time is at 11:45 p.m. on the 8th, on April

14  8th.

15          MR. PALACIO:  I'll play from this point forward.

16          (Video plays.)

17  Q     Can you remind us what the white arrow is intended to

18  show?

19  A     That indicates when the trunk opens or closes.

20  Q     And, again, remind us how you know that that happens?

21  A     There's a white little square there.  That's the license

22  plate.  You see the license plate go up and then go back down.

23  Q     At 1:35:04, can you just remind us what happened there?

24  A     Somebody came -- an individual came out of the passenger

25  side of the vehicle and walked up the driveway.

1          THE COURT:  You might have said this already, what's

2     the actual time?

3          THE WITNESS:  The actual time on top is midnight and

4     one minute.

5          THE COURT:  Say it again.

6          THE WITNESS:  Midnight 01 and 32 seconds.

7          THE COURT:  Okay.

8     Q    Detective, this is now on Monday, April 9; is that

9     correct?

10    A    Correct.

11    Q    And I'm just pausing here at 1:36:34.

12         (Video stops.)

13    Q    If you can, remind the jury what that red circle is

14    intended to show?

15    A    It's intended to show the light pattern of the vehicle.

16    Q    And if you could, just briefly describe once again the

17    unique features of that light pattern.

18    A    What stands out in the light pattern in this vehicle is

19    what I'll circle here, is that, what I'll call spillage.  It

20    goes out, like, 45-degree angle from the vehicle.  And between

21    the headlights and the spillage, there's a space, and then you

22    get the bright spot of the spillage.

23         On the side of the spillage -- on the sides of the

24    spillage, you get, like, a halo effect around it on both sides

25    of the vehicle.

1          And then, again, with the light pattern in front of

2     the vehicle, it's a little darker and the headlights are more

3     forwards.  The headlights are more forward.

4          (Video plays.)

5     Q    Starting at about 1:37:38, can you describe for the jury

6     what you saw on the video?

7     A    An individual walked down the driveway, walked down 148th

8     Road, and then walked in front of the Maxima and got in the

9     passenger seat carrying a white object.

10         MR. PALACIO:  I'm just pausing here before we

11    transition to the next portion of the video, at 1:38:40.

12         (Video stops.)

13    Q    We see a red line.

14         When we see red lines throughout the complication

15    video, what's that intended to show?

16    A    That indicates the vehicle's route.

17    Q    What location does this is compilation now transition to?

18    A    The Canarsie Park area.

19         (Video plays; video stops.)

20    Q    Detective, I'm pausing 1:38:47.

21         Do you see the Belt Parkway?

22    A    Yes.

23    Q    Can you indicate that with your finger?

24    A    Yes, it would be this road here.

25         I kind of messed it up.  Right there.

1  Q    You've indicated sort of a loop around the -- I guess

2  that's the bay, a highway?

3  A    Yes.

4  Q    And is that part of an interstate highway?

5  A    Yes -- no.  The Belt Parkway --

6  Q    Does it connect with an interstate --

7  A    Oh, connect, yes.

8            (Video plays.)

9  Q    And here at 1:38:59, when we see writing and a yellow

10  icon --

11           What is the yellow icon, by the way?

12  A    The yellow icon just indicates the location where -- that

13  specific location where I downloaded video from.

14  Q    So, where we see yellow icons and an address, that's a

15  location where you downloaded video from?

16  A    Correct.

17  Q    And here at 1:39:06, what's to the right-hand side of the

18  screen?

19           What location?

20  A    Canarsie Park.

21  Q    And the street that runs through the screen, through the

22  middle of the screen, what street is that?

23  A    Seaview Avenue.

24           (Video stops.)

25  Q    Pausing here at 1:39:29, can you tell us what we just

1    saw?

2    A    You saw the vehicle driving westbound on Seaview Avenue

3    and I highlighted the roof fade marks on the Maxima.

4    Q    And how were you able to tell that that was the Maxima

5    that we saw earlier from the house in Queens?

6             MS. THIELE:  Objection.

7             THE COURT:  Overruled.

8    A    The fade marks and the light pattern.

9    Q    And at about what time do we first see that Maxima in

10   this Seaview area of Canarsie Park?

11   A    12:22 a.m.

12   Q    The timestamp at the top, what does that read?

13   A    It's accurate.  It's 12:23:05.

14            (Video plays.)

15   Q    And the red arrow, it may be obvious, but what does that

16   indicate?

17   A    It's following the Maxima.

18   Q    Detective, can you tell the jury how you were able to

19   track that Nissan Maxima from video to video?

20   A    Based on direction, time, looking for the light pattern

21   and fade marks.

22   Q    Can you tell us what location here at 1:41:53 you've

23   indicated with the arrow?

24   A    That's the corner of the Seaview and East 91st Street.

25   Q    Does the Nissan appear to park at that location?

1  A     Yes.

2  Q     How far is that location from the corner of Seaview and

3  Remsen Avenue?

4  A     One block.

5         (Video stops.)

6  Q     Just pausing here at 1:42:26, again, what intersection

7  are we looking at?

8  A     East 91st Street and Seaview Avenue.

9  Q     Can you tell us what you've inserted here?

10  A     So, I inserted the Government's photo of the Maxima.  I

11  cut out the other parts and just kept the vehicle portion and

12  I inserted it to the approximate location where the Maxima was

13  at.

14  Q     What is that intended to show?

15  A     To show where it's parked at.

16         MS. THIELE:  Objection.

17         THE COURT:  Overruled.

18         (Video plays.)

19  Q     Based on your review of the video, does that Nissan

20  remain parked there for a period of time?

21  A     Yes.

22  Q     After about 1:43:36, can you describe the movement of the

23  Nissan Maxima that you saw on video?

24  A     The Nissan Maxima backed up and then pulled out and is

25  now driving eastbound on Seaview Avenue.

1    Q    Do you see it again on Seaview Avenue?

2    A    Yes, it comes -- it comes westbound.

3    Q    At 1:45:37, you see we also now see a dotted line.

4         Can you tell us what that's intended to show?

5    A    So, an individual crosses the street.  The dotted line

6    shows the route the individual is about to take.

7    Q    And when we see the lines, this previews what we're about

8    to see on video, correct?

9    A    Correct.

10   Q    Starting at about 1:45:45, can you tell us what we saw on

11   video?

12        I'll back up just a couple seconds.

13   A    An individual crossing Seaview Avenue.

14   Q    Where would the park be in relation to where we see this

15   individual?

16   A    It's across the street.

17   Q    Here at 1:45:58, we see an inset.

18        When we see that, what's that intended to show?

19   A    That shows two incidents that are happening almost at the

20   same time.

21   Q    What are those incidents?

22   A    The vehicle driving down East 88th Street and the

23   individual walking northbound on East 89th Street.

24   Q    Are those streets parallel to one another?

25   A    Yes.

1  Q    Can you describe the movement of the Nissan at about

2  1:46:44?

3  A    It's driving eastbound again now on Seaview Avenue.

4  Q    Does it eventually come to a stop?

5  A    Yes.

6  Q    At what location?

7  A    At East 91st Street again.

8  Q    I'm sorry, 1:47:43, where we see the Nissan at Seaview

9  and East 91st, can you give us the actual time?

10 A    The actual time is on the screen.  It's midnight 41.

11 Midnight and 41 minutes and 41 seconds in.

12 Q    Can you describe to us the movement of that Nissan at

13 about 1:49:20?

14 A    The Nissan drives westbound on Seaview.

15 Q    Detective, here at about 1:50:22, again we've got a video

16 inset.

17        On the larger video where we see the red arrow, what

18 is that meant to show?

19 A    It's an individual walking westbound on Seaview.

20 Q    Here at about 1:50:42, can you describe what we're seeing

21 here?

22 A    An individual appears to be carrying what appears to be a

23 suitcase walking eastbound on Seaview -- I mean westbound on

24 Seaview.

25 Q    Again, we see a solid line and a dotted line that appear

1   to converge.

2           What is that meant to show us?

3   A    The solid line is the route the Nissan is going to take

4   and the dotted line is the route the individual is going to

5   take.

6   Q    Detective, here at 1:53, can you tell us what we're

7   looking at here?

8   A    I inserted a still image of the previous video of the

9   individual walking with the suitcase to show that the

10  individual in the footage now is the same individual just

11  without the suitcase.

12  Q    And the video that we're currently watching, that's

13  coming from the right-hand side; is that correct?

14  A    Correct.

15  Q    Can you tell us what route that individual appears to

16  take after about 1:53:53?

17  A    He's crossing Seaview on Remsen.

18  Q    Is that the same side as the park?

19  A    Correct.

20  Q    And in which direction does he walk towards?

21  A    He walks eastbound.

22  Q    Where do we see the vehicle turn?

23          What street to do we see the vehicle turn onto from

24  Seaview?

25  A    East 92nd Street.

1   Q    That's at about 1:55:50.

2        Can you give us the actual time?

3   A    Actual time is midnight 53 –- and 53 minutes.

4   Q    In other words, 12:53 a.m.?

5   A    12:53 a.m., yes.

6   Q    After we see the Maxima drive up 92nd Street, do we see

7   it drive down a different street?

8   A    Yes.

9   Q    What street is that?

10  A    East 85th Street.

11  Q    Is that East 88th Street?

12  A    Sorry, East 88th Street, yes, correct.

13  Q    Just remind us, what's at the corner of 88th and Seaview?

14  A    Jewish school.

15  Q    Here at 1:56:25, where would that Jewish school be?

16       On what side of the street?

17  A    On the left side.

18  Q    And is that more towards the corner of 88th and Seaview?

19  A    Yes.

20  Q    And just remind us, back in 2018, was there any video of

21  that location, 88th and Seaview Avenue?

22  A    Of?

23  Q    At the intersection at the corner of East 88th and

24  Seaview Avenue.

25  A    That captured the corner?  No.

1    Q    Here at 1:56:37, can you tell us what happens?

2    A    The passenger of the Maxima gets out the vehicle and

3    walks on the sidewalk and walks towards Seaview.

4    Q    And again, is that the side of the Jewish school?

5    A    Yes.

6    Q    What does the Maxima do?

7    A    It pulls up a car length or two.

8    Q    And can you describe what we see here?

9    A    An individual opens the trunk and puts something in the

10   trunk and then closes it.

11   Q    And where does that individual go?

12   A    Into the Maxima.

13   Q    I'm sorry, can you give us the converted time for that

14   event?

15   A    12:57 a.m.

16   Q    Detective, here, at about 1:58:34, at the top --

17            First of all, can you give us the converted time?

18   A    It's 1 a.m.

19   Q    It says half speed.

20            Can you explain that to us?

21   A    So, this video downloaded in pretty much double speed.

22   It just plays fast.  So, to correct that, you had to play it

23   at half speed to correct for the time, essentially.

24            (Video stops.)

25   Q    Detective, I'm just pausing briefly at 2:02:53.

1          Can you tell us the approximate time that we last

2    see this Maxima near Canarsie Park?

3    A    From this time here on, 1:17 a.m.

4    Q    After this, where does the compilation transition to?

5    A    It goes back to Rosedale.

6

7          (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2    BY MR. PALACIO:

3    Q    Here at 02:03:35 into the video, first of all, can you

4    give us the converted time?

5    A    1:51 a.m.

6    Q    And tell us what we see here.

7    A    The vehicle drives down -- drives down 1-- 148th from

8    253rd and pulls into the driveway of 249-45.

9    Q    Now, Detective, over the course of the evening, did you

10   see that Maxima leave and return multiple times?

11   A    Yes.

12   Q    Detective, at 02:06 into the video, can you give under

13   the circumstances the converted time and describe the movement

14   of that Nissan?

15   A    The converted time is 2:06 a.m., and the Nissan is

16   backing up onto 148th Street -- 148th Road.

17   Q    About 13 minutes later, can you tell me what the Nissan

18   does?

19   A    It comes from 256th Street and then pulls into the

20   driveway.

21   Q    And just give us the converted time.

22   A    2:20 a.m.

23   Q    At 02:09:30, can you give us the converted time and

24   describe for us the movement of the Nissan?

25   A    4:20 a.m., the Nissan backs out the driveway and drives

1  toward 253rd Street and turns left onto 253rd Street.

2  Q    At this point in the compilation, where does the video

3  transition to now?

4  A    It goes back to Canarsie Park.

5  Q    And, specifically, at what location near Canarsie Park?

6  A    9319 Schenck Street.

7  Q    Where is Schenck Street in relation to the park?

8  A    It's on the east side of the park.

9            (Video plays.)

10  Q    Just pausing here at 02:10:29.

11            (Video stops.)

12  Q    Can you describe for the jury what we're seeing at the

13  top and the insight we see at the bottom?

14  A    So, the top is a video from 9313 -- 9319 Schenck, and the

15  bottom one is the video we saw already by the jewelry store on

16  East 88th Street.

17  Q    And what are you comparing here?

18  A    In this one, I'm comparing what I called earlier the

19  spinnage, the light pattern right here to the light pattern

20  right here.

21  Q    And can you give us the time when you see the vehicle,

22  the Nissan, on Schenck Street?

23  A    The time is four -- 4:45 a.m.

24  Q    And here at 02:10:45, can you describe what you're

25  comparing here?

1   A     I'm comparing the rear -- the rear license plates of

2   the -- of the back.  However, the -- the bottom picture which

3   is from East 88th Street, the vehicle was hitting the brakes,

4   so you see the third brake light by the top window.

5   Q     Here, what we do we see at 02:10:55?

6   A     As it drives off, you can kind of see the fade marks on

7   the roof.

8   Q     And from this point, where do we see the video -- the

9   compilation transition to?

10  A     It goes back to Rosedale.

11          (Video plays.)

12  Q     I'm just pausing briefly at 02:11:40.

13          (Video stops.)

14  Q     Can you give us a converted time, please?

15  A     5:08 a.m.

16  Q     And just describe what we see on the video, please.

17  A     We see an individual walking from 253rd Street towards --

18  towards the driveway of 249-45.

19  Q     After about 02:12:20, can you give us the converted time

20  of what you see on the video?

21  A     5:58 a.m., an individual walks down the driveway of

22  249-45 and walks back -- walks toward 253rd Street.

23  Q     Detective, after about 02:14:10, can you describe for the

24  jury what you see happening?

25  A     The -- the trunk of the Maxima was open and the -- at

1   least two individuals are putting stuff into the trunk.

2   Q    Was this the only time that you saw the Nissan reverse

3   into the driveway?

4   A    Yes.

5   Q    At about 02:18:40, can you describe what we see here?

6   A    An individual came out of -- walks on the driveway and

7   walks to the passenger's side of the vehicle, and walks

8   towards the driver's side and puts a briefcase in the -- a

9   suitcase in the backseat of the Maxima.

10            MS. THIELE:  Objection.

11            THE COURT:  Overruled.

12   Q    At 22:19:53 into the video, can you give us the converted

13   time when we see that Nissan return to the house?

14   A    3:54 p.m.

15   Q    And is this on the afternoon of Monday, April 9th?

16   A    Yes.

17   Q    Detective, at about 02:05:16, can you give us the

18   converted time when the Nissan comes home for the evening of

19   April 9th?

20   A    9:58 p.m.

21            MR. PALACIO:  All right, Your Honor, we can have the

22   lights?  I just have a few more questions.

23   Q    All right.  Detective, during the original video cam of

24   this back of this, back in 2018, was any video recovered in

25   that loop area of Skidmore and Schenck from Sunday, April 8th

1   before 8:00 a.m.?

2   A    Before what time?

3   Q    Before 8:00 a.m.

4   A    No.

5   Q    Now, did you watch the entirety of the video collected

6   from 249-40 and 249-44 148th Road?

7   A    Yes.

8   Q    Approximately how many hours of video did that include?

9   A    It was over 100 hours.

10  Q    Does this compilation include any and all movement into

11  and outside of the house at 249-45 148th Road between

12  April 2nd and April 9, 2018?

13  A    Yes.

14          MR. PALACIO:  Your Honor, I have nothing further.

15          THE COURT:  All right.

16          Cross-examination?

17          MS. THIELE:  One moment, Your Honor.

18          We have no questions for this witness, Your Honor.

19          THE COURT:  Thank you, Detective.  You can step

20  down.

21          (The witness steps down.)

22          THE COURT:  Are you ready to call your next witness?

23          MS. HAJJAR:  Yes, Your Honor.  The Government calls

24  Blythe Bradley.

25          THE COURT:  Say it again, please.

1            MS. HAJJAR:  Blythe Bradley.

2            THE COURT:  We're going to fix the lights.  We'll do

3    it at the break.

4            THE COURTROOM DEPUTY:  Raise your right hand for me,

5    please.

6            (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2          THE COURTROOM DEPUTY:  Please state your name for

3    the record.

4          THE WITNESS:  Blythe Rachel Bradley.

5          THE COURTROOM DEPUTY:  Thank you.  Have a seat.

6          THE COURT:  A couple of things before we begin.  I

7    think you're going to have to move the microphone a little bit

8    closer.  The chair is stuck there so it doesn't move.  I do

9    want to make sure everybody can hear everything you have to

10   say.  I also want to make sure our court reporter can take

11   down everything that you have to say.  So just don't speak too

12   quickly.  If there's a question that you need to have

13   repeated, just let me know, okay?  All right.

14          Go ahead.

15

16

17

18

19

20

21

22

23

24

25

1    (Witness takes the witness stand.)

2    **BLYTHE BRADLEY**, called as a witness, having been first duly

3    sworn/affirmed, was examined and testified as follows:

4    DIRECT EXAMINATION

5    BY MS. HAJJAR:

6    Q    Good morning, Ms. Bradley.

7    A    Good morning.

8    Q    Where do you work?

9    A    I work for Globe Life.

10   Q    What is your title at Globe Life?

11   A    Senior director and associate general counsel.

12   Q    What's the full name of Globe Life?

13   A    Well, the parent company is Globe Life Inc., and then we

14   have subsidiaries, Globe Life of New York being one of them.

15   Q    How long have you worked for Globe Life?

16   A    I have worked there since January 8th of 2018, just over

17   six years.

18   Q    What kind of company is Globe Life?

19   A    We're a life insurance company.

20   Q    And was Globe Life Insurance of New York previously known

21   by another name?

22   A    Yes.  I believe it was First United or –– it had united

23   in it I know.

24   Q    Where are Globe Life's headquarters located?

25   A    The principal place of business is in McKinney, Texas,

1    which is outside of Dallas.

2    Q    Which office do you work in?

3    A    I work in Oklahoma City in Oklahoma in the downtown

4    office.

5    Q    What are your responsibilities as senior director and

6    associate general counsel?

7    A    I manage claims litigation, I respond to subpoena

8    requests, I also answer consumer business department of the

9    insurance and attorney complaints and I give legal advice to

10   different departments in the company including the claims

11   department.

12            MS. HAJJAR:  May I approach the witness, Your Honor?

13            THE COURT:  Yes.

14   Q    Ms. Bradley, I have handed you what's been marked for

15   identification as Government's Exhibit 115, 116, 117, 118,

16   119, 120, and 121, and there's a drive there marked

17   Government Exhibit 116 A through P.

18            Do you recognize these exhibits?

19   A    Yes, I do.

20   Q    Have you reviewed the records contained in these exhibits

21   prior to your testimony today?

22   A    Yes, I have.

23   Q    Were those records kept in the regular course of business

24   by Globe Life?

25   A    Yes.

1  Q    And was the information contained in those exhibits

2  recorded at or near the time of the events that the documents

3  reflect?

4  A    Yes.

5  Q    And Ms. Bradley, could you look at that drive --

6  A    Yes.

7  Q    -- which is marked Government Exhibit 116 A through P.

8        Do you recognize that drive?

9  A    I do.

10 Q    What is it?

11 A    It is a drive containing all of the phone calls that we

12 produced in response to the subpoena.

13 Q    And did you mark it with your initials and yesterday's

14 date?

15 A    I did.

16        MS. HAJJAR:  Your Honor, the Government offers

17 Government Exhibits 116, 116 A through P, 117, 118, 119, 120

18 and 121.

19        THE COURT:  Any objection?

20        MR. CECUTTI:  No objection.

21        THE COURT:  Okay.

22        (Government Exhibit 116, 116A through P, 117, 118,

23 119, 120 and 121, were received in evidence.)

24 BY MS. HAJJAR:

25 Q    Ms. Bradley, could you just explain, in basic terms, to

1    the jury how life insurance works?

2    A    Yes.  When someone wants life insurance, they will fill

3    out an application answering some basic questions and signing

4    either electronically or in writing, and then that application

5    is submitted to our new business and underwriting department.

6    They make a determination of whether or not to issue the

7    coverage either as requested or for a different premium amount

8    or different face value.  And then once the coverage is

9    issued, premiums must be paid.  And if the individual dies

10   while the policy is enforced, then we evaluate and adjudicate

11   the claim.

12   Q    How does Globe Life determine whether to issue coverage

13   in a particular case?

14   A    Well, we look at the application.  So we receive the

15   application and then look at what the individual wrote on the

16   application, whether they answered any of the health questions

17   yes, for example.  If they answered yes, that they have some

18   health problems, then the company will look at that a little

19   bit more closely.

20        We do have simplified underwriting with our direct

21   to consumer products and, so, you know, we don't take all of

22   the steps that some other companies might.  But there is a

23   release at the bottom of the application where the applicant

24   signs that we can request some medical data from the Medical

25   Information Bureau and also prescription drug data so the new

1  business department can look at some of those electronic

2  records, decide if they're consistent with what was noted on

3  the application, make some follow-up phone calls if they'd

4  like, and decide whether all of that is consistent within our

5  risk tolerance.

6  Q    And you mentioned Globe Life offers insurance policies

7  directly to consumers.  Does that affect the maximum policy

8  amount offered?

9  A    Yes.

10 Q    How so?

11 A    Our policies are generally 100,000 or less -- well, they

12 are actually, Globe Life of New York is 100,000 or less.  We

13 don't offer large face values, and most of our -- most of our

14 policies are gonna be quite a bit less than 100.  They can

15 start as low as 5,000.

16 Q    Do monthly premiums for Globe Life insurance vary?

17 A    Yes, they do.

18 Q    What does that depend on?

19 A    It depends on the risk assumed by the company which has

20 to do with age, gender, health, also amount of the face value,

21 which goes to risk as well.

22 Q    How does Globe Life advertise its life insurance

23 products?

24 A    So we advertise online, we have some radio, we also do a

25 lot of print advertising.  Sometimes you might get, you know,

1   Arby's or Hardey's or something in the mail and you might have

2   a Globe Life, you know, slip fall out of the there, or there

3   might be something printed on there.  So there's print

4   advertisements.  We also do a lot of work on our branding.  We

5   have the Texas Rangers branding rights.  We do charitable

6   events.  So just a variety of ways.

7   Q    Is there a process by which Globe Life sends out

8   applications in response to inquiries by customers?

9   A    Yes.

10  Q    Can you explain that process?

11  A    Ones -- we call it a lead.  So we would get a lead from a

12  source, for example, a phone call if someone had a print piece

13  that they had seen with a phone number to call for an

14  application, that would be a lead.  And then, also, if someone

15  went online and looked at one of our be websites, maybe

16  pursuant to a Google ad word or something, that would be a

17  lead.

18          MS. HAJJAR:  Could I ask that Government's 115 in

19  evidence be published to the jury, please.

20          I think it's connected to the laptop.  Thank you,

21  Ms. Green.

22          (Exhibit published.)

23  Q    Now, looking at Government Exhibit 115, can you explain

24  to the jury what this is?

25  A    Yes.  So this is a log of the leads that we received

1    regarding the business that we were asked about pursuant to

2    this subpoena.

3    Q    And is -- how did you receive these inquiries?

4    A    So, the top two -- the top three, you have Try Martin,

5    two for Tory Martin and one for Adelle Anderson, and the

6    subtype flag is a T and that indicates that we -- that we

7    received those via telephone.  We had -- someone received a

8    print advertisement that they later called and provided their

9    information.

10   Q    And where did the caller call into typically if you

11   receive these types of leads?

12   A    The number will be on the -- on the document that they

13   had.

14   Q    Is it a call center that the caller calls into?

15   A    Yes.  It would be a call center.  And then we also had a

16   third party who was taking calls after hours at that time

17   called Convergence, and they are not -- no longer serving in

18   that function for us.

19   Q    Were these calls recorded?

20   A    They would -- might have been at that time, but we no

21   longer have access to them.

22   Q    And how does the information contained in the chart get

23   recorded?

24   A    So, for the ones that were received by phone call, the

25   third party or the CSR taking the call would have asked for

1    the name, address, full address, and asked them whether they

2    wanted juvenile or adult products or whether they are

3    responding to get applications for juvenile or adult, and then

4    they would have asked how they got our information, too.

5    Q    And, Ms. Bradley, when you say CSR, can you just explain

6    what that term means to the jury?

7    A    Yes, customer service representative.

8    Q    Looking at the first entry under Tory Martin, what can

9    you tell the jury about the information contained or the

10   information provided as a result of this call?

11   A    Well, the name, the address, the -- there was a sequence

12   number generated to help us track that -- that lead and to

13   help us track whether or not that translated into us getting

14   business from -- from the -- from the solicitation.  We have

15   an entry date and a subtype and the phone number that that

16   individual provided.

17   Q    And what is the address associated with this entry?

18   A    It is 249- 45148th Road, Rosedale, New York.

19   Q    What is the entry date?

20   A    The entry date is July 7, 2016.

21   Q    And entry date reflects the date the time and -- or the

22   date the call was placed?

23   A    Yes.

24   Q    What was the phone number associated with that inquiry?

25   A    347-779-6108.

1    Q    And I think you said this, Ms. Bradley, but the subtype

2    flag, does that reflect the type of inquiry.  In other words.

3    The T for telephone in this case?

4    A    Yes.

5    Q    Does the call center for Globe Life take any steps to

6    verify the caller's identity?

7    A    No.

8    Q    Why does the Tory Martin entry appear twice?

9    A    That is entered twice because the caller asked for

10   information about juvenile and adult policies, so there was

11   two -- two requests.

12   Q    Are there differences between juvenile and adult policies

13   that are issued by Globe Life?

14   A    Yes.

15   Q    What are those differences, just very generally?

16   A    Generally, the application itself is gonna look

17   different.  So for a juvenile, we would have space at the top

18   for multiple children to be entered.  And then in the middle,

19   the health questions are quite a bit abbreviated and it's

20   asked to the best of your knowledge and belief and it has

21   information about a grandparent's identity, for example, if

22   the grandparent is applying for grandchildren.  So the way the

23   application is structured is very different, and that's for

24   people 25 and under.

25              (Continued on the following page.)

1   BY MS. HAJJAR: (Continuing.)

2   Q    Did any of the other inquiries here request a juvenile

3   application?

4   A    No.

5   Q    Looking at the third entry for Adelle Anderson.

6            Could you read the address associated with that

7   entry, please?

8   A    Yes.  It's 2204 Fulton Street, Apartment 2B in Brooklyn,

9   New York 11233.

10  Q    And what is the entry date associated with that inquiry?

11  A    The date is August 4th, 2016.

12  Q    And the phone number, please.

13  A    (646)399-7637.

14  Q    And the last two inquiries relating to Brandy Odom, is

15  there a different way that these entires were recorded by

16  Globe Life?

17  A    Yes.

18  Q    How was that?

19  A    So the subtype flag is P and that is for paid.  So that

20  was a paid ad on Google.  It was taken online.

21  Q    So is that why there's an NA under phone?

22  A    Correct.

23  Q    Okay.

24            MS. HAJJAR:  If we could scroll down to the second

25  and third pages.  Second page, please.

1    Q    Does this contain additional information about the

2    inquiries for the Brandy Odom lead?

3    A    Yes, it does.

4    Q    Okay.  And what is the e-mail address associated with

5    that inquiry?

6    A    I'll just read it out, SAFIREB12054@Gmail.com.

7    Q    And what was the inquiry date?

8    A    This one is dated March 20th, 2017.

9    Q    Okay.

10           MS. HAJJAR:  And scrolling down to the third page,

11   please.

12   Q    Is this a different inquiry under the same name?

13   A    Yes.  This one is dated March 27, 2017.

14   Q    And what is the e-mail address associated with the person

15   who inquired?

16   A    MaryDestiny191@YAHOO.COM.

17   Q    Now, were there applications set by Globe Life in

18   connection with these phone calls and web inquiries?

19   A    Yes.

20           MS. HAJJAR:  Could we publish Government's 117 in

21   evidence, please.

22   Q    Ms. Bradley, could you tell us what this Excel

23   spreadsheet reflects?

24   A    Yes.  It reflects our fulfillments pursuant to the leads.

25   So it reflects all of the mailings that were sent out pursuant

1  to the request for life insurance applications.

2          MS. HAJJAR:  Ms. Rader, could you just scroll down

3  to the bottom of this spreadsheet.

4  Q    So it's a lot of applications sent in response to these

5  inquiries?

6  A    Mm-hmm.

7          And if you scroll over, you can see more information

8  about the dates that they were sent.  So when you do the full

9  scroll, you can see both up and down.  We send a lot of mail.

10 Q    Now, some of these cells --

11         MS. HAJJAR:  If you could just scroll back over to

12 the left.

13 Q    -- seem to reflect different addresses than that

14 initially provided in the inquiry.

15         Can you explain that?

16 A    Yes.  So since we do send so much mail, we have worked

17 with the postal service to get the best rate.  And so in order

18 to get that rate, we have to subscribe to keep up with the

19 address changes.  So when people do an address change at the

20 post office, we have to change our mailings to reflect the new

21 address.

22 Q    So in other words, is it right that the -- that even if a

23 person didn't update their address with Globe, they may just

24 get mail at their updated address?

25 A    At their new address pursuant to that card that they

1    turned in at the post office, yes.

2    Q    And can you explain what the difference is between the

3    blue and the white cells here in this spreadsheet?

4    A    Yes.  So if you can scroll over a little bit.  Okay.

5         So the white is adult and the blue is juvenile.

6    Q    And I think you said before that only that Tory Martin

7    requested a juvenile.

8         Can you explain why there are blue and white cells

9    for a lot of these inquiries?

10   A    Yes.  So we will, after the initial four rounds of

11   fulfillments, then we will attempt to cross cell into juvenile

12   business.

13   Q    Can you explain to the jury what you mean by cross cell?

14   A    So we're going to leverage that lead and try and solicit

15   business from that household for juveniles.

16   Q    Okay.  Even if that wasn't specifically requested?

17   A    Correct.

18   Q    Now, the sequence number listed here, does that

19   correspond to the sequence number we saw in Government

20   Exhibit 115?

21   A    Yes, it does.

22        MS. HAJJAR:  If we could pull up and publish

23   Government Exhibit 118 in evidence, please.

24   Q    Ms. Bradley, could you explain what this exhibit shows,

25   the first page of this exhibit?

1    A    Yes, this is a life insurance application.

2    Q    And looking at the top --

3         MS. HAJJAR:  If you could just zoom in the top of

4    the screen a little bit.

5    Q    -- where it says First United American Life Insurance

6    Company in Syracuse, New York.

7         Can you describe what relationship, if any, that

8    company has with what's now Globe Life?

9    A    Yes.  So that was -- company was renamed Globe Life of

10   New York, and it was right around -- you know, shortly after

11   this application was the timeframe around when that name

12   change was done.

13   Q    And can you read the name under proposed insured name?

14   A    Adelle D. Anderson.

15   Q    And the date of birth?

16   A    The date of birth is written as October 25th, 1988.

17   Q    And the name and address that was proposed insured, it

18   appears to be preprinted.

19         Can you explain why that would be?

20   A    Yes.  That was pursuant to the lead that we received the

21   request for the application.  We preprint that onto the app

22   before we mail it out.

23   Q    Okay.  And what is the amount of insurance that this

24   policy application requests?

25   A    100,000 box is checked.

1   Q    And is the beneficiary name Villardouin A. Villard?

2   A    It is.

3   Q    What is the stated relationship to proposed insured?

4   A    Fiance.

5   Q    I'm scrolling down to the bottom.

6        Can you read the date associated with this

7   application?

8   A    Yes.  It is August 18, 2016.

9   Q    And is there a number right below the signature?

10  A    Yes.

11  Q    Can you explain what the significance, if any, of that

12  number is?

13  A    Yes.  That is the sequence code which allows us to track

14  that -- whether or not that lead was successful.  So the

15  sequence code is printed onto the application.

16  Q    And is that the same sequence code we saw on the prior

17  two exhibits, the numbers associated with the inquiry?

18  A    It is.

19  Q    Can you explain what's noted at the bottom of this page

20  which is additional application for a relative or friend of

21  the Anderson family on reverse side?

22  A    Yes.  So we are trying to get in more business.  And so

23  this would have arrived as a two-page piece of paper printed

24  on -- there would be this on the front, and then on the

25  backside of that same page is another application.

1  Q    Is that a way for Globe Life to solicit additional

2  customers?

3  A    Yes.

4         MS. HAJJAR:  So turning to Page 4 of this exhibit.

5  Q    First of all, can you describe what this page reflects?

6  A    Yes.  So we call this the welcome letter, and it is

7  tacked on top of the policy.

8  Q    Okay.  And just looking at the very top, at the top

9  right, under Syracuse, New York.

10        Could you read the phone number that appears there?

11 A    Yes.  It's (315)451-2544.

12 Q    Are you familiar with that number?

13 A    I am.

14 Q    What is it?

15 A    So this is the customer service phone number for the

16 Syracuse, New York office.

17 Q    And if you were to call that number, where would it route

18 to?

19 A    We have only two customer service representatives in that

20 office.  So most of the time, due to volume, it's going to

21 role over to the McKinney office in McKinney, Texas, and it

22 will be answered by people in Texas.

23 Q    And is that office -- is that central time?

24 A    It is in the central time zone, yes.

25 Q    Now, just looking at this welcome letter.

1          Could you read the third paragraph beginning, You

2    will receive?

3    A     Yes.  You will receive a premium due notice for the

4    coverage you requested in the next few days.  This premium

5    must be paid to put this coverage in force.  The coverage you

6    requested will not be in force until payment has been received

7    and in our administrative office.

8          MS. HAJJAR:  And if you could scroll down to the

9    bottom of this page, the very bottom.

10   Q     The information that's listed here, above the name Adelle

11   Anderson, could you just read the number that appears there?

12   A     Yes.  That's the policy number 37-2798349.

13   Q     And you called this the welcome letter, but the text that

14   we just read that indicated the coverage you requested will

15   not be enforced until payment has been received, what does

16   that mean?

17   A     Well, that means that the -- even though we've sent this

18   policy, if they do not pay a premium, the policy is not going

19   to be put into force.  It's not going to be enforced.

20   Coverage is effective the date the first premium is received.

21   Q     Okay.

22         MS. HAJJAR:  If we ask can turn to Page 9 of this

23   document.  And scrolling down to the bottom.

24   Q     Is that information reflected anywhere on this document?

25   A     Yes.  So on -- this is what you might consider a face

1    sheet because it has all the policy details, and where it

2    says, policy date, it says date first premium received.

3    Q    Now, did Globe Life actually receive any premium payment

4    in connection with this policy?

5    A    No.  I don't believe we did, no.

6    Q    So was this policy ever in effect?

7    A    No, it wasn't.

8    Q    And so just to be clear, was there any coverage provided

9    by Globe Life in connection with this policy?

10   A    No.  If the insured had passed, we would not have paid

11   that claim because it wasn't in force.

12   Q    So turning to what's in evidence as Government

13   Exhibit 119.

14        Could you tell us what is this exhibit shows?

15   A    Yes.  This is another life insurance application.

16   Q    And just actually scrolling down to the bottom of the

17   page for a moment, could you just indicate the date that's

18   associated with this application?

19   A    Yes.  August 18th, 2016.

20   Q    And the number there at the bottom, does that have any

21   connection to the sequence number we saw on the prior

22   application?

23   A    It is the same one.

24   Q    What does that tell you, if anything, about this

25   particular application?

1    A    This is the page that would have been on the reverse

2    side.  So when it came in to the office, they would have

3    scanned one side, sent it on its way, scanned the other side,

4    and sent it on its way.  And so this is the application that

5    was on the other side.

6    Q    The other side of the -- of the policy we just looked at?

7    A    Yes.  Prior.

8              And we can also tell that by the policy numbers

9    themselves.  Since they scanned them at the same time, one

10   back to back, they have consecutive policy numbers.

11   Q    So scrolling up to the top under proposed insured name,

12   is that Villardouin A. Villard?

13   A    Yes, it is.

14   Q    And can you explain why this one would not be preprinted

15   on the application?

16   A    Because it was the one on the back that was just for

17   anybody in their household that they -- that was interested.

18   So we wouldn't have known that person's potential identity or

19   if it would even get used to, so it was left open for them to

20   fill in.

21   Q    And what is the amount of insurance requested by this

22   application?

23   A    This one is also checked off as 100,000.

24   Q    And the beneficiary name in this case?

25   A    Adelle D. Anderson, Fiance.

1    Q    Fiance, okay.

2         MS. HAJJAR:  If we could turn now to Page 2.

3    Q    And looking at the same paragraph we looked at in the

4    last application.

5    A    Yes.

6    Q    Does this contain the same terms, in other words, that

7    the policy is in effect as of the date the premium would have

8    been received?

9    A    It does.

10        MS. HAJJAR:  And looking at Page 8 and scrolling

11   down to the bottom of that page.

12   Q    Can you read the policy number associated with this

13   policy, please?

14   A    Yes.  It's 37-2798350.

15   Q    And the policy date -- the policy effective date?

16   A    And this one is date first premium received, as well.  So

17   the effective date isn't known until we receive that premium.

18   Q    And did this policy ever go into effect?

19   A    It did.

20        MS. HAJJAR:  Can we turn to Page 30 of this policy,

21   please.

22   Q    Could you explain what this set of screenshots depicts?

23   A    Yes.  So the top two really small hard to read ones is a

24   screenshot from our premium accounting system, and then the

25   middle that received, in the black, that is a screenshot from

1  what we call the LRN2 screen, and then the two smaller in

2  black, those are lines taken from what we call the notes

3  screen.

4  Q    And what can you tell us about the premiums that were

5  paid on this policy?

6  A    So we received a three-month payment on -- right around

7  September 23rd, 2016.  And then the next payment we received

8  was approximately three months later, and that was

9  December 29, 2016, and that was only for one month.

10  Q    Okay.

11       MS. HAJJAR:  And turning to Page 31.

12  Q    Does that contain additional information about the

13  payments themselves?

14  A    It contains information for one of the payments.  This is

15  the -- this is the December payment, and it was taken by

16  phone, and that's basically a record of what the person input

17  at the time that they were taking that payment, the CSR.

18       MS. HAJJAR:  Now, turning back to Page 27 of this

19  exhibit for a moment.

20  Q    Does this page reflect additional information about the

21  policy?

22  A    Yes.  We call that the policy detail.  That's from our

23  e-service center, and it listed in a little bit more plain

24  language, but records the effective date which, again, based

25  on the date the first premium was received, September 23rd

1   2016.  It also shows the paid-to date and the name and the

2   policy number, address, beneficiary.

3   Q    So that effective date relates to the date of the first

4   premium received by Globe Life?

5   A    Correct.

6   Q    And what does the paid-to date, reflect?

7   A    So that is the last day that they had coverage from their

8   premium payments, not including the contractual grace period.

9   So the premiums paid -- that we received paid the policy to

10  January 23rd, 2017.  And then more premiums were due to keep

11  it extended beyond that date.

12  Q    What is the contractual grace period?

13  A    So each state has a state-mandated grace period for life

14  insurance policies and they can vary.  But for these contracts

15  and these policies, it was 31 days.

16  Q    Did this policy, in fact, lapse?

17  A    It did, yes.

18  Q    Can you tell the jury approximately when that would have

19  been?

20  A    So it would have been 31 days from the paid-to date.  So

21  approximately February 24th, 25th, of 2017.

22        MS. HAJJAR:  Now, if we could turn to Government

23  Exhibit 120, in evidence.

24  Q    Can you tell us what this exhibit shows?

25  A    Yes, this is a life insurance application.

1    Q    And can you name -- if you read out the name of the

2    proposed insured?

3    A    Yes.  This one the proposed insured is Brandy Odom.

4    Q    And again, the name and address here is preprinted.

5         Is that a result of the inquiry we were talking

6    about?

7    A    Yes.  This one was preprinted from the online lead that

8    we received.

9    Q    And what is the amount of insurance associated with this

10   policy.

11   A    50,000.

12   Q    And the date of birth?

13   A    The date of birth is January -- it's a little bit hard to

14   make out -- you can say 5th or you could say 8th, 1992.

15   Q    And the telephone number associated with the application?

16   A    (718)600-1072.

17   Q    And the e-mail address is that beginning with Mary

18   Destiny?

19   A    Yes.

20   Q    Who is the beneficiary named?

21   A    Adelle D. Anderson.

22   Q    And what is the relationship to proposed insured that's

23   listed there?

24   A    Sister.

25         MS. HAJJAR:  If you scroll counsel down.

1   Q    Just indicate the date, please.

2   A    March 28th, 2017.

3   Q    Okay.

4            MS. HAJJAR:  Now, turning to Page 2 of this policy.

5   Q    Is this the welcome letter we'd seen on the prior policy,

6   as well?

7   A    It's a welcome letter, but it's a different welcome

8   letter.

9   Q    Okay.  And can you just read the first two sentences of

10  this letter?

11  A    It says, Congratulations.  Brandy Odom is now insured

12  with Globe Life Insurance Company of New York.

13  Q    And the next sentence?

14  A    You have already paid the introductory premium for the

15  first month.

16           MS. HAJJAR:  Could you just scroll down to the

17  bottom of this page.

18  Q    What is the policy number associated with this policy?

19  A    37-2831824.

20  Q    And is that Brandy Odom at 249-45 148th Road?

21  A    Yes, it is.

22           MS. HAJJAR:  Could you turn to Page 4, please.

23           I'm sorry, Page 6.

24  Q    Can you just explain what this document is?

25  A    Yes.  This is put into every policy likely pursuant to a

1  regulatory requirement.  It says that we've teamed up with New

2  York Alliance Against Insurance Fraud, and it's, you know, a

3  writeup and contact information in an effort to prevent fraud.

4  Q    Is this sent out with every policy?

5  A    This is enclosed in every policy, yes.

6  Q    Did this policy go into effect?

7  A    It did.

8  Q    And were there premium payments received by Globe Life in

9  connection with this policy?

10  A    Yes.

11        MS. HAJJAR:  I'd like to turn to Page 66 and 67 of

12  this document.  So starting with Page 66.

13  Q    Can you describe what this is, Ms. Bradley?

14  A    Yes.  This is a premium billing stub.  So this would have

15  been, when we send out the premium billing notice, the

16  individual sending it back would have ripped it off the bottom

17  of the notice and sent that in with their payment.

18  Q    And does that indicate the policy number associated with

19  this policy?

20  A    It does.

21        MS. HAJJAR:  And if you could turn to the next page,

22  please and zoom in a little bit.

23  Q    What does this reflect?

24  A    So this is a money order that was received for the

25  premiums.  It gives the -- in handwriting, you can see the

1    policy number was the written on there.  You can also see the

2    amount for $36.01, and then right by the line that went across

3    the top, probably due to scanning or for some reason, you can

4    see some small numbers under there that indicate the date that

5    the money order was purchased which is February 1st of 2018.

6                MS. HAJJAR:  Mr. Rader, if you could just go back up

7    to the prior date.

8    Q    What is the due date associated with this premium notice?

9    A    February 5th, 2018.

10   Q    And was the money order received by mail?

11   A    It was, yes.

12   Q    All right.

13               MS. HAJJAR:  Turning to Page 68, please.

14   Q    Could you explain what this page reflects?

15   A    Yes.  This is another premium pay stub, a bill stub.

16   Q    And what's the due date on this slip?

17   A    This is an earlier one.  It was due -- the due date is

18   November 5th, 2017.

19   Q    And can you explain what's written in the box underneath,

20   please make any telephone, e-mail, or address changes below?

21   A    Yes.  So there's that request that you just read that if

22   there's any changes, to write them down, and there's been an

23   e-mail and phone number written down in that box for us to

24   update our records with.

25   Q    And did Globe Life receive this e-mail and phone change?

1    A    Yes.

2    Q    Is there a corresponding money order for this?

3         MS. HAJJAR:  You can turn to the next page,

4    Mr. Rader.

5    A    Yes.

6    Q    And what is the amount of this money order?

7    A    $33.

8    Q    And again, was this received by mail --

9    A    It was.

10   Q    -- by Globe Life?

11   A    Yes.

12        MS. HAJJAR:  Turning to the next page.

13   Q    Is this another premium notice slip?

14   A    Yes.

15   Q    And the same policy number for this policy?

16   A    Correct.

17        MS. HAJJAR:  If you could turn to the next page,

18   please.

19   Q    Is this another corresponding money order?

20   A    Yes, it is.

21   Q    What is the amount of this order?

22   A    $64.58, and this one paid a six month premium.  Actually,

23   this one was split, I believe, into two modes.

24   Q    Okay.

25        MS. HAJJAR:  Turning to Page 72.

1    Q    Could you describe what this page is?

2    A    Yes.  This is the full premium billing notice.  So we

3    showed on the other screens, the slips.  But we are able to

4    reprint.  You can see at the top there it says, X stream.  So

5    we're able to reprint those premium billing notices as they

6    would have been billed, and this is the full page.

7         MS. HAJJAR:  I'm sorry, can you scroll down to the

8    bottom.

9    Q    Is this the slip that we just looked at?

10   A    Correct.

11   Q    That was returned by an individual?

12   A    Yes.

13        MS. HAJJAR:  If you could scroll up, please.

14   Q    Could you read what appears under, important?

15   A    Yes.

16        We're sorry, but at this time, you're Globe Life

17   Insurance Company of New York policy is in danger of lapsing.

18   Our records show that the premium has not been paid as of this

19   date.  The policy grace period has almost expired.

20   Q    Could you read the next paragraph, as well?

21   A    Sure.

22        At some future date the cash benefits that your

23   policy will pay on this life insurance plan will be so very

24   important, and Globe Life Insurance Company of New York

25   guarantees to make this payment, but only if your policy is in

1   force.

2   Q    Further down this page, does it say, Please act now keep

3   your insurance in force?

4   A    It does.

5   Q    What is the due date associated with this billing notice?

6   A    There's also a PS on there which more accurately reflects

7   the grace period.

8        The due date on this one was November 5th, 2017.

9   Q    And that does not incorporate the grace period that's

10  reflected in that foot note you just mentioned?

11  A    Well, yes.  I mean, we want to keep policies in force and

12  we want people to be encouraged to pay their premiums.  So I

13  believe at this time the first paragraph, that it had what was

14  technically lapsed, and so the PS is almost like a disclaimer.

15       But -- I'm sorry, what was the question?

16  Q    Well, I guess just to --

17  A    Correct.

18       THE COURT:  Just rephrase that question so the court

19  reporter can get it.

20       MS. HAJJAR:  I'm sorry.

21  Q    Would Globe Life have accepted a payment past the grace

22  period due to the grace period that you just described?

23  A    Yes.  We would accept the payment past the due date.

24       MS. HAJJAR:  And turning to Page 84, please.

25  A    And past the grace period.

1  Q    Okay.

2         MS. HAJJAR:  Turning to Page 84.

3  Q    Does this document reflect the payments that were

4  received by Globe Life?

5  A    Yes, it does.

6  Q    Can you just orient the jury, where is that indicated?

7  A    So at the bottom left under, received, and due mode, and

8  amount.

9  Q    And does that reflect four payments there?

10  A    Yes.  We only received three, so that's why I was talking

11  about how one of the payments was actually split, because --

12  and that is the -- the payment that was split.  So it's

13  reflecting four payments, but we only received three, and that

14  2/13/18, I have to look back at the money order to see how

15  much that was, but that payment was split into two.

16  Q    Now, what are the three dates associated with the -- from

17  the payment received?

18  A    First is June 2nd 2017, the second was January 3rd, 2018,

19  and the third was February 13, 2018.

20         MS. HAJJAR:  Now, you can take this down.

21  Q    In general, do you require a death certificate before

22  Globe Life will issue a policy benefit?

23  A    Yes.  That is our proof of loss.

24  Q    And are death certificates typically issued where a

25  person is missing?

1    A    Not usual, no, because they don't have the information

2    they would need to put on the death certificate.

3    Q    Could failure to provide a death certificate result in a

4    delay in paying out a claim?

5    A    Definitely.

6    Q    Now, in this case, the Brandy Odom policy we looked at,

7    did Globe Life receive any claim?

8    A    We did.

9         MS. HAJJAR:  Now, I'd like to show the witness

10   what's in evidence as Government Exhibit 116.

11   Q    Can you describe what this is?

12   A    Yes, this is a list of the recorded phone calls that

13   we've provided.

14   Q    And are these a list of recorded calls that Globe Life

15   received in this case?

16   A    Yes.  These were inbound phone calls, and then there are

17   some transfers internally.

18   Q    Okay.  And could you just describe what the record ID

19   reflects?

20   A    Yes.  The record ID is the ID of that recording.  So

21   that's how we find phone calls.

22   Q    And the date, is that the date the call was received?

23   A    Yes.

24   Q    And what can you tell us about the time?

25   A    This is the central time zone and it gives the hour, the

1    minute, and the second.

2    Q    And the names that appear under CSR?

3    A    Yes.  Those were the customer service representatives

4    that took the call.

5    Q    And the phone number, how is that generated?

6    A    That's the incoming -- that's the number they called

7    from.  So that's more of like a caller ID.

8    Q    Ms. Bradley, did you listen to these recordings?

9    A    I did.

10   Q    Were transcripts made of these recordings?

11   A    Yes.

12              MS. HAJJAR:  May I approach, Your Honor?

13              THE COURT:  Yes.

14   Q    Ms. Bradley, if I could ask you to look at just at 116A

15   through P.

16              Are there transcripts associated with each of those

17   exhibits in that binder?

18   A    Yes.

19   Q    And did you review those transcripts?

20   A    I did.

21   Q    What, if anything, did you do to establish to that you

22   reviewed them?

23   A    I put my initials at the bottom right-hand corner, BB.

24   Q    And are these transcripts fair and accurate

25   transcriptions of the recordings?

1    A    Yes.

2    Q    Were you able to make out every word in preparing these

3    transcripts?

4    A    There were some fast talkers, so I was able to make out

5    most words.  But there are some indications of UI for

6    unintelligible.  There is some talking over, there's some ums

7    and okays and all rights that might be not in here.  But those

8    are minor.

9             MS. HAJJAR:  Your Honor, the Government offers 116A

10   through P as aids to the jury.

11            THE COURT:  Any objection?

12            MR. CECUTTI:  No objection.

13            THE COURT:  All right.  These are aids to help you

14   follow along with the recording.

15            (Government Exhibits 116A through P, were received

16   in evidence.)

17            MS. HAJJAR:  And Your Honor, if either we can take a

18   break or, if we -- with Your Honor's permission, we'll just

19   hand out the binders now of the transcripts.

20            THE COURT:  Is everybody doing all right?

21            All right.  So why don't we just hand out the

22   transcripts and we'll save the time.

23            MS. HAJJAR:  Your Honor, with your permission, I'd

24   like to play Government Exhibit 116A, and just direct the

25   jury's attention to 116A-T which is behind the tabs 116 and A,

1  in the binder.

2           THE COURT:  Okay.

3           (Audio recording played.)

4           MS. HAJJAR:  I think it's a very long pause.  If you

5  could just move it ahead.

6           (Audio recording played; Audio recording stopped.)

7           MS. HAJJAR:  If we could just turn to Government

8  Exhibit 119, please.  And just turn to Page 2.  And scroll

9  down.

10 Q    Is the policy number that was provided the same as the

11 policy number indicated on Government's Exhibit 119?

12 A    Yes.

13 Q    And is that with Villard as the insured?

14 A    Yes.

15          MS. HAJJAR:  Now, if we could play Government

16 Exhibit 116B and direct the jury's attention tow 116B-T in the

17 binder.

18          (Audio recording played; Audio recording stopped.)

19          MS. HAJJAR:  If you could then play Government

20 Exhibit 116 and look at 116C.  I'm sorry, 116C.

21          (Audio recording played; Audio recording stopped.)

22 Q    Ms. Bradley, what's going on during this period of time?

23 A    So for compliance reasons, we have to block out any kind

24 of payment -- any payment information and card numbers, bank

25 account numbers.  So it's called PCI card compliance, and that

1    piece is blacked out and excerpted in.

2    Q    Does Globe Life maintain a copy of what was excerpted

3    out?

4    A    No, we do not maintain that.

5              (Audio recording played; Audio recording stopped.)

6    Q    Ms. Bradley, what's the date and time associated with

7    this call?

8    A    December 28th, 2016, and it was at 11:17 a.m. Central

9    Time.

10             MS. HAJJAR:  And if we could pull up what's in

11   evidence as Government's Exhibit 119, again, and turn to Page

12   30.

13

14             (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. HAJJAR (Continuing):

2    Q    Is there a relationship between what's indicated here as

3    the payment received and the date of that call or the contents

4    of the call we just listened to?

5    A    Yes.  That would have been that top little box, the

6    little hard to read one.  There's a date in the top left

7    corner that says 9 -- sorry, that's the second box, in the top

8    left corner is 12/29/16.

9         So, that second box there is associated with the

10   calling in of that payment.

11   Q    In other words, it records the payment that we just

12   heard?

13   A    Yes, that was our premium accounting record.

14        MS. HAJJAR:  I'd like to play Government Exhibit

15   116D.

16        (Audio plays; audio stops.)

17   Q    Ms. Bradley, was that policy number the one associated

18   with Brandy Odom that we looked at?

19   A    Yes.

20        MS. HAJJAR:  I'd like to look at 116E.

21        (Audio plays; audio stops.)

22        MS. HAJJAR:  I'd like to play Government Exhibit

23   116F, please.

24        (Audio plays; audio stops.)

25        MS. HAJJAR:  If we could play Government Exhibit

1  116G, please.

2          (Audio plays; audio stops.)

3          MS. HAJJAR:  If we could play Government exhibit

4  township 116H.

5          (Audio plays; audio stops.)

6          MS. HAJJAR:  If we could play Government Exhibit

7  116I, please.

8          (Audio plays; audio stops.)

9  Q    Stopping it there, Ms. Bradley.

10         Can you just remind us the date associated and time

11 associated with this call?

12 A    Yes.  This one is dated April 26, 2018, 9:14 a.m. central

13 time.

14         THE COURT:  Ms. Hajjar, I think this might be a good

15 time to stop for our lunch break.

16         Jurors, I'm going to excuse you for lunch.  I have a

17 couple of other matters to attend to, so I won't have you back

18 here until 2:30.  Have a good lunch.  Please don't talk about

19 the case at all.

20         (jury exits.)

21         THE COURT:  Everybody can sit down.

22         You can step down.  We'll see you after lunch.

23         THE WITNESS:  Okay.  Thank you.

24         THE COURT:  Anything before we break for lunch?

25         Do you know how much longer you have with this

1  witness?

2          MS. HAJJAR:  I think about 20 to 30 minutes.  I'm

3  not totally sure because of the length of the recordings.

4          THE COURT:  And then I think we can discuss the rest

5  of the schedule.  I know you want to discuss scheduling, but

6  can we do it at the end of the day?

7          MS. DEAN:  Yes, your Honor.

8          THE COURT:  Great.  See you at 2:30.

9

10          (Luncheon recess taken.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          A F T E R N O O N   S E S S I O N

2               (Time noted:  2:38 p.m.)

3               (In open court; jury not present.)

4               THE COURT:  Hi.  Everybody can sit down.  Are we

5     ready to continue?

6               MS. DEAN:  We are, Your Honor.

7               I guess, Your Honor, would it be appropriate to

8     address Mr. Turrisi, the material witness, his prior

9     convictions now or would you like to do that at the -- after

10    this witness is complete?

11              THE COURT:  No.  Let's -- are we far apart on them?

12    I mean, it looked like a bunch of violations, kind of all the

13    same thing.  It didn't seem like anything related to

14    credibility, although, did he get arrested for impersonating

15    somebody once?

16              MS. THIELE:  Your Honor, we don't intend to elicit

17    any testimony.

18              THE COURT:  Okay.  Good.  There we go.  All right.

19    Thanks.

20              MS. DEAN:  Then we're ready to proceed.

21              THE COURT:  All right.

22              Let's have the witness take the stand.

23              MS. HAJJAR:  May I stand at the podium, Your Honor?

24              May I just go to the podium, Your Honor?

25              THE COURT:  Yes, go ahead.

1          You can go ahead and sit down.

2          THE COURTROOM DEPUTY:  You may be seated.

3          THE COURT:  All right, everybody, we're ready to

4  continue with the direct examination of the witness.

5          Go ahead.

6          THE COURTROOM DEPUTY:  The witness is reminded she's

7  still under oath.

8          THE WITNESS:  Yes.

9          (The witness resumes the stand.)

10  DIRECT EXAMINATION (Continued)

11  BY MS. HAJJAR:

12  Q    With respect to the next call, Ms. Bradley, which was

13  Government Exhibit 116-J, was this call proceeded by some

14  communication between two Globe Life employees?

15  A    Yes, it was.

16  Q    Okay.

17          MS. HAJJAR:  So, then, if we could start the

18  recording then at 1:28, please.

19          (Audio played; audio stopped.)

20  Q    And, Ms. Bradley, did you omit that discussion in the

21  transcript?

22  A    It was omitted, yes.  It was the handoff between the two

23  CSRs.

24          (Audio plays.)

25          MS. HAJJAR:  If we could play the next call,

1    Government Exhibit 116-K.

2                (Audio played; audio stopped.)

3                MS. HAJJAR:  Turning now to

4    Government Exhibit 116-L.

5    Q    Ms. Bradley, is this the continuation of that call?

6    A    Yes.

7                (Audio played; audio stopped.)

8                MS. HAJJAR:  Mr. Rader, if you could just try to get

9    to the next part of the recording.

10                (Audio played; audio stopped.)

11                MS. HAJJAR:  If we can play the next recording,

12    Government Exhibit 116-M, please.

13                (Audio played; audio stopped.)

14                MS. HAJJAR:  And if we could play

15    Government Exhibit 116-N, please.

16                (Audio played; audio stopped.)

17    Q    Directing your attention to Government Exhibit 116-O,

18    Ms. Bradley, is this a continuation of that call, in other

19    words, with a different representative of that same company?

20    A    Yes, it is.

21                (Audio played; audio stopped.)

22                MS. HAJJAR:  If we could play

23    Government Exhibit 116-P, please.

24                (Audio played; audio stopped.)

25                MS. HAJJAR:  We can stop there, Mr. Rader.

1       Your Honor, may we approach the jury to retrieve the

2   binders?

3       THE COURT:  Sure.

4       MS. HAJJAR:  If we may publish

5   Government Exhibit 120, which is in evidence, and turn to page

6   82.

7       (Exhibit published.)

8   BY MS. HAJJAR:

9   Q    Ms. Bradley, can you describe to the jury what this page

10  is?

11  A    Yes.  This is from our Mainframe system, and we call it

12  the NDTH screen.  You can see in the top left corner, the

13  NDTH.  This is the screen that the customer service

14  representative will fill out when they take a notice of death

15  on the phone.

16  Q    Okay.  And can you indicate what is written next to

17  caller?

18  A    It says Odelle Anderson.

19  Q    And do you have any understanding of why that's written

20  there?

21  A    Yes.  So, when the customer service representative was

22  taking the call, she indicated on the recording it was her

23  first time and she was very upset about the -- about the

24  manner of death and, so, she made an error on that -- on that

25  screen.  She asked her to spell out Anderson but she did not

1   ask for the spelling of the first name.

2   Q    Is that the recording we reviewed earlier?

3   A    Yes, it is.

4            THE COURT:  I just want to make sure I understand.

5   You mean the person who was taking the call got so upset she

6   made a mistake; is that what you are saying?

7            THE WITNESS:  The one that prayed with the family,

8   yes.

9            THE COURT:  Okay.

10           THE WITNESS:  For the family, yeah.

11           THE COURT:  Thanks.

12           THE WITNESS:  I don't remember if it was Patty or

13  Penny.  I think it was Penny.

14           THE COURT:  Okay.

15  BY MS. HAJJAR:

16  Q    But you're referring to the representative, correct?

17  A    Yes.

18  Q    And turning to page 84, was this policy in effect at the

19  time the claim was made, Ms. Bradley?

20  A    Yes, it was.

21  Q    And how can you tell that looking at page 84?

22  A    So this is also from our Mainframe system and it's called

23  the LRN2 screen.  And if you look down on the left column, it

24  says, paid to, and it was paid to May 5, 2018.  So it was paid

25  past the date of death and it was enforced on the date of

1    death.

2    Q    And turning to page 32 of the same exhibit, can you

3    describe what this -- what this page is?

4    A    Yes.  So this page is a reprint of the letter that was

5    sent out by our system after the notice of death call was

6    taken.  So it's dated 4/27, the day after the notice of death

7    call, and it would have been closed, the claim forms and

8    described the items needed to file the claim.

9           MS. HAJJAR:  And if we could just scroll down

10   slightly on this page.

11   Q    Are these some of the items that would have been required

12   to process the claim?

13   A    Yes, these are the items that was -- that were described

14   by the customer service representative.

15   Q    Okay.  And turning to page 23 of the same exhibit, can

16   you describe what this page is?

17   A    Yes.  This is a claim form.  It's titled proof of death,

18   claim and statement, it has a receipt date and that's what

19   we -- we would have asked for as our claim form.

20   Q    And was this filled out by the claimant and sent into

21   Globe Life?

22   A    Yes, it was.

23   Q    Okay.  And the signature there, the printed name

24   associated with it, can you read that, please?

25   A    Adelle Anderson.

1  Q    And the relationship to deceased?

2  A    Sister.

3  Q    Now, Number Six, is any policy less than two years old.

4  What was indicated there?

5  A    No.

6  Q    Why does Globe Life ask that question?

7  A    Well, we -- we know when the policy was issued, but I

8  think that they ask that question only form just to remind the

9  claimant that if it was more than two years, then there's a

10 different process and that's why we request the claim forms

11 for the contestable claims.

12 Q    Was this policy less than two years old?

13 A    It was.

14 Q    And turning to the next page, page 24, can you describe

15 what this is?

16 A    Yes.  This is -- this is the death certificate for

17 Brandy Odom.

18 Q    Okay.  It's hard to see, but if you could just zoom in --

19 A    Zoom in a little, yeah, that can usually help.  Mark.

20 Q    And the decedent legal name there is listed as

21 Brandy Odom?

22 A    Yes, Brandy Keshawwn Odom.

23 Q    Was that document also sent as part of the claim file?

24 A    Yes, it was.

25 Q    And the last page -- I'm sorry, page 25, the following

1  page, can you describe what this page is?

2  A    Yes.  This is the medical release form that they refer to

3  as the HIPAA form.

4  Q    Okay.

5         MS. HAJJAR:  Turning to page 27, please.

6  Q    Can you describe what this document is?

7  A    Yes.  That is the return envelope that enclosed the claim

8  documents that we received.

9  Q    Did Globe Life ever pay a claim on this policy?

10  A    We did not.

11  Q    Okay.  Turning to what's in evidence as

12  Government Exhibit 121.  Can you describe what this is,

13  Ms. Bradley?

14  A    Yes.  This is a life insurance application with a

15  proposed insured of Cory W. Martin.

16  Q    What is the address on this application?

17  A    249-45 148 Road, Rosedale, New York 11422.

18  Q    And this -- this information for the proposed insured is

19  not preprinted on the form; is that right?

20  A    Correct.

21  Q    Okay.  What is the telephone number associated with this

22  applicant?

23  A    347-779-6108.

24  Q    And the email address?

25  A    Wayne11422@gmail.com.

1  Q    And can you read the first initial of the beneficiary

2  name?

3  A    T.

4  Q    And is the rest of that name redacted?

5  A    Yes.

6  Q    Okay.  What is the relationship to proposed insured?

7  A    Son.

8  Q    And could you scroll down to the bottom of this page and

9  just indicate what the date is associated with this

10 application?

11 A    May 30, 2017.

12 Q    Okay.  Turning to the following page, is this the welcome

13 letter that you described on the prior applications,

14 Ms. Bradley?

15 A    Yes, it is.

16 Q    And just -- that same paragraph you had read before, what

17 does this reflect about the coverage being enforced?

18 A    This reflects that the coverage will not be enforced

19 until the first premium is received.

20

21               (Continued on the following page.)

22

23

24

25

1   BY MS. HAJJAR: (Continuing.)

2   Q    And was any premium received in this policy?

3   A    No.

4   Q    Did this policy ever go into effect?

5   A    No.

6            MS. HAJJAR:  Just one moment, Your Honor.

7            No further questions.

8            THE COURT:  All right.  Cross-examination?

9            MR. CECUTTI:  Yes, Your Honor.

10  CROSS-EXAMINATION

11  BY MR. CECUTTI:

12  Q    Good afternoon, Ms. Bradley.

13  A    Hi.

14  Q    I want to pick up our discussion on the Brandy Odom

15  policy.

16  A    Okay.

17  Q    And that was issued on April 5th, 2017?

18  A    Let me find it.

19  Q    Okay.

20  A    Yes.

21  Q    And that was issued after leads were generated?

22  A    Correct.

23  Q    And in that policy, Brandy Odom is the insured, correct?

24  A    Yes.

25  Q    And the beneficiary is Adelle Anderson?

1    A    Yes.

2    Q    And she's the sole or only beneficiary on that policy,

3    right?

4    A    Yes.

5    Q    Now, you were asked questions concerning mail or

6    correspondence related to that policy.

7         Mail from Globe Life regarding that policy was sent

8    to the insured at the insured's address?

9    A    It was sent to the address that we had on file for the

10   proposed insured.

11   Q    And the insured is Brandy Odom, correct?

12   A    Correct.

13   Q    And the address is 249-45 148th Road?

14   A    It is on here.  We did not independently verify that

15   someone named Brandy Odom resided at that address at the time

16   that we mailed it.

17   Q    But that's where the mailings or written correspondence

18   was going to, right?

19   A    Yes.

20   Q    And some of that correspondence included the welcome

21   letter?

22   A    Well, the welcome letter is on top of the policy.  So the

23   policy packet includes that welcome letter.

24   Q    And the premium billing notices?

25   A    Let me look at those.

1      Yes.

2  Q    And other correspondence, they were sent to Brandy Odom

3  at the address on 148th Road; that's correct, right?

4  A    I've look at the two items that you mentioned.  I can go

5  through the other ones to make sure that all of them were sent

6  to that address.

7  Q    That's fine.  But those items were sent there, right?

8  A    Correct.

9  Q    And you have no reason to think that items were sent at a

10 different address, correct?

11 A    I mean, I can go back through these.  Whatever we

12 submitted is where they were sent.

13 Q    Well, let's just make sure everything was sent to the

14 148th Road address.

15 A    Okay.  So I've got the policy here, I've got the address

16 on the application.

17       Do you want me to talk about claim documents, as

18 well?

19 Q    Those documents were sent to the 148th Road address,

20 correct?

21 A    So I have that 148th Road was written on the HIPPA and

22 then I've got the claim forms were sent to the one -- the

23 claim letters were sent from the company to the 148th Road

24 address.  And then we talked about -- okay.

25       I actually have a different address on one of the

1   claim letters, so I'm glad we went through these.  So the

2   claim letters dated August 29th, 2018, and September 27th,

3   2018, were sent to 349 Massachusetts Avenue, as well as the

4   claim letter dated November 15th, 2018.

5   Q    And the Massachusetts Avenue address, that's an address

6   in New Jersey, correct?

7   A    Trenton, New Jersey, yes.

8   Q    And all of the written corresponds from Globe Life prior

9   to April 10th, 2018, was sent to the 148 Road address,

10  correct?

11  A    Yeah.  I'm still going back to the premium billing

12  notices.  I believe you're correct.  I'm just going to double

13  check all of these billing notices.  We have Trenton, New

14  Jersey on one of them.  Okay.

15          Okay.  There's a premium billing notice that was to

16  the 148 Road.  There's another one.  Yes, you are correct.

17  All of those went -- all of the premium billing notices were

18  the 148 Road.

19  Q    So just so we're all clear and on the same page, all of

20  the written correspondence from Globe Life from the date the

21  policy was issued on April 5th 2017, up until April 10, 2018,

22  went to 148th Road, correct?

23  A    No, because there was the letter dated 4/27/2018 went to

24  the other address.

25  Q    Right.  My deadline, Ms. Bradley, is April 10th, 2018.

1          So from April 5th, 2017, up until April 10th, 2018,

2    all of the correspondence, written correspondence went to

3    148th Road?

4    A    And beyond.  So it continued to go to 148th Road beyond

5    April 10th.

6    Q    Okay.  But again, everything prior to April 10th --

7    A    Yes.

8    Q    Okay.  Thank you.

9          Now turning to the calls that were played.  And

10   specifically, in 2017 --

11         MR. CECUTTI:  And it might be helpful if we pull up

12   Government Exhibit 116.

13   Q    Okay.  Ms. Bradley, can you see that?

14   A    I can.

15   Q    Okay.  So just focusing on the calls in 2017.

16         So that would be items 116D, E, F, G, and H.

17   A    Mm-hmm.

18   Q    Okay.  In those calls, the caller, it's fair to say, was

19   checking on the status of the policy, right?

20   A    Yes.

21   Q    And the caller purported to be the insured, Brandy Odom?

22   A    Yes.

23   Q    And the caller in each of these calls, fair to say, was

24   the same person?

25   A    It sounded -- the voice sounded similar in each of the

1  calls.

2  Q    And all the calls came from the same phone number,

3  (718)600-1072?

4  A    Yes.

5         It says on H that we didn't record the number.  So

6  that one -- last one in 2017, we weren't able to confirm.  Our

7  recordings didn't take that piece down.

8  Q    All the other calls, though, were from the same number,

9  right?

10  A    Yes.

11  Q    Now, turning to the calls in 2018.  So that would be

12  I16 -- I'm sorry, 116, I through P.

13         You see those, right, Ms. Bradley?

14  A    I do, yes.

15  Q    There are eight different communications with Globe Life

16  representatives, right?

17  A    Yes.

18  Q    And in each of those communications, the purported caller

19  was Adelle Anderson, correct?

20  A    Yes.

21  Q    And --

22  A    Well, no.  Yes, I think.  I have to remember.

23         Oh, yes, yes, yes.  Yes.

24  Q    And she was the sole beneficiary on this policy?

25  A    Yes.

1   Q    And she claimed to be Brandy Odom's sister, correct?

2   A    And a cousin in one call.

3   Q    Correct.

4            Now, just directing your attention to the same set

5   of calls.

6            During these calls, it's fair to say that

7   Ms. Anderson was trying to collect on this policy, correct?

8   A    Yes.

9   Q    And there are three communications on 8/28/2018.

10           Do you see those?

11  A    Yes.

12  Q    And those are connected to a 609 phone number?

13  A    Yes.

14  Q    And the calls in June were connected to a 917 number?

15  A    Yes.

16  Q    And aside from phone calls that Ms. Anderson made

17  regarding this policy in an effort to collect, she also sent

18  Globe Life a number of written items, as well?

19  A    Yes.

20  Q    She sent the claim form on August 24th, 2018?

21  A    Yes.

22  Q    She sent the HIPPA form?

23  A    Yes.

24  Q    She sent a -- claim documents?

25  A    The only other item I think is the death certificate for

1  claim documents.

2  Q    Do you want to double check?

3  A    Yeah.

4        So some of the items that I provided in response to

5  the subpoena were internal.  As far as what we received, we

6  received the claimant statement, the certificate of death, the

7  HIPPA form, a blank statement of position form, and the

8  envelope.

9  Q    Okay.  So from April 2018 to August of 2018, it's fair to

10  say that in an effort to collect on this policy, Ms. Anderson

11  made several calls to Globe Life and sent variety, a variety

12  of written correspondence to Globe Life, as well?

13  A    Yes.

14  Q    Now, you received a -- you mentioned about a minute ago

15  and I think on cross-examination, receiving a subpoena

16  request?

17  A    Yes.

18  Q    And you received that request in 2018?

19  A    Yes.

20  Q    And I believe, but you correct me, all of the materials

21  that were responsive to that subpoena are on the flash drive

22  that we -- that the Government presented to you during your

23  direct examination?

24  A    The flash drive that they presented contained phone

25  calls.  Some of those were produced in 2018, and some of them

1   were produced more recently.

2   Q    Okay.  In responding to the subpoena request, there were

3   no phone calls made by Adelle Anderson in an effort to collect

4   on this policy in 2019 or later, correct?

5   A    Right.  We don't have any other -- let me check one more

6   thing, actually.  I want to look at one of the screens, the

7   note screen just to refresh my -- okay.

8          So that's -- so the note screen shows that we

9   received the claim statement, the CDC which is short for

10  certified death certificate, and the HIPPA form, on

11  August 24th, 2018, and then from there, all I have a record is

12  letters mailed from claims.  I don't have a record of any

13  further phone calls, inbound phone calls or incoming

14  correspondence.

15  Q    For 2019 and later, right?

16  A    Correct.  You are correct, yes.

17  Q    Okay.  I want to turn now to a different policy, the Alex

18  Villard policy, which you're familiar with that, correct?

19  A    I have a different name.  The Villard one, Villard?

20  Q    I'm showing you Government Exhibit 119 which is in

21  evidence.

22  A    Oh, I thought you said Alex.  I'm sorry.

23  Q    I probably did.  My apologies.

24  A    Sorry.

25  Q    So this is Government Exhibit 119, and I will refer to it

1   as the Villard policy, okay?

2   A    Okay.

3   Q    And in this policy, Adelle Anderson is also the

4   beneficiary?

5   A    Yes.

6   Q    And the only or sole beneficiary on this policy?

7   A    Yes.

8   Q    And this policy went into effect, I believe, on

9   September 23rd, 2016?

10  A    Let me double check that.

11  Q    Okay.

12  A    Yes 9/23/16.

13  Q    And I believe you testified that there were a couple of

14  premiums that were paid on policy in that year?

15  A    Yes.

16  Q    And those premiums were paid by Adelle Anderson, correct?

17  A    I'm not sure.  Let me look here.

18       That would be the page with the tiny writing.  Hold

19  on.

20  Q    I think it's Page 31.

21       This is the page, yes?

22  A    Okay.  Yes.  So the payor that we have recorded on here

23  is Adelle Anderson.  But I don't know if that is the actual

24  person or that's just who we recorded as the payor.

25  Q    So the payor is Adelle Anderson?

1    A    Yes.

2    Q    And the credit card owner name is listed as Anderson,

3    correct?

4    A    That's the name that we were given.  Whether it's the

5    true name, I do not know.  But we do have a last four and an

6    expiration date.

7    Q    Of a Visa credit card, right?

8    A    There's two different ones.  So this one that you're

9    showing right now, that was the December payment, and then

10   there's a different last four and expiration for the September

11   payment that was taken online.

12   Q    So the only information that you have regarding the means

13   by which this was paid was Adelle Anderson's Visa card?

14   A    Well, if you scroll up to the little tiny box at the top,

15   that's the −− so that's what we have −− so since the −− since

16   that was taken by phone, we have more information for that

17   payment.  The payment for the September premiums was up at the

18   very, very top.  And we only have that little box for that

19   payment.  At the very it top.  All the way to the −− a few

20   more pages.  Keep going.  Sorry.

21        That little box right there.  That top −− not where

22   the cursor is, but the one above it where it says, the amount

23   is 201.77.  That's the different last four and expiration.

24   And you can see if you pause right there that those two are

25   different.  The top one is 2296 and expired November 2019, and

1   then the bottom one is last four is 0270, and it expired in 12

2   of '20.

3   Q    Right.  And so based upon the information here, it

4   appears that Adelle Anderson made these payments with credit

5   card?

6   A    They were made with a credit card, yes.

7   Q    By Adelle Anderson?

8   A    I don't know who actually owned that card.

9   Q    Well, the only other information -- you don't have any

10  other information indicating it was someone else, correct?

11  A    Right.  Well, what was input into our system was the name

12  of Adelle Anderson as the payor.

13       MR. CECUTTI:  And just going back to Government

14  Exhibit 119.  Yes.  That page.  If we could just look at the

15  address.

16  Q    The address listed on the April is 2204 Fulton Street?

17  A    Yes.  Apartment 2B, Mm-hmm.

18  Q    And let's finish it off, Brooklyn, New York 11233?

19  A    Yes.

20  Q    And that's where all the mail related to this policy was

21  going to, correct?

22  A    The policy was mailed there, and let me see if I -- I

23  don't know.

24       Yes, I'm showing that on the policy detail, as well,

25  yes.

1   Q      Okay.

2            MR. CECUTTI:  One moment, Your Honor.

3            THE COURT:  Okay.

4            (Pause in the proceedings.)

5   Q    Ms. Bradley, just one final question.

6            Adelle Anderson was the sole beneficiary on both

7   policies that we've been discussing, right?

8   A    Yes.  There were no other beneficiaries.

9            MR. CECUTTI:  I have nothing further.  Thank you.

10            THE COURT:  Any redirect?

11            MS. HAJJAR:  Just very briefly, Your Honor.

12            THE COURT:  Okay.

13  REDIRECT EXAMINATION

14  BY MS. HAJJAR:

15  Q    Ms. Bradley, you were just asked by defense counsel about

16  the premium payments made on the Villard policy.

17            Do you recall that?

18  A    Yes.

19  Q    And about the information in Globe Life's possession

20  about that premium payment in December?

21  A    Yes.

22  Q    Do you -- was that premium payment made in connection

23  with a phone call?

24  A    Yes.

25  Q    Okay.  Was that the phone call we listened to as 116B and

1  C?

2  A    Yes, it was those first three calls in the binder.

3         MS. HAJJAR:  If we could just play just the first 30

4  seconds of that, Government Exhibit 116B.

5         (Audio recording played.)

6         MS. HAJJAR:  If you could just stop there.

7         (Audio recording stopped.)

8  Q    And then we listened to another call that was the

9  continuation?

10 A    Yes.

11 Q    You had testified on direct that there was a gap in that

12 call, that second call that reflected payment information

13 being provided?

14 A    Yes.

15 Q    Okay.  And so this call relates to the -- that premium

16 payment being paid on the Villard policy; is that correct?

17 A    It does.

18        MS. HAJJAR:  Okay.  Thank you.

19        No further questions.

20        THE COURT:  Anything else, Mr. Cecutti?

21        MR. CECUTTI:  No, Your Honor.  Thank you.

22        THE COURT:  All right.  Thank you so much.  You can

23 step down.

24        (The witness steps down.)

25        THE COURT:  Are you ready to call your next witness?

1          MS. DEAN:  Yes, Your Honor.  The Government calls

2   Detective Claude Jean-Pierre.

3          (The witness takes the stand.)

4          THE COURTROOM DEPUTY:  Raise your right hand,

5   please.

6          (The witness was sworn and/or affirmed in by the

7   courtroom deputy.)

8          THE WITNESS:  Yes, I do.

9          THE COURTROOM DEPUTY:  Please state your name, for

10  the record.

11         THE WITNESS:  Detective Claude Jean-Pierre.

12         THE COURTROOM DEPUTY:  You can have a seat.

13         THE WITNESS:  Thank you.

14         THE COURT:  Okay.  Detective, the chair is stuck

15  there, so just use the microphone.  I want to make sure

16  everybody can hear you, so make sure it's in a place where we

17  can make the best use of it.

18         Do me another favor, also.  Don't speak too quickly.

19  It makes it too hard for the court reporter.

20         THE WITNESS:  Not a problem.  Do they need me to

21  spell out my name again?

22         THE COURT:  I don't think so.  They just like it

23  when you speak loudly and slowly.

24         And if there's a question that you don't understand,

25  just let me know, okay.

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  Okay.  Go ahead.

3  **CLAUDE JEAN-PIERRE**, called as a witness, having been first

4  duly sworn/affirmed, was examined and testified as follows:

5  DIRECT EXAMINATION

6  BY MS. DEAN:

7  Q     Good afternoon, Detective.

8  A     Good afternoon.

9  Q     Who do you work for?

10 A     I work for the New York City Police Department.

11 Q     How long have you been a detective with the NYPD?

12 A     Seventeen years.

13 Q     And could you briefly review your career with the NYPD.

14 A     Sure.  Next month will make me 27 years with the

15 department.  I started off as a patrol officer in the 7-0

16 Precinct, proceeded to plain clothes anticrime within the 7-0,

17 as well, and then I went upstairs to the detective squad.

18 Q     Were you working there in 2018?

19 A     Yes, I was.

20 Q     Directing you to April 28th into April 29th of 2018, were

21 you working on those days?

22 A     Yes, I was.

23 Q     Were you involved in the investigation into the homicide

24 of Brandy Odom?

25 A     I was assigned to attask force that assisted the 6-9

1   Detective Squad with that investigation.

2   Q    What was being done by detectives on April 28th into

3   April 29th of 2018 with respect to this investigation?

4   A    A search warrant -- search warrants, rather, had been

5   executed at the location, a residence located at 249-45 148th

6   Road, and crime scene unit personnel were there.

7   Q    And you just mentioned a search warrant.

8            Could you tell us what a search warrant is?

9   A    Sure.  A search warrant is a judicially authorized

10  document which is granted -- which grants access to the police

11  when conducting an investigation that allows us to retrieve

12  any kind of evidence, whether physical or forensic to aid with

13  an investigation.

14  Q    And in addition to the address that you described

15  conducting a search warrant, was there a second search warrant

16  that was conducted on April 28th into April 29th?

17  A    Yes.  A search warrant was also executed on a vehicle

18  parked in front of the residence.

19  Q    What kind of car was that?

20  A    It was a 2005 Nissan Maxima black in color.

21  Q    Were you there from the very beginning of the search

22  warrant or did you arrived during its execution?

23  A    I arrived during its execution and was tasked with

24  basically recovering whatever evidence was found.

25            THE COURT:  Do me a favor, just pull the microphone

1    closer to you.

2              THE WITNESS:  Sure.  Do you need me to repeat that?

3              THE COURT:  No.  Just go ahead.

4    Q    Did you arrive on April 28th at some point?

5    A    Late in the afternoon of April 28th.

6              MS. DEAN:  I'm going to ask that the witness only be

7    shown Government's 743 for identification.

8    Q    Do you recognize this?

9    A    Yes.

10   Q    What is this?

11   A    That's the semi-detached residence at that address,

12   249-45 148th Road.

13   Q    Does it fairly and accurately depict the residence and

14   vehicle that you observed on the date of the search warrant?

15   A    In fact, that is the residence.

16             MS. DEAN:  I ask that Government 743 be received in

17   evidence.

18             THE COURT:  Any objection?

19             MS. THIELE:  No objection.

20             THE COURT:  All right.  If we could please publish

21   it.

22             (Government Exhibit 743, was received in evidence.)

23             (Exhibit published.)

24   Q    And you said what unit was working there when you

25   arrived?

1   A     Crime scene unit personnel.

2   Q     What happened to the black Nissan Maxima that we see in

3   this photograph on the date of the search warrant?

4   A     Pursuant to the search warrant, that vehicle was

5   recovered and then taken to the 105th Precinct where crime

6   scene has a facility where they can process a vehicle indoors.

7   Q     What, if anything, did you personally collect from inside

8   of this residence?

9   A     Inside of the residence, I recovered and processed -- and

10  vouchered, rather, two pieces of identification belonging to

11  the deceased.

12  Q     What types of pieces of identification?

13  A     One was a New York State Driver's License, and the second

14  was a laminated Social Security card.

15  Q     Where were these items belonging to the victim found

16  within the residence?

17  A     Those items were found inside of a -- on top of a dresser

18  inside of a second floor master bedroom at the residence.

19        MS. DEAN:  And can I have, for the witness only,

20  Government's 789, please.

21  Q     Do you recognize this?

22  A     Yes.  That's the second floor master bedroom.

23  Q     And does this fairly and accurately depict the location

24  that the items you just described to us were found?

25  A     The items were on top of this -- the dresser depicted in

1    that photo.

2          MS. DEAN:  Your Honor, at this time, I move

3    Government's 789 into evidence.

4          THE COURT:  Any objection?

5          MS. THIELE:  No objection.

6          THE COURT:  All right.  You can display.

7          (Government Exhibit 789, was received in evidence.)

8          (Exhibit published.)

9    Q    And now that we all can see that picture, can you tell us

10   again where the victim's Social Security card and license were

11   found?

12   A    Atop that dresser in that bedroom.

13   Q    Have you also reviewed a diagram of the second floor of

14   this residence created by crime scene?

15   A    Yes, I had that opportunity.

16          MS. DEAN:  Can I have, for the witness only, please,

17   Government's 740.

18   Q    Do you recognize that?

19   A    Yes, I do.

20   Q    And what is that?

21   A    That's a sketch created by crime scene unit personnel

22   depicting the layout of the second floor of that residence.

23          MS. DEAN:  Your Honor, I ask that Government 740 be

24   received in evidence.

25          THE COURT:  Any objection?

1    MS. THIELE:  No objection.

2    THE COURT:  Okay.  You can publish that too.

3    (Government Exhibit 740, was received in evidence.)

4    (Exhibit published.)

5  Q    And can you please describe for us now that we can all

6  see this, what bedroom did you refer to as the master bedroom

7  where the victim's Social Security card and ID were found?

8  A    That would be the bedroom labeled number three at the

9  very bottom of that sketch.

10 Q    Were electronics, including cell phones also collected

11 during the course of this search warrant execution?

12 A    Yes, those items were collected.  Not by myself, but they

13 were collected by other personnel.

14 Q    Fair to say there were other detectives and members of

15 service that were collecting items at the same time you were?

16 A    Yes.

17 Q    What did you do with the Social Security card and

18 identification of the victim?

19 A    I returned with those items to the 69th Precinct where I

20 prepared vouchers for them.

21 Q    What was the voucher number that you assigned to the

22 victims personal identifying information?

23 A    If I may, can I refer to my paperwork?

24    THE COURT:  Sure.

25    MS. DEAN:  If we can bring up 3500CJB6, for the

1    witness only.

2    A    That is the voucher that I prepared.

3    Q    Does that refresh your memory as to the voucher number of

4    the items?

5    A    Yes.

6    Q    And what was it?

7    A    That would be -- it's blurred on the screen, but it's

8    3000960304.

9         MS. DEAN:  Your Honor, may I approach the witness

10   with Government's 352A and B?

11        THE COURT:  Yes.

12        (Counsel approaches the witness.)

13   Q    Detective, do you recognize Government Exhibit as 352A

14   and B?

15   A    Yes.  These are the two items that were recovered during

16   the execution of that search warrant and recovered by me and

17   then vouchered at the 69th Precinct.

18        MS. DEAN:  I ask that Government's 352A and B be

19   received in evidence at this time.

20        THE COURT:  Any objection?

21        MS. THIELE:  No objection.

22        THE COURT:  Do you want to publish them or do you

23   want to --

24        (Government Exhibits 352A and B, were received in

25   evidence.)

1          MS. DEAN:  May I publish them by holding them in

2     front of the jurors?

3          THE COURT:  Sure.

4          THE WITNESS:  It's kind of stuck together.

5     Q    Detective, you mentioned you did this vouchering at the

6     69th Precinct?

7     A    Yes, ma'am.

8     Q    Were the other items collected during the search warrant

9     also brought to that same precinct for vouchering?

10    A    I believe so.

11         MS. DEAN:  I have no further questions.

12         THE COURT:  Any cross?

13         MS. THIELE:  No cross-examination.

14         THE COURT:  All right, Detective.  Thanks so much.

15    You can step down.

16         THE WITNESS:  Thank you, ma'am.

17         (The witness steps down.)

18

19         (Continued on the following page.)

20

21

22

23

24

25

1   (Continuing.)

2           THE COURT:  Are you ready to call your next witness?

3           MS. DEAN:  Yes, your Honor.  The Government calls

4   Anthony Turrisi.

5           And before the witness takes the stand, the

6   Government offers Government 304 and 307 into evidence.  304

7   is certified records from Pinger and 307 are certified records

8   from Verizon Wireless.

9           THE COURT:  Any objection?

10          MS. THIELE:  No objection.

11          THE COURT:  Those will be admitted into evidence.

12          (Government Exhibits 304 and 307 so marked.)

13          (Witness takes the stand.)

14          THE COURTROOM DEPUTY:  Please raise your right hand.

15          Do you solemnly swear or affirm that the testimony

16  you're about to give will be the truth, the whole truth, and

17  nothing but the truth?

18          THE WITNESS:  Yes.

19          THE COURTROOM DEPUTY:  Please state your name for

20  the record.

21          THE WITNESS:  Anthony Turrisi.

22          THE COURTROOM DEPUTY:  Have a seat.

23          THE COURT:  Mr. Turrisi, the chair doesn't move but

24  the microphone does.

25          THE WITNESS:  Okay.

1          THE COURT:  I just want to make sure that everybody

2     can hear you, so make sure you're making use of the

3     microphone.

4          Our court reporters take down everything that you

5     say, so it's important that you not speak too quickly.

6          THE WITNESS:  Okay.

7          THE COURT:  And if there's a question that you want

8     to have repeated or that you don't understand, just tell me,

9     and I'll have the lawyer rephrase.

10         Okay?

11         THE WITNESS:  Thank you.

12         MS. DEAN:  Thank you, your Honor.

13    **ANTHONY TURRISI,** called as a witness, having been first duly

14    sworn/affirmed, was examined and testified as follows:

15    DIRECT EXAMINATION

16    Q    Mr. Turrisi, how old are you?

17    A    61.

18    Q    What do you do for work?

19    A    I'm a retired sanitation man in the city.

20    Q    When did you retire?

21    A    2018.

22    Q    And did you suffer an injury that caused you to retire?

23    A    Yes.

24    Q    What was --

25    A    I got hit with a forklift.  They broke my back.

1    Q    Do you have any children?

2    A    Yes.  Five.

3    Q    Are you currently married?

4    A    No, divorced.

5    Q    Generally, what area of New York do you live in?

6    A    Long Island.

7    Q    What is your phone number?

8    A    516-993-0101.

9    Q    And how long has that been your phone number?

10   A    30 years.

11   Q    Did you come to court today in the custody of law

12   enforcement?

13   A    Yes.

14   Q    Was that related to being a witness in this case?

15   A    Yes.

16         MS. DEAN:  I ask now that we publish Government 1

17   for everyone.

18         (Exhibit published to the jury.)

19   Q    Mr. Turrisi, do you recognize the woman in Government 1?

20   A    Yes.

21   Q    Do you remember her name?

22   A    No.

23   Q    How did you know her?

24   A    Online.

25   Q    What do you mean by "online"?

1  A    Like a dating/escort type.

2  Q    And when you say an escort type, could you explain to the

3  jurors what you mean by that?

4  A    Pay to see her.

5  Q    Specifically, did you pay this woman to have sex with

6  you?

7  A    Yes.

8  Q    You said you met her online?

9  A    Yes.

10 Q    What kind of website was that?

11 A    It was a long time ago.  I don't remember.

12        THE COURT:  One other thing I forgot to tell you is

13 you have to wait until the lawyer finishes speaking.

14        THE WITNESS:  Oh.

15        THE COURT:  No, it's okay, it just makes it hard for

16 the court reporter.

17        THE WITNESS:  Sorry.

18 Q    What name did this woman know you by?

19 A    Tony.

20 Q    That's your real name?

21 A    Anthony, yeah.

22 Q    What was your relationship like with her?

23 A    It was like, you know, we were just -- we got together,

24 you know, like friendly, very friendly we were together.

25 Q    How often would you see the woman in Government

1    Exhibit 1?

2    A    For a couple weeks straight, yeah.

3    Q    Do you remember how much you paid her for sex?

4    A    No, I don't.

5    Q    How was the price determined?

6    A    Whatever she wanted, that's all.

7    Q    Where would you go to see the woman in Government 1?

8    A    In her house.

9    Q    Where was that?

10   A    In Rosedale.

11   Q    Were you familiar with Rosedale?

12   A    Yeah, I used to live there for 30 years.  When I was a

13   kid.

14   Q    Did you ever see this woman anywhere but in her house in

15   Rosedale?

16   A    No, always in her house.

17   Q    Can you describe the house?

18   A    Yeah, it was like a six-over-six square, it was a

19   six-over-six family house.  Yeah, it was a very big house.

20   And, yeah, it was like a colonial type of house.

21   Q    Where was the entrance?

22   A    On the side, driveway side.

23   Q    And when you entered the house, where would you go to see

24   this woman?

25   A    We'd go in the driveway side.

1  Q    What about once you entered the house?

2  A    We went up a staircase and to the right was her bedroom.

3  Q    What was she like as a person?

4  A    Very good person, very friendly.  She was a very good

5  person.

6  Q    On the times that you came to this woman's house to have

7  sex with her, did you ever see anyone else in the house?

8  A    No, never saw anybody in the house.

9  Q    Was it noisy, was it quiet in the house?

10 A    It was quiet all the time.

11 Q    Do you know the exact date that you last saw her?

12 A    No, I don't.

13 Q    Do you know the exact date that you last spoke to her?

14 A    No, I don't.

15      MS. DEAN:  I'm going to ask that Government 304 be

16 opened up and specifically the file labeled DML.

17      If we could scroll down a little bit and if we can

18 zoom in on the context between the number ending in 7056 and

19 the number ending in 0101 on 2018-04-02.

20 Q    Do you see your own phone number in these phone records?

21 A    Yes, I do.

22      MS. DEAN:  If we could now scroll up to the top.

23 Q    And I'm going to just point you to a series of entries

24 dated 4/6, 4/8, 4/9, and 4/10.

25      Was there a point in time when the woman in the

1  picture we were just looking at stopped responding to you when

2  you would reach out to her?

3  A    Yes.

4  Q    Did you learn why?

5  A    I finally found out on the news what happened and I

6  figured it out.

7  Q    What specifically did you see on the news?

8  A    That she was -- there was body pieces all over the park.

9  Q    How did you feel when you found that out?

10 A    I cried.

11 Q    Did the police come to speak to you about this in 2018?

12 A    Yes.

13 Q    And did you speak to them?

14 A    Yes.

15 Q    Did you answer their questions?

16 A    Yes.

17 Q    Did you agree to give your DNA to law enforcement?

18 A    Yes.

19 Q    Sorry, let me finish.

20      Did you agree to give your DNA to law enforcement?

21 A    Yes.

22 Q    Mr. Turrisi, do you ever go to Brooklyn?

23 A    No.

24 Q    Are you familiar with Canarsie Park?

25 A    No.

1    Q    Do you know the Canarsie neighborhood at all?

2    A    No, I don't.

3    Q    Do you have any other information regarding this woman's

4    murder other than what you saw on the news?

5    A    No, whatever I saw on the news.

6              MS. DEAN:  I have nothing further.

7              THE COURT:  Any cross-examination?

8              MS. THIELE:  One moment, your Honor.

9              Just a few questions, your Honor.

10   CROSS-EXAMINATION

11   Q    Good afternoon, Mr. Turrisi.  I only have a couple of

12   questions for you.

13             You testified on direct examination that you learned

14   about this woman's murder on the news?

15   A    Yes.

16   Q    Do you remember that at some point in April 2018 you went

17   in person to the Rosedale house after the murder?

18   A    I don't remember.

19             MS. THIELE:  Mr. Gover, could you please pull up

20   3500-ANT-1 just for the witness and parties, please.

21             If you could just highlight the paragraph.

22   Q    Mr. Turrisi, can you read that?

23   A    No, I can't.

24             MS. THIELE:  Can you please zoom in a little?

25   A    I don't have my reading glasses, I'm sorry.

1    Q    That's all right, no problem.  We'll make it as big as we

2    can.

3            Can you read that?

4    A    No.

5            Okay.  I can read that.

6    Q    We'll go -- give me one second.  Maybe I can make it

7    easier for you.

8            THE COURT:  Is there a copy that doesn't have the

9    red writing on it?

10           Or maybe not.  Okay.

11           MS. DEAN:  Your Honor, we can pull up one.

12           THE COURT:  It might be easier for him to see it if

13   you use a different copy.

14           MS. THIELE:  Sure.  Thank you, your Honor.

15           (Pause in proceedings.)

16           THE COURT:  How is that, can you read that?

17           Can you make it a little bit bigger?

18   Q    Mr. Turrisi, we're going to need you to read Lines 6 and

19   7 of this paragraph.  I'm sorry that this is the only way to

20   view it.

21           THE COURT:  Can you count down to the...

22           THE WITNESS:  Okay.

23           THE COURT:  You don't have to have read it out loud.

24   What she wants you to do is read it to yourself.

25           THE WITNESS:  Okay.

1          THE COURT:  And then I think she's going to ask you
2   some questions about whether it refreshes your recollection.
3          THE WITNESS:  Oh, all right.
4          THE COURT:  Do I have that right, Ms. Thiele?
5          MS. THIELE:  Yes, thank you, your Honor.
6   A    Okay.
7   Q    Mr. Turrisi, does this refresh your memory as to whether
8   you went to the house?
9   A    No, I didn't go to the house.
10  Q    So, you don't remember --
11  A    I don't remember, yeah.
12  Q    And you don't remember telling the NYPD on June 4, 2018,
13  that you were told by a roommate that she was killed?
14  A    No, no.
15         MS. THIELE:  Okay.  Nothing further.
16  A    They came where I was staying, yeah.
17         THE COURT:  I didn't hear what you said.
18         THE WITNESS:  I said the police came where I was
19  staying at the time.
20         THE COURT:  They came to where you were staying.
21         THE WITNESS:  Long Island, yes.
22         THE COURT:  Anything else?
23         MS. THIELE:  Nothing further, your Honor.
24         THE COURT:  Any redirect?
25         MS. DEAN:  No, thank you, your Honor.

1          THE COURT:  Mr. Turrisi, thank you so much.  You can

2    step down.

3          (Witness excused.)

4          THE COURT:  I think it might be a good time to take

5    a break, just about ten minutes or so.  Please don't talk

6    about the case or look anything up.

7          We'll see you in a few minutes.

8          (Jury exits.)

9          THE COURT:  Everybody can sit down and we'll just be

10   in recess for about ten minutes.

11         Who is your next witness?

12         MS. HAJJAR:  Samuel Lemus, your Honor.

13         THE COURT:  All right.  See you in a few minutes.

14         (Recess taken.)

15         THE COURT:  Are we ready for the jury?

16         MS. DEAN:  Yes, your Honor.

17         (Jury enters.)

18         THE COURT:  All right, everybody, we're ready to

19   resume.

20         Are you ready to call your next witness?

21         MS. HAJJAR:  Yes, your Honor.  The Government calls

22   Samuel Lemus.

23         (Witness takes the stand.)

24         THE COURTROOM DEPUTY:  Raise your right hand for me,

25   please.

1        Do you solemnly swear or affirm that the testimony

2   you're about to give will be the truth, the whole truth, and

3   nothing but the truth?

4        THE WITNESS:  I do.

5        THE COURT:  Please state your name for the record.

6        THE WITNESS:  Samuel Lemus.

7        THE COURT:  Mr. Lemus, are you comfortable taking

8   off your mask?

9        THE WITNESS:  I'm sick, so...

10       THE COURT:  Keep it on.

11       I'm just going to ask you to do a couple of things.

12  First, make sure you're using the microphone and don't speak

13  too quickly.  It's hard for the court reporter.  And if you

14  need to have a question repeated or clarified, let me know,

15  okay?

16       THE WITNESS:  Okay.

17       THE COURT:  All right.  Go ahead.

18       MS. HAJJAR:  Thank you, your Honor.

19  **SAMUEL LEMUS**, called as a witness, having been first duly

20  sworn/affirmed, was examined and testified as follows:

21  DIRECT EXAMINATION

22  Q    Good afternoon, Mr. Lemus.

23       Without telling us a specific address, where do you

24  live?

25  A    The south shore of Nassau County.  Long Beach.

1    Q    And what is your phone number?

2    A    516-491-0840.

3    Q    How long has that been your phone number?

4    A    For a long time.

5    Q    I'd like to show you what's in evidence as Government

6    Exhibit 1.

7              (Exhibit published to the jury.)

8    Q    Do you recognize the person in this photograph?

9    A    Yes.

10   Q    How do you recognize her?

11   A    I was a client of hers.

12   Q    Can you explain to the jury what kind of client?

13   A    She was a call girl, I was a John.

14   Q    Do you know her by any name?

15   A    I met her as Chocolate and then she told me her name was

16   Brandy at one point.

17   Q    How did you first get in contact with Brandy?

18   A    It was through an online classified, through Backpage.

19   Q    And approximately how many times did you see her?

20   A    Three or four times, I think.

21   Q    Sitting here today, do you recall the last time you saw

22   her, the exact date?

23   A    It was at some point the first week of April 2017.  Had

24   to be around that point, give or take.

25   Q    Where did you see her?

1   A    It was a house in Queens.

2   Q    And what neighborhood was that?

3   A    I'm not too sure if it was Rosedale or...

4   Q    Okay.  Do you often spend time in Queens?

5   A    No.

6   Q    Do you have any ties to Queens?

7   A    No.

8   Q    What about to Brooklyn?

9   A    Not to Brooklyn.

10  Q    Can you describe what Brandy was like?

11  A    She was always nice to me.  Very sweet.  She seemed like

12  a good person.

13  Q    Can you describe the house that you saw her in?

14  A    It was like a typical house in the suburbs, I guess, in

15  Queens.

16  Q    How did you enter the house?

17  A    We'd walk in through a side door.

18  Q    Did you see anyone else in the house?

19  A    No.

20  Q    How did you communicate with Brandy?

21  A    It was usually via text.

22  Q    What numbers did you use to communicate with her?

23  A    Two different numbers.  Offhand, off the top of my head,

24  I know there was a 718.  I can't remember the other one.

25  Q    At some point, did you provide two phone numbers that you

1    used to communicate to Brandy to police officers?

2    A    Yes.

3         MS. HAJJAR:  Can I show the witness only what's been

4    marked as 3500-SL-1?

5    Q    Just looking down at the text --

6         MS. HAJJAR:  If you could zoom into the text there.

7    If you could zoom in just once more, Mr. Radar.

8    Q    -- does this refresh your recollection about the phone

9    numbers you provided to law enforcement?

10        MS. HAJJAR:  If you could scroll down, please.

11   A    It does.

12   Q    What were those numbers?

13   A    516-309-7437.

14        THE COURT:  When you say -- are these your phone

15   numbers or were they Brandy's phone numbers?

16        THE WITNESS:  They were her numbers.

17        THE COURT:  They were her phone numbers.  Okay.

18   Q    You provided us with your phone number as well.  That was

19   the number ending in -- I'm sorry, ending in 0840?

20   A    Correct.

21   Q    So, the two numbers you provided to law enforcement, were

22   those numbers used by Brandy?

23   A    I'm sorry, could you repeat the question.

24   Q    The two numbers you provided to law enforcement, were

25   those numbers you understood were used by Brandy?

1  A    Yes.

2  Q    Could you just repeat one of the numbers, please?

3  A    516-309-7437.

4  Q    Was there another number?

5  A    It was a 718 number.

6          There is 718-600-1072.

7  Q    Mr. Lemus, why don't you just take a moment to read that

8  paragraph and just let me know when you're done.

9          THE WITNESS:  I'm still a bit nervous, I'm sorry.

10         THE COURT:  Don't worry about it.  Just take your

11 time.

12 A    The 929 number was the number I was using to contact

13 Ms. Brandy.

14 Q    I'm sorry, what was that number that you used --

15 A    The 929 number.

16 Q    Could you read that out, please?

17 A    929-357-7056.

18 Q    And just to -- you testified earlier about the date you

19 believed you last saw Brandy.

20         What year was that?

21 A    2017.

22 Q    Do you want to -- I'm sorry, could you just read the top

23 of this, the top of this report?

24 A    2018.

25         I'm sorry.  It was around the time -- I started may

1  job at the time.  So, it was 2018.

2  Q    Now, at some point, did Brandy stop responding to your

3  texts?

4  A    At one point, I think I had just stopped contacting her,

5  but there wasn't any contact for a while until I had initiated

6  it again.

7  Q    At some point did you find out that she was dead?

8  A    Yes, through texts.  I had tried to contact her and I

9  received a text that she was dead.

10  Q    Did you contact the police in this case?

11  A    I did.

12  Q    Why?

13  A    Because it shouldn't have happened.  It's horrible.  And

14  I felt that if I had anything to give, I could give it.  As

15  far as information went.

16  Q    Did you provide information to the police?

17  A    As much as I could.

18  Q    At some point, did police officers ask you to provide a

19  DNA sample and fingerprints in connection with this case?

20  A    Yes.

21  Q    Did you do so?

22  A    Yes.

23  Q    And do you have any other information besides what you've

24  described here today regarding the circumstances of her death?

25  A    No.

1    MS. HAJJAR:  Thank you.  No further questions.

2    THE COURT:  Any cross-examination?

3    MS. THIELE:  Yes, your Honor.

4  CROSS-EXAMINATION

5  Q    Good afternoon, Mr. Lemus.

6  A    Hello.

7  Q    I just want to clear up some dates with you.

8    You were a client of Brandy's between September 2017

9  and about March 2018?

10 A    That sounds about right.

11 Q    Do you remember telling the NYPD on April 13, 2018, that

12 your last date with Brandy was March 9, 2018?

13 A    Thinking back on it now, it does ring a bell.  It's been

14 six or seven years, so yes.

15 Q    Would it help to look at a document?

16 A    Possibly, yes.

17    MS. THIELE:  Mr. Gover, can you please pull up

18 3500-SL-1?

19 Q    I'm going to draw your attention to the second paragraph

20 there.  Read it to yourself and let me know when you've

21 finished.

22 A    Okay.

23 Q    Does that refresh your recollection as to whether the

24 last date you had with Brandy was March 9, 2018?

25 A    It was definitely around that time, 'cause, like I said,

*Linda A. Marino, Official Court Reporter*

1    I started my new job.  I believe it was right in that same

2    time frame, so I know it was between March and April.  That

3    does ring a bell.

4    Q    And do you also remember telling the NYPD that the

5    residence was empty of other people every time you went for a

6    date?

7    A    I remember telling them that I believed it was empty.

8    Q    And on April 9, 2018, you texted Brandy to one of the

9    numbers that you had for her looking to set up another date?

10   A    Correct.

11   Q    And you received no response from Brandy?

12   A    I don't believe it was -- it wasn't from her, it was a

13   response from somebody else.  I'm not too sure if it was a

14   different number, but it was a response from somebody else.

15   Q    On April 12, 2018, you did eventually receive a response

16   from a number ending in 1072?

17              I can show you a document if helpful.

18              THE COURT:  I think it's still up.

19              MS. THIELE:  Yes, it is.

20   Q    Take a look at Paragraph 3 towards the bottom and let me

21   know when you finish reviewing.

22   A    I remember speaking to the police about that.

23   Q    Do you also remember telling them that the person who

24   texted you from the 1072 number identified herself as Brandy's

25   sister?

1    A    Yes.

2    Q    And she explained to you via text message that Brandy had

3    been killed?

4    A    Yes.

5    Q    And that text message is the reason that you felt uneasy

6    and called the police?

7    A    Yes.

8              MS. THIELE:  Nothing further.

9              THE COURT:  Any redirect?

10             MS. HAJJAR:  No, your Honor.

11             THE COURT:  Mr. Lemus, thank you so much.  You can

12    step down.

13             (Witness excused.)

14             THE COURT:  Who is your next witness?

15             MR. PALACIO:  The Government calls Detective

16    Benjamin Colecchia.

17             (Witness takes the stand.)

18             THE COURTROOM DEPUTY:  Please raise your right hand.

19             Do you solemnly swear or affirm that the testimony

20    you're about to give is going to be the truth, the whole

21    truth, and nothing but the truth?

22             THE WITNESS:  Yes.

23             THE COURTROOM DEPUTY:  Please state your name for

24    the record.

25             THE WITNESS:  Benjamin Colecchia.

1          THE COURT:  All right, Detective, couple of things.

2          The chair doesn't move -- I tell everyone that and

3    it should have a sign on it -- but the microphone does and I

4    want to make sure you're making good use of it.  You might

5    want to pull it a little bit closer.

6          Just make sure you don't speak too quickly so you

7    don't make it too hard for the court reporter.  And if there's

8    a question you want to have clarified or repeated, just tell

9    me.

10          THE WITNESS:  Thank you.

11          THE COURT:  All right.  Go ahead.

12          MR. PALACIO:  Thank you, your Honor.

13          (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1   **BENJAMIN COLECCHIA,** called as a witness, having been first

2   duly sworn/affirmed, was examined and testified as follows:

3   DIRECT EXAMINATION

4   Q    Detective, good afternoon.

5   A    Good afternoon.

6   Q    Can you tell us by whom your employed?

7   A    New York City Police department.

8   Q    And how long have you been employed by NYPD?

9   A    27 years.

10  Q    Can you tell the jury an overview of your career

11  following graduation from the academy?

12  A    I was a police cadet.  I was going through college as a

13  police cadet.

14          Then in 1997, I winded up going to the police

15  academy.  I did my six months through the academy and then I

16  was assigned to the 120 Precinct out in Staten Island.

17          In 2003, I put in for the K9 Unit, and they picked

18  me up, and I've been there ever since then.

19  Q    You mentioned the K9 Unit.

20          What does a K9 Unit do?

21  A    We cover the entire city, from Staten Island up all the

22  way to the Bronx, and we do specialty situations.  Like, we do

23  patrol services, which includes we do tracking for missing

24  people, we do evidence recovery, we do firearm recovery, and

25  we do criminal apprehensions.  And some dogs do specialties.

1    Q    You mentioned dogs.

2          In the K9 Unit, do you work with dogs?

3    A    Yes.

4    Q    Can you give us a little bit detail about that?

5    A    Yeah.  My dog -- I had three dogs throughout my career.

6    My second dog was K-9 Timoshenko, Timmy, and he recently

7    passed away, in October.  He was 13.  And I've been with him

8    since he was one year old.

9          THE COURT:  Is that the dog that you were working

10   with at the time of the events in question here?

11         THE WITNESS:  Yes.

12         THE COURT:  Do me a favor, maybe it's me, I'm having

13   a little trouble hearing you.  Just move it up a little bit

14   more.  That's great.  Thank you so much.

15         Go ahead.

16   Q    Detective, just to be clear, in 2018, your K9 partner was

17   Timoshenko?

18   A    Yes.

19         MR. PALACIO:  Your Honor, with the Court's

20   permission, if we could show the witness what is marked as

21   Government 991 for identification.

22   Q    Detective, do you recognize what's in front of you as

23   Government 991?

24   A    Yes.

25   Q    Can you tell us what you see there?

1   A    My partner.

2   Q    Is that Timoshenko?

3   A    Yeah, Timoshenko.

4   Q    And does that photograph fairly and accurately show us

5   what Timoshenko looked like?

6   A    Yes, sir.

7        MR. PALACIO:  Your Honor, offering Government

8   Exhibit 991 into evidence.

9        THE COURT:  Any objection?

10       MS. THIELE:  No objection.

11       THE COURT:  You can publish it.

12       (Government Exhibit 991 so marked and published to

13   the jury.)

14  Q    What kind of dog was Timoshenko?

15  A    German shepherd.

16       MR. PALACIO:  We can take it down, your Honor.

17  Q    You mentioned you worked with Timoshenko since he was

18  one; is that correct?

19  A    Yeah.

20  Q    Did Timoshenko go through specialized training with the

21  K9 Unit?

22  A    Yeah, so, K9 training is basically about five months of

23  training.  And it's eight hours a day, day in, day out.  And

24  we do the disciplines I was telling you about; tracking

25  evidence, recovery.

1    Q      And is that part of patrol training for K9s?

2    A      Correct, yes.

3    Q      Can you walk us through each of those disciplines and

4    give us a little more detail of those disciplines?

5    A      One discipline is tracking.  So, if somebody goes

6    missing, we actually use the person who's missing a piece of

7    clothing, a pillow, anything that associates the odor to that

8    person.  I would take that article, I would put it in front of

9    the -- where the person was last seen, I would place the

10   article down.

11          The dog has a harness, so the dog knows at that

12   point he'll be doing a track.  I put the harness on him and

13   then I'll give him a command.  Each discipline we have goes by

14   a command and tracking is tracking for a human.

15   Q      Did you do tracking jobs with Timoshenko?

16   A      Absolutely, yes.

17   A

18              (Continued on the following page.)

19

20

21

22

23

24

25

1   (Continuing.)

2   BY MR. PALACIO:

3   Q    Can you give us an example of that?

4   A    I had one back in 2015 in Staten Island, a little boy was

5   missing.  I went to the residence, I spoke with the mother and

6   she was ecstatic, nervous, scared, I'm like where does the

7   child sleep.  So I went to his bedroom.  She pointed to where

8   he was sleeping.  There was a blanket, sheets, pillow,

9   clothing.  I personally like to use pillows because pilows

10  collect odor of the victim, the person missing.  I asked if

11  anybody else sleeps on it, she's like no.  I took the pillow.

12  I went to the front of the house because she said that's the

13  exit where, you know, people would leave.

14          So, it was an apartment building.  It was a

15  seven-story apartment building.  So I put the pillow down in

16  front of the exit, I put the harness on, I put the leash on, I

17  helped him up and I gave him the command, track.

18          He went right to the pillow.  He -- he takes the

19  odor from the pillow and he starts odoring.  He starts

20  smelling.  And then instead of going straight out through the

21  exit, he booked to the right going down the aisle -- I mean

22  going down the hallway.  There was a stairwell door.  He

23  looked at me, so that means he's wanting to go through the

24  door, opened the door, phew, right upstairs to the fifth

25  floor, same thing, opened the door.  He booked right out to

1   the right, took me right down to the hall -- the end of the

2   hall and there was a door and he started scratching on it and

3   I'm like, oh, we got, you know -- you got to talk to him.  He

4   understands me, I understand him, that's our partnership.

5   And, so, I'm like, let me try.  So I knocked on the door and

6   low and behold, the child was with his friend in the

7   apartment.

8   Q    You mentioned three other --

9               THE COURT:  Safe, right?

10              THE WITNESS:  Safe, yes, yes.

11              THE COURT:  Okay.

12  BY MR. PALACIO:

13  Q    You mentioned three other disciplines.  Firearms.  Can

14  you tell us how Timoshenko was --

15  A    Yeah.  So, basically, it's from odor recognition.  A

16  firearm has its own odor.  Also too -- you want an example of

17  what he did or?

18  Q    Sure.

19  A    Yeah.  So, basically, we always do, like, firearms inside

20  the vehicle.  The dog will go around a vehicle and if there's

21  any indication of odor or of firearm detection, the dog will

22  indicate.  He'll give us his firearm alarm response.

23  Q    Is there a command that Timoshenko was trained on?

24  A    Yeah.  So that would be trigger.

25              THE COURT:  Does that, does that, saying trigger to

1   the dog, does that -- you say that before he starts looking?

2          THE WITNESS:  Correct.  Yes.

3          THE COURT:  Okay.  And what do they do that makes

4   you know that they have found something?

5          THE WITNESS:  Well, has a -- it's final response

6   where he will indicate, he could do -- it's called an active

7   alert, had can nose poke, he'll bark, he'll scratch.  He would

8   sit and I would reward him.

9          THE COURT:  Okay.

10         THE WITNESS:  And there's two ways I reward him.  I

11  either give him a ball or I praise him, just tell him good

12  boy.

13         THE COURT:  Okay.  So once he's done one of those

14  things that indicate that he's detected, in your example, a

15  firearm, then you would then go look to see if there was one,

16  correct?

17         THE WITNESS:  Correct.  Or the detective or whoever

18  is assigned to that would have to get a search warrant and --

19         THE COURT:  It wouldn't be you?

20         THE WITNESS:  No.

21         THE COURT:  Okay.

22         THE WITNESS:  Unless it's out in the open.

23         THE COURT:  Okay.  All right.  Go ahead.

24  BY MR. PALACIO:

25  Q    Two more disciplines that you mentioned.  Evidence

1  recovery; what is that?

2  A    That's if -- for example, somebody gets stabbed, throws

3  the knife into the woods, we can send the dog out, instead of

4  sending a police officer out in the dark, we'll send a dog.

5  Q    And what command is -- was Timoshenko --

6  A    That's called seek.

7  Q    And, finally, you mentioned criminal apprehension as one

8  of the disciplines.  What is that?

9  A    Yeah.  So, basically, if it's a barricaded person who has

10 a firearm or a gun or a knife and they are threatening to kill

11 a police officer or is wanted for a felony, we'll send the dog

12 into the apartment, you know.  I would have to make an

13 announcement saying that I'm here and the dog will apprehend

14 you.  That's another discipline that we would do.

15 Q    Did Timoshenko undergo specialized training aside from

16 the patrol training?

17 A    Yes.

18 Q    What?

19 A    Human remains detection.

20 Q    Was he otherwise known as a cadaver dog?

21 A    Yes.

22 Q    Okay.  And can you talk us through the type of training

23 that he received as a cadaver dog?

24 A    That training is approximately about three months and we

25 have -- we have human remains and the way it works is from the

1    beginning, we'll put the human remains with a tennis ball and

2    once the dog recognizes the odor, we would just pay him for

3    the tennis ball and then we just repeat, repeat, over and

4    over.  And as we progress, we would do more human decomp and

5    no ball.  So once a dog hits on the human odor, we would pay

6    him personally.

7    Q    What do you mean by that?

8    A    I'm sorry, we would pay him -- we would give him the

9    ball.

10   Q    Now, you mentioned that human decomposition was used to

11   train the dog and the scent of human remains; is that correct?

12   A    Correct.

13   Q    What types of human remains were used?

14   A    A lot.  We had -- we use hair, human hair, human teeth,

15   decomposition -- fluids we use, we use body parts, fingers,

16   legs.

17   Q    And --

18   A    And, also, we also use fresh blood, like some people from

19   the unit would donate blood for us for the day.

20   Q    So, is it fair to say that Timoshenko was trained to

21   detect the odor or human remains at various stages of age?

22   A    Absolutely, yes.

23   Q    Now, you mentioned that his training began with a tennis

24   ball.  Did that progress and advance for Timoshenko?

25   A    Yes.

1  Q    Can you describe that, how the training progressed?

2  A    Yeah.  So, basically, we start basic and as he

3  progresses, we do -- we take the human remains and we do

4  different hides, we do vehicles, we do burials, we do houses,

5  cabinets, whatever would cold put a human body in, we would

6  do.

7  Q    What is a hide?

8  A    A hide is a, basically, trying to discretely the -- our

9  aid, which is human decomposition, so nobody knows where it is

10 except if told -- the dog will indicate on it.

11 Q    And how is a human decomposition hidden or buried?

12 A    We usually put it in a jar because it's a lot cleaner,

13 and on top, we put a screen so the odor will come out and then

14 we will bury it and then we'll do our training with the dog.

15 Q    Can you tell us what residual odor is and what an example

16 of that is?

17 A    So, basically, residual odor is, basically, odor that is

18 still -- if somebody removes something and -- and it's still

19 there.  For example, we can do popcorn in a room, obviously in

20 a microwave and we pop the popcorn, take the popcorn out, ten

21 minutes later, you go back into the room, it still smells like

22 popcorn.  So the odor is always there.

23 Q    And is that what Timoshenko was trained to pick up on,

24 the scent of human remains or --

25 A    As long as the human remains odor of the human remains,

1   yes.

2   Q    Now, you started to get into this.  You described an

3   active alert.  Can you tell us the difference between a

4   passive alert and an active alert?

5   A    Yeah.  So, me, personally, I like active alert.  One of

6   the other ways to do an alert is a passive alert, which a

7   passive alert, basically, he could find an item or an article

8   and he would just sit and wait.  I don't like that.  I like

9   the aggressive alert where he would go nose poke, he would

10  poke his nose, he would bark, he would scratch, and his whole

11  body, demeanor would change.

12  Q    Can you describe how his demeanor would change if he

13  actively alert?

14  A    Yeah.  So, basically, he gets excited, his ears go

15  straight up, his tail, he had a little, little tail and it

16  used to go really fast like a rattlesnake.  And I'm the only

17  one that could read him, I could understand him and he was

18  amazing.

19  Q    And what would that active alert indicate to you?

20  A    He's -- there's presence of human odor that he was

21  trained on.

22  Q    Now, did Timoshenko complete -- was there an examination

23  process at the end of his training?

24  A    Yes.

25  Q    And did he complete that training?

1    A    Yes.

2    Q    Did he do so successfully?

3    A    Yes.

4    Q    Did Timoshenko receive any certifications after his

5    training?

6    A    Yes, we did the United States Police Canine Association.

7    It's a yearly certification that we do.  He also won

8    nationals.  He got first place nationwide.  And the way that

9    works, basically there's four hides.  There's two hides in a

10   vehicle, so you get -- there's two vehicles out of the five,

11   you have to put the aids in and then there's two burials out

12   in the field.

13   Q    And he won an award for that?

14   A    He won the award, yeah.

15   Q    Okay.  Now, did he receive any certification from any

16   other agencies?

17   A    We are also part of the FEMA team, Federal Emergency and

18   Management Agency, and that we'd go to disasters around the

19   country.

20   Q    So after Timoshenko completed his training, did you

21   deploy with him to other locations outside of New York?

22   A    Yes.

23   Q    For what types of jobs?

24   A    We had one down, 2014, out in Seattle, Washington State.

25   There was a mudslide.  It was Oso.  The county was Oso.  There

1    was a mudslide and it took out two towns, destroyed it.  Just

2    mud, that's all you see.  And we -- we got deployed there.  We

3    were there for 16 days and Timmy recovered numerous, numerous

4    deceased people.

5    Q    Were -- did you deploy to any other locations with

6    Timoshenko?

7    A    Yeah.  Also in '21, we got deployed to Florida, Miami.

8    There was a building collapse surfside, the entire building

9    collapsed, and they sent -- they sent us and he also recovered

10   numerous deceased people, numerous.

11   Q    Detective Colecchia, I would like to direct your

12   attention now to April 28 of 2018.  Were you working that day?

13   A    Yes.

14   Q    And what was your tour?

15   A    I was 14:00 by 15:00 -- I'm sorry, 14:00 by 22:35.  So

16   it's 2:00 pm to 10:35 p.m.

17   Q    What was your assignment that day?

18   A    Each K-9 unit has their own K-9 assignment.  So mine is

19   K-9 44.  So that was my assignment for that day which covered

20   Brooklyn and Staten Island.

21   Q    Back in 2018, how many cadaver dogs did NYPD have?

22   A    At that time, about three.

23   Q    Now, on April 28, 2018, were you in uniform?

24   A    Yes.

25   Q    And did there come a point where you responded to a

1   residence located at 249-45 148th Road in Rosedale, Queens?

2   A    Yes.

3   Q    At, approximately, what time did you respond to that

4   location?

5   A    It was police time.  It was 15:00, so it was 3:00 p.m.

6   Q    Had you responded to any other jobs earlier that day?

7   A    No.

8   Q    Can you describe the location that you responded to?

9   A    It was a semi-house, I remember.  It was a nice -- it was

10  a nice day.  Green grass, I remember, and there was a vehicle

11  inside the driveway.

12  Q    And do you remember what that car looked like?

13  A    It was black sedan, four-door.

14  Q    Did you respond with Timoshenko?

15  A    Yes.  Of course.

16  Q    Did anyone else respond from the K-9 unit?

17  A    No.

18  Q    Was there already police at that location?

19  A    Yes.

20  Q    And when you arrived, had the crime scene unit already

21  responded to that house?

22  A    No.

23  Q    And can you tell us why you were asked to respond to that

24  location?

25  A    They were looking for any evidence in regards to a

1   homicide.

2   Q     And when you got to that location, did you ask the police

3   personnel anything about that case or that investigation?

4   A     Me personally, the way I work, I don't want to know

5   anything unless -- I don't want to be told anything about the

6   job.  He told me it was a homicide and he's looking for

7   evidence.

8   Q     And why was that important to you?

9   A     Because I don't want to direct the dog in a certain way.

10  I want the dog to direct me.

11  Q     Did you perform an evidence search in the driveway?

12  A     Yes.

13  Q     And can you describe for us, just walk us through how

14  that happened?

15  A     Yeah.  So, basically, it was a four-door sedan and I

16  recommended -- I do an evidence search in front of the house,

17  and I had the dog, Timmy, on -- on his leash and I gave him

18  the command, search, and that's one of the commands that we

19  use for human decomposition, and I deployed him.  I sent him

20  to work and he took me to the front of the vehicle and he

21  worked his way around the vehicle to the trunk area, and as

22  soon as he hit the trunk, his whole demeanor changed, his body

23  bulked up, his ears went up, he started throwing his nose, he

24  nose poked.  That's one of the indications.  He nose poked the

25  rear trunk seam, and he's telling me there's odor of human

1    remains there.  That was his -- that's his final response.

2    Q    Did he also bark?

3    A    And he barks.

4    Q    And can you describe what that bark sounds --

5    A    This bark, it's unique.  When the dogs ran odor, it's

6    a -- it's a deeper bark.  And that, with his whole behavior

7    change, it's deep.

8    Q    And can you describe, again, the location on that car

9    where he alerted to you?

10   A    Yeah.  So, obviously, it was a four-door sedan.  It was

11   on the rear trunk along the seam between the headlight and the

12   middle, the seam.

13   Q    And did you lead Timoshenko to that area of the car or

14   did he lead you there?

15   A    No, no, no, he leads.  K-9 always leads.  He leads the

16   way.

17   Q    What did his response indicate to you?

18   A    That there's odor of human decomposition.

19   Q    In what part of that car?

20   A    The trunk.

21   Q    Now, do you recall the license plate number for that car?

22   A    No.  Do you have -- can I see my paperwork?  It should be

23   on my paperwork.

24         MR. PALACIO:  Your Honor, if we could pull up, for

25   the witness only, 3500-BC6.  Maybe we can just expand that a

1    little bit.

2             THE WITNESS:  Let me get my glasses on.

3    Q    If you could review that.  Once you're done, just look

4    up.  I'll have a question for you.

5    A    Yeah.  So, yeah.  I got the vehicle information.

6    Q    What was the license plate for that black sedan?

7    A    So it's a New York plate, it's HLC7182, New York.

8             MR. PALACIO:  We can take that down.

9    Q    Detective Colecchia, was the trunk of that car ever

10   opened in your presence?

11   A    No.

12   Q    Did you leave before that happened?

13   A    I left, yes.

14   Q    Did you notify anyone on scene, the police personnel, of

15   Timoshenko's positive alert?

16   A    Yeah.  There was detective, I might say his name wrong,

17   Kurkrose (ph), he was on the scene and I mentioned it to him.

18   Q    Were there other detectives, as well, on scene?

19   A    Yes, but I just dealt with him.

20   Q    Detective Colecchia, did you leave after that happened?

21   A    Yes.

22   Q    Okay.

23            MR. PALACIO:  Your Honor, nothing further.

24            THE COURT:  All right.

25            Cross-examination?

1            MS. THIELE:  One moment, Your Honor.

2            MR. CECUTTI:  Your Honor, can we have a sidebar,

3    please?

4            THE COURT:  Sure.

5            (Continued on the next page.)

6            (Sidebar conference.)

1          (The following occurred at sidebar.)

2          MR. CECUTTI:  We were informed right before we

3   resumed that this witness was testifying --

4          THE COURT:  Right.

5          MR. CECUTTI:  That's not the issue.

6          THE COURT:  Okay.

7          MR. CECUTTI:  But he has testified significantly

8   different than what we expected.  In light of that, we just

9   wanted maybe ten minutes just to regroup.

10         THE COURT:  Okay.

11         MR. CECUTTI:  Just because of the differences that

12  we were not expecting.

13         THE COURT:  Okay.

14         MR. PALACIO:  No objection.

15         MS. DEAN:  No objection.

16         (End of sidebar conference.)

17         (Continued on the next page.)

18

19

20

21

22

23

24

25

1          (In open court; jury present.)

2          THE COURT:  So, we are just going to take a few

3    minutes just to discuss an issue.  It shouldn't take too long.

4    Just ten minutes.  Please don't talk about the case while we

5    are on break.

6          THE COURTROOM DEPUTY:  All rise.

7          (Jury exits the courtroom.)

8          THE COURT:  All right.  Everybody can sit down.

9    We'll be in recess.

10         You can step down, Detective.  Just don't leave, and

11   we'll be just about ten minutes.

12         (Brief recess.)

13         (In open court; jury not present.)

14         THE COURT:  Before we start again, I think I'm going

15   to tell the jury we'll go until six tomorrow and Wednesday.

16   I'm getting a little spooked by everybody getting sick so I

17   want to use the of our day.

18         Does that ruin anyone's life?

19         MR. CECUTTI:  No.  I was going to bring this up

20   later when we had our conversation around scheduling.  I have

21   a 3:00 p.m. sentencing tomorrow before Judge Cogan.  Now, my

22   cocounsel is making all the sentencing arguments.

23         THE COURT:  Okay.  Maybe we'll take our break then.

24         MR. CECUTTI:  It would be -- it would be helpful if

25   I was there.  I have a relationship with our client for four

1    years.

2              THE COURT:  That's fine.

3              MR. CECUTTI:  He's getting sentenced.

4              THE COURT:  And I'll give Judge Cogan a call and let

5    him know that you'll be doing it.  So we'll just take our

6    break then.

7              MR. CECUTTI:  Okay.  That's fine.  Thank you.

8              THE COURT:  Okay.

9              Are we ready?

10             So let's bring in our witness and then we'll get the

11   jury.

12             (The witness resumes the stand.)

13             (Jury enters the courtroom.)

14             THE COURTROOM DEPUTY:  You may be seated.

15             THE COURT:  All right.  Thanks so much for your

16   patience, ladies and gentlemen.  We're ready to proceed with

17   the cross-examination of the detective.

18             Go ahead.

19             THE COURTROOM DEPUTY:  You're reminded, you are

20   still under oath.

21             THE WITNESS:  Yes, ma'am.

22   CROSS-EXAMINATION

23   BY MS. THIELE:

24   Q    Good afternoon, Detective Colecchia.

25   A    Hi.  Good afternoon.

1   Q    K-9 Timoshenko was a multidisciplinary K-9 correct?

2   A    Yes.

3   Q    He was trained to detect, as I believe you testified,

4   more than one type of source?

5   A    Correct.

6   Q    Including narcotics?

7   A    No.

8   Q    Not narcotics?  Firearms?

9   A    Firearms.

10  Q    Cadavers?

11  A    Yes.

12  Q    Human remains?

13  A    That's cadaver, yes.

14  Q    Okay.  You provided the Government with various training

15  records relating to K-9 Timoshenko, correct?

16  A    Yes.

17  Q    And they included records dating back to 2012?

18  A    I didn't personally do it.  I guess my training staff did

19  it.  I don't have access to that.

20  Q    Okay.  But are you aware of any records related to

21  training of K-9 Timoshenko and human remains detection after

22  2012?

23  A    I don't keep records of that.

24  Q    Okay.  Are you aware of a certification that K-9

25  Timoshenko had in human remains detection?

1   A    We had numerous.

2   Q    Okay.  Do you know that only one certification related to

3   human remains detection was provided to the Government in this

4   case?

5   A    No.

6   Q    Okay.  Are you human remains detection certifications

7   that K-9 Timoshenko received, were they issued by the Federal

8   Emergency Management Agency?

9   A    That's one of the agencies, yes.

10  Q    Okay.  Otherwise known as FEMA?

11  A    FEMA, yes.

12  Q    Okay.  And in order to get the FEMA human remains

13  certification, isn't it true that a dog is not supposed to

14  alert to residual odors?

15  A    Never heard of that before.

16  Q    Isn't it also true that an active alert requires a

17  focused bark indication for 30 seconds?

18  A    No.

19  Q    And not alternative actions like tail wagging?

20  A    That's the newer way they train it.  That's -- the old

21  way with Timmy, we never had to do that.

22  Q    Okay.  What was the specific active alert that was

23  required from K-9 Timoshenko back then?

24  A    Back then it's basically, it was active alert, either

25  bark, scratch, or nose poke.

1   Q      Okay.  And are those --

2   A      And he did all that.

3   Q      Are those found source indications for other sources as

4   well?

5   A      No, just human remains.  His final response is only

6   for -- for cadaver which is human decomposition.

7   Q      Okay.  And isn't it true that cadaver detection and human

8   remains detection are different disciplines?

9   A      That, I don't know.

10  Q      That human remains detection is about detecting small

11  amounts of human remains rather than an entire human body?

12  A      Well, that's what he's basically trained on, little bit

13  of blood and then a huge body.  He's trained in all of it.

14  Q      Okay.  Are you aware of any deployment records for

15  K-9 Timoshenko that were shared with the Government in this

16  case?

17  A      Deployment records, no.

18  Q      Any records that share his accuracy in the field?

19  A      No.

20  Q      Okay.  On April 28, 2018, you responded to a scene at

21  249-45 148th Road in Rosedale?

22  A      Yes.

23  Q      And it was requested that the K-9 find evidence of human

24  remains if he could, correct?

25  A      Correct.

1    Q    And you testified on direct that during training for

2    human remains, fresh blood as was sometimes used?

3    A    Yes.

4    Q    Blood, for example, donated by other officers in your

5    unit?

6    A    Correct.

7    Q    And you testified that K-9 Timoshenko gave an alert at

8    the trunk of the Nissan?

9    A    The rear trunk, yes.

10   Q    Do you remember telling the Government on February

11   4th, 2024 about a second alert inside the residence?

12   A    Yes.

13   Q    A second alert near the slop sink in the basement?

14   A    Yes.

15   Q    But you did not testify about that on direct today?

16   A    I wasn't asked about it.

17   Q    Okay.  Detective, you keep a memo book in the course of

18   your daily work activities with the NYPD, right?

19   A    Yes.

20   Q    And you keep accurate and truthful information in that

21   memo book?

22   A    Yes.

23   Q    Mr. Gover, could you please pull up 3500-BC5.

24        THE COURT:  For the witness only, right?

25        MS. THIELE:  Yes, which has been marked for

1   identification as Defense Exhibit C, for the witness and

2   parties only.

3   BY MS. THIELE:

4   Q     Okay.  Detective, do you recognize that?

5   A     Yes.

6   Q     What is it?

7   A     It's my memo book.

8         MS. THIELE:  And if you could scroll to the second

9   page, Mr. Gover.

10  Q     Does this accurately reflect a page of your memo book

11  from April 2018?

12  A     Yes.

13  Q     Is that your handwriting?

14  A     Yes.

15        MS. THIELE:  The defense would like to offer this as

16  Defense Exhibit C.

17        THE COURT:  Any objection?

18        MR. PALACIO:  No objection, Your Honor.

19        THE COURT:  Okay.  That's in evidence.

20        (Defense Exhibit C, was received in evidence.)

21        MS. THIELE:  Can we please publish that.

22        (Exhibit published.)

23        MS. THIELE:  Thank you.

24  Q     According to your memo book, the only alert by K-9

25  Timoshenko was near the trunk of a sedan; is that correct?

1    A    Yes.

2    Q    A sedan in front of the residence?

3    A    Yes.

4    Q    And there are no other notes from your evidence search in

5    the residence in this memo book, right?

6    A    No.

7    Q    Okay.  After conducting an evidence search with your K-9,

8    in this case Timoshenko, you would prepare a K-9 team

9    utilization report?

10   A    Correct.

11   Q    In other words, you draft a report that documents the

12   results of your evidence searches with your K-9?

13   A    Correct.

14   Q    And you write thorough utilization reports?

15   A    Yes.

16   Q    That contain accurate and truthful information?

17   A    Yup.  Yes.

18   Q    Okay.

19        MS. THIELE:  Mr. Gover, can you please pull up for

20   the parties and the witness 3500-BC6, which has been marked

21   for identification as Defense Exhibit D.

22

23        (Continued on the following page.)

24

25

1          MS. THIELE:  And if you could just scroll down a

2     little bit.

3     BY MS. THIELE: (Continuing.)

4     Q    Okay.  Detective Colecchia, do you recognize this?

5     A    Yes.

6     Q    What is it?

7     A    That is my utilization.

8     Q    And is that your handwriting?

9     A    Yes.

10    Q    Is this a fair and accurate depiction of the utilization

11    report you prepared in this case?

12    A    Yes.

13         MS. THIELE:  The Defense would like to offer this as

14    Defense Exhibit D.

15         THE COURT:  Any objection?

16         MR. PALACIO:  No objection.

17         THE COURT:  All right.  That's in evidence.

18         (Defense Exhibit D, was received in evidence.)

19    Q    Okay.  Detective Colecchia, this report was prepared

20    shortly after your search at the Rosedale residence?

21    A    At the location, yes.  148th Road, correct.

22    Q    Back in 2018?

23    A    Correct.

24    Q    Detective, can you tell us what's written next to the

25    type of location at the top right of that report?

1   A    Outside residence.

2   Q    Okay.  Now, can you read us the entire section that's

3   tiled, K9 officer's notes?

4   A    K9 team was requested to do --

5           THE COURT:  You got to slow down a little bit.

6           THE WITNESS:  Okay.  Do you want me to start over?

7           THE COURT:  You might as well?

8   A    K9 team was requested to above location in regards to a

9   homicide.  K9 was deployed in front of location and did have

10  an active alert mid rear trunk.  Vehicle is a four-door black

11  sedan, SD, sedan, New York registration number HLC7182.  K9's

12  active alert is indicating any fluids of human body.

13  Detective Kyrkos on scene and was notified of K9's alert.

14  Q    Okay.  Thank you, Detective.

15          There's K9 Timoshenko went inside the residence,

16  correct?

17  A    Correct.

18  Q    Okay.  On April 29th, 2018, one day after the search, do

19  you remember inquiring by e-mail as to updates about the case?

20  A    No.

21  Q    Okay.

22          MS. THIELE:  Mr. Gover, can I please pull up, just

23  for the witness and parties, 3500-BC-8.

24          And you can scroll down to the bottom.

25  Q    Detective Colecchia, does this refresh your recollection

1   as to whether you inquired on April 29, 2018, about updates in

2   the case?

3   A    Looking at it now, yes.

4   Q    Okay.  And you learned in this e-mail thread that no

5   forensic evidence was found, correct?

6           MS. THIELE:  If you can scroll up.

7   Q    Yeah, if you don't mind.

8   A    Yes.

9   Q    And you were surprised by that, right?

10  A    Not really.

11  Q    Do you remember saying that you were fully convinced that

12  the -- K9 Timoshenko gave an alert at the Nissan?

13  A    Well, I know for a fact my dog gave an active alert.  He

14  knows the order.

15  Q    So wouldn't it be the case that you were surprised by the

16  fact that nothing was found?

17  A    People don't understand how odor works.  So my

18  profession, I know how it works and I know when my dog is

19  indicating on human -- not even just human remains, but just

20  in general, that something is there or was there.

21  Q    Okay.  I want to go back to your meeting with the

22  Government on February 4th, 2024, in preparation for your

23  testimony.

24          Do you remember them showing you various photos of

25  the residence during that meeting?

1    A    Yes.

2    Q    Of the basement?

3    A    Yes.

4    Q    The side of the house?

5    A    I don't recall.

6    Q    But you remember them showing you various photos of the

7    residence?

8    A    Yes.  Mm-hmm.

9    Q    And you remember telling them that the dog detected an

10   odor on the second floor?

11   A    Yes.

12   Q    But that was not included in your memo book, right?

13   A    Correct.

14   Q    Or in the 2018 report?

15   A    Correct.

16   Q    And you also remembered that the dog had an active alert

17   on the slop sink in the basement?

18   A    Yes.

19   Q    And that was not included in either your memo book or

20   your report?

21   A    Correct.

22   Q    You also recalled that the K9's demeanor changed in the

23   bedroom upstairs, correct?

24   A    Yes.

25   Q    And ran back and forth in half of the bedroom?

1    A    Yes.

2    Q    And near the closet?

3    A    Into the bathroom, yeah.

4    Q    And into the bathroom.

5         Even jumped into the bathtub?

6    A    Yes.

7    Q    Wagged his tail?

8    A    Yes.

9    Q    Sniffed the drain?

10   A    Yes.

11   Q    And none of these actions are alerts, correct?

12   A    Well, to me he's working the odor.  Meaning, I know how

13   my dog's demeanor is.  I know how he acts on odor, and I -- me

14   personally, because I'm the handler, I know how he reacts.

15   Q    But you can only --

16   A    -- he has presence of odor of human decomposition.

17   Q    Okay.  But you can only conclude that the dog is

18   indicating that it finds human remains when there is, in fact,

19   an alert, right?

20   A    Right.  But I know my dogs' demeanor and his whole

21   demeanor changed.  Like I said, his tail wagging really fast,

22   his ears go up, and he gets frustrated and he goes back and

23   forth, back and forth.  So to me, he's working the odor.

24        And at that time, people started coming into the

25   house, and that's when I removed the dogs.

1   Q    Okay.  None of those actions inside the residence were

2   documented anywhere in your reports, correct?

3   A    Correct.

4   Q    Okay.  But you felt they were significant to share with

5   the Government during a phone call earlier this year?

6   A    A phone call?

7   Q    Yes.  I believe, if you remember, the Government -- the

8   meeting that you had with the Government in February 2024 was

9   a phone call; is that right?

10  A    Oh, yes.  I'm sorry.  Yes.

11  Q    And you shared these details with them at that time?

12  A    Yes.

13  Q    Okay.  And they didn't ask you anything about that on

14  direct examination?

15  A    No.

16         THE COURT:  We were here.

17         MR. PALACIO:  Objection.

18         THE COURT:  The objection is sustained.

19  Q    You told the Government on February 4th, 2024, that you

20  failed to document these other actions by K9 Timoshenko

21  because the crime scene unit was showing up, correct?

22  A    Yes.

23  Q    You didn't want to disturb them?

24  A    That and also, there were a lot of people coming in, and

25  I didn't want to disturb any evidence and that's why I removed

1    from the house.

2    Q    But a utilization report could have filled -- could have

3    been filled out afterwards, correct?

4    A    Yes.

5              MR. PALACIO:  Objection.

6              THE COURT:  Well, did you fill out a utilization

7    report afterwards about those other things that you described?

8              THE WITNESS:  Yes, the vehicle.

9              THE COURT:  The vehicle.

10             But in addition to the vehicle, the bedroom and the

11   bathroom and the slop sink, did you fill out one of those?

12             THE WITNESS:  No.  No, I didn't.

13             MS. THIELE:  Nothing further.

14             THE COURT:  Okay.  Any redirect?

15             MR. PALACIO:  Yes, Your Honor.

16   REDIRECT EXAMINATION

17   BY MR. PALACIO:

18   Q    Detective Colecchia, you were asked some questions by

19   defense counsel about alerts inside of the house; is that

20   correct?

21   A    Yes.

22   Q    Let's talk about those alerts.

23             Now, did you go into the basement of that house?

24   A    Yes.

25   Q    Can you tell us what happened, how Timoshenko reacted in

1   the basement?

2   A    So basically, when I do a house, a residence, I like to

3   have the person -- one detective person and then me and the

4   dog.  The way I work, I don't put him on a leash, I just let

5   him go, let him free, and let him work the entire basement or

6   whatever, I just let him work.  So that one time we did in the

7   basement, he went in, his whole demeanor changed.  He went

8   right up to the slop sink and his demeanor changed, deep bark,

9   roof -- you know, bark, bark, and his ears went up, his tail

10  started going strong.

11  Q    What is a slop sink?

12  A    It's basically a big old slop sink with -- you could

13  do -- you could throw laundry in there or just cleaning your

14  hands.  It's not a kitchen sink.  It's different.

15  Q    And what did his reaction to that slop sink indicate to

16  you?

17  A    He did his final response which his final response will

18  make sure that human remains are in there, odor of human

19  remains.

20  Q    Now, you told us that you also went to the second floor;

21  is that correct?

22  A    Correct.

23  Q    Now, tell us what happened on the second floor.

24  A    All right.  So we went up the stairs.  Same thing, I let

25  him go freely.  He went -- there's a bedroom.  As soon as you

1  go upstairs, there's a bedroom to the right.  And he started

2  working, doing circles in the bathroom -- in the bedroom.  He

3  was it hitting the closet, and he kept going back and forth,

4  back and forth, and his tail started going really strong, his

5  ears going up --

6  Q    Can you describe the flooring of that bedroom?

7  A    It was carpet.  It was a carpet.

8            And then he took himself right into the bathroom.

9  It was to the right of the bedroom.  And he took himself and

10  he kept going back and forth, bedroom, bathroom, bedroom,

11  bathroom.  To me, he's working the odor.

12  Q    What does that mean, to work the odor?

13  A    So he's working the odor, meaning, he's picking up the

14  odor of a human, decomposition, because I gave him the word

15  search.  So he puts search with decomposition odor.  And his

16  final response is his tail wags, and to me, he's picking up

17  odor in that general area.

18  Q    And what happened in the bathroom?

19  A    He jumped into the tub and he threw his nose right down

20  the drain.

21  Q    Did he alert any other way?

22  A    And the same way he alerted, his tail went up, his ears

23  went up.  He's telling me there's odor there.

24  Q    Did he alert that same way in any other area of the

25  house?

1    A    Not at all.

2    Q    Were you allowed to complete that search on the second

3    floor?

4    A    Well, people started coming in, and I didn't want the dog

5    to get disturbed or God forbid accidently bite -- somebody

6    getting bitten by accident, because a lot of people don't

7    understand how the dogs work.  And so I removed the dog and

8    then I suggested to do the vehicle outside the house.

9    Q    And when you say people, do you mean other police

10   personnel?

11   A    Detectives, I'm sorry, yes.  And then I suggested to do

12   the vehicle.

13   Q    And can you explain why that information was not in your

14   paperwork?

15   A    It was the spur of the moment, quick.  I wanted to do a

16   quick survey, just trying to help the detective squad out.

17   Just trying to get things going for them.

18   Q    So is it fair to say it was an oversight?

19   A    Yes.

20            MR. PALACIO:  Nothing further, Your Honor.

21            THE COURT:  Any recross?

22            MS. THIELE:  No, Your Honor.

23            THE COURT:  All right, Detective.  Thanks so much.

24   You can step down.

25            (The witness steps down.)

1          THE COURT:  All right.  I just want to see the

2     parties at the side about scheduling.

3               (Continued on the next page.)

4               (Sidebar conference.)

1      (The following occurred at sidebar.)

2          MR. PALACIO:  We have one bank representative from

3   Capital One.  She will probably be about 30 minutes, then a

4   crime scene detective.  I know we won't be able to get to that

5   today.

6          THE COURT:  I think then now is a good time to stop.

7          But I'm going to tell them that we'll be working a

8   little later tomorrow and possibly Wednesday, as well.

9          What do you have left in terms of -- you have the

10  two witnesses that the crime scene and the bank person.  I

11  guess you have the ME?

12         MS. DEAN:  Yes.  And the forensic anthropologist.

13  We also have an analyst from our office who is going to be

14  dealing with cell phone evidence.  We have a number of

15  witnesses.  We have another civilian witness who is a client

16  of the victim's.  We have -- we have the special agent who did

17  the search on the New Jersey home where the defendant was

18  arrested with the notebooks.

19         THE COURT:  All right.

20         MR. PALACIO:  DNA.

21         MS. HAJJAR:  May I make a suggestion?

22         I think we are still -- at least the Government's

23  case, we're still on track to rest on Thursday.  And maybe if

24  Your Honor is going to tell the jurors we're going to stay

25  late tomorrow and Wednesday --

1          THE COURT:  I got this.  I got it.

2          MS. HAJJAR:  Sorry.

3          THE COURT:  This part, I have.

4          MS. HAJJAR:  Sorry, Judge.

5          THE COURT:  All right.  Anything you want to say?

6          MR. CECUTTI:  My calculation, and I could very well

7    be wrong, is that the Government has 19 witnesses left.  It

8    would be very helpful for our preparation to know who is

9    testifying tomorrow.

10         THE COURT:  Oh, they'll tell you that.

11         MR. CECUTTI:  Well, we had four surprises today, and

12   so we moved things along and we worked diligently, but it

13   would be very helpful not to repeat that.

14         THE COURT:  All right.  So just tell them the order

15   in which you plan to call people, and if there are witnesses

16   that you're not going to call, tell them that.

17         MS. DEAN:  We just sent the rest of the week in the

18   proposed current order via e-mail, and we'll try to touch base

19   to make sure we're on the same page.

20         MR. CECUTTI:  And on that note, I wanted to inquire

21   as to whether or not Detective Hopkins, Detective Pignatelli

22   are testifying in this trial, because they were not listed.

23         MS. DEAN:  I don't think -- we need to regroup.  But

24   I don't think we need to call them anymore, that's why they

25   were not on the e-mail I sent to you this afternoon.

1          THE COURT:  Aside from those two, the guy from

2    Scotland and the lady from Arizona, anybody else that you're

3    thinking -- and I'm not -- and possibly the defendant,

4    obviously.  Anybody else that you're thinking of calling,

5    assuming I permit you to call those two other people?

6          MR. CECUTTI:  We will have a better sense, I would

7    say, by Wednesday morning.

8          THE COURT:  Okay.

9          MR. CECUTTI:  It just depends on how things

10   continue --

11         THE COURT:  Sure.  I just like to have an idea.

12   Okay.  Thanks.

13              (End of sidebar conference.)

14              (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; Jury present.)

2          THE COURT:  All right.  I was just trying to get an

3   idea of how we're doing, and we're doing very well.  So you

4   know, I think we are on pace to finish far earlier than you

5   were estimated, I think, when Judge Kuo did the jury

6   selection.

7          But I also want to make sure we're being efficient.

8   So what I would like to do is have us work a little later.  So

9   I want you to prepare for that maybe until 6:00 o'clock

10  tomorrow, Wednesday, and Thursday.  I think that'll enable us

11  to be even more efficient.  So I wanted to give you that heads

12  up.

13         And we're the going to break for today.  But please

14  be healthy.  Don't get sick.  And continue to show up on time.

15  As I said, we can't start until everybody's here.  Don't talk

16  about the case or look anything up.  But have a good and

17  restful night.  I'll see you tomorrow.

18         THE COURTROOM DEPUTY:  All rise.

19         THE COURT:  All right.  Everybody can sit down.

20         (Jury exits the courtroom.)

21         THE COURT:  So we discussed schedule a little bit,

22  and I know the Government is going to advise Defense -- I

23  guess they have already -- of the order in which the witnesses

24  will testify, and I guess that e-mail via location also lists

25  the witnesses that you're not calling.

1          Anything else that we need to say about scheduling?

2          MS. DEAN:  Your Honor, just with respect to defense

3     comment made at sidebar about deciding if there will be

4     additional witnesses by Wednesday morning.  The Government has

5     asked since well before trial, for a witness list from the

6     Defense, and it seems that Wednesday morning is extremely late

7     to tell us if there's any other witnesses in this case.

8          THE COURT:  You haven't mentioned any other possibly

9     witnesses aside from those two experts?

10         Who else would you be calling?

11         MR. CECUTTI:  Your Honor, I think that it really

12    comes down to our two experts.

13         THE COURT:  Okay.

14         MR. CECUTTI:  And that really could just be our

15    case.

16         THE COURT:  Okay.  I think the concern is that

17    there's some person out there about whom they have no

18    discovery or anything like that.

19         MR. CECUTTI:  I can represent that any potential

20    other non-expert witness, the Government is fully aware of.

21         THE COURT:  Okay.  But you still have to tell them

22    who it might be at some point.

23         MR. CECUTTI:  I completely understand.  And I will

24    do it -- do that if we make the decision to call that

25    person --

1      THE COURT: And I guess you'll know when you look

2 and you have a chance to peruse that e-mail about which

3 witnesses they're not calling, whether or not any of those

4 witnesses are someone or some people that you might wish to

5 call.

6      MR. CECUTTI: Yes. Exactly.

7      THE COURT: All right. That seems fair.

8      MR. CECUTTI: Okay.

9      MS. DEAN: So with regards to scheduling, Your

10 Honor, we expect to rest at some time on Thursday. I think

11 it's too hard to say what time right now. But I don't think

12 we'll go until the end of the day on Thursday.

13      THE COURT: Well, I mean, I'm using our time. So

14 when you're done, I'll expect the defense to put on whatever

15 case they have.

16      MR. CECUTTI: Your Honor, we --

17      THE COURT: So we're not going to stop when the

18 People -- sorry, when the Government rests.

19      MR. CECUTTI: So -- and I'm not --

20      THE COURT: Bossing?

21      MR. CECUTTI: No, no, I'm not. But just for

22 planning purposes, we need to contact our experts and arrange

23 for their travel if Your Honor permits them to testify.

24      THE COURT: Well, I don't know yet, because one of

25 the witnesses was going to testify -- I don't even know what

1   the DNA person was going to testify to, because it seemed like

2   the person didn't have a whole lot to say about -- except the

3   person's opinion was that there was no DNA evidence suggestive

4   of the defendant's guilt or something very general like that

5   which is not happening.  So if that person has something else

6   to say about the DNA, that's fine.

7          With respect to the K9 person, whom I understand has

8   never been qualified as an expert before, that doesn't mean --

9   there's always a first time.  You know, you've got to start

10  somewhere.  But that person too didn't seem to have a whole

11  lot to say about the evidence in this case.  And so that's why

12  I needed you to amplify.  And you may decide after thinking

13  about what you've heard already that you don't have to call

14  the person.

15         But, at this point, just because I haven't gotten

16  your response yet, I don't know what additional things the

17  witness might be testifying about.  I see -- go ahead.  I'm

18  sorry.

19         MR. CECUTTI:  I understand.  And I think I had

20  mentioned this earlier, but we are going to provide Your Honor

21  with our supplemental letter in a timely manner, where we will

22  send it to you --

23         THE COURT:  Remember, I'm getting older, so our

24  definitions of -- my definition of timely is not midnight.

25         MR. CECUTTI:  It will definitely not be by midnight.

1   Well before that.

2              THE COURT:  All right.  Need my rest.  All right.

3              I'll still read it if you send it that late, but I

4   wish you wouldn't.

5              MR. CECUTTI:  We will send it much sooner --

6              THE COURT:  Okay.  You have a note passed to you.

7              What is it?

8              MS. DEAN:  I think, Your Honor, it's with respect

9   to -- I'm not trying to micromanage the Defense scheduling.

10             With respect to travel concerns, our schedule is on

11  the record.  Whatever travel arrangements need to be made --

12             THE COURT:  I feel like it's okay.  It's all right.

13  They'll get them here.  I believe I've already signed the

14  request, so I think we're good.  All right.

15             MS. DEAN:  And Your Honor, with regards to

16  summations, should we plan to sum on Friday?

17             THE COURT:  If we're done, yeah.  Yeah.

18             I don't usually like to charge a jury at the -- I

19  probably won't charge them until Monday just because I don't

20  like to charge a jury on a Friday.

21             I mean, it depends.  I don't know how long

22  everybody's summation is going to be.  I have a feeling

23  they're not going to be short.  So if we start summations in

24  the morning and then we finish, and then maybe I can charge

25  them and get them deliberating a little bit.  But I feel like

1    that that might be squeezing a lot into one day.  But I'm here

2    for it if I can do it.  All right.

3                    MS. DEAN:  Thank you.

4                    THE COURT:  All right.  Everybody have a good night.

5

6                         *    *    *    *    *

7

8                    (Proceedings adjourned at 5:32 p.m. to resume on

9    February 27, 2024 at 9:30 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         I N D E X

2    WITNESS                              PAGE

3
     OMAR SANTIAGO
4
     DIRECT EXAMINATION    BY MR. PALACIO    825
5

6    BLYTHE BRADLEY

7    DIRECT EXAMINATION    BY MS. HAJJAR     844

8    DIRECT EXAMINATION    BY MS. HAJJAR     883

9    CROSS-EXAMINATION     BY MR. CECUTTI    891

10   REDIRECT EXAMINATION  BY MS. HAJJAR     903

11
     CLAUDE JEAN-PIERRE
12
     DIRECT EXAMINATION    BY MS. DEAN       906
13

14   ANTHONY TURRISI

15   DIRECT EXAMINATION    BY MS. DEAN       915

16   CROSS-EXAMINATION     BY MS. THIELE     921

17
     SAMUEL LEMUS
18
     DIRECT EXAMINATION    BY MS. HAJJAR     925
19
     CROSS-EXAMINATION     BY MS. THIELE     931
20

21   BENJAMIN COLECCHIA

22   DIRECT EXAMINATION    BY MR. PALACIO    935

23   CROSS-EXAMINATION     BY MS. THIELE     955

24   REDIRECT EXAMINATION  BY MR. PALACIO    968

25
```

E X H I B I T S

| GOVERNMENT | PAGE |
|---|---|
| 116, 116A through P, 117, 118, 119, 120 and 121 | 846 |
| 116A through P | 876 |
| 743 | 908 |
| 789 | 910 |
| 740 | 911 |
| 352A and B | 912 |
| 304 and 307 | 914 |
| 991 | 937 |

E X H I B I T S

| DEFENSE | PAGE |
|---|---|
| C | 960 |
| D | 962 |