UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,    : 20-CR-549(AMD)
:
:
:
    -against-    : United States Courthouse
: Brooklyn, New York
:
:
CORY MARTIN,    : Wednesday, February 28, 2024
: 9:30 a.m.
    Defendant.    :
:
:

- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
BEFORE THE HONORABLE ANN M. DONNELLY
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government:    BREON S. PEACE UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK
   271 Cadman Plaza East
   Brooklyn, New York 11201
BY:EMILY J. DEAN
   TANYA HAJJAR
   ANDRES PALACIO
   Assistants United States Attorney

For the Defendant:    LAW OFFICE OF ANTHONY CECUTTI
   217 Broadway - Suite 707
   New York, New York 10007
BY:ANTHONY CECUTTI, ESQ.

THE LAW FIRM OF KESTINE M. THIELE
   305 Broadway - Suite 700
   New York, New York 10007

Court Reporter:    LINDA A. MARINO, OFFICIAL COURT REPORTER
   225 Cadman Plaza East/Brooklyn, NY 11201
   lindacsr@aol.com
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription.

1        (In open court; jury not present.)

2        THE COURT:  All of our jurors are here.  I reviewed

3   the notebooks.

4        Did you all come to any kind of accommodation?

5        MS. DEAN:  If I can just tell you what the

6   discussions were.  I think that we're -- as Mr. Cecutti

7   indicated yesterday, the only objections are to the stories.

8        What the Government proposed was that other than

9   what is highlighted in yellow, that the agent summarize and

10  describe to the jury the story; in part, due to the graphic

11  nature, but in part due to the time it would take to read in

12  these stories.

13       So, our proposal is that the agent, we put them into

14  evidence and the agent go through and summarize portions of

15  the story and we only publish what's highlighted.

16       And then we could come to a decision about which

17  pages of the notebook actually go back to the jury if they

18  were to ask for them.  They don't need to get all the pages,

19  perhaps just the pages with the yellow highlighting and the

20  other stuff from the notebook, not the story.

21       We also said we would take the rap lyrics out of the

22  notebooks.  Those aren't relevant to us.

23       THE COURT:  And the drug stuff?

24       MS. DEAN:  So, the drugs, your Honor, go directly to

25  Ms. Anderson's testimony because she talked about how the

1  Defendant got her into cocaine, ecstasy, and molly and they

2  would do it together.  She specifically described doing

3  cocaine at the time of filling out the Alex Villard policy,

4  and those are the exact drugs described being used through the

5  stories.

6          THE COURT:  Do you have anything you want to say

7  about this?

8          MR. CECUTTI:  I do, your Honor.

9          Obviously, we maintain our objections under 401 and

10 403.

11         THE COURT:  Be specific.  This is to the story

12 portion.

13         MR. CECUTTI:  This is to the story.

14         I don't recall the item number in the Government's

15 letter, but just to be -- so that we're clear, it would be

16 item number four or the last point in the Government's letter

17 dated February 25, 2024.

18         And we are objecting under 401 and 403.  We maintain

19 that it is not an autobiography.  It is a story.  It's urban

20 fiction.  The content is not sufficiently similar to the

21 allegations in this case --

22         THE COURT:  Let me just push back on that a little

23 bit.

24         Just having looked at Judge DeArcy Hall's decision,

25 there's another decision from the District Court in

1  Connecticut, *United States v. Wiley*.  The question is really

2  whether whatever the material is that's being offered has any

3  nexus to the criminal conduct here.  It's not a blanket

4  preclusion of -- in that case, it was rap lyrics.  I guess

5  here it's --

6          What did you call it, urban fiction?

7          MR. CECUTTI:  Urban fiction.

8          THE COURT:  The fact that you give it -- the

9  question is really whether there's something in here that

10 bears a nexus to the crimes charged.  There are pretty

11 significant similarities to some of the testimony in the case.

12         There was a reference to purchasing Uggs.

13         There was a reference to starting a sex work

14 business that involved having clients come to the house.

15         There's the financial distress of the protagonist,

16 including having the light turned off, having the electricity

17 turned off.

18         There's a reference to having a garbage collector

19 pick up garbage after a murder.

20         There is a description of the protagonist as someone

21 who doesn't shower very often.

22         These are all pretty specific details that are

23 reflected in the testimony, and I think in the case that Judge

24 DeArcy Hall wrote was just more general discussions of lyrics

25 that were kind of the hallmark of a lot of rap music.  I don't

1  think this is the same thing.  And I don't think the fact that

2  it's just something from the creative process precludes it

3  from being admitted.

4       That's why I'm just wondering, it's not just sort of

5  a general description of things that are possibly related to

6  this, it's pretty specific detail.  And that's why I'm just

7  wondering why that doesn't set it apart.

8       MR. CECUTTI:  Your Honor, I guess we just don't see

9  it the same.  We obviously read the highlighted portions,

10  we've read them in the context of the voluminous stories that

11  are in both notebooks.  We just see it differently.

12       And we don't believe that there is a sufficient

13  nexus whereby they come in under 401 and anything that does

14  come in we do believe is unfairly prejudicial under 403.  So,

15  that's why we maintain those two objections.

16       THE COURT:  Okay.  But you don't dispute that those

17  details appear in the writings, correct?

18       MR. CECUTTI:  We don't disagree with any of the

19  content.  It's there.  We read it.  But we do disagree that it

20  is specifically related to the allegations in this case in

21  light of the overarching context of those stories.

22       THE COURT:  Okay.  I think it's admissible.  The

23  question for me is what some of it that ought to come out.

24       The other thing I'll say generally about people

25  reading things into evidence, not a huge fan.  When something

1 is coming in, you can point things out.  But if something is

2 going to be in evidence, just as a general matter, I don't

3 love when someone reads something that the jury can read

4 itself.

5          I don't really think you've done that so far, but I

6 don't envision somebody sitting and reading long excerpts from

7 this or from any other materials, really.

8          I take it there are text messages that are going to

9 come in.

10          MS. DEAN:  Yes, your Honor.

11          THE COURT:  I know.  But having tried a few cases in

12 my time myself, once it's in evidence, it's in evidence.  So,

13 you can read some of the stuff -- I'm not telling you you

14 can't do anything, I'm just saying that I would prefer not to

15 have long readings of things that the jury, who I believe can

16 all read, can see.

17          So, it's just something to keep in mind.  It's

18 extremely time consuming.  And if it's in evidence, of course

19 you're going to be able to refer to it in your summation.  I'm

20 just saying you don't have to hit them over the head with it.

21          So, no need to worry, I just find it not a great use

22 of our time to be reading things verbatim.  Take it for what

23 you will.  And I do want you to consider it because I think

24 sometimes it's a little bit of a time-suck.  So, it's just my

25 observation.

1      At our lunch break I have another case, but I'll

2 take a look at the specifics of things that maybe shouldn't --

3 that I don't think should be in.

4      MR. CECUTTI:  Your Honor, if I could help move along

5 this item, if the Court's ruling is that the content of the

6 notebooks is all going to come in, then we're okay with both

7 notebooks being admitted.

8      THE COURT:  So you don't want me to take out

9 parts -- it's either in for a penny, in for a pound.

10      MR. CECUTTI:  Correct.

11      THE COURT:  I just want to make sure I understand.

12      So, your position is that if I rule that any of it

13 is admissible, it should all come in.

14      MR. CECUTTI:  Correct.  I hope that helps.

15      THE COURT:  It helps a lot.  Thank you.

16      So, the notebooks are in.

17      MR. CECUTTI:  Your Honor, obviously without the

18 highlights.  Just the notebooks would go back.

19      THE COURT:  Correct, correct.

20      MS. DEAN:  So, your Honor, if you don't mind that I

21 just preview how I plan to present the evidence briefly.

22      I think it will not be extensive reading from the

23 notebook.  We plan to ask the agent about the story and we

24 plan to move to targeted pages and ask the agent to give brief

25 summaries and to publish the very few items that are yellow

1 highlights, which would be a sentence or for the financial

2 distress electricity paragraph.  So, it would be limited.

3          However, while the notebooks will come in without

4 highlights, for the purpose of the presentation so that the

5 agent knows what he's looking at, would we be permitted to use

6 the highlighted version --

7          THE COURT:  Yes.

8          MS. DEAN:  -- but what's in evidence would be the

9 clean?

10          THE COURT:  Yes.  It's just like when you're

11 highlighting something for somebody to read.  That's fine.

12          Let's get the jury.

13          Who is your first witness today?

14          MS. DEAN:  Detective James Richardson.

15          (Jury enters.)

16          THE COURT:  Good morning, everybody.  We're ready to

17 press ahead.

18          Are you ready to call your next witness?

19          MS. DEAN:  Yes, your Honor.  The Government calls

20 Detective James Richardson.

21          (Witness takes the stand.)

22          THE COURTROOM DEPUTY:  Raise your right hand for me,

23 please.

24          Do you solemnly swear or affirm that the testimony

25 you're about to give in this matter will be the truth, the

1  whole truth, and nothing but the truth?

2            THE WITNESS:  I do.

3            THE COURTROOM DEPUTY:  State your name for the

4  record.

5            THE WITNESS:  Detective James Richardson.

6            THE COURTROOM DEPUTY:  Have a seat, please.

7            THE COURT:  Okay, Detective, just a couple of

8  things.

9            I want to make sure everybody can hear you.  That's

10  why we have the microphone.

11            Also, I'm going to ask you to please not speak too

12  quickly.  It makes the court reporter's job harder.  So, take

13  your time.

14            If there's a question you want to have repeated or

15  you don't understand, just let me know, okay?

16            Go ahead.

17            MS. DEAN:  Thank you, your Honor.

18  **JAMES RICHARDSON**,

19            called by the Government, having been

20            first duly sworn, was examined and testified

21            as follows:

22  DIRECT EXAMINATION

23  BY MR. PALACIO:

24  Q    Good morning, Detective.

25  A    Good morning.

1    Q    Who do you work for?

2    A    The NYPD.

3    Q    What's your job there?

4    A    I am a squad detective.

5    Q    In what precinct?

6    A    The 113.

7    Q    What area does that cover?

8    A    It covers Jamaica and Rosedale by the JFK Airport.

9    Q    What are your duties and responsibilities there?

10   A    I catch cases as they're assigned, so it could be

11   harassment to homicide.

12   Q    Directing you to April 24, 2017, was a complaint made to

13   the NYPD regarding fraud on an MCU bank account?

14   A    Yes.

15   Q    What was the name of the complainant?

16   A    Adelle Anderson.

17   Q    Was a copy of Ms. Anderson's MCU bank statement related

18   to this complaint attached to the NYPD case file?

19   A    Yes.

20        MS. DEAN:  Your Honor, at this time I move

21   Government 133 into evidence, which are certified business

22   records from MCU.

23        THE COURT:  Any objection?

24        MR. CECUTTI:  No objection.

25        THE COURT:  Those are in evidence.

1      (Government Exhibit 133 so marked.)

2      THE COURT:  You can publish.

3      (Exhibit published to the jury.)

4  Q    Detective, have you reviewed Government 133, MCU bank

5  records for an account in the name of Adelle Anderson?

6  A    Yes.

7      MS. DEAN:  If we could turn to Page 3 of the

8  records, please?

9      And then if we could also look at Page 5 of the

10 records.

11 Q    Do those three highlighted transactions reflect the

12 transactions under investigation related to the complaint of

13 fraud under the name Adelle Anderson in 2017?

14 A    Yes, they do.

15     MS. DEAN:  And if we could zoom in, please,

16 Mr. Rader, on the highlighted portions.  We'll start with

17 these two.

18 Q    Could you just describe to us the three transactions

19 under investigation?

20 A    So, the first one is March 16 and it's a withdrawal from

21 an ATM at 163 Merrick Road in Valley Stream, New York, for

22 $803 dollars.

23     The second transaction is on March 17 and it's a

24 withdrawal from an ATM -- a Bank of America ATM in Rosedale,

25 New York.

1    Q    Also for $803?

2    A    Yes.

3    Q    If we can turn back to Page 3 so you can see the third

4    transaction, is the third transaction also $803?

5    A    Yes.

6    Q    And that's an ATM withdrawal from what location?

7    A    From One Veterans Memorial Plaza in Hewlett, New York.

8         MS. DEAN:  If we could go back to Page 5, please,

9    and highlight the March 16 transaction at the top.

10   Q    Were copies of subpoenas sent to JPMorgan Chase, Bank of

11   America, and TDBank regarding this investigation uploaded to

12   the NYPD file?

13   A    Yes.

14   Q    And that included the Chase subpoena for the transaction

15   at 163 Merrick Road, Valley Stream, New York?

16   A    Yes.

17   Q    What, if anything, was created related to this

18   investigation?

19   A    A wanted flier.

20        MS. DEAN:  And could you please, Mr. Rader, show

21   Government 134?

22        (Exhibit published to the jury.)

23   Q    Do you recognize Government 134?

24   A    Yes.

25   Q    What is that?

1  A     That's the photograph on the wanted flier.

2         MS. DEAN:  I have no further questions.

3         THE COURT:  Any cross-examination?

4         MR. CECUTTI:  Yes.

5  CROSS-EXAMINATION

6  BY MR. CECUTTI:

7  Q     Good morning, Detective.

8  A     Good morning.

9  Q     The complainant in this case was a woman by the name of

10 Adelle Anderson?

11 A     Yes.

12 Q     And she claimed that money was stolen?

13 A     That's what the complaint report IS for.

14 Q     And she claimed that money was stolen from her on three

15 specific dates?

16 A     That's what the complaint reported, yes.

17 Q     Based on three specific transactions?

18 A     Yes.

19 Q     And those three specific transactions occurred at three

20 different locations?

21 A     Yes.

22 Q     And it was ultimately determined that Adelle Anderson's

23 complaint was false?

24 A     I'm not aware of that.

25 Q     You're not aware that -- you're aware that she claimed

1   that money was stolen, right?

2   A     Yes.

3   Q     But you're not aware that her claim was ultimately

4   determined to be false?

5   A     No.

6              MR. CECUTTI:  Nothing further.

7              THE COURT:  Any redirect?

8              MS. DEAN:  No thank you, your Honor.

9              THE COURT:  Thanks a lot, Detective.  You can step

10  down.

11             THE WITNESS:  Thank you, your Honor.

12             (Witness excused.)

13             THE COURT:  Are you ready to call your next witness.

14             MR. PALACIO:  Yes, your Honor.  The Government calls

15  Jasper Moulder.

16             (Witness takes the stand.)

17             THE COURTROOM DEPUTY:  Raise your right hand.

18             Do you solemnly swear or affirm that the testimony

19  you're about to give will be the truth, the whole truth, and

20  nothing but the truth?

21             THE WITNESS:  I do.

22             THE COURTROOM DEPUTY:  State and spell your name for

23  the record.

24             THE WITNESS:  My name is Jasper Moulder, J-A-S-P-E-R

25  M-O-U-L-D-E-R.

1        THE COURTROOM DEPUTY:  Thank you.  Have a seat.

2        THE COURT:  Good morning, Mr. Moulder.

3        THE WITNESS:  Good morning.

4        THE COURT:  I'm just going to ask you to do a couple

5   of things.

6        I want to make sure everybody can hear you, so make

7   good use of the microphone.

8        THE WITNESS:  Okay.

9        THE COURT:  The chair doesn't move.

10       Don't speak too quickly.  Our court reporter takes

11  down everything that you say.  And if you speak too fast, it

12  just makes her job harder.  So, I'm going to ask you to take

13  your time.

14       If there's a question that you don't understand or

15  want to have repeated just let me know, all right?

16       Go ahead.

17       MR. PALACIO:  Thank you, your Honor.

18  **JASPER MOULDER**,

19            called by the Government, having been

20            first duly sworn, was examined and testified

21            as follows:

22  DIRECT EXAMINATION

23  BY MR. PALACIO:

24  Q    Good morning, Mr. Moulder.

25  A    Good morning.

1   Q    Can you tell us how old you are?

2   A    Sixty years old.

3   Q    Do you have any children?

4   A    Yes.

5   Q    How many children?

6   A    Four children.

7   Q    And without giving us an address, can you tell us what

8   neighborhood you live in?

9   A    Canarsie.

10  Q    And how long have you lived in Canarsie?

11  A    About 20 years.

12  Q    Can you tell us what you do for a living?

13  A    HVAC.

14  Q    I'm sorry?

15  A    HVAC.

16  Q    Can you explain to us what that is?

17  A    That's heating, ventilation, air conditioning.

18  Q    And can you tell us what you do in that field?

19  A    Variety of work of servicing air conditioners, installing

20  air conditioners or boilers, which entails a lot of piping,

21  plumbing, wiring.

22  Q    And do you work for a company or do you own your own

23  business?

24  A    I own my own business.

25  Q    What's the name of your business?

1  A    Jazz Heating & Cooling.

2  Q    And how long have you owned that company?

3  A    About nine years.

4  Q    What types of services does your company offer?

5  A    We offer plumbing repairs, heating repairs, heating

6  installation, cooling repairs, cooling installation.

7  Q    What kind of clients do you have?

8  A    Form of clients?

9  Q    In other words, do you work with companies, do you work

10  with individuals?

11  A    Individuals and some companies.

12  Q    Do you also use a work vehicle in connection with your

13  line of work?

14  A    Yes.

15  Q    What type of vehicle?

16  A    Pick-up truck.

17  Q    What kind of equipment do you generally keep in your

18  pick-up truck?

19  A    We carry vacuum pumps, a variety of hand tools, hammers,

20  screwdrivers, pliers, snips, reciprocating saws, circular

21  saws.

22  Q    Sir, are you familiar with Canarsie Park in Brooklyn?

23  A    Yes, somewhat.

24  Q    How are you familiar with that park?

25  A    I usually go walking and jogging there in the morning

1  hours.

2  Q    I'm going to direct your attention to the morning of

3  April 10, 2018.

4            Do you remember parking your truck near Canarsie

5  Park?

6  A    Yes.

7  Q    And can you tell us what happened that morning and what

8  led you to the park that morning?

9  A    Well, I went to the park as normal to jog, but I couldn't

10  get into the park.  It was taped off and there was a

11  helicopter in the air.

12            And the regular guys that usually walk in the park,

13  they were on the outside of the park.  So, I asked them what

14  happened, they said:  They found a girl, like, half a girl,

15  somewhere over there, on the other side of the park, so we

16  can't really get in to do anything.

17  Q    I'm sorry, go ahead.

18  A    Yeah.

19  Q    Did you drive to the park?

20  A    Yeah.

21  Q    And where did you park?

22  A    I parked on Seaview Avenue.  That's facing the eastbound

23  side traffic.

24  Q    Were you actually able to enter the park or was it

25  completely sealed?

1    A    No, it was completely sealed.  It was taped.

2    Q    Tell us what you did after you got to the park.

3    A    Well, I decided if -- I couldn't get into the park, so I

4    decided to clean my truck out, take out whatever unnecessary

5    stuff for garbage and stuff like that, and then dispose of it.

6    Q    And what kind of things did you get rid of?

7    A    I got rid of a SAWZALL case, like a fabric kind of case.

8    It was a DeWalt case, actually.  Some blades, SAWZALL

9    blades --

10              THE COURT:  What are they called, those blades?

11              THE WITNESS:  SAWZALL blades.

12              THE COURT:  Sorry about that.

13   A    Receipts, I had in there a wire loom for my lights.  The

14   LED lights for the pick-up truck comes on a wire loom.  So, I

15   use the bulbs and I dispose of the wires.

16   Q    And where did you throw all of those things into?

17   A    In the bin of the park.

18   Q    What did you do after you threw those things out?

19   A    I just left and went to work.

20   Q    Now, did there come a point later in April when you spoke

21   with police about the things you threw out at the park?

22   A    Yes.

23   Q    And did you explain to the police and tell them what

24   items you threw out?

25   A    Yes.

1  Q    Did you also give police your fingerprints and a sample

2  of your DNA?

3  A    Yes.

4           MR. PALACIO:  Your Honor, with the Court's

5  percentages, if we could show the witness what's in evidence

6  as Government 887.

7           THE COURT:  Okay.

8           (Exhibit published to the jury.)

9           MR. PALACIO:  And if we could zoom in around

10 evidence marker three.

11 Q    Mr. Moulder, can you see that?

12 A    Yes.

13 Q    Can you tell us if you recognize what's near evidence

14 marker three?

15 A    The escutcheon and wire loom.  The escutcheon is the

16 circular stuff that goes around the pipes to seal the opening

17 of the pipes if you open a wall and you bring a pipe through.

18           THE COURT:  Is it E-S-C-U-T-C-H-E-O-N, is that how

19 you spell it?

20           THE WITNESS:  Yes.

21           THE COURT:  Spelling bee champ.

22 Q    The wire loom that you were talking about earlier, is

23 that what we see next to evidence marker three?

24 A    Yes.  That's for the headlight for the Chevy Silverado,

25 2005.

1   Q    And that's the work truck that you use for your work?

2   A    Correct.

3             MR. PALACIO:  If we could show the witness

4   Government 906.

5             (Exhibit published to the jury.)

6             MR. PALACIO:  And if we could zoom in around the top

7   left-hand corner of the photograph.

8   Q    Mr. Moulder, do you recognize that item?

9   A    Yes.

10  Q    What is that?

11  A    That's a BX cable with the Greenfield.

12  Q    And what do you use that for?

13  A    For the wiring the boilers.

14            MR. PALACIO:  If we could show the witness

15  Government Exhibit 897.

16            (Exhibit published to the jury.)

17  Q    Mr. Moulder, do you recognize this?

18  A    Yes.

19  Q    What is this?

20  A    That's a SAWZALL case.

21  Q    What is DeWalt?

22  A    DeWalt is a brand name.

23  Q    Is that the case that you through out that morning?

24  A    Yes.

25            MR. PALACIO:  If we could show the witness

1    Government Exhibit 905.

2               (Exhibit published to the jury.)

3               MR. PALACIO:  And if we could zoom in around YB-4D.

4    Q    Mr. Moulder, do you see that?

5    A    Yes.

6    Q    Do you recognize that?

7    A    Yes.

8    Q    What is that?

9    A    That's a receipt.

10   Q    From what location?

11   A    Looks like one of the stores on Rockaway Parkway, the

12   electronic store.

13   Q    Do you shop at that electronic store?

14   A    Not regularly, but I will buy the headlights for the

15   truck there.

16   Q    Is that something you threw out that morning?

17   A    Yes, yes.

18               MR. PALACIO:  Mr. Rader, if we could zoom back out

19   and focus in on YB-4F and YB-4G on the right-hand side.

20   Q    Mr. Moulder, this might be a little difficult to see.

21               Are you able to see that?

22   A    I see it's a Home Depot receipt, but I can't see exactly

23   what's on it.

24   Q    Do you shop at Home Depot for your line of work?

25   A    Yes, regularly.

1  Q    Can you tell us what kind of things you purchase at Home

2  Depot?

3  A    A variety of stuff.  Piping for plumbing, blades for the

4  saw, bolts, screws, nuts.

5         MR. PALACIO:  Ms. Greene, may I use the Elmo?

6  Q    Mr. Moulder, I'm showing you what's in evidence as

7  Government Exhibit 360B.

8         (Exhibit published to the jury.)

9  Q    Do you see that a little better?

10 A    Yes.

11 Q    Do you recognize this address, 579 Gateway Drive?

12 A    Yes.

13 Q    How do you recognize that address?

14 A    That's in the Gateway Mall, the Home Depot.

15 Q    Do you shop at that location?

16 A    Yes.

17 Q    Do you recognize some of the items on this receipt?

18 A    Yes.

19 Q    Can you tell us what they are?

20 A    Steel rods, aluminum like -- it's like aluminum; not a

21 rod, but it's flat.  It's about, you know, like, three-quarter

22 inches wide.

23         Coupling, three-quarter couplings for the piping,

24 drywall screws, coarse drywall screws.

25 Q    And what do you use these items for, just generally

1    speaking, in your work?

2    A    Those are all in line of my work.  Like when you cut the

3    walls to get into the pipes and stuff like that, then you

4    would fix the pipes and repair the walls.

5    Q    I'm zooming in here around the credit or debit card

6    ending in 7941.

7              Do you recognize that number?

8    A    Yes.

9    Q    How do you recognize that number?

10   A    That was one of my cards.

11   Q    Mr. Moulder, I'm also showing you what's in evidence as

12   Government Exhibit 360C.

13             (Exhibit published to the jury.)

14   Q    Again, is this the same Home Depot that you mentioned

15   earlier?

16   A    Yes.

17   Q    And just moving down, there's a credit or debit card

18   ending 6705.

19             Do you recognize that number?

20   A    Yes.

21   Q    How do you recognize the number?

22   A    Another one of my cards.

23   Q    And I'm showing you Government Exhibit 360A.

24             (Exhibit published to the jury.)

25   Q    Do you see the address of this Home Depot?

1    A    Yes.

2    Q    Do you recognize that one?

3    A    Uh-huh.

4    Q    Is that a yes?

5    A    Yes.

6    Q    Is that a Home Depot that you also shop at for your work?

7    A    Yes, sometimes.

8    Q    Do you recognize the items that were purchased?

9    A    Yes.

10   Q    What do you recognize them to be?

11   A    Tailpiece washer, strainer, tailpiece, inch-and-a-half

12   flange, tailpiece washer.

13   Q    What do you use those items for?

14   A    Those are for sink repair, like kitchen sink.  Kitchen

15   sink uses inch-and-a-half tailpiece.

16          MR. PALACIO:  Ms. Greene, if I could have access to

17   the...

18          And if we could show the witness Government

19   Exhibit 901.

20          (Exhibit published to the jury.)

21          MR. PALACIO:  And if we could focus in on the

22   left-hand side of the picture.

23   Q    Mr. Moulder, can you see that?

24   A    Yes.

25   Q    Do you recognize those items?

1    A    Yes.

2    Q    What are they?

3    A    SAWZALL blades.

4    Q    And are those blades that you threw out that morning?

5    A    Yes.

6    Q    Can you tell us why you threw those blades out?

7    A    Well, they were used, used blades.  And I buy new blades

8    all the time, so I just throw them out.

9    Q    Mr. Moulder, you mentioned a couple things.

10            A reciprocating saw, is that something you use in

11   your work?

12   A    Yes.

13   Q    Is that also known as a SAWZALL?

14   A    Yes.

15   Q    Can you explain to the jury what a reciprocating saw is?

16   A    I would say a reciprocating saw is an electric saw and it

17   goes into motion, either push-and-pull or back-and-forth

18   motion.

19   Q    And I'm sorry, could you just, for people who might not

20   be familiar with that instrument, just a little more detail

21   about what it is and how it works?

22   A    Okay.  It's a saw that cuts various types of materials,

23   like wood, metal.  We use it mostly to cut wood or metal.  And

24   you have various types of blades that goes into those saws to

25   cut various types of materials.

1    For example, wood, you really cannot use a wood

2 blade to cut metal or pipes because I wouldn't go through and

3 stuff like that.  And you have different sizes of blades; long

4 blades, short blades.

5 Q    And can you tell us how, for example, a blade that's

6 designed for wood would cut into wood?

7 A    A blade designed for wood would cut into wood quicker and

8 faster, cut through the wood quicker and faster, than a metal

9 blade.

10 Q    Do you use different types of blades for your line of

11 work?

12 A    Yes.

13 Q    Is a SAWZALL more powerful than a manual saw?

14 A    Yes.

15 Q    And in your line of work, why would you use a SAWZALL

16 instead of a manual saw?

17 A    It's quicker in terms of time.  If you use a manual saw,

18 you would be there all day pretty much.

19 Q    And can you describe the sound that a SAWZALL makes?

20 A    It's a loud sound (demonstrating).  Very loud.

21    MR. PALACIO:  Your Honor, nothing further.

22    THE COURT:  Cross-examination?

23    MR. CECUTTI:  Yes, your Honor.

24    THE COURT:  Okay.

25

1  CROSS-EXAMINATION

2  BY MR. CECUTTI:

3  Q    Good morning, Mr. Moulder.

4  A    Good morning.

5  Q    You run a heating and cooling company or HVAC company,

6  right?

7  A    Correct.

8  Q    And you were asked questions specifically about a

9  reciprocating saw.

10 A    Correct.

11 Q    And you use reciprocating saws as part of your work with

12 your company?

13 A    Correct.

14 Q    And tell us some of the purposes by which you would use a

15 reciprocating saw.

16 A    You would use it to cut pipes mostly.

17 Q    And I believe you mentioned wood?

18 A    Wood also, Sheetrock.

19 Q    So, we have wood, Sheetrock --

20 A    Sheetrock, pipes.

21 Q    And when you're cutting metal pipes using a reciprocating

22 saw, fair to say you're able to cut through it pretty easily?

23 A    Well, we use it mostly to cut -- yeah, the pipes cut

24 through pretty easily.

25 Q    And you testified about or you made the sound of how loud

1   that saw is.

2            Fair to say it's pretty loud?

3   A    Yeah, it's pretty loud.

4   Q    And when you're using the reciprocating saw to cut

5   through Sheetrock or wood or metal pipes, creates a lot of

6   debris as well?

7   A    Yes.

8            MR. CECUTTI:  Nothing further.

9            THE COURT:  Any redirect?

10           MR. PALACIO:  No, your Honor.

11           THE COURT:  Thank you so much.  You can step down.

12           (Witness excused.)

13           THE COURT:  Are you ready to call your next witness?

14           MS. HAJJAR:  Yes, your Honor.  The Government calls

15  Adam Van Duzer.

16           (Witness takes the stand.)

17           THE COURTROOM DEPUTY:  Raise your right hand,

18  please.

19           Do you solemnly swear or affirm that the testimony

20  you're about to give will be the truth, the whole truth, and

21  nothing but the truth?

22           THE WITNESS:  Yes.

23           THE COURTROOM DEPUTY:  Please state your name for

24  the record.

25           THE WITNESS:  Adam Van Duzer.

1          THE COURTROOM DEPUTY:  Please spell it.

2          THE WITNESS:  V-A-N D-U-Z-E-R.

3          THE COURTROOM DEPUTY:  Thank you.

4          THE COURT:  Just pull the microphone a little bit

5     closer to you.  I want to make sure everybody can hear you.

6          So, the other thing I want to make sure you do is

7     that you not talk too fast.  Our court reporter is taking down

8     what you say and if you talk too fast it makes her job

9     difficult.

10          If there's a question that you want to have

11    clarified or repeated, just tell me, all right?

12          THE WITNESS:  Will do.

13          THE COURT:  Go ahead.

14    **ADAM VAN DUZER**,

15          called by the Government, having been

16          first duly sworn, was examined and testified

17          as follows:

18    DIRECT EXAMINATION

19    BY MS. HAJJAR:

20    Q    Good morning.

21    A    Good morning.

22    Q    Where do you work, Mr. Van Duzer?

23    A    The Home Depot.

24    Q    And what is your title?

25    A    I'm a corporate investigator.

1   Q    What do you do in your role as corporate investigator?

2   A    I investigate organized retail crime, which is basically

3   traveling in groups from store to store to steal.  I kind of

4   work with law enforcement to put that together.

5         I also support law enforcement in any requests that

6   they would send to me to obtain from Home Depot records.

7   Q    How long have you been in that role?

8   A    Since 2017.

9   Q    And directing your attention to approximately April 2018,

10  were you asked by law enforcement to identify a particular

11  transaction?

12  A    Yes.

13  Q    And were you able to identify an account associated with

14  that transaction?

15  A    Yes.

16        MS. HAJJAR:  I'd like to show the witness what's in

17  evidence as Government Exhibit 360B, if I could just switch to

18  the Elmo, Ms. Greene.

19        (Exhibit published to the jury.)

20  Q    Do you recognize this transaction, Mr. Van Duzer?

21  A    Yes, I do.

22  Q    And were you able to identify a professional account

23  associated with this transaction?

24  A    Yes.

25  Q    Do I recall what it was?

1   A    It was Rizzi.  There was a Rizzi Heating & Cooling, I

2   believe it was.

3        MS. HAJJAR:  Could I show the witness just himself

4   something?

5   Q    This is a clearer version of that transaction.

6   A    Apologies, yes.

7        Jazz is the name on there, the job name as well as

8   the PO name, which were to be attached to an account.

9   Q    And were there other transactions associated with that

10  purchaser?

11  A    Yes, there were.

12  Q    Did there come a time when you were asked by law

13  enforcement to pull records of transactions at a Valley Stream

14  Home Depot store?

15  A    Yes.

16  Q    I'm showing you --

17       MS. HAJJAR:  If I could switch to the laptop,

18  Ms. Greene.

19       I'm showing for the witness only what's marked as

20  Government Exhibit 56.  If we could just zoom in at the top

21  paragraph.

22  Q    Do you recognize this transaction, Mr. Van Duzer?

23  A    Yes, I do.

24  Q    Is this the transaction you were asked to identify?

25  A    Yes.

1          MS. HAJJAR:  Your Honor, the Government offers
2    Government 56 and asked that it be published.
3          THE COURT:  Any objection?
4          MS. THIELE:  No objection.
5          THE COURT:  Okay.
6          (Government Exhibit 56 so marked and published to
7    the jury.)
8    Q    What can you tell us, Mr. Van Duzer, about this
9    particular transaction?
10   A    That it took place at Store 1216, which is Valley Stream,
11   April 6, 2018, and that there were three items purchased and
12   they paid cash.
13   Q    This is a receipt for a cash transaction?
14   A    Yes.
15   Q    What are the numbers that appear on the left side of this
16   receipt?
17   A    Those are the UPC.
18   Q    The bar codes that appear there?
19   A    Yes.
20   Q    Are you able to identify particular items based on those
21   codes?
22   A    Yes.
23   Q    So, the first item that's ending in 8539?
24   A    Yes.
25   Q    Did you search for a particular product corresponding to

1    these UPCs?

2    A    Yes.

3    Q    Could you just read the last four digits of each of those

4    codes, please?

5    A    Sure.  8539, second one is 5193, the third one is 6703.

6              MS. HAJJAR:  Could I show for the witness only

7    what's been marked as Government Exhibit 59?

8    Q    Do you recognize this exhibit?

9    A    Yes.

10   Q    What is it?

11   A    They're Diablo SAWZALL blades or reciprocating saw

12   blades.

13   Q    Did this correspond to the code that was in

14   Government Exhibit 56 that we just looked at?

15   A    Yes.

16             MS. HAJJAR:  I offer Government Exhibit 59.

17             THE COURT:  Any objection?

18             MS. THIELE:  No objection.

19             THE COURT:  That's in evidence and you can publish

20   it.

21             (Government Exhibit 59 so marked and published to

22   the jury.)

23             MS. HAJJAR:  Thank you, your Honor.

24             Mr. Rader, if you could just highlight the top of

25   this document.

1  Q    Is there a number at the top there, Mr. Van Duzer?

2  A    Yes.

3  Q    Does that number correspond to the code that you searched

4  to get this item?

5  A    Yes.

6  Q    Could you read what this item is?

7  A    9-inch 8/14 teeth per inch Demo Demon general purpose

8  reciprocating saw blade five-pack.

9          MS. HAJJAR:  Could you just highlight the picture?

10 Q    And is that the associated item?

11 A    Yes, it is.

12         MS. HAJJAR:  If I could show the witness only what's

13 been marked as Government Exhibit 60, please.

14 Q    Mr. Van Duzer, did this also correspond to a UPC code in

15 the exhibit that we looked at before, Government 56?

16 A    Yes.

17         MS. HAJJAR:  I offer Government Exhibit 60.

18         THE COURT:  Any objection?

19         MS. THIELE:  No objection.

20         THE COURT:  That's in.  You can publish.

21         (Government Exhibit 60 so marked and published to

22 the jury.)

23         MS. HAJJAR:  Thank you.

24         Mr. Rader, if you could just highlight the name and

25 the picture associated with this item.

1   Q    Mr. Van Duzer, is this one of the other items on the

2   receipt that we just looked at?

3   A    Yes, it is.

4   Q    What is this item?

5   A    45-gallon extra large heavy duty trash bags, 50 count.

6            MS. HAJJAR:  If I could show the witness what's been

7   marked for identification as Government 58, please.

8   Q    Do you see this exhibit?

9   A    Yes.

10  Q    Does this also correspond to one of the items on the

11  receipt that we looked at?

12  A    Yes, it does.

13           MS. HAJJAR:  I offer Government Exhibit 58.

14           THE COURT:  Any objection?

15           MS. THIELE:  No objection.

16           THE COURT:  You can publish it.  That's in evidence.

17           (Government Exhibit 58 so marked and published to

18  the jury.)

19           MS. HAJJAR:  If you could zoom on the name of the

20  product and the product picture.

21  Q    Could you read what product this is, Mr. Van Duzer?

22  A    It's a DeWalt 12-amp corded variable speed reciprocating

23  saw.

24  Q    And did this correspond to one of the entries on

25  Government Exhibit 56?

1    A    Yes, it did.

2          MS. HAJJAR:  Could we pull up Government 56 in

3    evidence, please?

4          (Exhibit published to the jury.)

5          MS. HAJJAR:  And just zooming in on the transaction

6    itself.

7    Q    Are those the three items that are listed on this

8    receipt?

9    A    Yes, they are.

10   Q    What was the total of this transaction?

11   A    Including tax, it was $144.41.

12   Q    Are you able based on these codes to identify particular

13   physical product at a Home Depot store?

14   A    Yes.

15         MS. HAJJAR:  Your Honor, I ask permission to show

16   the witness what's marked as Government Exhibit 361 and 362.

17         THE COURT:  Okay.

18         For the witness only.

19         MS. HAJJAR:  Yes, but may Agent Wendel just approach

20   the witness to show him?

21         THE COURT:  Sure.

22   Q    Do you recognize this exhibit, Mr. Van Duzer?

23   A    Yes.

24   Q    Do they correspond to the bar codes of the items that we

25   just looked at?

1    A    Yes.

2    Q    Do you need to compare them --

3    A    That's okay.

4              MS. HAJJAR:  I offer Government Exhibit 361 and 362.

5              THE COURT:  Any objection?

6              MS. THIELE:  One moment, your Honor.

7              (Pause in proceedings.)

8              MS. THIELE:  No objection.

9              THE COURT:  Those are in evidence.

10             (Government Exhibits 361 and 362 so marked.)

11

12             (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. HAJJAR (continuing):

2    Q    And just to confirm, Mr. Van Duzer, the first item

3    there that's ending in 539, what does that correspond to?

4    A    The Diablo saw blades.

5    Q    Is that Government Exhibit 362?

6    A    Yes.

7    Q    And the last item, the third transaction with barcode

8    ending in 6703, what does that correspond to?

9    A    This DeWalt saw, reciprocating saw.

10              MS. HAJJAR:  Your Honor, may I ask Mr. Van Duzer

11   to show this to the members of the jury by showing them the

12   two items?

13              THE COURT:  Do you want him to get down and walk

14   around?

15              MS. HAJJAR:  Yes, please.

16              THE COURT:  Sure.

17              THE WITNESS:  Do both at the same time?

18              THE COURT:  I think you could probably do them

19   both.

20              MS. HAJJAR:  Could you take the item out of the

21   box, Mr. Van Duzer, as well?

22              THE WITNESS:  Both of them?

23              MS. HAJJAR:  No, just the -- just the saw.

24              THE WITNESS:  (Indicating.)

25              MS. HAJJAR:  Thank you.

1        THE WITNESS:  Back in?

2        MS. HAJJAR:  Yes.

3        No further questions, Your Honor.

4        THE COURT:  All right.  Cross-examination?

5        MS. THIELE:  Just briefly, Your Honor.

6   CROSS-EXAMINATION

7   BY MS. THIELE:

8   Q    Good morning, Mr. Van Duzer.

9   A    Morning.

10  Q    You assist in law enforcement investigations in your

11  position at the Home Depot?

12  A    Yes.

13  Q    So I want to put aside for a moment all of the Jazz Pro

14  account purchases, you know what I am referring to, correct?

15  A    Yes.

16  Q    Around 2018, the NYPD asked to you look into another

17  possible transaction, correct?

18  A    I believe so.

19  Q    And specifically, they wanted to know what item may be

20  located in a specific aisle and bay number in a specific

21  store, correct?

22  A    Yes.

23  Q    And they included a date range of between April 6th

24  through the morning of April 9th, 2018?

25  A    Sounds correct, yes.

1  Q    And specifically, they asked about what item may be

2  located in aisle 72, bay EC1 at the Valley Stream Home Depot

3  location?

4  A    Yes.

5  Q    And you asked them whether they had any more

6  information on the subject, correct?

7  A    Yes.

8  Q    And they didn't have any further information, correct?

9  A    Correct.

10  Q    At some point you shared that your team believed that

11  the item in that aisle and bay number at the Valley Stream

12  location was actually a Makita brand reciprocating saw,

13  correct?

14  A    Yes.

15  Q    The NYPD then requested that you pull all purchases

16  made of that particular item in Valley Stream within that

17  date range?

18  A    Yes.

19  Q    And you responded that the item was not sold in the

20  Valley Stream location, but multiple had been sold in the

21  surrounding area?

22  A    Yes.

23  Q    You told them specifically that about 85 saws were

24  purchased during that time period, correct?

25  A    Yes.

1   Q    The receipt that we were looking at, Government

2   Exhibit 56, with the DeWalt saw and the Diablo blades, that

3   receipt did not include a Makita brand reciprocating saw,

4   correct?

5   A    No, it did not.

6            MS. THIELE:  Nothing further.

7            THE COURT:  All right.  Any redirect?

8            MS. HAJJAR:  No, Your Honor.

9            THE COURT:  Thanks so much.  You can step down.

10           THE WITNESS:  Thank you.

11           (Witness excused.)

12           THE COURT:  Ready for the next witness?

13           MR. PALACIO:  Yes, Your Honor.  The Government

14   calls Dr. Shana Straub.

15           (Witness takes the stand.)

16           THE COURTROOM DEPUTY:  Raise your right hand for

17   me, please.

18           (Witness sworn.)

19           THE WITNESS:  Yes.

20           THE COURTROOM DEPUTY:  Please state and spell your

21   name for the record.

22           THE WITNESS:  My name is Shana Straub, S-H-A-N-A,

23   S-T-R-A-U-B.

24           THE COURT:  All right.  Dr. Straub, just a few

25   things.  I want to make sure everybody can hear you so

1   that's why we will make good use of the microphone.  And I

2   also want to I make sure you don't speak too quickly.  Our

3   court reporter takes down what you say, and it's hard if you

4   speak too fast.

5            THE WITNESS:  Okay.

6            THE COURT:  Kind of related to that is whichever

7   lawyer is asking you questions, just let that person finish

8   talking before you start talking.  Again, it's just harder

9   for the court reporter.

10           If there is something you want to have clarified

11  or repeated, just tell me, all right?

12           THE WITNESS:  Okay.

13           THE COURT:  Go ahead.

14  **SHANA STRAUB**,

15           called as a witness, having been first duly

16           sworn/affirmed, was examined and testified as

17           follows:

18  **DIRECT EXAMINATION**

19  **BY MR. PALACIO**:

20  Q    Good morning, Dr. Straub.

21  A    Good morning.

22  Q    Could you tell us who you work for?

23  A    Yes, I currently for the State of Connecticut Office of

24  the Chief Medical Examiner.

25  Q    And what position do you hold there?

1   A    I am an associate medical examiner.

2   Q    How long have you worked at that location?

3   A    I have been there since September of 2019.

4   Q    And where did you work before you worked at the medical

5   examiner's office in Connecticut?

6   A    I worked at the Office of the Chief Medical Examiner

7   for the City of New York.

8   Q    And what did you -- what position did you hold at the

9   ME's office in New York?

10  A    In New York, I was a city medical examiner.

11  Q    Were you employed there in April of 2018?

12  A    Yes.

13  Q    And how long were you in that position?

14  A    I was in New York for approximately two years.

15  Q    Can you tell the jury about your educational

16  experience?

17  A    Certainly.  I will start with undergraduate education.

18  So I did my undergraduate degree at Whitman College, which

19  is in Walla Walla, Washington, where I majored in

20  biochemistry, biophysics and molecular biology.  I then went

21  on to do four years of medical school at Albany Medical

22  College, where I got my MD degree.  After that, I did four

23  years of residency training program in clinical and anatomic

24  pathology, and I did that at the University of Rochester in

25  Rochester, New York.  After that, I did two years of a

1  fellowship training program here in New York City at the

2  Office of the Chief Medical Examiner's in both forensic

3  pathology and then one year in forensic neuro and cardiac

4  pathology, which is hearts and brains.

5  Q    Can you -- excuse me.  Are you licensed to practice

6  medicine?

7  A    Yes.

8  Q    Are you also board certified?

9  A    Yes.

10  Q    Can you tell us what that means?

11  A    So a board certification for any physician in any field

12  means that they have taken extra examination in the board of

13  their specialty to certify that they demonstrated competence

14  in their field of practice.

15  Q    Do you have a particular field of specialty?

16  A    Yes.

17  Q    What is that?

18  A    My subspecialty field is forensic pathology.

19  Q    And could you tell us what pathology is, and then what

20  forensic pathology is?

21  A    Yes.  So in general terms, pathology is the study of

22  disease and injury and its affects on the human body.  It's

23  a field of medicine just like any other field.  Within

24  pathology, there are two main branches of study.  So there's

25  clinical pathology, which is all of the lab tests that are

done, right?  So any blood test that you get drawn, any

chemistries that you get done, those are all under clinical

pathology.  Then there's anatomic pathology, which is the

bigger branch.  That's basically what most people think of

when they think of a pathologist, right?  So they look at

slides under a microscope to make diagnoses of cancer, other

tumors, tissue injury, things like that.

THE COURT:  Slow down just a little bit.

THE WITNESS:  Oh, I apologize.

THE COURT:  That's okay.

A    So within anatomic pathology, there are several

subspecialties.  One subspecialty is forensic pathology.

And forensic pathology, basically, deals with performing

autopsies and doing investigations into sudden unexpected or

unnatural deaths in order to come to a determination as to

the cause and manner of a person's death.

Q    And what are your duties and responsibilities as a

forensic pathologist?

A    So as a forensic pathologies, our main task is to

investigate any sudden unexpected unnatural death that

occurred.  And we do that through performing autopsies,

talking with family members or involved parties, reviewing

medical records.  And we put all of that information

together to come to a conclusion as to the cause and manner

of a person's death.

1   Q     What is an autopsy?

2   A     So an autopsy is an examination of a deceased

3   individual's body after death.  You know, we look at the

4   external examination to look for any external signs of

5   disease or injury.  We then will sometimes perform an

6   internal examination to examine all of the organs and see if

7   there are any signs of disease or injury.  We can perform

8   additional studies at that point to help us figure out what

9   the cause and the manner of death is.

10  Q     Approximately how many autopsies have you performed?

11  A     To date, I've performed just under 2,000 autopsies.

12  Q     And in addition to performing autopsies, have you also

13  witnessed other medical examiners perform autopsies?

14  A     Yes.

15  Q     Approximately how many autopsies have you witnessed?

16  A     Oh, gosh.  Several hundred more.

17  Q     And can you explain to the jury what cause of death

18  and, alternatively, what manner of death means?

19  A     Yes.  So the cause of death is basically the disease or

20  the injury process that is responsible for initiating the

21  sequence of events that lead to someone dying, right?  So

22  heart disease is a cause of death.  Being shot is a cause of

23  death.

24        In contrast to that, manner of death is really a

25  check box that sort of explains how the cause of death

1    happened.  So for manner, we have different check boxes.  So

2    we have natural, we have accident, suicide, homicide, and in

3    some cases, we will use undetermined when we don't know what

4    the circumstances were.

5    Q    And Doctor, have you testified in courts of law?

6    A    Yes.

7    Q    Approximately how many times?

8    A    Approximately 12 prior times.

9    Q    Have you ever been denied expertise?

10   A    No.

11   Q    Have you ever been suspended or disciplined?

12   A    No.

13        MR. PALACIO:  Your Honor, at this time I would

14   offer Dr. Straub as an expert in the field of forensic

15   pathology pursuant to Rule 702.

16        THE COURT:  Any objection?

17        MS. THIELE:  No objection.

18        THE COURT:  All right.  Again, I will instruct you

19   on what it means to testify as an expert in my final charge.

20        Go ahead.

21   BY MR. PALACIO:

22   Q    Dr. Straub, on April 10th, 2018, did you perform an

23   autopsy on the body that was identified to the Office of

24   Chief Medical Examiner as Brandy Keshawwn Odom?

25   A    Yes, I did.

1  Q    And did you also prepare, in connection with that

2  autopsy, a report that was filed with the Office of Chief

3  Medical Examiner?

4  A    Yes, I did.

5        MR. PALACIO:  Your Honor, if we could show for the

6  witness what's marked as Government Exhibit 200 for

7  identification?

8  Q    Doctor, do you recognize what is in front of you as

9  Government Exhibit 200?

10 A    Yes.

11 Q    And what is this?

12 A    This looks like a copy of the autopsy report.

13 Q    And was this report made in the regular course of

14 OCME's business?

15 A    Yes.

16 Q    Is it the regular course of business to keep or

17 maintain this type of report?

18 A    Yes.

19 Q    Was this report made at or near the time of the autopsy

20 performed on Ms. Odom?

21 A    Yes.

22 Q    Is there a business duty to report truthfully and

23 accurately?

24 A    Yes.

25 Q    And as a medical -- as the medical examiner who

1  performed this autopsy, are you a custodian of this report?

2  A    Yes.

3        MR. PALACIO:  Your Honor, I'm offering into

4  evidence as Government's Exhibit 200.

5        THE COURT:  Any objection?

6        MS. THIELE:  No objection.

7        THE COURT:  Okay, you can publish.

8        (Government Exhibit 200 received in evidence.)

9        (Exhibit published.)

10        MR. PALACIO:  We can take it down for now.

11  Q    Dr. Straub, do you have a copy of that report before

12  you?

13  A    Yes, I do.

14  Q    And will that help you testify today?

15  A    Yes.

16  Q    Can you tell us what part of Ms. Odom's body was

17  initially received by the medical examiner's office?

18  A    Yes.  So on the 10th, which was the first day of

19  examination, I had the torso and the head.

20  Q    And what was the number given to the torso received for

21  Ms. Odom, the number from the medical examiner's office?

22  A    Yes.  Our case number for that was K-18-009095.

23  Q    Did you perform an autopsy on Ms. Odom's torso?

24  A    Yes, I did.

25  Q    And initially, when she came in, was she identified?

1    A    Initially, no.

2    Q    And did you later learn what her name was?

3    A    Yes.

4    Q    Now, did there come a point later, on April 10th, the

5    day that you performed the autopsy on Ms. Odom's torso, when

6    you responded to Canarsie Park in Brooklyn in connection

7    with that autopsy?

8    A    Yes, I did.

9    Q    Did anyone else from the medical examiner's office

10   respond to the park with you?

11   A    Yes.

12   Q    Who did?

13   A    There were individuals from our anthropology department

14   there as well as our investigator.

15   Q    And why did you respond to the park?

16   A    So earlier that day, I had performed the autopsy on

17   Ms. Odom's torso.  We had then gotten reports that there

18   were additional body parts discovered at the exact same

19   park, which appeared to be consistent with or possibly

20   consistent with that of belonging to Ms. Odom.  So I

21   responded because I was the doctor that had already

22   performed the autopsy, and it was expected that I would

23   continue to investigate this case.

24   Q    Can you tell us what you saw at the park?

25   A    Yes.  So when I arrived at the park, there was already

1  police there and our anthropology department was there, as

2  well.  We found two garbage bags there that had body parts

3  within them.

4  Q    Can you break that down for us?  What was inside of

5  each of those bags?

6  A    Yes.  So one of the garbage bags had two thighs.  They

7  looked like they were thighs.  And the other bag had the

8  other legs with attached feet as well as the forearms with

9  the attached hands.

10 Q    And did those extremities appear to belong to the body

11 of Ms. Odom?

12 A    They did initially appear consistent, yes.

13 Q    Were those body parts later sent to the ME's office?

14 A    Yes, they were.

15 Q    Did you later perform an autopsy on those body parts

16 once they arrived at the ME's office?

17 A    Yes, I did.

18 Q    When did that autopsy take place?

19 A    So that examination was done on April the 12th.

20 Q    As part of the autopsy process, did you also take

21 photographs?

22 A    Yes.

23       MR. PALACIO:  Your Honor, with the Court's

24 permission, if we could show the witness what is marked as

25 Government's 201 to 215 for identification.

1    THE COURT:  All right.  Subject to our prior

2    discussion, do you have any objection to these going into

3    evidence?

4    MS. THIELE:  No, Your Honor.

5    THE COURT:  All right.  Those are in evidence.

6    (Government Exhibits 201-215 received in evidence.)

7    Q    Dr. Straub, I would like to talk now about the external

8    examination of Ms. Odom's body.

9    And, again, just remind us what an external

10   examination is.

11   A    Yes.  So an external examination is part of the autopsy

12   that we perform.  And generally we take down general body

13   characteristics, you know, height, skin color, general body

14   habitus.  We will also note down any identifying marks,

15   tattoos, scars, as well as any injuries that we might see

16   externally.

17   Q    Can you describe the condition that Ms. Odom's torso

18   was in when it was received by the ME's office?

19   A    Yes.  So initially, when the torso was received, it was

20   covered in a number of leaves and twigs, things like that.

21   There was no clothing with the body.  The arms were cut off,

22   just around the elbows.  And the legs were cut off just

23   right at the thighs.

24   Q    Did you notice any evidence or signs of decomposition

25   to Ms. Odom's body?

1  A    Not a whole lot.

2  Q    What did the absence or very -- or the sign of very

3  little decomposition indicate to you?

4  A    Well, in general terms, it would mean that the body had

5  not been deceased for that long.

6  Q    Did you record Ms. Odom's age?

7  A    Yes.

8  Q    And what was that?

9  A    The reported age was 26 years.

10 Q    Did you also record the approximate weight of

11 Ms. Odom's head and torso?

12 A    Yes, I did.

13 Q    What was that?

14 A    I will have to refer to my notes.  The head and torso

15 weighed approximately 78 pounds.

16       MR. PALACIO:  If we could show the witness

17 Government Exhibit 205.

18       (Exhibit published.)

19 Q    Dr. Straub, can you tell us what we are looking at?

20 A    Yes.  This is a photograph of Ms. Odom's face taken at

21 the time of autopsy.

22 Q    And can you describe the condition of her face?

23 A    Well, her face, as you can see, has a number of

24 superficial injuries to it.  There are a lot of scrapes or

25 abrasions, these red marks, on her face.  And she does have

1  one small incised wound just to the left corner of her

2  mouth.

3  Q    What is an incised wound?

4  A    So an incised wound is a type of sharp force injury.

5  In definition, it is longer on the skin than it is deep, so

6  it's a very shallow wound.

7  Q    And in that external examination, did you notice any

8  tattoos to Ms. Odom's body?

9  A    Yes.

10 Q    What did you notice?

11 A    There was one tattoo just above the left breast.

12 Q    And what did it say?

13 A    The tattoo stated:  Chocolate.

14        MR. PALACIO:  And if we could show the witness

15 Government Exhibit 206.

16        (Exhibit published.)

17 Q    Can you tell us what we see here?

18 A    Yes.  This is a photograph of that tattoo.

19 Q    And this is above the left breast?

20 A    Yes.

21 Q    Can you give us an overview of the types of injuries

22 you noted to Ms. Odom's torso when you began that external

23 examination?

24 A    Yes.  So as I mentioned, there were several superficial

25 scrapes to her face.  In addition to that, there were

1    several additional scrapes to her torso, front and back,

2    some of them were very, very fine and linear.  Some of them

3    actually did break into the skin very superficially.  There

4    was no bleeding associated with any of those injuries.

5           In addition, she had very coarse hemorrhages or

6    bleeding in her eyes in the soft tissues around her eyes.

7           MR. PALACIO:  If we could show the witness

8    Government Exhibit 207.

9           (Exhibit published.)

10   Q    Dr. Straub, can you describe what we see here?

11   A    Yes.  This is an overall photograph of the front of

12   Ms. Odom's torso.

13   Q    And can you describe the locations of dismemberment?

14   A    Yes.  So in the photograph, you can see that the arms

15   have been dismembered, just above the elbow.  So the right

16   arm is actually cut just above the elbow joint, so it's

17   through the humerus bone.  The left one is actually directly

18   through the elbow joint itself.  And then the thighs are cut

19   both through the proximal femurs, right at the top of the

20   femurs.

21   Q    And can you describe the difference in appearance of

22   the two thighs?

23   A    The right thigh has additional -- there's an additional

24   skin flap there, so the cut was not exactly straight up and

25   down in relation to her body.  It's sort of at an angle.

1　Q　Dr. Straub, as part of the -- before you began the

2　autopsy, did you also perform a sexual assault evidence

3　collection kit?

4　A　Yes, I did.

5　Q　And what is that?

6　A　So the sexual assault evidence collection kit is a box

7　that has several envelopes with different swabs and things

8　that you can take as part of collecting evidence for that.

9　So you can choose which things to take or not.  So some of

10　those swabs will include swabs of the mouth, the genitals,

11　the anus.  If you notice any other debris or anything, you

12　can submit that for evidence as well.  And in addition,

13　there are envelopes for collecting hair and clothing.

14　Q　Why is that done?

15　A　That is done basically to collect any evidence, trace

16　DNA or anything that might be on the body to help with the

17　investigation.

18　Q　But in what circumstances?

19　A　Usually for us it will be in circumstances where we

20　might suspect sexual assault.

21　Q　Were swabs of Ms. Odom's neck also taken?

22　A　Yes.

23　Q　Now, I would like to focus on the external examination

24　of Ms. Odom's head and neck.  But first, can you tell us the

25　difference between contusions, abrasions, and lacerations?

1   A    Yes.  So contusions, abrasions and lacerations are all

2   blunt force injuries in that they're not caused by a sharp

3   instrument.  They're usually caused by either a blunt object

4   hitting somebody or somebody hitting a blunt surface.  So

5   contusions are bruises, all right?  We've all had bruises

6   before, so that's a contusion.  An abrasion is a superficial

7   scrape of the skin, like road rash, is an example.  And they

8   will usually be a reddish color.  And then a laceration is

9   an actual tearing of the skin, so it's a physical defect in

10  the skin or in an organ.

11  Q    Can you tell us what hemorrhaging is?

12  A    Yes.  So hemorrhaging is a term that just means

13  bleeding.

14  Q    And can you tell us what petechiae is?

15  A    Yes.  So petechia are a specific type of hemorrhage

16  that we will sometimes see particularly in the eyelids or in

17  the mucous membranes around the eye as well as in the -- the

18  mouth around the oral mucosa.  And those are very, very fine

19  pinpoint hemorrhages that, to us, make us concerned for some

20  sort of asphyxia or compression, some sort of vascular

21  insult.

22  Q    What causes petechiae to appear?

23  A    So there can be a couple of different things that can

24  cause petechiae to appear, but generally it is thought to be

25  a mechanical manifestation of some sort of vascular

1  compression.  So if you are impairing blood flow in one

2  direction but not the other, the blood will back up into the

3  smaller vessels, and so once the blood backs up too much, it

4  can cause the smaller vessels to burst and that will cause

5  those little pinpoint hemorrhages.

6  Q    And did you see any evidence of petechiae on Ms. Odom's

7  body?

8  A    Yes, I did.

9  Q    Where did you see that?

10  A    She did have some petechiae on the right lower eyelid

11  and she had a few very fine petechiae in her mouth on the

12  gingival mucosa.

13  Q    And did you also see hemorrhaging in her eyes?

14  A    Yes, I did.

15  Q    Where?

16  A    She had very coarse hemorrhages in both of her eyes,

17  upper and lower.

18  Q    And what does that mean, "coarse hemorrhages"?

19  A    Coarse just means larger hemorrhages.  So petechiae are

20  very pinpoint and fine and when I'm saying course, I mean

21  that there's much larger.

22  Q    And what did that indicate to you?

23  A    To me, that indicates that there likely was some sort

24  of vascular compression or compromise to cause the blood to

25  back up into her head and burst those vessels.

1    MR. PALACIO:  If we can show the witness

2  Government Exhibit 201.

3        (Exhibit published.)

4    MR. PALACIO:  And if we can zoom in on the top

5  half of the photograph.

6  Q    All right, Dr. Straub, can you tell us what we are

7  looking at here?  Specifically, which eye and then describe

8  what we see.

9  A    Yes.  So this is a photograph of the left eye.  And

10  this is the upper eyelid of the left eye.  So I have the

11  eyelid pulled upward and out so that you can see the

12  undersurface of the eyelid, that's this top part here.  And

13  you can see here in the inside part of her eye, this coarse

14  hemorrhage that I was describing, this area of bleeding

15  right on her eyeball.

16  Q    And just for reference, what is the scale that we see

17  below?

18  A    This is the scale with the measurement and it has our

19  case number.

20    MR. PALACIO:  If we could show the witness

21  Government Exhibit 202.

22        (Exhibit published.)

23    MR. PALACIO:  And again, if we can zoom in around

24  the area around the eye.

25  Q    Dr. Straub, which eye are we looking at, and can you

1   tell us what you observed?

2   A    Yes.  So this is still the left eye, but this is now

3   the lower eyelid that is pulled downward so that you can

4   see, again, this coarse hemorrhage that is just right along

5   the entire lower part of her eyelid, here.  And she has an

6   additional hemorrhage right in the corner of her eye, as

7   well.

8   Q    Dr. Straub, we are showing you Government Exhibit 203.

9          (Exhibit published.)

10         MR. PALACIO:  And once again, zooming in in the

11  area around the eye.

12  Q    Dr. Straub, I believe you said that you noticed

13  petechiae in the right eye; is that correct?

14  A    Yes.

15  Q    Do you see that here?  And can you describe where it is

16  and how it looks on this photograph?  You should be able to

17  circle on the screen itself.

18  A    Yes.  So this is a photo of the right eye and

19  specifically the lower eyelid of the right eye.  And you can

20  see again there is a coarse hemorrhage.  Here is the coarse

21  hemorrhage.  And in the lower right eyelid, you can actually

22  see the petechiae, which are these smaller pinpoint

23  hemorrhages and there are a couple -- you know, there are

24  several fine ones here, as well.

25         MR. PALACIO:  At the bottom, I believe, right-hand

1   side, there is a clear button.

2         All right.  We're showing you Government

3   Exhibit 203 -- I'm sorry, 204.

4         (Exhibit published.)

5   Q    And again, can you tell us what we see here?

6   A    Yes.  So this is another picture of the right lower

7   eyelid.  Again, just to point out the -- the very coarse

8   hemorrhage that is here, and several of the petechiae that

9   you can make out down here on the actual eyelid.

10  Q    Can you tell us what livor mortis is?

11  A    Yes.  So livor mortis is a phenomenon that happens

12  after a person is deceased where the blood will pool into

13  the gravity-dependent areas, meaning that if a person dies

14  and then is lying flat on the floor, the blood will pool

15  towards their back, right, it will just pool towards the

16  floor.  And so you will get this discoloration of the skin

17  along the back that is just a phenomenon we see in the

18  postmortem setting.

19  Q    And can you tell us what Tardieu hemorrhages are?

20        MR. PALACIO:  That's T-A-R-D-I-E-U.

21  A    Yes.  So Tardieu hemorrhages are essentially

22  accentuated livor mortis, right?  So they are coarse

23  hemorrhages that we would see that is basically where the

24  liver has become so distended that the vessels will actually

25  burst and so you will get coarse hemorrhages that is just

1   part of the livor mortis.  But we will only see Tardieu

2   hemorrhages in areas of lividity, because it's part of the

3   lividity process.

4   Q    And did you notice -- and does that type of

5   hemorrhaging, the Tardieu hemorrhaging, occur premortem or

6   postmortem?

7   A    That happens postmortem, *i.e.*, after death has

8   occurred.

9   Q    Was the evidence of petechiae in Ms. Odom's eyes and

10  mouth consistent with Tardieu hemorrhaging?

11  A    It does look similar, but I do not think it is

12  consistent with Tardieu.

13  Q    Why not?

14  A    If it were Tardieu, I would expect her face to have

15  also had Tardieu spots.  If she had been facedown for a long

16  period of time, I would expect the livor mortis to have

17  collected on her face and for there to have been Tardieu

18  hemorrhages on her face and sometimes we can see the eye

19  hemorrhages as part of that total picture of Tardieu.

20  Q    Did you notice any internal hemorrhaging on Ms. Odom's

21  chest?

22  A    On her chest, no.

23  Q    Now, turning to the internal examination of Ms. Odom's

24  body, did you examine all of her organs?

25  A    Yes, I did.

1  Q    And what general observations did you make to her

2  organs?

3  A    In general, her organs were not injured and appeared to

4  be healthy.

5  Q    Did this include a review of her cardiovascular system?

6  A    Yes.

7  Q    And what observations did you make?

8  A    That her cardiovascular system appeared to be healthy,

9  there was no atherosclerosis, her heart was of a normal

10 size.

11 Q    And how about her digestive system?

12 A    It appeared to be normal.

13 Q    Did you see any evidence of disease in Ms. Odom's body?

14 A    Natural disease, no.

15 Q    And turning your attention specifically to the internal

16 examination of Ms. Odom's neck, what did you do to explore

17 her neck?

18 A    So with the neck dissection, particularly, in

19 Ms. Odom's case, we did a layer-by-layer dissection.  And

20 what I mean by that is, so the anterior neck has several

21 layers of strap muscles and we will take those layers out

22 one by one and look at the muscles individually to assess

23 for any injury or hemorrhage.  You know, we will also look

24 at the cartilage of the larynx and the trachea to see if

25 there are any fractures.  We will look at the hyoid bone,

1   which is a small C-shaped bone that sits right above your

2   voice box, and we'll check that for any signs of hemorrhage

3   or fractures as well.

4   Q    And once you reflected Ms. Odom's neck, can you tell us

5   what you observed?

6   A    Yes.  So in Ms. Odom's neck, I saw that there was a

7   small hemorrhage or bleeding in one of the strap muscles on

8   the right side of her neck.

9   Q    And what observations did you make to her larynx and

10  hyoid bone?

11  A    The larynx and hyoid bone, I did submit to anthropology

12  for further evaluation, but initially I did not note any

13  hemorrhages or fractures to that.

14  Q    And what did the internal hemorrhaging that you saw

15  indicate to you?

16  A    To me that indicates that there was possibly some sort

17  of pressure or compression on the neck at some point.

18  Q    Were you able to tell if that hemorrhaging occurred

19  premortem or postmortem?

20  A    Likely premortem.

21  Q    Can you tell us what mechanism of death means?

22  A    Yes.  So we've already discussed cause and manner of

23  death, right?  So a cause of death is the underlying disease

24  or injury process that causes a person's death.  The

25  mechanism of death is sort of the explanation of how that

1   disease actually causes the death.  It's sort of the

2   definition of death.  So some examples of a mechanism would

3   be examination, right?  Bleeding out, right?  So if someone

4   is shot, the cause of death is the gunshot wound, but the

5   mechanism would be the -- the hemorrhaging, right, the

6   examination.  They're dying because they're losing blood.

7   So asphyxia is a mechanism of death and that explains, you

8   know, how a death is occurring, but there are several

9   different causes of asphyxia.

10  Q    What did the combination of the petechiae that you

11  observed in Ms. Odom's eyes and the evidence of hemorrhaging

12  in her neck indicate to you with respect to her mechanism of

13  death?

14  A    Those things taken in combination to me strongly

15  indicate that the mechanism was likely an asphyxia.

16  Q    What is asphyxia?

17  A    So asphyxia is a mechanism of death.  Basically, it

18  means that there is a disruption in the oxygen that the body

19  receives.  So there's a lack of oxygen and a buildup of

20  carbon dioxide.  And for asphyxia to be in play, that lack

21  of oxygen needs to happen in some unnatural fashion, right,

22  because a lack of oxygen is essentially a definition of

23  death, right?  Everybody dies because they lose oxygen, so.

24  Q    What are different types of asphyxia?

25  A    So some examples of asphyxia, right, you could have --

1    excuse me -- external compression of the neck or the airway,

2    right.  So in a hanging, for instance, if there is some sort

3    of ligature compression, manual strangulation, choke hold.

4    You can also have internal obstruction of the airway, right,

5    like in a choking for instance.  If someone chokes on food,

6    they are obstructing their airway and therefore obstructing

7    oxygen.  You could also have exclusion of oxygen from the

8    air, right, so if you put a bag over your head and you are

9    displacing the oxygen, that's another type of asphyxia.

10   Drowning is another example of asphyxia because you are not

11   getting oxygen from your environment, carbon monoxide

12   poisoning is another example.  There are several types.

13   Q    And based on your training and experience, how long

14   does it take to manually strangulate a person?

15   A    To cause death?

16   Q    To cause death.

17   A    That would be somewhere in the order of minutes.

18   Q    What happens to the human body as someone is being

19   asphyxiated?

20   A    So essentially, when you are asphyxiating, you are

21   cutting off, you know, the oxygen flow to your organs and

22   your brain, in particular, is very sensitive to the lack of

23   oxygen because it just needs a constant supply of oxygen to

24   keep going.  So your brain can really only survive a couple

25   of minutes without oxygen before there is irreversible brain

1  damage and eventually, if you don't get any oxygen, that
2  will cause death.
3  Q    And based on your training and experience, you
4  discussed your observations to the hyoid bone.  Is there
5  always injury or fracture to that bone in cases of neck
6  compression?
7  A    Not always, no.
8  Q    Why not?
9  A    Well, it just depends on how much force and effect, how
10 that force is applied.  So the lack of a fracture does not
11 really rule out that a strangulation did not happen.
12 Q    Now, I would like to move on to the external
13 examination of Ms. Odom's limbs.
14        You told us earlier that her extremities were
15 recovered from Canarsie Park -- you saw them on April 10th?
16 A    Yes.
17 Q    Can you describe the condition of her limbs when they
18 were received by the ME's office?
19 A    Yes.  So we received them in -- in two separate bags,
20 as previously described.  They were intact, other than the
21 areas where they were dismembered, and appeared to be
22 consistent both in terms of body size and skin color and as
23 well as which portions were missing to that of Ms. Odom's
24 torso.
25 Q    Did you notice any evidence of decomposition to those

1   extremities?

2   A    Not much at all.

3   Q    And what did the absence of that indicate to you?

4   A    Just that death occurred fairly recently.

5   Q    Once you received all of Ms. Odom's body parts, were

6   you able to approximate her overall height and weight?

7   A    Yes.

8   Q    And what was her approximate height?

9   A    Her overall approximate height was five foot three

10  inches.

11  Q    And her weight?

12  A    The total weight was 117 pounds.

13  Q    Were you able to tell if the dismemberment took place

14  premortem or postmortem?

15  A    Yes, I was able to tell.

16  Q    How so?

17  A    Because of the lack of hemorrhage around all of the

18  dismemberment sites, that indicated to me that it happened

19  in the postmortem setting, *i.e.*, after the death had

20  occurred.

21  Q    What happens to a human's blood flow after death?

22  A    So after death, right, the heart is not beating anymore

23  and so the blood flow just stops, right?  There's no active

24  blood flow anymore because the heart's not pumping blood

25  anymore.

1    Q    And based on your training and experience, would you

2    expect a postmortem dismemberment to be as bloody as a

3    premortem one?

4    A    No.

5    Q    Why not?

6    A    Well, again, because there's no active heartbeat,

7    right?  So if the dismemberment happened in the premortem

8    setting, before death had occurred, there would still be the

9    heart pumping blood and so if you cut into vessels, there's

10   going to be active bleeding occurring from those injured

11   vessels.  Whereas in a postmortem setting, you know, there

12   is no active heartbeat anymore, and so if you cut into

13   vessels in a postmortem setting, there is just going to be

14   passive leakage of blood, because there is still going to be

15   blood in the vessels and it will just leak out, but there's

16   not going to be that active flow anymore.

17   Q    Now, I would like to talk about the -- your examination

18   of the dismemberment locations.

19         Can you tell us where the right arm was severed?

20   A    Yes.  So the right arm was cut just above the elbow

21   joint.  So it's cut through the -- the distal end of the

22   humerus.

23         MR. PALACIO:  If we could show the witness

24   Government Exhibit 208.

25         (Exhibit published.)

1      MR. PALACIO:  And if we could zoom in, yes, around

2   that area.  A little bit lower.

3   Q   Dr. Straub, can you tell us what we're looking at?

4   A   Yes.  So this is a photograph of the dismemberment site

5   of the right arm.

6   Q   And can you describe the margins and what you see

7   there?

8   A   Yes.  So the margins or the edges around this

9   dismemberment site are very irregular and jagged.  It's not

10  a straight clean line at all.  And you can see there are

11  additional several parallel defects here in the skin

12  adjacent to that.

13  Q   What did those parallel defects indicate to you?

14  A   That those must have occurred in the process of the

15  dismemberment.  There's no hemorrhage to them whatsoever.

16  And they're parallel to the line of cut of the

17  dismemberment.  It could be from whatever instrument that

18  was being used or it could be from stretching of the skin as

19  that site is getting cut.

20      MR. PALACIO:  And if we can show -- before I do

21  that --

22  Q   Can you tell us where the left arm was severed?

23  A   Yes.  The left arm was cut actually at the elbow joint.

24      MR. PALACIO:  If we could show the witness

25  Government Exhibit 209.

1              (Exhibit published.)

2    Q    Can you describe what we see in Exhibit 209?

3    A    Yes.  So this is a closer-up photograph of the

4    dismemberment site through the left elbow.

5    Q    And can you describe the margins here of the injury?

6    A    Yes.  So the margins, while straighter than from the

7    right side, are still a little bit irregular.  You can see

8    right up here.

9              What happened?  It's not letting me do it anymore.

10             But right up at the top you can see where the skin

11   is irregular and jagged.

12   Q    Now moving down to Ms. Odom's legs, can you tell us

13   where they were severed from her body?

14   A    Yes.  So the legs were actually cut in two spots.  So

15   from the body, they were cut right at the -- the groin.  So

16   right at the -- where the legs start.

17   Q    And at what other location?

18   A    And then near the knees was the second location.

19   Q    We're showing you Government Exhibit 210.

20             (Exhibit published.)

21   Q    Can you tell us what we see here?

22   A    Yes.  So this is an overall photograph of both of the

23   lower extremities.

24   Q    And I'm showing you Government Exhibit 215.

25             (Exhibit published.)

1  Q    Can you tell us what location of Ms. Odom's body we're

2  looking at?

3  A    Yes.  Sorry.  This is the proximal left thigh.

4  Q    Did you also -- you told us her legs were also severed

5  at the knees; is that correct?

6  A    Yes.

7  Q    I am showing you Government Exhibit 214.

8         (Exhibit published.)

9  Q    Can you describe what we see, and also the margins of

10 the injury?

11 A    Yes.  So this is a photograph of the dismemberment site

12 through the right knee.  So the top part of this photograph

13 is the right thigh.  And at the bottom where the label is,

14 that's the right leg.

15 Q    And did you also see those parallel markings?

16 A    Yes, yes.  At the top of the photograph, you can see

17 again those parallel markings right along the margins on the

18 skin.

19 Q    I'm showing you Government Exhibit 211.

20        (Exhibit published.)

21 Q    And what are we looking at here?

22 A    This is a photograph of the dismemberment site of the

23 left leg around the knee.

24 Q    Now, Dr. Straub, you testified that there was little,

25 if any, evidence of decomposition; is that fair?

1    A    Yes.

2    Q    But can you give an estimation of when cause of death

3    would have taken place?

4    A    That's difficult, so probably no.

5    Q    Are there factors that play into that?

6    A    Several.

7    Q    Such as?

8    A    So in estimating the time of death, we -- we'll look --

9    you know, we'll assess things like the rigor mortis, how

10   stiff the body is, the livor mortis, if that's set or not

11   set yet, the temperature of the body, things like that, but

12   there are several outside factors that can affect all those

13   things that can change how quickly a body will decompose.

14   So the person's own body habitus, whether they're obese or

15   skinny will affect how long they retain their own body

16   temperature because anything that retains the body

17   temperature or anything that has a higher temperature will

18   cause the body to decompose faster, and anything that's in a

19   colder environment will slow down that decomposition

20   process.  So if she's outside, if she has clothing or not,

21   you know, the temperature of the outside, whether there are

22   bugs there or not, all those things will play into how

23   quickly a body will decompose.  And so it's very -- very

24   difficult to estimate time of death.

25            (Continued on the following page.)

1  BY MR. PALACIO:   (Continuing.)

2  Q    So, is it fair to say that colder temperatures slow down

3  decomposition?

4  A    In general, yes.

5  Q    As part of the autopsy was a toxicology conducted?

6  A    Yes.

7  Q    Can you tell the jury what toxicology is?

8  A    Yes.   Toxicology is another field of study that basically

9  looks at measuring different substances in a person's bodily

10  fluids or organs to assess the presence of drugs, medications,

11  alcohol, any substance really, just to see what the levels are

12  and then what the effects are on the person.

13  Q    Were various bodily fluids from Ms. Odom tested?

14  A    Yes.

15  Q    Which fluids?

16  A    The blood was tested and also the bile.

17  Q    In the toxicology report of Ms. Odom was any alcohol

18  found in her body?

19  A    No.

20  Q    Were there any drugs detected in Ms. Odom's system?

21  A    Yes, there were.

22  Q    Which drugs?

23  A    So, there was cocaine present and there was fentanyl

24  present and there was fluoro isobutyl fentanyl present.

25  Q    Generally speaking, what effect does cocaine have on the

1  human body?

2  A     In general terms cocaine is a stimulant drug in that it

3  sort of revs your body up.  Its main effect is on the heart.

4  It will cause your heart rate to go up and blood pressure to

5  go up.  It effectively amps up your heart.

6  Q     What effect does fentanyl have on the human body?

7  A     So fentanyl in contrast to cocaine is a depressant drug.

8  Its effects are mostly on the respiratory system, on

9  breathing, in that it will cause your breathing to slow down.

10 Q     What was the level of fentanyl in Ms. Odom's body?

11 A     The fentanyl level was 0.39 nanograms per milliliter.

12 Q     And are you able to tell when those drugs were consumed

13 in relation to Ms. Odom's death?

14 A     Not exactly, no.

15 Q     Did the consumption of those drugs contribute to her

16 death?

17 A     No.

18 Q     Doctor, to a reasonable degree of medical and scientific

19 certainty, what was the cause of death for Ms. Odom?

20 A     The cause of death was homicidal asphyxia.

21           MR. PALACIO:  Your Honor, nothing further.

22           THE COURT:  Cross-examination?

23           MS. THIELE:  Yes, Your Honor.

24 CROSS-EXAMINATION

25 BY MS. THIELE:

1  Q    Good morning, Dr. Straub.

2  A    Good morning.

3  Q    You performed the autopsy of Brandy Odom in April of

4  2018?

5  A    Yes.

6  Q    And you prepared the autopsy report in this case as well?

7  A    Yes.

8  Q    In preparation for your trial testimony you spoke with

9  the Government?

10 A    Yes.

11 Q    How many times would you say?

12 A    Probably two or three.

13 Q    Approximately how long were each of those meetings?

14 A    An hour to --

15         MR. PALACIO:  Objection.

16         THE COURT:  Beg your pardon?

17         MR. PALACIO:  Objection.

18         THE COURT:  Overruled.

19 BY MS. THIELE:

20 Q    How many people were present?

21 A    It varied.

22 Q    Approximately.

23 A    Between one to three.

24 Q    Do YOU remember if any of them were taking notes at any

25 of those meetings?

1   A    I am not sure.  It was over Zoom.

2   Q    Okay.  You testified that the cause of death was

3   homicidal asphyxia; correct?

4   A    Yes.

5   Q    And strangulation usually involves pressing the front and

6   sides of the neck?

7   A    It can.

8   Q    And a person can LOSE consciousness after only ten

9   seconds?

10  A    That's possible, yes.

11  Q    And death can result, I believe as you testified, only

12  after minutes of constant and sustained compression?

13  A    That's correct.

14  Q    You testified about certain juries you believe Brandy

15  Odom sustained before her death; correct?

16  A    Yes.

17  Q    She sustained an injury to the back of her head?

18  A    There was a small one.

19  Q    Bruises on the back of her right forearm?

20  A    Yes.

21  Q    And on her right and left legs?

22  A    Yes.

23  Q    Observing these premortem injuries, you cannot conclude

24  how exactly these injuries were sustained; correct?

25  A    That is correct.  I don't know how they were sustained.

1  Q    You also testified that you performed a sexual evidence

2  collection kit in this case?

3  A    Yes.

4  Q    And that kit suggested no sexual trauma to Brandy Odom;

5  correct?

6  A    I only collected the evidence.  I didn't examine the

7  results of that.

8  Q    Okay.

9         MS. THIELE:  Give me one second.

10  BY MS. THIELE:

11  Q    A toxicology report was also prepared in this case,

12  correct?

13  A    Yes, there was.

14  Q    And it showed traces of cocaine in Ms. Odom's system?

15  A    Yes.

16  Q    And traces of fentanyl?

17  A    Yes.

18  Q    And just knowing the amounts observed in Brandy's body

19  you cannot tell us anything about how these drugs may have

20  affected her behavior while she was alive; correct?

21  A    Correct.  I don't know how these particular levels would

22  have affected her individually.

23  Q    And would it be fair to say that she could have used the

24  cocaine only a few hours before her death?

25  A    That's possible, yes.

1   Q    And the fentanyl a day before or even two days before?

2   A    Possibly.

3   Q    Fentanyl stays in the body longer than cocaine; correct?

4   A    It does, yes.

5   Q    After examining Brandy Odom's body, you concluded that

6   there was no discernable lividity; correct?

7   A    That's correct.

8   Q    Can you explain to the jury what lividity is?

9   A    Yes.  So lividity or rigor mortis is that phenomenon we

10  discussed where the blood will pool in the tissue towards the

11  gravity dependent areas after death occurs.

12  Q    Would it be fair to say that in general blood that has

13  settled in a body due to gravity becomes fixed after

14  approximately eight to twelve hours?

15  A    The time can vary, but that's the general rule.

16  Q    And no matter how much time has passed after the blood

17  becomes fixed, it stays fixed; correct?

18  A    Yes.  It would typically stay fixed.

19  Q    And lividity may be more difficult to discern in a person

20  with dark skin?

21  A    It can be at times.

22  Q    But you would still expect to detect some lividity if her

23  blood had become fixed in this case; right?

24  A    Yes.

25  Q    And observed perhaps postmortem hypostatic hemorrhages

1   or --

2   A    Can you repeat the question?

3   Q    Yes.  You might also expect, if the blood had become

4   fixed in her body, to see evidence of postmortem hypostatic

5   hemorrhaging?

6   A    We don't always see them.  You can, but not always.

7   Q    Okay.  But you did not see them in this case; correct?

8   A    No, I did not.

9   Q    Approximately how many liters of fluid are in the average

10  human body?

11  A    For the average person the total blood volume is about

12  five to seven liters.

13  Q    And turning to the dismemberment itself, would it be fair

14  to say that cutting through long bone takes some effort?

15  A    I would expect it would.

16  Q    And you noted that the edges around the dismemberment

17  site were jagged?

18  A    Yes.

19  Q    Some with parallel defects and stretches in the skin?

20  A    Yes.

21  Q    There were no straight, clean cuts at the dismemberment

22  sites; correct?

23  A    No.  They were all fairly irregular.

24  Q    Is there any way to tell whether one person did this

25  versus multiple?

1    A    No.

2    Q    In your role as a medical examiner, what tools have you

3    used, if any, to cut through bone during examinations?

4    A    So, we when perform autopsies we do use what's called a

5    Stryker saw or a bone saw to cut through bone, particularly

6    with the skulls, because we will examine the brains in every

7    case.

8    Q    Can you describe what that saw looks like?

9    A    It's a handheld device that has a handle that you can

10   hold and there's a little semicircular saw at the end of it.

11   It's designed to only cut through bone.  So it will actually

12   not cut through soft tissue like muscle and fat.

13   Q    And that's a mechanical tool; correct?

14   A    Yes.

15   Q    Understanding that there are a number of variables would

16   you say that it would take only a few minutes to go through

17   bone with that saw that you're describing?

18   A    It depends on which bone and the person using it, but

19   probably minutes or so.

20   Q    And if a mechanical tool was used on tissue, let's say a

21   saw, a regular saw, would you expect blood and tissue may be

22   sprayed on lateral surfaces?

23   A    It could be.

24   Q    Would you expect the same of bone particles; that they

25   may be sprayed on lateral surfaces?

1    A    There could be.

2    Q    There were no good signs of decomposition in this case;

3    correct?

4    A    Correct.  There were not.

5    Q    And if there were, can you explain to the jury what you

6    would expect to see?

7    A    Well, so, for decomposition there are a couple of

8    different types that depend on the environment that that

9    person is in.  One type of decomposition is putrefaction where

10   the skin will start turning, like, a greenish-brown color and

11   it might start sloughing off and the person may become bloated

12   with gasses that the bacteria are producing as they decompose

13   the tissue.

14          Another type of decomposition we can see in very dry

15   environments is mummification where the skin will get dry and

16   papery and turn brown/orange color and I did not see either of

17   those.

18   Q    Would it be fair to say that signs of decomposition in

19   general start to occur within 36 to 48 hours after death?

20   A    In very general terms, yeah.

21          THE COURT:  Does that depend, again, on the

22   environment?

23          THE WITNESS:  Very much so, yes.

24   BY MS. THEILE:

25   Q    If a dead body was kept at room temperature for a couple

1   of days, would you expect to see some of these signs of

2   decomposition?

3   A    Again, perhaps it depends on several other factors as

4   well.

5   Q    Sure.  If a body was kept in something that, say,

6   retained heat, could that also speed up the decomposition

7   process?

8   A    Yes.  If there was a hotter environment then I would

9   expect the process to be sped up.

10  Q    And a dead body can start to emit a smell during the

11  decomposition process; correct?

12  A    It can, again, depending on the type of decomposition.

13  Q    Would you expect more smell the further into the

14  decomposition process?

15  A    In general, yes.

16  Q    And I believe you testified that you would not be able to

17  tell us how much time passed between Brady Odom's

18  dismemberment and when her body was discovered in Canarsie

19  Park, correct?

20  A    That's correct.  I would not be able to estimate.

21  Q    You kept case notes in this case; correct?

22  A    Yes.

23       MS. THIELE:  Mr. Gover, can you please pull up

24  Government Exhibit 200 which is already in evidence at page

25  35?

1          (Exhibit published.)

2  BY MS. THIELE:

3  Q    Dr. Straub, do you see the entry that is highlighted and

4  we'll zoom in for you.

5  A    All right, yes.

6  Q    Do you remember on May 16, 2018 inquiring with the NYPD

7  as to whether they had updates into their investigation into

8  Brandy Odom's homicide?

9  A    Yes.  There's a note here as such.

10 Q    Taking a look at the highlighted entry, can you please

11 read the second sentence that begins with "They as of right

12 now"?

13          MR. PALACIO:  Objection.

14          THE COURT:  Sustained.

15          MS. THIELE:  Can I have one moment, Your Honor?

16          THE COURT:  Sure.

17          (Pause in proceedings.)

18 BY MS. THIELE:

19 Q    Dr. Straub, I just want to go back to the question about

20 whether any sexual trauma was observed.

21          MS. THIELE:  Mr. Gover, can you please pull up that

22 same government exhibit at page three and four?  I believe it

23 starts at the bottom of page three.

24          (Exhibit published.)

25          MS. THIELE:  And if you can scroll down a little

1  bit.

2  BY MS. THIELE:

3  Q    Dr. Straub, can you explain to us what atraumatic

4  genitalia means?

5  A    Without trauma.

6  Q    And can you explain what it means when it says the anus

7  is unremarkable?

8  A    The anus being unremarkable, meaning I did not note any

9  injuries or lesions or anything of note.

10 Q    So, is it fair to say that no sexual trauma was observed

11 here?

12 A    Right, there was no trauma observed.

13          MS. THIELE:  Nothing further.

14          THE COURT:  Any redirect?

15          MR. PALACIO:  Yes, Your Honor.

16 REDIRECT EXAMINATION

17 BY MR. PALACIO:

18 Q    Dr. Straub, is OCME an independent agency?

19 A    Independent from what?

20 Q    From the police department, from the prosecutor's

21 offices.

22 A    Yes, it is.

23 Q    What does that mean to be an independent agency?

24 A    So, we operate under our own procedural standards and do

25 our own investigations.

1   Q    So, fair to say that the medical examiner's office is not

2   an arm of the police or of the prosecutor's offices?

3   A    That's correct.

4   Q    Is it also fair to say that you meet with prosecutors and

5   defense attorneys equally?

6   A    Yes.

7   Q    In this case have you met with Mr. Cecutti and

8   Ms. Theile?

9   A    I did have a phone conversation, yes.

10  Q    When did you most recently speak with them?

11  A    Monday morning.

12  Q    Now, Ms. Thiele asked you some questions about bruising

13  on Ms. Odom's arms and legs.  Do you remember those

14  questions?

15  A    Yes.

16  Q    And can you tell us specifically where that bruising was?

17  A    Yes, I did note some bruising under the skin to the back

18  of the right forearm as well as the front of the left leg and

19  to the outside side of the right leg.

20  Q    Was that bruising -- I'm sorry, did you also notice

21  internal hemorrhaging at those locations?

22  A    Those were internal under the skin.

23  Q    Was that bruising consistent with physical restraint?

24  A    It could be.

25  Q    Ms. Thiele asked you some questions about the locations

1    where Ms. Odom was dismembered.  Did you examine Ms. Odom's

2    bones yourself?

3    A    Only briefly.

4    Q    Did another medical professional examine the bones more

5    carefully?

6    A    Yes.

7    Q    Who does that?

8    A    So that examination was done by our anthropology

9    department.

10   Q    And were you able to make any conclusions about what

11   tools or instruments were used to sever Ms. Odom's body?

12   A    I did not make any of those conclusions.

13   Q    Are you able to?

14   A    That's not my area of expertise.

15   Q    Ms. Thiele also asked you some questions about the

16   evidence of drug use in Ms. Odom's body.  Have you examined

17   beads where there's been death by overdose?

18   A    Yes.

19   Q    What signs do you see in the body when that is the case?

20   A    So, typically with overdose deaths particularly if

21   fentanyl or some type of opioid is involved, not always, but

22   many cases we will see soft signs that indicate that it might

23   be an overdose, those signs include extra fluid in the lungs,

24   a very full bladder.  Sometimes even the brain can be swollen.

25   It acts as a respiratory expressant so it slows your breathing

1   and the fluids will build up in the body and we can see that.

2   Q    Did you notice any evidence of that in Ms. Odom's body?

3   A    No, she did not have any of those signs.

4   Q    And what signs have you seen in cases of chronic cocaine

5   users?

6   A    So for chronic cocaine use again because cocaine mainly

7   acts on the heart and raises the blood pressure and revs up

8   the heart.  People who use cocaine a lot over a long period of

9   time, they can have a heart that looks like someone who has

10  high blood pressure.  It can be enlarged, it can be thickened.

11  Q    Did you notice any of that on Ms. Odom's body?

12  A    No.

13  Q    Ms. Thiele asked you some questions about decomposition

14  and I want to talk more about some of those external factors

15  that can play into decomposition.  If a body is kept in a cold

16  environment, what effect will that have on decomposition?

17  A    If it's in a cold environment I would expect

18  decomposition to be slowed down.

19  Q    She also asked you some questions about sexual trauma.

20  Have you examined cases involving sexual assault?

21  A    Some.

22  Q    And have you examined cases in sexual assault where there

23  is no vaginal trauma, for example?

24  A    Not that I recall specifically.

25  Q    If you're aware, does sexual assault always lead to

1  vaginal trauma?

2  A    It does not.

3  Q    Why not?

4  A    Because of the nature of the assault.  It does not

5  necessarily have to leave any jury.

6  Q    So if a person is perpetrated with a sex toy will that

7  necessarily have vaginal trauma?

8            MS. THIELE:  Objection.

9            THE COURT:  Overruled.

10  A    It would not necessarily cause injury.

11           MR. PALACIO:  Nothing further, Your Honor.

12           THE COURT:  Any cross?

13           MS. THIELE:  No, Your Honor.

14           THE COURT:  All right.  Thank you very much, Doctor.

15           You can step down.

16           (Witness excused.)

17           THE COURT:  This is a good time for a break, fifteen

18  minutes.  Please don't talk about the case or look anything

19  up.  We'll see you in a few minutes.

20           THE COURTROOM DEPUTY:  All rise.

21           (Jury exits.)

22

23

24

25

1          THE COURT:  So we'll come back at noon.

2          (Judge exits.)

3          MR. CECUTTI:  Your Honor, one question.  I didn't

4     understand Your Honor's sustaining the objection when the

5     Government objected when we had --

6          THE COURT:  Hearsay.

7          MR. CECUTTI:  But, Your Honor, it's in evidence.

8          THE COURT:  Was that a thing that was in evidence?

9     Was it in evidence.

10          MR. CECUTTI:  It's the report it's in evidence.

11          THE COURT:  It was asking for some detective saying

12    something about what the status of the case was.  It's an

13    improper question to this witness.  You can put the question

14    to somebody who would know about it, but that's why I

15    sustained it.

16          All right.  We'll be back.

17          (Recess taken.)

18          (Judge resumes bench.)

19          THE COURT:  Anything from you Mr. Cecutti before we

20    bring the jury in.

21          MR. CECUTTI:  No, Your Honor.

22          MR. PALACIO:  No.

23          THE COURT:  Let's bring the jury in.

24          (Jury enters.)

25          THE COURTROOM DEPUTY:  You may be seated.

1          THE COURT:  All right, everybody.  We are ready to

2    continue.

3          Can you call your next witness, please?

4          MS. HAJJAR:  Yes.  Your Honor, the Government calls

5    Jamie Brust.

6          (Witness takes the stand.)

7          THE COURTROOM DEPUTY:  Can you please raise your

8    right hand?  Do you solemnly swear or affirm that the

9    testimony you shall give in this case now on trial before this

10   Court and jury will be the truth, the whole truth and nothing

11   but the truth, so help you God?

12         THE WITNESS:  I do.

13         (Witness sworn/affirmed.)

14         THE COURTROOM DEPUTY:  Have a seat.  Please state

15   and spell your name for the record.

16         THE WITNESS:  Jamie Brust, J-A-M-I-E B-R-U-S-T.

17         THE COURT:  Good afternoon.  I just want to give you

18   a couple of instructions before we begin.  It's important to

19   use the microphone so everybody can hear.  Don't talk too

20   fast.  It makes it hard for the Court Reporter.  And if

21   there's a question you don't understand tell me and I'll have

22   the lawyer rephrase.  Okay?

23         Go ahead.

24         (Continued on the next page.)

25

1   **JAMIE BRUST**,

2                   called by the Government, having been

3                   first duly sworn, was examined and testified

4                   as follows:

5   DIRECT EXAMINATION

6   BY MS. HAJJAR:

7   Q    Where do you work, Ms. Brust?

8   A    American National Insurance Company.

9   Q    What is your title?

10  A    Claims consultant.

11  Q    How long have you worked for American National Insurance

12  Company?

13  A    Combined 15-plus years.

14  Q    Where are your headquarters located?

15  A    Galveston, Texas.

16  Q    Ms. Brust, what are your responsibilities as a claims

17  consultant?

18  A    I handle, review and analyze contestable claims, foreign

19  death claims, any potential fraud cases and then anything

20  other than natural causes.

21               MS. HAJJAR:  Your Honor, with the consent of the

22  defense, I would like to offer Government Exhibit 122 and

23  122-A through C into evidence.

24               THE COURT:  No objection, right?

25               MR. CECUTTI:  No objection.

1        THE COURT:  That will come in.

2            (Government Exhibits 122 and 122-A through C

3    received in evidence.)

4    BY MS. HAJJAR:

5    Q    Ms. Brust, what kind of company is American National?

6    A    Insurance company.

7    Q    And what kind of products does it provide?

8    A    We do life, annuities, health insurance, property and

9    casualty.

10   Q    And with respect to life insurance how does American

11   National determine whether to issue coverage any particular

12   case?

13   A    Through an application process.

14   Q    What are some of the factors that you consider when

15   determining whether to issue coverage?

16   A    Health issues, income.

17   Q    Do monthly premiums for American National Life Insurance

18   vary?

19   A    Yes.

20   Q    Based on what?

21   A    Based on the health history of the insured, age, income

22   itself.  Depending upon face value as well.

23   Q    The net asset value of the policy?

24   A    Yes.

25   Q    I would like to show you what's in evidence as Government

1   Exhibit 122 and if we could turn to page 409, please?

2            (Exhibit published.)

3            MS. HAJJAR:  If you could zoom in on the first part.

4   BY MS. HAJJAR:

5   Q    Ms. Brust, can you just describe what that document is?

6   A    It's page one of the -- an application for a life

7   insurance policy.

8   Q    And what is the name of the primary proposed insured?

9   A    Cory Martin.  Cory W. Martin.

10  Q    And what is the date of birth associated with this entry?

11  A    6/18 of '87.

12  Q    And the height and weight?

13  A    Height and weight is 5'11", 175.

14  Q    What does it say under "Annual Income"?

15  A    65,000.

16  Q    And "Net Worth"?

17  A    Net worth is 250,000.

18  Q    And could you also read the type of business?

19  A    Type of business is HVAC.

20  Q    And employer name?

21  A    Self-employed.

22  Q    Why does American National ask for employer information,

23  employment information?

24  A    Usually it's to compare the annual income and the net

25  worth.

1   Q    Is employment information that's specified in an

2   application taken into account in evaluating whether to issue

3   a policy?

4   A    We would look at that and compare it with the annual

5   income.  If there were any discrepancies between the two, we

6   would question it.

7   Q    And if there's -- if someone were to write unemployed

8   would that be taken into account as well?

9   A    Yes.

10            MS. HAJJAR:  So, turning to the next page, 410, at

11  the bottom if you could zoom into the category six, at the

12  bottom.

13  Q    Can you describe what kind of life insurance policy this

14  application is for?

15  A    So, this is an American National signature term policy

16  for a duration of twenty years at a specified face amount of

17  250,000.

18  Q    Can you explain to the jury in basic terms what that is,

19  what that means?

20  A    So there's two different types of life insurance; a term

21  policy or a whole life policy.  A term policy would be a short

22  period of time where that premium would be X amount for, say,

23  twenty years in this case.  So it would be a level premium.

24  Usually at the end of that twenty years, the premium would

25  usually skyrocket or increase in price.

1  Q    Which would have higher premiums, a whole life policy or

2  a term --

3  A    A term policy.  So term policies are usually going to be

4  for the same amount of a whole life and a term policy for that

5  same face value would be cheaper premiums.  For those

6  specified as a whole life policy it would usually be quite

7  higher.

8  Q    And this is a term policy?

9  A    This was a term policy.

10         MS. HAJJAR:  If we could then turn to page 413,

11 please.  And if you could highlight Section 16 where it says

12 "Insurance History."

13         THE COURT:  I just want to make sure I understand.

14 The term policy has lower premiums or higher premiums?

15         THE WITNESS:  Lower premiums.

16         THE COURT:  Okay, okay.

17 BY MS. HAJJAR:

18 Q    What did the applicant indicate under B, "Has any

19 proposed insured in the last six months applied for or is any

20 proposed insured contemplating applying for other insurance?"

21 A    It says "No."

22 Q    Why does American National ask that question?

23 A    Insurance companies look at how much insurance does that

24 individual have in force or is applying for at the time that

25 that application is completed.  They look at that because in a

1   whole insurance industries will take into consideration if

2   they can afford that amount of insurance that they're pulling

3   out or they're taking out.

4   Q    Can answers to this question affect American National's

5   decisionmaking process?

6   A    Yes, definitely.

7   Q    And turning now to the billing data that's on page 415.

8           MS. HAJJAR:  Could you could highlight that section

9   under billing data.

10  BY MS. HAJJAR:

11  Q    Ms. Brust, can you explain what this is?

12  A    This is the option of billing.  So in this case the

13  applicant stated they wanted to have a direct billing on a

14  quarterly basis.  And the individual that would be paying that

15  premium would be Cory Martin.

16  Q    What does it mean to indicate direct billing?

17  A    So direct billing means that they would be getting a

18  monthly bill per se instead of it being drafted out of an

19  account, a checking account or something of that nature.

20          MS. HAJJAR:  If you could highlight the bottom of

21  this page, please.

22  Q    Just directing your attention to the bottom here, can you

23  explain what it says under "Signature of premium payor and

24  agent"?

25  A    It's E signed on 12/8/2017 by Cory Martin.

1   Q    And what about under "Agent"?

2   A    E signed 12/8/2017 by Robert Young.

3   Q    Can you explain to the jury what the difference is

4   between using an agent and direct-to-consumer type insurance

5   policies?

6   A    So an agent usually assists the applicant in completing

7   the application process.  Sometimes they will -- any kind of

8   change of beneficiaries is more of a direct contact with the

9   applicant and then they're the middle person for the insurance

10  agent or the insurance company.

11  Q    And in this case how were the signatures transmitted from

12  payor to agent to American National?

13  A    So the agent would actually complete the application

14  based upon the questions and answers that are given by the

15  applicant and then it is usually -- in this case, if it's

16  e-signed, it's e-mailed to the applicant to complete that

17  signature like a doc signing and then it's returned back to

18  the agent.

19  Q    And then it's transmitted to American National?

20  A    Yes, correct.

21  Q    So turning then to page 420, please, and turning your

22  attention to the top half of this document, can you describe

23  what the soliciting agent's report is?

24  A    So this is like a checkoff sheet for the agent to

25  complete during the application process.  It's going to just

1  confirm some details.  If the insured was present at the time

2  the questions -- it's more so a checkoff for the agent.

3  Q    And did the agent complete this part of the application?

4  A    Yes.

5  Q    Who is the name of the licensed agent?

6  A    Robert Young.

7  Q    And what was the date of the signature?

8  A    12/8 of 2017.

9  Q    And the agent e-mail?

10 A    It is bob@truebluelifeinsurance.com.

11 Q    And the telephone number associated with the agent?

12 A    480-582-1574.

13 Q    Can you indicate what the soliciting agent wrote under

14 the first question, How long have you personally known the

15 proposed insurer?

16 A    It says zero years and zero months.

17 Q    And looking down to item I, what did the agent indicate

18 under, "Did you see each person proposed for insurance when

19 the application was completed?"

20 A    He indicated no.

21 Q    And the next one, "Was beneficiary present during the

22 completion of the application?"

23 A    He indicated no.

24 Q    Now, the next question can you explain what the next

25 question is asking?  It's item K.

1  A    "As agent do you certify that on the date of this

2  application you asked the proposed insured each question in

3  the application, recorded the answers given you, witnessed

4  such person's signature and collected the initial premiums

5  shown on the application?"  He indicated "Yes."  This is

6  basically stating that he read the questions on the

7  application and recorded them accurately as provided to him by

8  the applicant.

9  Q    When the soliciting agent's report is e-signed what does

10 it mean when the agent represents witness had such persons

11 signature?

12 A    Usually it would be that they're e-mailing that to the

13 individual, to the applicant based on the e-mail that was

14 provided to them and then they do a docusign and then it ships

15 back directly to the agent.

16         MS. HAJJAR:  If you can zoom out.

17 BY MS. HAJJAR:

18 Q    What is the date associated with this application?

19 A    12/8/2017 was when Robert Young signed it.

20 Q    Now were premiums ever paid on this policy?

21 A    No.

22 Q    Did this policy, this application, I should say, ever

23 become a policy, ever go into effect?

24 A    No.

25 Q    Turning to page 454, can you read the date on this

1  document?

2  A    December 13, 2017.

3  Q    And what is this document?

4  A    This is basically saying that the application went

5  through the underwriting process.  It was approved for issue

6  upon -- basically cash on delivery upon initial premium being

7  paid and it's giving the initial premium amount that needs to

8  be paid in order for this policy to go into effect.

9  Q    When it states that initial premium is required before

10 the policy --

11 A    That means that the policy isn't actually effective until

12 we receive that first premium.

13 Q    And turning now to page 507 of this document.

14       MS. HAJJAR:  If you could zoom in on this.

15 Q    What is the date of this document?

16 A    January 30th, 2018.

17 Q    And what does this document reflect?

18 A    This is basically stating that we never received that

19 first initial premium.

20 Q    And is that what's meant by your policy was not placed in

21 force due to the following reasons that balance of premium has

22 not been received?

23 A    Correct.

24 Q    And is there a period of time between when this

25 application was submitted and when American National informed

1    the applicant that the policy was not in effect?

2    A    Like a specified period that they --

3    Q    Yes, some time elapsed.  You said the date was January

4    30th?

5    A    Yes.  There was a period of at over -- over 30 days that

6    had elapsed between the time that we provided them the

7    opportunity to pay that premium and then the letter that goes

8    out.

9    Q    Is that typical?

10   A    Yes.

11   Q    Turning now to page one of this exhibit, and directing

12   your attention to the first page of that, the first part,

13   could you read the information related to this primary

14   proposed insured?

15   A    "Brandy Odom."

16   Q    Could you read the date of birth, height and weight

17   please?

18   A    Date of birth is 1/8/1992.  Height is 5"0" and 127

19   pounds.

20   Q    And what is the residence associated with this

21   applicant?

22   A    249-45, 148 Road in Rosedale, New York, 11422.

23   Q    And could you also read the telephone number associated

24   with this application?

25   A    718-712-8767.

1  Q    What is the type of business that's written on this

2  application?

3  A    Tax and accounting.

4  Q    What employer name?

5  A    Incore Services.

6  Q    And what is occupation job title?

7  A    Dispatcher.

8  Q    You said that this type of information is taken into

9  account when determining whether to issue a policy?

10 A    That's correct.

11        MS. HAJJAR:  Turning now to page two if you could

12 zoom in.  That's the entry for primary proposed insured --

13 sorry, section five.

14        Could you read what's specified what's specified

15 for?

16 A    Adelle Anderson.

17 Q    And what is the stated relationship to primary proposed

18 insured?

19 A    Sibling.

20 Q    Can you describe how this information is taken into

21 account by American National?

22 A    For a life insurance policy there needs to be an

23 insurable interest so there needs to be some sort of loss that

24 would be incurred in the event the insured passes away, a

25 financial loss.

1  Q    If the specified beneficiary were a stranger or a friend

2  rather than a sister would that affect American National's

3  decisionmaking process as to whether to issue such a

4  policy?

5  A    There would be additional questions that would need to be

6  asked.

7  Q    And turning now to the bottom of this page, product

8  information, can you explain to the jury what is being sought

9  by this application?

10 A    On this one, it's an American National signature term

11 policy for a duration of thirty years at $150,000 specified

12 amount.

13 Q    And, again, I think you explained that term policies

14 involve lower monthly premiums than a whole life policy?

15 A    Correct.

16 Q    Turning now to page five fair to say, Ms. Brust, there

17 other parts of this application are medical questions to be

18 answered by the proposed insured?

19 A    Correct.

20 Q    Now turning to the bottom of this page insurance history,

21 what did the -- on this application what is noted for has any

22 proposed insured applied for other insurance with any other

23 company?  I'm directing your attention to item B.

24 A    No.

25 Q    Turning now to page seven, would you highlight the bottom

1    of this page, please.  In the last application, Ms. Brust you

2    explain direct billing.

3            Is there a difference between what's filled out on

4    this application?

5    A    Yes, this one has actually requested for electronic funds

6    transfer on a monthly basis.  So it would come out of this

7    specified bank account each month, the premium would.

8

9            (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MS. HAJJAR(Continuing):

2  Q    And what is the name of the payor on the electronic fund

3  transfer?

4  A    The payor is specified as the applicant or insured,

5  Brandy Odom.

6  Q    Is there a Social Security number that's noted here?

7  A    Yes.

8  Q    The account number, is it a checking or savings account?

9  A    Checking.

10  Q    Can you read the account number, please?

11  A    00003027359093.

12  Q    What bank is this account associated with?

13  A    Capital One Bank.

14  Q    And is there a bank address and bank transit number?

15  A    There is a transit number, 065000090, and the bank

16  address is indicated as 145-15 243rd Street in Rosedale, New

17  York 11422.

18  Q    When an application designates electronic fund transfer,

19  does that mean the premiums are automatically debited from the

20  payor's account?

21  A    Upon approval of the application, the first premium would

22  be deducted immediately.

23  Q    And can you explain what we see at the bottom of this

24  document, please?

25  A    It was e-signed on 12/18/2017 by Brandy Odom and then

 1  e-signed by the agent, Robert Young, on 12/19/2017.

 2  Q    Is this the same agent name as the prior application we

 3  looked at?

 4  A    Yes.

 5  Q    And was this application also submitted electronically

 6  the same way?

 7  A    Yes.

 8  Q    Turning now to Page 13 and directing your attention to

 9  the top of this document, is this a soliciting agent's report

10  that we looked at that appears on the prior application as

11  well?

12  A    Yes.

13  Q    Looking at Item A, what did the agent put down for, How

14  long have you personally known the proposed insured?

15  A    He says, Zero years and zero months.

16  Q    And is there an estimate of the insured's annual income?

17  A    Yes, that's $70,000.

18  Q    And if you know, how does an agent determine this

19  information?

20  A    It's usually just provided by the insured, proposed

21  insured.

22  Q    For Item H, If beneficiary is not a relative, explain

23  insurable interest, can you complain what that is asking?

24  A    It's stating if it's not a family member or whatnot, then

25  to provide that -- why that beneficiary is being stated on the

1  application, what kind of financial link is there.

2  Q    It's blank next to that, but is that because the

3  beneficiary in this case was purported to be a relative?

4  A    Correct.

5  Q    For the next item, Did you see each person proposed for

6  insurance when the application was completed? what did the

7  agent write?

8  A    No.

9  Q    And, Was beneficiary present during the completion of the

10 application? what did the agent write?

11 A    No.

12 Q    And as to the next item about witnessing such person's

13 signature, is this again an electronic signature at the bottom

14 of this page?

15 A    Yes, correct.

16 Q    And what is the agent e-mail associated with this agent?

17 A    Bob@truebluelifeinsurance.com.

18      MS. HAJJAR:  Can you turn now to Page 38?

19 Q    Could you describe what this document is?

20      MS. HAJJAR:  Mr. Rader, if you could zoom in on the

21 text.

22 A    This is one of our internal sheets.  It gives a lot of

23 the issue date, application date, address, issue state, how

24 much the policy is worth, what kind of additional riders the

25 policy may have on it.

1  Q    Was this policy actually issued?

2  A    Yes.

3  Q    And what was the policy number associated with this

4  policy?

5  A    NE000183.

6  Q    Were premiums collected on this policy?

7  A    Yes, they were drafted.

8  Q    What is the issue date associated with this policy?

9  A    Issue date is December 21, 2017.

10  Q    This is for the insured, Brandy K. Odom?

11  A    Yes.

12         MS. HAJJAR:  Turning to Page 97, please.

13  Q    Can you describe what this document reflects?

14  A    That's our delivery receipt.  So, when the actual

15  contract is delivered to the insured and they have to sign

16  that to show that they got that contract.

17  Q    Can you describe how in this case the delivery receipt

18  was provided to the agent and then provided to American

19  National?

20  A    Usually, we would forward the delivery receipt with the

21  contract to the agent and the agent's responsible for

22  delivering that contract, getting the delivery receipt signed

23  and back to us, the company.

24  Q    Can that be done by mail?

25  A    Yes.

1   Q     Turning your attention to the next page, please, did

2   American National receive the delivery receipt by mail in this

3   case?

4   A     Yes.

5   Q     Was it postmarked in New York?

6   A     Yes.

7   Q     Was that received from the applicant?

8   A     Based on this envelope, it was sent through New York but

9   our agent was actually located in Scottsdale, Arizona.

10  Q     Is that the True Blue Life Insurance, Inc., that we saw

11  associated with Robert Young?

12  A     Correct.

13        MS. HAJJAR:  And turning to Page 132 and just

14  zooming in on the middle of the document, please.

15  Q     Can you describe what this document reflects?

16  A     This is a premium history for the policy on Brandy Odom.

17  Q     And is this an internal document or a document that was

18  actually provided?

19  A     So, it can be provided to the insured upon request.  Or

20  sometimes if we have a reason to have that information

21  internally, then we would print it out for our file.

22  Q     Based on the date, do you know in this case was it

23  printed out for the file?

24  A     That, I can't tell from here.

25  Q     Could you indicate the months and amounts that are

1  associated with these premium payments?

2  A     The premiums were 21.38 a month.

3  Q     And which months did you receive premium payments from?

4  A     The initial payment was done December 21 of 2017, and

5  then around that time every month up until June.  The last

6  premium was June 21, 2018.

7  Q     Now, as to this policy, did American National receive a

8  claim?

9  A     Yes.

10 Q     Ms. Brust, did you provide the Government with recordings

11 that American National received in connection with this

12 policy?

13 A     Yes, correct.

14 Q     Did you review those recordings yourself?

15 A     I did.

16 Q     Were transcripts made of those recordings?

17 A     Yes.

18        MS. HAJJAR:  May I approach the witness, your Honor?

19        THE COURT:  Yes.

20 Q     Ms. Brust, if you could flip to 122 at the back of this

21 binder.  It's tabbed 122.

22 A     Okay.

23 Q     Did you review those transcripts?

24 A     Yes.

25 Q     And to establish that you reviewed them, what, if

1  anything, did you do?

2  A    I reviewed them and then -- for accuracy based on the

3  recording itself, and then I initialed and dated.

4          MS. HAJJAR:  Your Honor, the Government offers 122A

5  and B as aids to the jury.

6          THE COURT:  Any objection?

7          MR. CECUTTI:  No objection.

8          THE COURT:  Is the recording already in evidence?

9          MS. HAJJAR:  The recording is in evidence, your

10 Honor.  But with your permission, I'd like to hand out the

11 binders.

12         THE COURT:  That's fine.

13         MS. HAJJAR:  At this time, your Honor, I'd like to

14 play Government Exhibit 122A and direct the jury's attention

15 to 122AT in the binder.

16 Q    Ms. Brust, just before we begin, what's the date

17 associated with this recording?

18 A    January 24, 2018.

19         THE COURT:  And that's at the end of the binder; is

20 that right?

21         MS. HAJJAR:  Yes, it's at the very end after the

22 Tab 122.  There are two tabs after that, A and B.

23         (Audio plays; audio stops.)

24 Q    Ms. Brust, just to clarify, how do these calls come in to

25 American National?

1   A    Through our 1-800 number, through customer service.  That

2   one did through customer service.

3           MS. HAJJAR:  Now I'd like to play Exhibit 122B in

4   evidence and direct the jury's attention to 122BT, which is

5   behind the B tab.

6   Q    Ms. Brust, what was the date associated with this

7   recorded call?

8   A    June 21, 2018.

9           (Audio plays; audio stops.)

10  Q    After receiving this call, did American National process

11  a claim on this policy?

12  A    No.  It's currently pending.

13          MS. HAJJAR:  Turning to Page 142 of Government

14  Exhibit 122, Mr. Rader, if you could just zoom in on the top

15  of this page.

16          (Exhibit published to the jury.)

17  Q    Ms. Brust, can you explain what this document reflects?

18  A    This is an internal system printout of the death benefit

19  and what we would pay on the claim.  So, it indicates death

20  benefit of $150,000, and then there's a premium refund for any

21  overpaid premiums that were not necessary to cover the

22  passing, which is an additional $71.73.

23  Q    Can you explain to the jury what you mean by "overpaid

24  premiums"?

25  A    So, any premium that they've paid in an excess to cover

1  the passing, we would refund those back to the beneficiary.

2  Q    In other words, premiums paid after the death?

3  A    It doesn't necessarily mean they were paid after the

4  death, it's just they weren't needed to cover the date of

5  death.

6         So, if she passed away in April, we would only need

7  that premium for April 21.  And anything for the next two

8  months, May and June, we would give back to the beneficiary.

9  Q    Is that what's reflected by the premium refund?

10 A    Correct.

11 Q    This internal document, when was it generated?

12        Can you tell from the bottom of it?

13 A    6/26/2018.

14 Q    And could you explain what it says at the top:  Amount

15 $150,000.

16 A    That's the face amount of the policy.

17 Q    And what does it mean when it says as of April 10, 2018?

18 A    So, that's basically generating it as of the date of

19 passing.

20 Q    Turning to Page 116, did the claims department receive an

21 e-mail?

22        Is that reflected here?

23 A    Yes, correct.

24 Q    And who is the e-mail from.

25 A    Adelle Anderson.

1   Q    What is the e-mail address associated with this?

2   A    safireb12054@gmail.com.

3   Q    Turning to the next page, Page 117, was this the contents

4   of that e-mail?

5   A    Correct.

6        MS. HAJJAR:  If you'll turn to the next page,

7   please, 118.

8   Q    Did have American National receive another e-mail from

9   the same sender?

10  A    Yes.

11       MS. HAJJAR:  If you could turn to the following

12  page, please, 119 and could you zoom in?

13  Q    Could you just read the text of the attachment?

14  A    I am writing to American National to inquire about

15  providing information that I am the sole beneficiary of Brandy

16  K. Odom policy.  I can be reached at 917-294-0105 or my e-mail

17  safireb12054@gmail.com.  Please get back to me regarding this

18  matter.

19       MS. HAJJAR:  Mr. Rader, if we could just go back to

20  the prior page for a moment, 118.

21  Q    What was the date this was sent to American National?

22  A    June 12, 2018, at 12:10 p.m. -- June 22, sorry.

23       June 22, 2018, at 12:10 p.m.

24       MS. HAJJAR:  If we could turn to Page 127, please --

25  sorry, 128.  I'm sorry, Mr. Rader, just the prior page.

1  Q    Did American National receive a fax?

2  A    Yes.

3  Q    And can you tell what date the fax was received?

4         MS. HAJJAR:  If you'd zoom out the bottom.

5  A    June 29, 2018 at 4:34 p.m.

6         MS. HAJJAR:  Mr. Rader, if you could go to the next

7  page, could you enlarge the text, please?

8  Q    Ms. Brust, could you just read what the contents of this

9  fax was?

10 A    I, Adelle D. Anderson, am writing American National in

11 regards to providing information that I am the sole

12 beneficiary of Policy No. 26NE000183, belonging to Brandy K.

13 Odom.

14 Q    Stopping you there, does the rest of it include a change

15 of address and a signature?

16 A    Yes, correct.

17         MS. HAJJAR:  Turning now to Page 182, please?

18         THE COURT:  Ms. Hajjar, I'm so sorry to interrupt

19 you.

20         I have another matter that I have to tend to.  I

21 don't know how much more you have with the witness.

22         MS. HAJJAR:  Not much more, but it's fine.  Whatever

23 your Honor prefers.

24         THE COURT:  If you can finish the direct, we'll do

25 that.

1       MS. HAJJAR:  Okay.

2           If you could just turn to Page 182.

3   Q    Could you explain what this document reflects?

4   A    That's our claim form, Page 1 of our claim form.

5   Q    And turning to the following page, what is the date on

6   the claim form?

7   A    7/7/2018.

8   Q    And going to the prior page for a moment, just at the

9   top, can you tell when American National received this claim

10  form?

11  A    July 12, 2018.

12  Q    Who is listed under claimant information at the bottom of

13  this form?

14  A    Adelle Anderson.

15  Q    And turning to Page 185, is this part of the claim form?

16  A    This is the certified death certificate that was received

17  with the claim form.

18  Q    And what is the legal name associated with this death

19  certificate?

20  A    Brandy Keshawwn Odom.

21  Q    Is this document requested by American National?

22  A    Yes.

23  Q    And just turning to Page 186, were all of these items

24  mailed to American National?

25  A    Yes, they were received via mail.

1  Q    Turning now to Page 200, what is the date on this letter?

2  A    July 13, 2018.

3  Q    And can you explain what this letter represents?

4  A    Once we receive our claim documents, this policy, the

5  insured passed away within the first two years of the policy,

6  so we do a standard contestable review on any policy where the

7  insured passed away within that first two years.

8  Q    Was that the case here?

9  A    Yes.

10  Q    Turning now to Page 202, could you describe what this

11  letter is?

12  A    Same.  It's notifying the agent that the insured passed

13  away within that first two years and it's providing our

14  process, basically, an agent statement for them to complete.

15  Q    What was the date associated with this letter?

16  A    July 13, 2018.

17  Q    And who was it sent to?

18  A    Robert Cameron Young, the agent.

19  Q    Did you ever receive a response to this letter?

20  A    We did not.

21         MS. HAJJAR:  Thank you.  No further questions.

22         THE COURT:  Do you have any cross-examination?

23         MR. CECUTTI:  I do have some, your Honor.

24         THE COURT:  Want to do it after lunch?

25         MR. CECUTTI:  Yes, please.

1      THE COURT:  So, we will be in recess for lunch.

2  We'll be back at 2:15.  Please don't look anything up or talk

3  about the case, but have a nice lunch.

4      THE COURTROOM DEPUTY:  All rise.

5      (Jury exits.)

6      THE COURT:  Everybody can sit down.

7      You can step down.  We'll see you after lunch.

8      (Witness leaves the stand.)

9      THE COURT:  Anything before we break?

10     MS. DEAN:  No, your Honor.

11     THE COURT:  How many more witnesses do we have?

12     MS. DEAN:  Three, your Honor.

13     THE COURT:  Okay.

14     MS. DEAN:  And one tomorrow.  Three this afternoon.

15     THE COURT:  And one tomorrow.

16     Let me just see the parties at the side with respect

17 to scheduling.

18

19     (Discussion off the record; luncheon recess taken.)

20

21

22

23

24

25

1              A F T E R N O O N   S E S S I O N

2              (In open court; jury not present.)

3         THE COURTROOM DEPUTY:  All rise.

4         THE COURT:  Everybody can have a seat.

5         Anything before we get the jury?

6         MS. DEAN:  No, Your Honor.

7         THE COURT:  Have you thought about that extra

8    charge?

9         MS. HAJJAR:  Oh, I'm so sorry, Your Honor.  We

10   don't have a proposed charge yet.  We will work on that.

11        THE COURT:  That's okay.  Donna will give you the

12   law clerk's e-mail also so you can send it to them as well.

13        MS. HAJJAR:  Sounds good.

14        THE COURT:  Okay?  All right.

15        Let's get our jury.

16        (Pause in proceedings.)

17        (Jury enters.)

18        THE COURTROOM DEPUTY:  You may be seated.

19        THE COURT:  All right, jurors.  We are ready to

20   continue.

21        You can call -- oh, we are doing

22   cross-examination.  So let's have the witness come back and

23   Mr. Cecutti can do his cross-examination.

24        Does the witness know to come back?  All right.

25        (Witness takes the stand.)

1       THE COURTROOM DEPUTY:  The witness is reminded she

2   is still under oath.

3       MR. CECUTTI:  Your Honor, may I proceed?

4       THE COURT:  Yes, go ahead.

5   CROSS-EXAMINATION

6   BY MR. CECUTTI:

7   Q    Good afternoon.

8   A    How are you?

9   Q    I want to pick up our conversation concerning the

10  Brandy Odom policy that we were talking about before lunch.

11  A    Okay.

12  Q    Again, the insured on that policy was Brandy Odom,

13  correct?

14  A    Correct.

15  Q    And there was one or -- there was only one beneficiary,

16  right?

17  A    Correct.

18  Q    And that was Adelle Anderson?

19  A    Correct.

20  Q    And the address listed on the policy was at 148th Road?

21  A    I would have to see the documents again to remember.

22  Q    Sure.

23      MR. CECUTTI:  Mr. Gover, if we could pull up --

24  one moment, Your Honor --

25  Q    I'm showing you what's in evidence as Government

 1   Exhibit 122.  If you can just take a look at that and

 2   confirm the address on the Brandy Odom policy, please.

 3          (Exhibit published.)

 4   A    249-45 148th Road.

 5   Q    Thank you.

 6          MR. CECUTTI:  We can take that down.

 7   Q    Now, after Brandy Odom had passed away, Adelle Anderson

 8   had attempted to collect on the policy?

 9   A    Correct.

10   Q    She called American Life?

11   A    American National.

12   Q    I'm sorry, American National?

13   A    Mm-hm.

14   Q    She also sent e-mails to American National?

15   A    Correct.

16   Q    And in an e-mail on June 22nd, she indicated that she

17   was the sole beneficiary area; do you remember that?

18   A    Yes.

19   Q    And she also provided a New Jersey address?

20   A    Yes.

21   Q    And then Adelle Anderson also sent a fax to American

22   National, correct?

23   A    Correct.

24   Q    And that was also in June of 2018?

25   A    I believe so.

1   Q    And then in July, Adelle Anderson sent a claim for to

2   American National, correct?

3   A    Correct.

4   Q    And in that claim form or attached to that claim form,

5   she had provided a death certificate?

6   A    Yes.

7   Q    And that death certificate was requested by American

8   National, correct?

9   A    Correct.

10           MR. CECUTTI:  Thank you.  I have no further

11  questions.

12           THE COURT:  All right.  Any redirect?

13           MS. HAJJAR:  No, Your Honor.

14           THE COURT:  Thank you so much.  You can step down.

15           (Witness excused.)

16           THE COURT:  Are you ready to call your next

17  witness?

18           MR. PALACIO:  Yes, Your Honor.

19           The Government calls Bo Lim.

20           (Witness takes the stand.)

21           THE COURTROOM DEPUTY:  Please raise your right

22  hand for me.

23           (Witness sworn.)

24           THE WITNESS:  Yes, I do.

25           THE COURTROOM DEPUTY:  Please state and spell your

1   name.

2           THE WITNESS:  My name is first name is spelled

3   Boramchan Lim.  First name is spelled B-O-R-A-M-C-H-A-N,

4   last name spelled L-I-M.

5           THE COURT:  That chair doesn't move.  Sorry, it's

6   stuck there, but you can pull the microphone up a little

7   bit.

8           Just a couple of things.  Please make sure that

9   you are using the microphone.  Also, don't speak too fast.

10  It's just hard for the court reporter.  If there is

11  something you want to have repeated or clarified, just tell

12  me, all right?

13          THE WITNESS:  Thank you.

14          THE COURT:  Go ahead.

15          MR. PALACIO:  Thank you, Your Honor.

16  **BORAMCHAN LIM**,

17              called as a witness, having been first duly

18              sworn/affirmed, was examined and testified as

19              follows:

20  DIRECT EXAMINATION

21  BY MR. PALACIO:

22  Q    Mr. Lim, can you tell us where you work?

23  A    I currently work for the Office of Chief Medical

24  Examiner or OCME for short.  They're the Department of

25  Forensic Biology.

1  Q    And how long have you worked at OCME?

2  A    For about nine-and-a-half years.

3  Q    What is the function of the Forensic Biology Lab of

4  OCME?

5  A    The main functions of the OCME and the Department of

6  Forensic Biology is to serve the public of New York City and

7  to provide investigative leads with the scientific testing

8  that we can perform at the laboratory for the evidence that

9  are submitted to our laboratory.

10  Q    What is your title at the Forensic Biology Lab?

11  A    I am a Criminalist level III.

12  Q    What do your duties entail?

13  A    As a level III, I am considered a senior level

14  interpreting analyst, out of the four levels that exist.  So

15  my duties can range from analyzing or reviewing testing

16  results, writing and reviewing case reports, testifying in

17  court as needed, as well as participating in special

18  projects within the department.

19  Q    And prior to your responsibilities as a Criminalist

20  level III, did you hold any other positions within the lab?

21  A    Yes.  I was hired as a Criminalist level I.  Since then

22  I have been promoted to a level II.  And then subsequently,

23  to a level III.

24  Q    Can you tell the jury about your educational

25  background?

1 A    I have Bachelor's degree in genetics and criminal

2 justice from Rutgers University.

3 Q    And have you received any special training in the field

4 of forensic science?

5 A    Yes, I have.

6 Q    Can you explain what you received, the type of training

7 you received?

8 A    The Department of Forensic Biology has an extensive

9 in-house training program run by the analysts in the

10 laboratory.  What that means is that it can last several

11 months long of lectures, demonstrations and oral and written

12 examinations which the analyst must pass of the testing and

13 the analysis that are to be performed in the laboratory.

14 Once I can show that I can independently perform the testing

15 and the analysis, I can complete the training progress

16 itself.  You can think of training also an ongoing process

17 as new technology becomes developed and is incorporated into

18 our operations from time to time.  The training itself can

19 also include attending the conferences or scientific

20 journals that are available to the analyst within the

21 laboratory, as well as discussions of the testing and

22 analysis as well.

23 Q    Can you define the term "forensic science" for the

24 jury?

25 A    Forensic science is the application of natural

1    sciences, such as biology, chemistry, or physics, to the

2    matters of law.

3    Q    And what is forensic biology?

4    A    Forensic biology is the subset of forensic science

5    where biological materials that are known to yield DNA, such

6    as bodily fluids, like blood, semen, saliva, or skin cells,

7    are examined and we conduct the scientific testing to

8    determine the potential source of those biological

9    materials.

10   Q    As a criminalist at your lab, have you ever personally

11   performed DNA analysis on crime scene evidence submitted to

12   the lab?

13   A    Yes, I have.

14   Q    Approximately how many times?

15   A    Approximately several thousands of times.

16   Q    And approximately how many reports have you written?

17   A    I have written at least 1200 case reports.

18   Q    Approximately how many reports have you reviewed?

19   A    I would say approximately dozens, if not hundreds.

20   Q    Whenever you or anyone under your direct supervision

21   performs DNA analysis, are they required to document every

22   step of the process?

23   A    Yes.

24   Q    Do you record the results in some way?

25   A    I do.

1    Q    Are notes kept during the testing process?

2    A    Yes.

3    Q    Are those notes incorporated into the forensic biology

4    case files?

5    A    Yes.

6    Q    Where is your lab located?

7    A    OCME is located within the Manhattan borough of New

8    York City next to the Bellevue Hospital.

9    Q    Is OCME considered an independent city agency?

10   A    Yes.  OCME is an independent municipal agency for the

11   City of New York.

12   Q    Is the laboratory within the Forensic Biology Unit at

13   OCME accredited?

14   A    It is.

15   Q    By whom?

16   A    The Department of Forensic Biology is accredited by the

17   New York State Commission on Forensic Science, as well as by

18   the National -- American National Standards Institute

19   National Accreditation Board.

20   Q    What does it mean to be accredited?

21   A    Accredited laboratory means that the forensic experts

22   in the field have carefully inspected our operations.  This

23   can include the chemicals or instruments that we use, the

24   procedures followed, the training program, the personnel and

25   so on.  This is done to ensure that our laboratory is

1  operating at the highest level, and that we're also

2  maintaining set of suitable standards that are used in the

3  forensic community.

4  Q    As part of the accreditation process, is it required

5  that your lab undergo internal and external audits?

6  A    Yes.

7  Q    And what do those audits involve?

8  A    The audits, themselves, involve the rigorous review of

9  all the testing or the analysis that we perform so that we

10  can demonstrate that our laboratory is operating at the

11  highest level.

12  Q    Does OCME participate in proficiency testing?

13  A    Yes, we do.

14  Q    And what does that involve?

15  A    Proficiency test, you can think of it as a final exam,

16  but it is administered by external testing agency.  The

17  analyst typically takes two proficiency test a year.  It

18  involves performing testing or the analysis of all the

19  techniques that you are trained and competent in.  Once you

20  perform the testing independently and the results are

21  submitted and verified as correct, then the analyst, like

22  myself, will be deemed to be proficient to continue to

23  perform the testing or the analysis in the laboratory.

24  Q    Have you ever failed a proficiency test?

25  A    I have not failed any of my proficiency tests.

1  Q    Have you been qualified as an expert in the field of

2  DNA analysis?

3  A    I have.

4  Q    Approximately how many times?

5  A    I have previously testified in 35 grand juries and

6  approximately in 25 trials.

7  Q    And when you testified in those cases, did you give

8  testimony regarding the statistical calculations associated

9  with DNA testing conducted in those cases?

10  A    Yes, I did.

11  Q    Have you ever been denied qualification as an expert?

12  A    No, I have never been denied.

13        MR. PALACIO:  Your Honor, at this time I offer Mr.

14  Lim as an expert in the field of forensic biology, forensic

15  DNA analysis, and the statistical significance of such

16  testing pursuant to Rule 702.

17        THE COURT:  Any objection?

18        MS. THIELE:  No objection.

19        THE COURT:  Mr. Lim will be deemed an expert in

20  those fields.

21  BY MR. PALACIO:

22  Q    Mr. Lim, can you explain to the members of the jury

23  what DNA is?

24  A    DNA is the genetic blueprint of who we are as a human.

25  We receive half of our DNA from our biological mothers and

1   the remaining half from our biological fathers.  So more

2   than 99 percent of the DNA is the same for all of us.

3   That's why we share similar physical traits of having arms,

4   nose, mouth, legs and the body, itself.  So the fraction of

5   less than one percent differences among us is what our

6   laboratory can test for.  You can think of the DNA as unique

7   information for every single person in the world, except in

8   the case of identical twins.

9   Q    Why in the case of identical twins?

10  A    The individuals who are identical twins would have the

11  same DNA profile.

12  Q    And can you define the term "locus"?

13  A    A locus generally refers to the specific location on

14  the DNA that our laboratory tests for, and we all share the

15  same locations.

16  Q    And can you define the term "allele"?

17  A    Allele is the genetic variation that exists at each of

18  those specific locations on the DNA that we all share.  And

19  these genetic variations are represented in numbers.  One

20  you inherit from your father, and the other you inherit from

21  your mother.

22  Q    What is a DNA profile?

23  A    A DNA profile is a combination of all those alleles or

24  numbers that you have inherited from your biological parents

25  for all of the locations on the DNA that we share.

1    So for an example, at one location, I may have

2  numbers 15, 16.  And at the same location, different

3  individuals may have numbers 10, 10.  So different numbers

4  at the same location would mean different DNA profile,

5  different individuals.  So a DNA profile may look like a

6  really long string of numbers, like a barcode, for each

7  individual.

8  Q    And can you tell us what the steps are involved in DNA

9  testing?

10  A    Upon completion of the evidence examination, there are

11  four major steps of DNA testing.  First is extraction, where

12  we attempt to remove the DNA deposited on the evidence.

13  Next is quantitation, where we estimate the amount of DNA.

14  Only when we have sufficient or enough DNA, we go proceed

15  further with the step, which is the amplifications.  And

16  amplifications is a step where we make millions and millions

17  of copies of the DNA at the locations that we all share.  So

18  you can think of it as xerox copy machine of your own DNA.

19  And lastly, the amplified DNA go through DNA detection

20  methods, so that they can be better visualized in the form

21  of graph so that an analyst like myself can look at that

22  graph and use our guidelines to potential interpret that

23  into a DNA result.

24  Q    Is that also known as autosomal DNA testing?

25  A    Yes.

1    Q    And what does a DNA profile look like?

2    A    Once testing is completed, a DNA profile may, again,

3    look like a really long string of numbers that are unique to

4    yourself, except in the case of identical twins.

5    Q    How is DNA or a DNA profile useful in the field of

6    forensic science?

7    A    DNA testing, itself, can be useful in forensic science

8    in general because it is universal, meaning every one of us

9    has the information about our DNA, but it will be highly

10   variable from person to person and we can use the

11   differences in order to provide investigative leads on the

12   DNA results that we can obtain from the evidence submitted

13   to our laboratory.

14   Q    Is someone's DNA profile the same throughout his or her

15   body?

16   A    It will be the same.

17   Q    Does an individual's DNA profile remain the same

18   throughout age and time?

19   A    Yes, it will remain the same.

20   Q    As to the DNA profile, itself, which locations are

21   forensic biologists examining on the DNA chain?

22   A    Our laboratory looks at 22 specific locations on the

23   DNA that we all share, plus two locations that are used to

24   determine biological sex of an individual, so male or

25   female, in short, total of 24.

1  Q    And why does the scientific community look at those

2  specific locations?

3  A    The scientific community may look at the specific

4  locations because they are universal.  All of us share the

5  locations.  And we have the information at the same

6  locations that our laboratory tests for.  So having

7  different information at the same location will allow us to

8  differentiate your own DNA profile from the evidence that

9  can be obtained.

10 Q    Do these locations code for any physical

11 characteristics that one can actually see?

12 A    No.  The type of DNA testing we perform, you cannot

13 tell a single physical trait, such as skin color or eye

14 color, any of that, from the testing that we do.

15 Q    Can you tell us what Y-DNA is?

16 A    Y-DNA is the type of DNA that is male-specific.  So

17 those that are biological female will not have the Y-DNA.

18 And this type of testing is -- this type of DNA is inherited

19 through paternal lines, meaning the biological brothers who

20 have the same biological father will all share the same

21 Y-DNA.

22 Q    Does your lab perform Y-DNA testing?

23 A    We can.

24 Q    And how is that different from the testing that we have

25 been discussing?

1    A    So the DNA type of testing that I spoke at first is the

2    one that we all have regardless of your gender, male or

3    female.  And we look at 24 locations.  The Y-testing is,

4    again, specific to males.  So -- and it is inherited to the

5    paternal line.  So grandfather, son of the grandfather, and

6    then grandson of that, will all share the same Y-profiles.

7    Q    When is Y-DNA testing used?

8    A    The Y-testing is typically used after the typical

9    testing of DNA, which is another way autosomal is performed,

10   is the one that is coming from both genders.  And if the

11   sample has a lot of DNA coming from both male and female and

12   has enough male, then we may attempt to perform the

13   Y-testing to get the male component and get that separated

14   out and potential interpreted into a Y-profile, if you

15   cannot get the autosomal results.

16   Q    And why is that helpful?

17   A    The Y-profile can be helpful because it can also

18   provide investigative leads.  When you get a Y-profile or

19   Y-result separated from the evidence, that is submitted to

20   our laboratory, and it can then compare to the different

21   Y-profile from the person of interest submitted to be

22   compared.

23   Q    Is this type of DNA testing discriminating?

24   A    The Y-testing can be discriminating, as in different

25   male individuals are likely to have different DNA profile,

1  but, again, because it is inherited through paternal lines,

2  it is not as discriminating as the autosomal DNA testing

3  that we all have.

4  Q    Are you familiar with touch DNA?

5  A    I am.

6  Q    What is that?

7  A    Touch DNA generally refers to the DNA that is detected

8  or recovered from the surfaces of an item or a person

9  through a physical contact.

10 Q    What factors can influence the recovery of DNA from

11 physical contact?

12 A    When we talk about touch DNA, there are essentially a

13 limited number of circumstances or factors that may come

14 into play in the quality or the quantity of DNA that can be

15 recovered.  This could be biological, meaning how many

16 persons have come into contact, who was the last person, or

17 was there a repeated contact or a habitual user.

18 Environmental, meaning the condition where the contact has

19 been made.  Was it exposed to elements such as heat,

20 moisture, dirt and so on.  Circumstantial, meaning were

21 there any chemicals involved, such as bleach or gloves.

22        So what we have to remember about touch DNA is the

23 manner in which the DNA could have been deposited in the

24 form of skin cells, the conditions surrounding that contact,

25 and if any other additional contact has been made to that

1    surface.

2    Q    With respect to the steps of DNA testing that you

3    described earlier, are there protocols and procedures that

4    determine how you conduct DNA testing at OCME?

5    A    Yes.  We do have an extensive protocols and procedures

6    in place.  They're also publicly available, as well.

7    Q    And referring back to the separation or analysis

8    portion of the testing, after the samples containing DNA are

9    processed through a genetic analyzer, what happens?

10   A    So the genetic analyzer is the name of the instrument

11   where we allow the DNA testing to go to completion.  And the

12   DNA that is generated from the genetic analyzer we use a

13   software to visualize that in the form of graphs.  And then

14   we interpret our results and use statistics on that result

15   afterwards if applicable.

16   Q    What is the analyst's role in that process?

17   A    The analyst's role in that analysis portion will be

18   looking at the graph and see whether or not the sample is

19   suitable or if the testing has been completed properly

20   according to our guidelines and manuals that we have.  And

21   also estimate how many number of individuals could have

22   contributed DNA to that particular sample.  And if the

23   sample is suitable for comparison, meaning DNA profile of

24   person of interest, if that can be compared to that DNA

25   result.

1   Q    When an analyst examines the data, do they refer to any

2   information about the case?

3   A    We can.  The certain context of the case may provide

4   more information.  For example, if there is an indication of

5   additional contributors that were involved in the case but

6   the person that have come into contact with the items such

7   as finding an item but was not involved with the alleged --

8   the incident with the case, then we may have DNA profile

9   from that individual in order to provide more informed

10  determination of number of contributors, whether they are a

11  suitable comparison and so on.

12  Q    Are any edits or changes made by an analyst documented

13  within the case file?

14  A    Yes.

15  Q    Are you the original analyst for this case?

16  A    I am not.

17  Q    Who was that?

18  A    The original analyst assigned to the case was Michelle

19  Hoffman.

20  Q    And where is Ms. Hoffman now?

21  A    I believe, to my knowledge, she has moved to a

22  different state, so she is no longer employed by the agency.

23  Q    What did you personally do with respect to interpreting

24  the data in this case?

25  A    So I have taken the ownership of the case files which

1  involved looking at all the examination work, all the

2  testing work, and all the data that has been generated from

3  the evidence.  Then I would use the experience that I have

4  and the guidelines that we have to draw my own independent

5  conclusions, which are reflected in the case reports of the

6  files.

7  Q    If your conclusions had been any different than a prior

8  analyst, what is the procedure?

9  A    If my independent conclusion would have been different

10 than what is reflected in the case report, then a discussion

11 might have taken place and ultimately, our technical leader

12 might reach a conclusion as to what is to be reported.  But

13 in this case, that did not occur.

14 Q    Now, did there come a point in time when the forensic

15 biology lab at OCME received a number of items for DNA

16 testing in connection with a homicide investigation into the

17 death of someone named Brandy Keshawwn Odom?

18 A    Yes.

19 Q    When the evidence was received by the forensic bio lab,

20 was a forensic biology number assigned to the case?

21 A    It was.

22 Q    And what was that number?

23 A    It is FB-18-02127.  So FB stands for forensic biology.

24 18 is the year, 2018.  And the last few numbers are the

25 sequential order in which we process the case in the

1   laboratory.

2          MR. PALACIO:  Your Honor, I am offering Government

3   Exhibit 275 A through D into evidence on consent.

4          THE COURT:  Okay.  Consent?

5          MS. THIELE:  No objection.

6          THE COURT:  All right.  So those will be in

7   evidence.  You can publish them.

8          (Government Exhibits 275-A through -D received in

9   evidence.)

10  Q    Mr. Lim, do you have a copy of that case file here with

11  you today?

12  A    Yes, I do.

13  Q    And would it help you to testify with that in front of

14  you?

15  A    Yes.

16  Q    Mr. Lim, when evidence first enters a lab, where does

17  it initially go?

18  A    The evidence is initially received by our evidence unit

19  within our laboratory.

20  Q    And what role does the evidence intake unit play?

21  A    Our evidence unit ensures that the integrity of the

22  evidence is kept secured, meaning all the packaging

23  surrounding evidence is secure and also the accompanying

24  paperwork that indicates what may have been submitted is

25  also clearly stated so that the analyst would know what type

1   of biological material the evidence is submitted to be

2   tested for so that it can be accepted for testing.

3   Q    Was that procedure followed here?

4   A    Yes.

5   Q    To begin with, did your lab examine a postmortem sexual

6   assault evidence collection kit for Brandy Odom?

7   A    Yes, we did.

8   Q    And what items of evidence were swabbed or received as

9   part of that kit?

10          THE WITNESS:  Your Honor, may I refer to the case

11  file?

12          THE COURT:  Yes.

13  A    Could you repeat the question, please?

14  Q    Yes.  Can you tell us what types of swabs or from what

15  location swabs were taken as part of that sexual assault

16  evidence collection kit?

17  A    So I'm looking at the evidence received section of the

18  report that was issued on April 18th of 2018.  So within

19  this postmortem sexual assault evidence collection kit from

20  Brandy Keshawwn Odom postmortem, it simply means the items

21  that are collected post-death of an individual.  So within

22  this kit, we had received all swabs smear.  Swab is similar

23  to a cotton swab that is rubbed against the surface of an

24  item or person.  A smear is a microscopic slide.

25  Q    Mr. Lim, just to stop you, I'm sorry.

1      If you can just generally tell us what locations

2  the swabs were taken from.

3  A    Okay.  So the swabs are from the oral area and the dry

4  secretions that are from the neck anterior area, the neck

5  posterior area, right and left breast area, as well as from

6  the perianal, anal, vulva, vaginal and cervical areas of the

7  individual.

8  Q    Can you tell us what a stain card is?

9  A    A stain card will be something that contains the blood

10  stain of an individual and it is typically used to develop a

11  DNA profile of a known individual.

12  Q    And were all of those samples received for Brandy Odom

13  on or about April 10, 2018?

14  A    Yes, that's correct.

15  Q    Were those postmortem samples screened for the presence

16  of male DNA?

17  A    Yes.

18  Q    Was male DNA detected on any of those postmortem

19  samples?

20  A    Male DNA was indicated on some of the samples of the

21  kit.

22  Q    Which ones?

23  A    So on the same report as well.  So male DNA was

24  indicated from the dried secretion swab 1.3.1.  From neck

25  swab anterior, dried secretion swab 1.3.2.  From neck swab

1  interior and dried secretion swab 1.3.4.  From neck

2  posterior.  And also at the time there was one additional

3  swab from perianal swab where at the time it was stated that

4  no male DNA was detected.  But since then, our laboratory

5  has transitioned into treating this part as a presumptive in

6  nature.  So any swab that had gone through the screening

7  process that has any indication of male DNA more than zero,

8  then we have transitioned into saying that that swab is

9  indicated with male DNA.  So there is perianal swab that

10 also has an indication of male DNA.

11 Q    Was there a sufficient concentration of DNA on any of

12 those samples to continue a DNA testing?

13 A    No.  None of the samples had sufficient amount to go

14 with further testing beyond the screening process.

15 Q    Can you tell us how the lab decides what evidence

16 should be tested?

17 A    Determining what evidence is submitted for testing is

18 dependent on many circumstances or upon request as well.  So

19 our laboratory may receive request to test specific items

20 that are probative in nature.  And also our laboratory,

21 ourselves, may select samples that may have the highest

22 chance of detecting DNA on it, depending on the context of

23 the case.

24 Q    Does the lab test every piece of evidence that is

25 submitted for testing?

1  A    Not necessarily.  If a case simply has one item

2  submitted, then we may test all of the item within that

3  case, but a case like this, where we have received over

4  hundreds of different items, we may select the item that may

5  be the most probative in nature or the ones that are most

6  relevant to the content of the case or the ones that would

7  have the highest chance of developing DNA results.

8  Q    In this case, were there multiple rounds of testing

9  conducted by the lab?

10 A    Yes, there were.

11 Q    Let's discuss the initial round of testing.

12       Did there come a point when your lab received

13 evidence on or about April 16, 2018 for testing?

14 A    Yes.

15

16            (Continued on the following page.)

17

18

19

20

21

22

23

24

25

1    BY MR. PALACIO:  (Continuing.)

2    Q    What evidence was received?

3    A    On April 16th of 2018 -- so I'm looking at the evidence

4    received section of the report that is issued on May 2nd of

5    2018.  So we have received three separate plastic bags.

6    Q    And did the lab test all of those bags?

7    A    No, the first two plastic bags are marked as item one and

8    two were examined.

9    Q    What was the condition of that evidence when it was

10   received?

11   A    Those items would be submitted in a packaging that was

12   sealed and secured in a locked cage.

13   Q    What was the voucher number for the plastic bags?

14   A    The plastic bags the voucher number for that is

15   3000952042.

16   Q    Does that include items one and two?

17   A    Correct.

18        MR. PALACIO:  If we could show the witness

19   Government Exhibit 287 in evidence on consent, I believe.

20        MS. THIELE:  Yes.

21        (Exhibit published.)

22   BY MR. PALACIO:

23   Q    Mr. Lim, you testified that the lab received two plastic

24   bags for testing; is that right?

25   A    We had received three and then two were selected for

1   testing.

2   Q    And what is the information we see at the bottom here?

3   A    So, this will be a portion of the photos taken during our

4   evidence examination of the plastic bag.  The markings on the

5   bottom are the identifying information for the item itself.

6   So it states that it's item one for the specific voucher

7   number ending in 042 for this case and you will see a

8   photograph of the plastic bag that was received as knotted and

9   this is all clearly documented in the notes section of the

10  case file.

11  Q    In other words this was how the bag was received by OCME?

12  A    Correct.  This is how the plastic bag was received upon

13  opening the package.

14  Q    And did there come a point when the bag was unknotted?

15  A    Yes.  So the knotted portion of the plastic bag is the

16  area where I would expect an individual would have come into

17  contact in order to knot the plastic bag in this fashion.  So

18  in order to obtain DNA results from the knotted section of the

19  plastic bag we unknotted it or untangled it during

20  examination.

21  Q    What does the bottom portion of Government Exhibit 287

22  show us?

23  A    This picture that's on display is what the plastic bag

24  would look like upon untangling it by the analyst during

25  examination and the area that is marked with the gray border

1  that you see across the lower half of the plastic bag, are the

2  areas where it was in the knotted fashion.  That was the one

3  that the analyst have taken the samples for the examination.

4  Q    When you say they took a sample for examination, was that

5  area swabbed with a Q-Tip?

6  A    Correct.  The analyst had taken the sample using the swab

7  and again essentially rubbing against the surface where it was

8  knotted initially and then the entirety of that was submitted

9  for further testing.

10 Q    Would you tell us what a Z voucher is?

11 A    A Z voucher generally refers to the set of new items that

12 are created upon the items that were submitted previously.

13 So, for example, in the specific voucher, you may have

14 received a knife and then the subsequent Z voucher could be

15 the swab from that knife.

16 Q    And where are Z vouchers usually taken?

17 A    It is typically taken from the item itself, from the

18 surfaces of the item itself.

19 Q    I'll come back to that in just a second.

20         MR. PALACIO:  But if we could show the witness what

21 is in evidence on consent as Government's Exhibit 288.

22         (Exhibit published.)

23         MR. PALACIO:  If we could show the top portion.

24 BY MR. PALACIO:

25 Q    Mr. Lim, you told us that OCME tested two different bags;

1    is that right?

2    A    That is correct.

3    Q    And the other bag was designated item two?

4    A    Yes.

5    Q    Is that the bag we see here?

6    A    Yes, it is.

7    Q    And the bottom portion of this picture, does that, again,

8    show us the area of the bag that was swabbed for testing?

9    A    That is correct for item two.

10   Q    We were talking about Z vouchers.  Did the lab also

11   receive Z vouchers with respect to swabs that were taken by

12   the police lab with respect to these two garbage bags?

13   A    Yes, we did.

14   Q    Were all of the swabs from the Z voucher examined?

15   A    No.

16   Q    Which ones?

17   A    The swab of torn edges of plastic under Z voucher Z

18   17228, as well as the swab of edges of bag opening and not

19   from plastic bag item two as well as the swab of edges of bag

20   opening and not on plastic bag item one and swab of edges of

21   bag opening from plastic bag item three were examined from the

22   Z voucher 1017229.

23   Q    Did there come a point on April 19, 2018 when examination

24   began on this evidence?

25   A    Could you repeat the question, please?

1   Q    Yes.  Did there come awe point on April 19, 2018 when
2   examination began on the evidence?
3   A    Is there a specific evidence that you're referring to?
4   Q    The testing on the black garbage bags.
5   A    The plastic bags?
6   Q    Yes.
7   A    Yes.
8   Q    Were the bags examined for the presumptive presence of
9   blood?
10  A    Yes.
11  Q    What is the name of that test?
12  A    The name of the presumptive testing for the potential
13  presence of blood is Kastle—Meyer.  So a presumptive test is a
14  type of testing that we see be performed to determine the
15  potential presence of blood.  And because it's presumptive in
16  nature it's not confirmatory.
17  Q    Was any of the evidence presumptively positive for blood?
18  A    Yes.
19  Q    Which ones?
20  A    For this report that's on May 2nd of 2018, the plastic
21  bag item one and two from the voucher ending in 042 were
22  presumptively positive for blood.
23  Q    And, to be clear, that's the two bags we just saw
24  pictures of; is that correct?
25  A    Correct.

1  Q    Was DNA testing done on the plastic bags?

2  A    Yes.

3  Q    What type of DNA testing was conducted?

4  A    For both of those plastic bags, item one and two, both

5  the autosomal which is coming from both genders and also the Y

6  testing which is male specific done on both of the items.

7  Q    So let's start with the autosomal DNA testing.  Can you

8  tell us what sole source DNA is?

9  A    Sole source or the single source is the type of DNA

10 result that is best described that come from a single

11 individual.

12 Q    Was Brandy Odom the single source of DNA on any of the

13 items tested?

14 A    Yes.

15 Q    Which items?

16 A    So, for the swab of edges of bag opening and not from

17 plastic bag item both one and two from the voucher ending in

18 229 were best described to come from a single source and this

19 profile is the one that matched to Brandy Keshawwn Odom.

20 Q    Can you tell us what a mixture is?

21 A    Mixture is a DNA result that is coming from more than one

22 individual.  So two, three, four and so on.

23 Q    What is a likelihood ratio?

24 A    A likelihood ratio is the type of statistic that we

25 perform in our laboratory.  It is a comparison of two

1  competing scenarios.  So one scenario would be that the person

2  of interest or the known person is doing the DNA and the

3  second is if an unknown person is donating DNA.

4          So, the value of the likelihood ratio would give a

5  support as to which of those two scenarios a person of

6  interest or if unknown is donating DNA to the evidence, given

7  the results that we saw.  And the possible conclusions that

8  you can draw from this likelihood reach a conclusion is the

9  individual is purported to be included or excluded as a

10 contributor to that sample or excluded as a contributor and

11 lastly in the uninformative range where it does not give

12 support for either, inclusion or exclusion.

13 Q    Did you identify any mixtures of DNA on the evidence

14 tested?

15 A    I did.

16 Q    From which items?

17 A    So with the report that's still issued on May 2nd of

18 2018, there were mixtures that were detected for both of those

19 plastic bags so item one and two from the voucher ending in

20 042.

21 Q    How many possible contributors were identified?

22 A    Both of the plastic bags item one and two were best

23 described to come from two people.

24 Q    Was Brandy Odom considered to be one of the two

25 contributors?

1   A    Yes.

2   Q    What was the result of that?

3   A    For both of the items, items one and two, the plastic

4   bags, were best described to come from two contributors and

5   assuming that Brandy Keshawwn Odom is a contributor no DNA

6   profiles for additional contributors could be determined.

7   However, the results are suitable for comparison.

8   Q    Was Y DNA testing also done on those plastic bags?

9   A    Yes, Y testing was performed.

10  Q    And what was the result of that testing?

11  A    So, for plastic bag item one, due to our laboratory

12  interpretation policies, no interpretation or comparisons were

13  made to this sample because the mixture is best described as

14  four or more contributors, but for the item two of the plastic

15  bag, it was best described to come from three individuals and

16  from this mixture we have developed a 410 locus.  Locus is the

17  location that we all share of our DNA.  Of DNA profile, a

18  major male contributor was developed and this major male

19  contributor was designated with the name male donor A.

20  Q    So, can you explain to us why the autosomal DNA testing

21  revealed the presence of two possible contributors but the Y

22  DNA testing revealed the presence of three possible

23  contributors?

24  A    So, for the case of plastic bag item two with the

25  autosomal testing it was best described to come from two

1    individuals and within those two individuals, one of them

2    which was Brandy Odom, was contributing the overwhelming

3    percentage of DNA or about 99 percent of DNA.

4            So what we're working with is the small amount of

5    DNA that is detected within that part of the mixture so that

6    small part of the mixture that is not Brandy Odom will be the

7    ones that may be targeted with the Y testing because there was

8    a detection within the Y DNA of the mixture itself.  So upon

9    targeting that male component of that sample, we were able to

10   gain additional information and use our guidelines to estimate

11   that there were three male individuals' profiles part of the Y

12   component of that same sample and also the autosomal in Y

13   testing, even though they're done on the same sample, they're

14   independent of each other and are targeting different

15   components because Y is male specific.

16   Q    What is masking?

17   A    Masking could be when an individual could be donating

18   overwhelming amount of DNA to a particular sample so any

19   individual that could have contributed a small amount might

20   not be detected because one individual is simply masking the

21   presence of the detention of the additional contributors.

22   Q    And is that what you notice here with plastic bag item

23   two?

24            THE COURT:  Please scoot the microphone away from

25   you a little bit.

1      Sorry to interrupt you.  Let's put the question

2  again.

3  BY MR. PALACIO:

4  Q    Sure.  Mr. Lim, the question was, you explained to us

5  what masking means.  Did you see that with plastic bag item

6  two?

7  A    It is one of the explanations why the number of

8  contributors could be different from the autosomal set of data

9  and also Y set of data from the same sample.

10 Q    And with that plastic bag, what was the percentage of

11 contribution of female DNA from Brandy Odom?

12 A    It was roughly about 99 percent so the overwhelming

13 percent of DNA was coming from that major contributor.

14 Q    And so the Y DNA testing focused on that one percent; is

15 that fair to say?

16 A    Since male DNA was detected within the mixture, it may be

17 accurate to say the Y component focused on that male component

18 of the mixture of the same sample.

19 Q    And there was only one complete male profile that was

20 able to be generated; is that correct?

21 A    There was a distinct male profile that was separated from

22 the mixture that was best described to come from three people

23 and that separated Y profile we called it male donor A.

24 Q    Did there come a point in time in May 2018 when the lab

25 received pillowcases for testing in this case?

1    A    Could you repeat the question, please?

2    Q    Yes.  Did there come a point in May of 2018 when the lab

3    received pillowcases for testing?

4    A    Yes, we did.  And I'm looking at the evidence received

5    section of the report issued on May 22nd of 2018.

6    Q    And what was the voucher number for the pillowcases?

7    A    The voucher number for the pillowcases is 6000018800.

8         MR. PALACIO:  If we could show the witness what is

9    in evidence on consent as Government Exhibit 289.

10        (Exhibit published.)

11   BY MR. PALACIO:

12   Q    Mr. Lim, can you tell us what we're looking at here?

13   A    So, this is the one photograph taken of the pillowcase.

14   I'm not seeing the markings here because usually markings are

15   part of the middle or the bottom part of the photo that tells

16   you what the FB number it is, what voucher it is from and what

17   item number it is.

18        On here with dimensions you see multiple black line

19   borders that you see on the pillowcase.  So those are the

20   stains that were observed by the analyst during the

21   examination process and those are marked with dimensions with

22   a line connecting to it and a designation of which stain

23   number it is.

24        So, for example, the one all the way to the left,

25   you will see 1-P-1, which would be the pillowcase item number

1   one or the stain one with the dimension that is roughly one

2   inch by one inch.  So these -- these kind of stains will be

3   the ones that will be selected for testing.

4   Q    What is the appearance of those stains?

5   A    I'm looking at the evidence examination note for this

6   particular item.  Multiple stains were seen because they were

7   varying in color and intensity.  Some were in red orange.

8   Some were in red-ish brown which is closer to the indication

9   of potential blood or also that have been faint yellow as

10  well.

11  Q    Looking at the bottom half of this exhibit can you tell

12  us which item number this is under that voucher?

13  A    So on the right side of this photograph, you will see it

14  states item one of the FB number 2127 with the voucher number

15  and it also has the additional stains from the other side of

16  the pillowcase that also have been observed by the analyst.

17          MR. PALACIO:  If we can show what's in evidence on

18  consent as Government Exhibit 290.

19          (Exhibit published.)

20  BY MR. PALACIO:

21  Q    Can you tell us what we see at the bottom of Government

22  Exhibit 290?

23  A    This will be the photograph taken of a different

24  pillowcase that is item number three, as you see on the right

25  side with the markings done by the analyst.  This also

1   includes dimensions of the pillowcase for the item itself and

2   also dimensions of the stains that were observed by the

3   analyst and those were the ones that would be selected for

4   testing as well.

5   Q    And how many stains were selected on the pillowcase item

6   number one for testing?

7   A    So I'm looking at the page 1 of 85 or the examination

8   note.  For this particular item one there were a total of ten

9   stains that were selected for testing.

10  Q    How many stains were selected for testing from item

11  three?

12  A    For item three on the examination note there were a total

13  of seven stains that were selected for testing from the

14  pillowcase, item three.

15  Q    Was DNA testing performed on those stains?

16  A    Yes.

17  Q    What type of DNA testing?

18  A    The same type of testing that I mentioned before where

19  the stains, the portions of the stains would have been

20  submitted and extraction would have taken place to remove the

21  DNA deposited from the stains as well as the quantification or

22  the estimation amount of DNA from those particular items.

23  Q    Let's start with the autosomal DNA testing.

24         Did you identify a single source of female DNA on

25  any of those stains?

1  A    Looking at the page, the case report, it shows it on May
2  22 of 2018, yes.
3  Q    On which pillowcases?
4  A    It was pillowcase both item one and three, the stain four
5  from both of those items.
6  Q    And how did you designate the source of that DNA from the
7  stains on the pillowcases?
8  A    The -- both of those stains four from item one and three
9  were described to come from single source which results from
10 developing a DNA profile for that individual and this was
11 designated as from coming from a biological female individual
12 which was designated as female donor A.
13 Q    And, to be clear, is the DNA of female donor A different
14 from the DNA of Brandy Odom?
15 A    That is correct.  The female donor A is not same DNA
16 profile as the DNA profile of Brandy Odom.
17 Q    Did you identify any mixtures of DNA on any of those
18 stains?
19 A    Yes, I did.
20 Q    On which pillowcases?
21 A    It was for the stain ten from item one of pillowcase as
22 well as stain five from the item three of pillowcase.
23 Q    How many possible contributors did you identify on those
24 two stains?
25 A    Both of those stains were best described to have come

1   from two people.

2   Q    And was a male DNA profile developed from either or both

3   of those stains?

4   A    Yes.

5   Q    And what was -- how was that male profile designated?

6   A    It was designated as male donor A.

7   Q    Was a likelihood ratio performed on those mixtures?

8   A    Yes.

9   Q    Was Brandy Odom included or excluded from any of those

10  mixtures?

11  A    Brandy Odom was excluded as a contributor to both of

12  those stains.

13  Q    Did the lab also perform Y DNA testing on those two

14  stains from both of those pillowcases?

15  A    Yes, we did.

16  Q    Can you tell us what the results were of that testing?

17  A    So both of the stain ten, item one of pillowcase and

18  stain five, item three of pillowcase through the Y testing it

19  was best described to have come from one person.  And so a 16

20  locus DNA profile from a male was determined and this profile

21  matched the DNA profile of male donor A that we previously

22  established.  Therefore, he or one of his paternal male

23  relatives could be the source of this DNA.

24  Q    And can you tell us what that means, what those results

25  mean?

1    A    It means that there was one distinct male Y profile that

2    was developed from both of those stains, but because Y profile

3    is inherited through paternal lines, it could be the

4    biological siblings, it could be the biological father and so

5    on.

6    Q    So did the Y DNA on the stains from the pillowcases match

7    the Y DNA of male donor A on the plastic bag, item two, that

8    we talked about earlier?

9    A    That is correct.  They're of the same Y profile.

10   Q    Did there come a point where your lab performed

11   additional testing in this case?

12   A    We did.

13   Q    And did that include additional samples from the sexual

14   assault evidence kit for Brandy Odom?  Did it also include a

15   carpet kitchen knives and swabs from those knives?

16   A    Yes.

17   Q    How many physical knives were accepted for testing?

18   A    Looking at the evidence received section of the report

19   issued on August 31st of 2018, we had received two separate

20   knives that were selected for testing.

21   Q    And what was the voucher number for those knives?

22   A    It was 6000018799.

23   Q    What area of those kitchen knives were swabbed by OCME

24   for testing?

25   A    The handle portion of the knives were examined and taken

1  the samples from as if, for example -- items such as a knife

2  is submitted, then we would look at which area of the item

3  would have likely been used by the potential perpetrator.  So

4  the handle of the knife would be the one that would be sampled

5  and sent for additional testing.

6  Q    Did the lab also receive swabs of the blades of those two

7  knives that were taken by the NYPD lab?

8  A    Yes.

9  Q    And what was the voucher number for those swabs from the

10 blades?

11 A    It was Z -- it's Z-017559.

12 Q    And you mentioned that a carpet was tested as well; is

13 that correct?

14 A    Correct.

15 Q    What was the voucher number for that carpet?

16 A    The voucher number for the carpet is 3000962689.

17 Q    I just want to turn back just quickly to the post mortem

18 samples from Brandy Odom.  What were the results of that

19 testing?  Actually, withdrawn.  Let me rephrase the

20 question.

21        Were any of those postmortem samples presumptively

22 positive for blood?

23 A    Yes, on multiple items that were submitted from the

24 postmortem collection kit were presumptively positive for

25 blood.

1   Q    And were any of swabs from the knives or the carpet

2   presumptively positive for blood?

3   A    Yes.

4   Q    Of the evidence that was received by OCME, did that

5   evidence have a sufficient amount of DNA for further

6   testing?

7   A    No.  The samples did not have sufficient amount of DNA to

8   go with the additional testing so the sample from the

9   postmortem collection kit or the samples from the carpet or

10  the samples from the blade.

11  Q    So let's talk about the items that did have sufficient

12  amount of DNA to proceed.  What was the result of that

13  testing?

14  A    There were a total of three samples that had the

15  sufficient amount of DNA to go with the additional testing, so

16  I'll speak to it one by one.  The first is the sample that is

17  collected from the wooden handle kitchen knife, nine-inch

18  blade and this is the item one from voucher ending in 799 and

19  because there are so many items and vouchers submitted in this

20  case, each sample name may be long and have a voucher number

21  or the item number.

22          So for this, it's a mixture that was best described

23  to come from three people and from this there was a 22 locus

24  DNA profile from a female individual that was determined and

25  this matched the DNA profile of female donor A that was

1    previously established and female donor A was donating the

2    majority of the DNA, or about 94 percent of the DNA to the

3    mixture.

4        There was also a likelihood ratio that was performed

5    for this case with the Brandy Odom's profile and based on this

6    likelihood ratio Brandy Keshawwn Odom was concluded to be

7    included as a contributor to the sample.  And the next sample

8    from wooden handle kitchen knife, eight-inch blade and this

9    would be item two of the same voucher, was best described to

10   come from three people and for this assuming Brandy Odom is a

11   contributor, we were able to develop a 19 locus profile from a

12   female individual and this profile matched again with the

13   female donor A.

14       For this sample Brandy Odom was contributing about

15   40 percent, 44 percent of DNA while female donor A was

16   contributing about 54 percent.  Lastly the swab of the top of

17   handle on blade which is from knife item two of the same

18   voucher was a mixture that was best described to have come

19   from two people.  And for this the DNA profiles for the

20   individual contributors could not be determined.

21       However, the results are suitable for comparison and

22   for this the likelihood ratio involving Brandy Odom fell

23   within the uninformative range which meant that there isn't

24   enough data to support that Brandy Odom is included or

25   excluded as a contributor to this mixture.

1  Q    Did there come a point when your lab tested a swab taken

2  from a railing?

3  A    Yes.

4  Q    And what was the voucher number for that swab?

5  A    Looking the report, you see on January 26th of 2024 the

6  voucher number for swab on railing is 3000961220.

7  Q    And what was the result of that testing?

8  A    No blood was detected on the swab of railing.

9  Q    Mr. Lim, did there come a point where the lab received

10 DNA samples from several individuals for comparison to the

11 evidence in this case?

12 A    Yes, we did.

13        MR. PALACIO:  Your Honor, with the Court's

14 permission if I could hand up to the witness what is in

15 evidence on consent as Government Exhibit 276 to 286.

16        THE COURT:  Yes.  The answer to your question is

17 yes.

18        (Counsel approaches.)

19        MR. PALACIO:  Your Honor, may we approach?

20        THE COURT:  Do I need the reporter?

21        MR. PALACIO:  No, we don't.

22        (Sidebar held.)

23        THE COURT:  So, I think we're going to take a little

24 break just to make sure that this goes efficiently.  So,

25 fifteen minutes.  Don't talk about the case or look anything

1    up.  We'll see you in a few minutes.

2            THE COURTROOM DEPUTY:  All rise.

3            (Jury exits.)

4            THE COURT:  Everybody can sit down.

5            We'll regroup in fifteen minutes.

6            Sir, you can step down.

7            (Witness steps down.)

8

9            (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (In open court; jury not present.)

2      THE COURT:  Let's get the witness back on the stand.

3      Anything before we start?

4      MS. DEAN:  Do you mind if the Government reads in

5  two stipulations before the witness resumes?

6      THE COURT:  No, I don't mind.

7      (Witness resumes the stand; jury enters.)

8      THE COURT:  All right, everybody.  We're ready to

9  proceed.

10      I think before we continue with the examination of

11  Mr. Lim, the Government is going to read portions of two

12  stipulations, which are things that the parties have agreed

13  to.

14      MS. DEAN:  Thank you.

15      Reading from Government 1200.

16      It is hereby stipulated and agreed by and between

17  the United States of America, by the undersigned Assistant

18  United States Attorneys, and the Defendant Cory Martin, by his

19  undersigned attorneys as follows:

20      NYPD Property Clerk Invoice Number 3000171900

21  contained a DNA sample from Samson Alabi.  The DNA swab was

22  sent to the Office of Chief Medical Examiner for DNA analysis,

23  which was conducted and documented in OCME Certified File

24  Number FBS13-00094.

25      NYPD Property Clerk Invoice Number 6000018729

1  contained a DNA sample from Samuel Lemus.  The DNA swab was

2  sent to OCME for DNA analysis, which was conducted and

3  documented in OCME Certified File Number FBS18-01552.

4         NYPD Property Clerk Invoice Number 6000018728

5  contained a DNA sample from Jaleel Ottley.  The DNA swab was

6  sent to OCME for DNA analysis, which was conducted and

7  documented in OCME Certified File Number FB18-01554.

8         NYPD Property Clerk Invoice Number 30000956891

9  contained Derrick Martin.  The DNA swab was sent to OCME for

10  DNA analysis, which was conducted and documented in OCME

11  Certified File number FBS18-01551.

12         NYPD Property Clerk Invoice Number 30000956893

13  contained a DNA sample from Darrel Bristow.  The DNA swab was

14  sent to OCME for DNA analysis, which was conducted and

15  documented in OCME Certified File Number FBS18-01553.

16         NYPD Property Clerk Invoice Number 30000957567

17  contained a DNA sample from Jasper Moulder.  The DNA swab was

18  sent to OCME for DNA analysis, which was conducted and

19  documented in OCME Certified File Number FBS18-01607.

20         NYPD Property Clerk Invoice Number 30000959937

21  contained a DNA sample from Adelle Anderson.  The DNA swab was

22  sent to OCME for DNA analysis, which was conducted and

23  documented in OCME Certified File Number FBS18-01710.

24         NYPD Property Clerk Invoice Number 30000975147

25  contained a DNA sample from Frederick Ardis.  The DNA swab was

1  sent to OCME for DNA analysis, which was conducted and

2  documented in OCME Certified File Number FBS-02274.

3        NYPD Property Clerk Invoice Number 30000975154

4  contained a DNA sample from Anthony Turrisi.  The DNA swab was

5  sent to OCME for DNA analysis, which was conducted and

6  documented in OCME Certified File Number FBS18-02277.

7        NYPD Property Clerk Invoice Number 60000246648

8  contained a DNA sample from Andrew Hoffman.  The DNA swab was

9  sent to OCME for DNA analysis, which was conducted and

10  documented in OCME Certified File Number FBS19-03941.

11        NYPD Property Clerk Invoice Number 40000822715

12  contained a DNA sample of the Defendant Cory Martin.  The swab

13  was sent to OCME for DNA analysis, which was conducted and

14  documented in OCME Certified File Number FBS18-02304.

15        This stipulation is admissible in evidence as

16  Government Exhibit 1200.

17        And it's signed by the parties.

18        Turning to the second stipulation, Government 1201.

19        It is hereby stipulated and agreed by and between

20  the United States of America, by the undersigned Assistant

21  United States Attorneys, and the Defendant Cory Martin, by his

22  undersigned attorneys, as follows:

23        On May 4, 2018, detectives from the NYPD's crime

24  scene unit processed a black 2005 Nissan Maxima with New York

25  State license plate HLC 7182 and vehicle identification number

1   1N4BA41E85C867746 pursuant to a judicially authorized search

2   warrant.  Crime scene unit detectives took photographs of the

3   vehicle and collected the following items:

4           A.  Cushion and backrest cutouts from the front and

5   rear driver's side and passenger side seats, labeled OH1

6   through OH8.

7           B.  The trunk mat, labeled OH9.

8           C.  Carpeting from the trunk, labeled OH10.

9           D.  Trim from the left, middle, right, and the lid

10  of the trunk, labeled OH11-14.

11          E.  Floor mats from the front and rear driver's side

12  and passenger's side, labeled OH15-18.

13          The items labeled OH1-18 were properly packaged,

14  sealed, and vouchered under NYPD Invoice Number 3000962689.

15          If we can display Government 700 and 701, please.

16          (Exhibit published to the jury.)

17          Government 700 and 701 are photographs of the

18  Nissan's trunk.

19          Government 702 is a photograph of the Nissan's trunk

20  mat, OH9

21          Government 703 is a photograph of carpeting taken

22  from the trunk of the Nissan, OH10.

23          This stipulation is admissible in evidence as

24  Government Exhibit 1201 and signed by the parties

25          THE COURT:  Thank you, Ms. Dean.  We'll continue now

1  with the direct examination of Mr. Lim.

2  BY MR. PALACIO (Continuing):

3  Q    Mr. Lim, I handed you Government Exhibit 276 and 286.

4       Did you have a chance to review all of those what

5  are known as suspect files?

6  A    Yes, I did.

7  Q    And are those the suspect files for which we just heard

8  the names on the stipulation that was just read?

9  A    Yes, they are the certified case files for the

10 individuals mentioned.

11 Q    Now Mr. Lim, can you tell us what an "exemplar" is?

12 A    An exemplar is a type of sample that is submitted from a

13 known individual which we can use to develop a DNA profile.

14 It is typically submitted from inner cheek of an individual so

15 that we can develop a unique profile for that individual.

16 That is typically submitted to be compared to associated had

17 evidence files.

18 Q    Now turning specifically to the names that were just

19 mentioned as part of those suspect files, and specifically

20 with respect to Samson Alabi, Derrick Martin, Darrel Bristow,

21 Jaleel Ottley, Jasper Moulder, Frederick Ardis, Anthony

22 Turrisi, and Andrew Hoffman, were there samples in which these

23 individuals were either excluded as contributors or supported

24 to be excluded to samples suitable for comparison?

25 A    That is correct based on the likelihood ratio of

1  comparison of those exemplars of those individuals to the DNA

2  results of the evidence.

3  Q    Were the remaining samples in the uninformative range

4  which did not support either inclusion or exclusion?

5  A    Correct.

6  Q    Now, did your lab also receive an exemplar from someone

7  named Adelle Anderson under suspect file FBS18-1710?

8  A    Yes.

9  Q    What type of exemplar was received?

10         That should be marked as Government Exhibit 282.

11         THE WITNESS:  Your Honor, may I refer to the case

12  file?

13         THE COURT:  Sure.

14  A    Could you repeat the question, please?

15  Q    What type of exemplar was received for Ms. Anderson?

16  A    It was a bottle that was submitted for Adelle Anderson.

17  Q    And was her DNA typed from that bottle?

18  A    Yes, her DNA profile was developed from the DNA donor to

19  the bottle that was specifically submitted for Adelle

20  Anderson.

21  Q    You told us before we broke that you were able to

22  identify a Female Donor A from some of the items that were

23  tested for DNA.

24         Did you compare the DNA profile of Female Donor A

25  and Male Donor A to the profile received for Ms. Anderson?

1   A    Yes.

2   Q    Did either of those profiles match Female Donor A?

3   A    Yes.  The DNA profile of the DNA donor to the bottle

4   submitted for Adelle Anderson matched the DNA profile of

5   Female Donor A.

6   Q    Was Ms. Anderson's DNA compared to the plastic bags?

7   A    Yes.

8   Q    And what were the results?

9   A    So, I'm looking at the report issued on May 17 of 2018.

10           So, for plastic bag item one under voucher ending in

11  042, a likelihood ratio was calculated for the comparison of

12  the DNA donor to the bottle submitted for Adelle Anderson to

13  the DNA mixture on the plastic bag, resulting in a likelihood

14  ratio within the uninformative range.  Therefore, this does

15  not support whether DNA donor to the bottle submitted for

16  Adelle Anderson is included or excluded as a contributor to

17  this sample.

18           For the plastic bag item two of this same voucher, a

19  likelihood ratio was also calculated using the DNA donor to

20  the bottle submitted for Adelle Anderson against this mixture.

21  And the DNA donor to the bottle submitted for Adelle Anderson

22  is excluded as a contributor to the sample.

23  Q    Was Ms. Anderson's DNA compared to the stains on the

24  pillowcases?

25  A    Yes.

1   Q      Was the DNA for Ms. Anderson the single source of DNA on

2   any of those pillowcase stains; and, if so, on which one

3   specifically?

4   A      Looking at the report issued on May 26 of 2018, the

5   pillowcases where the donor to the Adelle Anderson matched the

6   Female Donor A were from the stain four of pillowcase item one

7   and stain four of pillow case item 3 on the voucher ending in

8   800.

9   Q      Was the DNA for Ms. Anderson included as a contributor to

10  any of the other pillowcase stains; and, if so, which ones?

11  A      Based on the likelihood calculation, the DNA donor to the

12  bottle submitted for Adelle Anderson is included as a

13  contributor to both of the stain ten of pillow case of item

14  one and stain five of pillow case of item three.

15  Q      Was the DNA from Ms. Anderson compared to the kitchen

16  knives?

17  A      Yes.

18  Q      And what were the results of that testing?

19  A      The DNA donor to the bottle that was submitted for Adelle

20  Anderson matched the DNA profile of Female Donor A that was

21  developed on the sample from wooden handle of kitchen knife

22  9-inch blade as well as the sample from wooden handle kitchen

23  knife 8-inch blade.

24          So, the 9-inch blade is the item one from the

25  voucher ending in 799.  The 8-inch blade is item two of the

1    same voucher.

2    Q    Okay.  Now I'd like to turn your attention to a suspect

3    file for Samuel Lemus under FBS18-1552.  That should be marked

4    as Government Exhibit 278.

5              Mr. Lim, with the exception of the Y-DNA on the

6    plastic bag item two on the voucher ending 042, did you

7    compare the DNA profile of Samuel Lemus to all the other

8    samples suitable for comparison?

9    A    Yes.

10   Q    Was the profile of Samuel Lemus excluded or supported to

11   be exluded to those samples except for the one I just

12   mentioned?

13   A    That's correct.

14   Q    Now returning to the Y testing for Samuel Lemus on the

15   plastic bag, what was the result of that comparison?

16   A    So, for the plastic bag, item two that ends in voucher

17   042, the Y profile of Samuel Lemus is included in the number

18   of males who are possible contributors, which is approximately

19   seen in 1 in 38 African-Americans, 1 in 138 Asian males, 1 in

20   13 Caucasian males, and 1 in 21 Hispanic males.

21   Q    How is that calculation reached?

22   A    This calculation or this statistic was calculated using

23   the Y mixture tool that we have within the laboratory when a Y

24   profile of person of interest is being compared to the Y

25   results of the associated evidence.

1    MR. PALACIO:  If we could show what's in evidence on

2    consent as Government 291.

3         THE COURT:  Okay.

4         (Exhibit published to the jury.)

5    Q    Mr. Lim, can you explain -- it's a little hard to see.

6         Can you explain to us what this chart shows us?

7    A    This graph that you see is how Y mixture tool is used

8    within the laboratory.

9         The markings on the upper right corner gives you

10   which case you're using it to compare to.  So, this result was

11   used to compare to against the evidence result with the sample

12   that is labeled not two.

13        So the middle portion of the graph, you'll see a lot

14   of columns with a couple numbers below it.  So, the numbers

15   that you see below are the Y results of the mixture that was

16   detected for the plastic bag item two in the voucher ending

17   042.  And it was a mixture that was best described to have

18   come from three people.  So, all of those locations where

19   three males were represented were entered into this database

20   and used for the calculations.

21        And the numbers that you see on the bottom half, you

22   will see the first column lists the different population

23   groups.  The African-American, Asian, Caucasian, Hispanic,

24   Native, and combined.  We have different population groups

25   because there can be a difference in the way DNA is inherited

1  among different population groups which had been separated

2  geographically over extended period of time.

3          And the number that you see the third column from

4  the left on the top, it says N.  What that means is that

5  number of different Y profiles from the population group that

6  are in the database.  So, for example, African-American males,

7  there will be roughly 6,200 profiles in the database.

8          And the number to the left of that, which is under

9  Column X, is the number of times the combination of the

10 evidence mixture for this particular sample was seen in the

11 database.  So, it was seen roughly 143 times among the

12 African-American profiles in the database, which is why you

13 will see a statistic that is in the vicinity of 1 in 38

14 African-American males after applying the level of

15 conservatism.

16 Q    Can you give us a statistic for Caucasian males?

17 A    Yes.  For the Caucasian, which is the third column from

18 the top, what's in the database, there were roughly 512 times

19 that it was seen.  So, after applying the level of

20 conservatism, it was 1 in approximately 14 Caucasian males.

21 Q    How many times was that Y profile observed in the

22 database?

23 A    Roughly 1,010 times among different population groups.

24 Q    And for Caucasian males?

25 A    Roughly 512 times that this combination of mixtures for

1   the plastic bag was seen in the database for the Caucasian

2   population group.

3   Q    Mr. Lim, did you your lab also received a Court-ordered

4   exemplar from Cory Martin under suspect file FBS18-2304, in

5   evidence now as Government Exhibit 285A and B?

6   A    Yes.

7   Q    And do you have that file in front of you?

8        What type of suspect exemplar did you receive for

9   Cory Martin?

10  A    We have received a straw that was submitted for Cory

11  Martin.

12  Q    Did you receive a Court-ordered swab at a certain point?

13  A    Yes, we did.

14  Q    What type of swab was that?

15  A    It will be the buccal exemplar, meaning coming from the

16  inner cheek of the individual.

17       THE COURT:  B-U-C-C-A-L?

18       THE WITNESS:  Yes, B-U-C-C-A-L.

19  Q    Did you compare the DNA profile of Female Donor A and

20  Male Donor A to the DNA of Cory Martin?

21  A    Yes.

22  Q    What was the result of that comparison?

23  A    The DNA profile of Cory Martin matched the DNA profile of

24  Male Donor A.  And this is coming from September 15, 2021

25  report.

1  Q    Did you compare Cory Martin's DNA to the evidence in this

2  case?

3  A    Yes.

4  Q    Was Cory Martin excluded as a contributor to the

5  fingernail samples from Brandy Odom that we talked about

6  earlier?

7            Postmortem samples.

8  A    Could you repeat the question, please?

9  Q    Yes.  Was Cory Martin excluded as a contributor to the

10  fingernail samples, the postmortem fingernail samples, from

11  Brandy Odom?

12  A    There were no fingernail samples that were suitable for

13  comparison, so comparison using DNA profile of Cory Martin was

14  not performed.

15  Q    What were the results of the comparison of Cory Martin's

16  DNA to the plastic bags items one and two under voucher ending

17  042?

18  A    For plastic bag item one ending in 042, the DNA mixture

19  found on plastic bag is approximately 3.73 times more probable

20  if the sample originated from Brandy Keshawwn Odom and one

21  unknown person than if it originated from Cory Martin and

22  Brandy Keshawwn Odom.  And this likelihood ratio value is

23  within the uninformative range; therefore, it does not support

24  whether Cory Martin is included or excluded as a contributor

25  to this particular plastic bag.

1      And for plastic bag item two, a likelihood ratio was

2  calculated using the DNA profile of Cory Martin to the DNA

3  mixture found on plastic bag item two, and Cory Martin is

4  excluded as a contributor to the sample.

5  Q    Now, with respect to the kitchen knives and swabs from

6  those knives, was Cory Martin either excluded or within the

7  uninformative range which did not support either inclusion or

8  exclusion?

9  A    That is correct?

10 Q    Did Cory Martin's DNA match to any of the stains or

11 profiles developed from any of the -- sorry.

12      Did Cory Martin's DNA match to any of the profiles

13 developed from any of the pillowcase stains?

14 A    Yes.

15 Q    Which ones?

16 A    The DNA profile of Cory Martin matched the DNA profile of

17 Male Donor A that was developed from stain ten of pillowcase

18 item one and stain five of pillowcase item 3, both on the

19 voucher ending in 800.

20 Q    Now, was the Y-DNA profile of Cory Martin compared to the

21 Y-DNA profile of Male Donor A on the pillowcase stains?

22 A    Yes.

23 Q    And what were the results?

24 A    For the plastic bag item two, the Y-DNA profile --

25 Q    Sorry, Mr. Lim.  I was talking about the pillowcase

1  stains.

2  A    Oh, I apologize.

3        For both of those pillowcase stains, so those would

4  be stain ten of pillowcase item one and stain five of

5  pillowcase item three, the Y-DNA profile of Cory Martin

6  matches the Y-DNA profile of Male Donor A.  Therefore, he or

7  one of his male relatives, paternal male relatives, could be

8  the source of this DNA.  And the DNA profile of Male Donor A

9  is expected to be found in approximately 1 in 2,080

10 African-American males, 1 in 1,330 Asian males --

11 Q    We can stop right there, Mr. Lim.

12       Now, turning to the plastic bags was the Y-DNA

13 profile of Cory Martin also compared to the Y-DNA profile of

14 Male Donor A to the plastic bag item two?

15 A    Yes.

16 Q    And what was the result of that?

17 A    The Y-DNA profile of Cory Martin matched the Y profile of

18 Male Donor A.  So, he or one of his male paternal relatives

19 could be the source of the DNA.

20 Q    What was the statistic for African-American males?

21 A    1 in 2,080 African-American males.

22 Q    Can you explain why Cory Martin was excluded as a

23 contributor to the sample from the bag under autosomal testing

24 but included as a contributor after Y-DNA testing?

25 A    So, given that the autosomal and the Y testing are coming

1   from the same sample, they're essentially looking at different

2   targets.

3           So, for the autosomal, it was best described to come

4   from two people.  And of those two people, one person which

5   match the Brandy Odom was estimated to be contributing about

6   99 percent of DNA.

7           And there was a presence of both female and male

8   presence, so there was small amount of additional contributors

9   that were detected in that particular sample.  So, based on

10  our manuals and guidelines, it was estimated to be coming from

11  two people.  But that small amount of DNA that was detected

12  from additional contributors could have come from more

13  additional contributors.

14          So, those other contributors that is likely coming

15  from the male component is what the Y testing would target.

16  And the Y testing will be something that is, again, male

17  specific.  And by doing so, we have gained additional

18  information where we have determined that it was coming from

19  three male contributors.

20          So, the comparison, again, using the Y data and also

21  fusion data are independent of each other because they are

22  looking at different targets of the same sample.  In this

23  case, the profile that was specifically separated from the Y

24  testing did match with the Y profile that was developed for

25  Cory Martin.

1    MR. PALACIO:  If we could show the witness what's in

2  evidence as Government 292 on consent.

3    (Exhibit published to the jury.)

4  Q    Mr. Lim, can you explain what we see here?

5  A    This is the Y mixture tool that was used for the male

6  Donor A that was developed from the plastic bag of item two.

7  And in this case, the male Donor A profile was entered into

8  the database in the yellow box we see in the middle, as

9  opposed to all of the numbers that were present for the

10  mixtures for the previous mixture tool that we have seen in

11  the display.

12    The bottom, where it lists the different population

13  groups, you will see a number zero under where it says Column

14  X.  So, that is the number of times this particular Y profile

15  was seen in the database for each population group.

16    And it's zero, meaning this profile was not seen in

17  the database.  And with the level of conservatism applied, the

18  statistics that is reported on the case report is the number

19  that you see all the way to the right, one in particular

20  number for each population group.

21  Q    What was the statistic for African-American males?

22  A    This is expected to be seen in approximately 1 in 2,080

23  African-American males.

24  Q    Is this the highest Y-DNA comparison reported out by

25  OCME?

1    A    It is the highest statistic you can reach within the Y

2    statistics that we use.

3    Q    How does it compare to the Y data that we saw for Samuel

4    Lemus earlier?

5    A    In comparison of sample number to number comparison, this

6    would be more rare, as in this is higher than the number that

7    we have seen for the previous statistical tool in the display.

8                MR. PALACIO:  Thank you, your Honor.  Nothing

9    further.

10                THE COURT:  Cross-examination?

11                MS. THIELE:  Yes, your Honor.

12

13                (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2    CROSS-EXAMINATION

3    BY MS. THIELE:

4    Q    Good afternoon, Mr. Lim.

5    A    Good afternoon.

6    Q    You conducted numerous DNA tests in this case, correct?

7    A    I have done the review of the data included in the case

8    file.

9    Q    And safe to say that was numerous different tests, that

10   included numerous different tests, correct?

11   A    Correct.

12   Q    In preparation for your trial testimony, did you have

13   meetings with the Government?

14   A    Yes.

15   Q    How many times would you say?

16   A    I would say approximately two times.

17   Q    Do you know how long those meetings were,

18   approximately?

19   A    Off the top of my head, I believe the first meeting was

20   short and the second meeting was relatively long.

21   Q    How long would you say?

22   A    I would say couple hours to three hours.

23   Q    Do you remember anyone taking notes at that long

24   meeting?

25   A    I'm not sure off top of my head.  I'm not sure.

1    Q     Thank you, Mr. Lim.

2          You testified that there were many rounds of

3    testing in this case, correct?

4    A     Yes.  There were multiple rounds of testing.

5    Q     And the NYPD sent hundreds of swabs or items to OCME

6    for testing?

7    A     Yes.  I believe there are more than hundreds of items

8    that were submitted for multiple rounds of testing.

9    Q     And these items are submitted because they might yield

10   probative evidence to help in the investigation, right?

11   A     They can be.

12   Q     Some of those items included knives?

13   A     Yes.

14   Q     And plastic bags?

15   A     Yes.

16   Q     And swabs from the victim's fingernails?

17   A     Yes.

18   Q     Swabs from the carpeting in a vehicle?

19   A     Yes.

20   Q     And pillowcases?

21   A     Yes.

22   Q     Okay.  Can you briefly explain the different ways DNA

23   can be deposited on an item?

24   A     DNA can be deposited on an item via various ways.  It

25   can be done in the form of biological fluid.  You can

1  deposit in the form of semen, saliva or blood, or in the

2  skin cells where if the physical contact is made, then there

3  may be a chance of depositing DNA on to that surface.

4  Q    So that last example you gave, it's possible that DNA

5  can be deposited if a person directly touches a surface,

6  correct?

7  A    It is possible, but it is dependent on many factors

8  whether that is detectable or not of DNA, it is, again,

9  dependent on a lot of different factors.

10  Q    Would you say that's why you called it touch DNA?

11  A    That's one way to say it, because the likely source of

12  detecting DNA from a particular item, if no other

13  indications of bodily fluid is mentioned, then I would say

14  the DNA coming from skin cells or the touch itself could be

15  logical explanation.

16  Q    For example, if you had a fingerprint or a palmprint on

17  an object, it could be swabbed in an attempt to extract DNA,

18  correct?

19  A    It can be.

20  Q    Do you know if OCME swabbed any prints in this case?

21  A    The Department of Forensic Biology, I believe, do not

22  do the fingerprinting ourselves.

23  Q    Okay.  It's also possible for DNA to be found on an

24  item that an individual was never in contact with, correct?

25  A    It is possible.

1   Q    For that reason, it's more appropriately called trace

2   DNA, correct?

3   A    It can be.  The transfers of DNA primarily can come

4   from physical contact, but there can be other instances

5   where an indirect contact can also result in detection of

6   DNA, but that is dependent on the circumstances in which the

7   deposit was made, the conditions surrounding the deposit, or

8   if any other events were introduced post-contact.

9   Q    So there are many variables, correct?

10  A    Yes.

11  Q    And if DNA is, in fact, collected from a surface, you

12  cannot actually conclude that an individual came in contact

13  with that surface, correct?

14  A    That is correct.  So DNA testing, itself, does not give

15  yes or no answer if someone has made the contact.  While

16  having a high amount of DNA, coming from particular

17  individuals might give an indication that might have come

18  from contact, but, again, DNA itself, alone, cannot conclude

19  that the contact has been made.

20  Q    And I believe you testified that DNA can be extracted

21  from a number of different bodily fluids?

22  A    Yes.  If they are deposited on a surface and a portion

23  of that surface is submitted for testing, DNA can be

24  extracted.

25  Q    And skin cells, correct?

1  A    Yes.

2  Q    And looking just at a DNA sample, can you tell what

3  type of substance it was extracted from?

4  A    No.  DNA is going to be the same regardless of which

5  biological material it is from.  So your DNA is the same

6  whether it's coming from your skin cell or bodily fluids.

7  Q    DNA can survive on surfaces for a long time, right?

8  A    It can, upon the right conditions and the right

9  circumstances.  I have worked on cases where DNA was

10 obtained from evidence that was collected from decades ago,

11 but there are also instances where DNA was not obtained from

12 evidence that was collected recently.  So it depends.

13 Q    You also discussed serology tests done in this case,

14 correct?

15 A    Yes.  And serology testing refers to the presumptive

16 testing that we do for the potential presence of bodily

17 fluids.  So in this case, it was a potential presence of

18 blood.

19 Q    And from the results, even if positive, due to the fact

20 that it's a presumptive test, you cannot confirm that human

21 blood was, in fact, on the item, correct?

22 A    That is correct, it is not confirmatory, while there

23 may be indications that blood is the likely source, because

24 one of the indications is that it's a reddish brown in

25 nature.  Also if overwhelming amount of DNA is coming from

1   an individual from that area where it was reddish brown, it

2   is likely that it is coming from blood.  But, again, the

3   testing, itself, is not confirming the presence of blood.

4   Q    And turning to a specific test, there was a positive

5   serology test on the carpeting of a Nissan, correct?

6   A    Correct.

7   Q    And there were no results as to whether the victim's

8   DNA was found on that carpeting, right?

9   A    Correct.  Because the sample that was presumptively

10  positive for blood was sent for additional testing, but it

11  was insufficient for the amount of DNA.

12  Q    Okay.  I am going to turn to Y-profile.  A Y-STR DNA

13  profile is the DNA on the Y-chromosome?

14  A    Correct.  So the Y-chromosomes that are specific to

15  biological males.

16  Q    Meaning that it's transferred from father to son?

17  A    Correct.  So the male paternal biological relative.  So

18  grandfather, father, son, grandson and so forth.

19  Q    And this profile would go back many generations,

20  correct?

21  A    It can be.

22  Q    Can you tell us, briefly, what a nuclear DNA profile

23  is?

24  A    A nuclear DNA profile would be the one that we all

25  have.  It's where we can get DNA profile from.  It comes

1    from the cells, which is -- are the smallest living unit of
2    life.  We are made up of cells.  And nuclear is the part
3    where we're getting the DNA from.
4    Q    And many men can share a Y-profile, but not a nuclear
5    profile, correct?
6    A    I would say biological male paternal relatives would
7    share the same Y-profile, but if they're not identical
8    twins, they would have different nuclear DNA profile.
9    Q    And you also testified on direct that STR or autosomal
10   testing is more discriminating than Y-testing?
11   A    It can be.  So STR stands for Short Tandem Repeat.  So
12   it's another way of small fragments of DNA that are looking
13   for at all the locations that our laboratory is testing for.
14   It can be more discriminatory because every person has a
15   different DNA profile, but in terms of Y-male profile, we
16   don't know how many different Y-male profiles are there in
17   the world since male paternal lines can be essentially
18   unlimited.
19   Q    Humans have 23 pairs of chromosomes?
20   A    Yes.
21   Q    And autosomal chromosome make up 22 of those 23
22   patching pairs?
23   A    Correct.
24   Q    You would agree that's the bulk of an individual's DNA?
25   A    We only look at the fraction of the DNA that we are

1  different in.  So we're looking at the small component of

2  DNA within us that are different.

3  Q    I would like to turn to the reports.

4        MS. THIELE:  With the Court's permission, I would

5  like to publish what is in evidence as Government

6  Exhibit 275 so that the witness and jury can follow along

7  with my next set of questions.

8        THE COURT:  Sure.

9        MS. THIELE:  And page 13 of Government

10 Exhibit 275, Mr. Gover, thank you.

11       (Exhibit published.)

12       MS. THIELE:  If this is page 13, can we scroll to

13 the bottom?  Perfect.  Okay.

14 Q    Would it be correct to say that four total samples were

15 taken from plastic bag Item 1 and 2 in this case?

16 A    Could you repeat the question, please?

17 Q    Yes.  Would it be correct to say that four total

18 samples were taken from plastic bag Item 1 and 2 that were

19 then tested?

20 A    So for Item 1, there was one sample taken for -- for

21 the testing, the same for Item 2.  So total of two samples

22 from the two plastic bags were submitted for additional

23 testing.

24 Q    And I believe --

25       MS. THIELE:  Mr. Gover, if you could just go to

1   the top of the next page for me?  Thank you.

2   Q    I believe you testified on direct that this first set

3   of samples, swabs of edges of bag opening and knots from

4   plastic bags Item 1 and 2 were also taken from those same

5   items; is that right?

6   A    Yes.  I was referring to the samples taken from the

7   plastic bag by the analyst at the OCME.  So the analyst

8   taking one sample from each of the plastic bags.

9   Q    So is it only one swab from each plastic bag or two

10  swabs?

11  A    There were multiple swabs taken from the plastic bag,

12  but they were combined as one sample from each of the

13  plastic bags, Item 1 and 2, by the analyst during the

14  examination.

15  Q    Can you explain what you mean when you say they were

16  combined?

17  A    So you may have seen the plastic bag earlier in the

18  display.  And the surface area of this plastic bag is

19  relatively large.  So the swab they would use to rub against

20  the surface of that large surface is typically divided in

21  small areas so that we would capture all different parts of

22  the area of the plastic bag was knotted initially.  So five

23  small -- the swabs that were specifically swabbed from parts

24  of the knotted area were combined as one sample and treated

25  as one sample for that particular item which is plastic bag.

1    Q    And just to clarify, you did not take those swabs,

2    correct?

3    A    I -- I physically did not.  But that is well documented

4    in the notes of the case file.

5    Q    Okay.

6              MS. THIELE:  Mr. Gover, can you go back to the

7    bottom of the previous page?

8    Q    A Y-STR DNA kit was used in an attempt to detect male

9    DNA on plastic bag Item 2, correct?

10   A    Correct.

11   Q    And it was determined that the DNA mixture was best

12   described to have come from three male contributors?

13   A    Correct.

14   Q    But would you be comfortable concluding that there

15   were, in fact, three male contributors?

16   A    They would be the three male paternal profiles, it

17   could be additional male contributors, but if they were

18   sharing the male DNA profile, then I do not know exactly how

19   many different male profiles were to be present.

20   Q    But a 14 locus DNA profile was pulled for a major male

21   contributor, Male Donor A, correct?

22   A    Correct.  From this mixture, it was clear that one of

23   the major male paternal profile could be separated from the

24   mixture and be designated as Male Donor A profile.

25   Q    And looking at the last sample on that page, these are

1   the results of the same test conducted on plastic bag

2   Item 1?

3   A    Yes.

4   Q    And it was determined that the mixture was best

5   described to come from four or more contributors?

6   A    Correct.

7   Q    And pursuant to lab policies, there was no further

8   Y-STR testing on this item, correct?

9   A    Correct.  For Y-samples, we will only interpret with

10  further conclusions if the sample is best described to have

11  come from three or less.

12           MS. THIELE:  Can we go to the top of page 14

13  again, Mr. Gover?

14  Q    And these two set of samples at the top of the page,

15  these results came from an STR DNA kit, correct?

16  A    Correct.

17  Q    And for the first set of samples, it was found that

18  there was only one contributor, and that was Brandy Odom,

19  correct?

20  A    It was best described to come from single source, and,

21  yes, it did match the DNA profile of Brandy Odom.

22  Q    And the second set of samples on the same page, these

23  were also the results of STR testing, Items 1 and 2,

24  correct?

25  A    Correct.

1  Q    And these results suggest that the mixture is best

2  described as having two contributors, correct?

3  A    Correct.

4  Q    And although an autosomal DNA profile could not be

5  determined in addition to Brandy Odom's, the results were

6  suitable for comparison, correct?

7  A    Correct.  There were additional information in the

8  mixture that did not belong to the DNA profile of Brandy

9  Odom.  And those, in its entirety, can be compared when you

10 have the DNA profile of a known person.

11        MS. THIELE:  Mr. Gover, we can take that down for

12 now.  Thank you.

13 Q    You performed DNA comparisons between -- for these

14 items with DNA samples from a number of different

15 individuals, correct?

16 A    Yes, we can.

17 Q    You used a statistic called the likelihood ratio,

18 correct?

19 A    Yes.  That is the type of result we list in the case

20 report.

21 Q    And this is a calculation used to assess the value or

22 the weight of certain DNA evidence?

23 A    It gives a support as to if an individual could be

24 included or excluded as a contributor of that particular

25 sample it is being compared to.

1    Q    But this test does not tell you the probability that

2    the individual's DNA is on the item, right?

3    A    It gives -- it's a probability, a statistical

4    calculation, again, whether someone could be included or

5    excluded as a contributor given the data that we see.

6    Q    But before calculating a likelihood ratio, you have to

7    assume certain hypothesis, correct?

8    A    Correct.  There can be instances where we would have to

9    determine how many number of contributors are donating to

10   the DNA or if there are any instances of reasonable expected

11   individual that can better inform the calculation.

12          So for example, the clothing that you are wearing,

13   you are expected to have your own DNA, so you might be

14   assumed as a contributor to better inform the calculation of

15   who else could be detected on that particular item.

16   Q    Regardless of the likelihood ratio value that results,

17   it's possible that neither of the hypothesis assumed are

18   actually true, correct?

19   A    I am not sure what you mean by that.  The likelihood

20   ratio calculation is based on the data of alleles or the

21   numbers that are detected through our testing.  So it is

22   empirical results based on the calculation that we perform.

23   Q    If I could use your example about clothing.  Before

24   running the test, you would assume, for example, that the

25   person wearing the item is a contributor of DNA, correct?

1    A    So in this hypothetical situation, we probably would

2    have developed a DNA profile of the person wearing the

3    clothing in the form of an exemplar.  And even running

4    before the statistics, we may be able to see indication that

5    that person's DNA is seen within the data in itself.

6    Q    But if you did not develop a profile from the item, you

7    could still run the calculation, correct, assuming that the

8    person's DNA contributed to the mixture?

9    A    If the data supports that, we can.

10   Q    Okay.  I would like to go back to plastic bag Item 1.

11              You calculated a number of likelihood ratios in

12   these reports related to a number of individuals for which

13   you received DNA samples, right?

14   A    Yes.

15   Q    And these were conducted as a part of autosomal

16   testing, right?

17   A    Correct.

18   Q    For Darrell Bristow, the results did not support

19   whether he was included or excluded as a contributor to

20   plastic bag Item 1, correct?

21   A    I would have to ask you which FB number that is.

22              MS. THIELE:  How about we pull up Government

23   Exhibit 280 at page 20.

24   Q    To save us some time, Mr. Lim, you remember a number of

25   likelihood ratios calculated with respect to plastic bag

1    Item 1, correct?

2    A    Correct.

3    Q    And a number of those results lead to a conclusion that

4    you could not include or exclude that person as a

5    contributor, correct?

6    A    Correct.

7    Q    And that's true for Cory Martin, as well, correct?

8    A    Correct.

9    Q    And this result means that you cannot tell us whether

10   Cory Martin's DNA was found on plastic bag Item 1, correct?

11   A    The likelihood ratio found in the uninformative range,

12   so it simply means that there was not enough data to

13   conclusively support if the data that we detected could be

14   from that particular individual, either it be included or

15   excluded as a contributor of that particular sample.

16   Q    I would like to turn to additional results from Cory

17   Martin's report.

18            MS. THIELE:  With the Court's permission, I would

19   like to publish what I know is in evidence as Government

20   Exhibit 285-A.

21            THE COURT:  Okay.

22            MS. THIELE:  At page 56.

23            (Exhibit published.)

24            MS. THIELE:  If you could scroll down to the last

25   sample on that page.

1  Q    And do you see the last sample, Mr. Lim?

2  A    Yes, I do.

3  Q    The results of an autosomal test on plastic bag Item 2

4  suggest that Cory Martin was excluded as a contributor to

5  this sample, correct?

6  A    Correct.  Based on the likelihood ratio.  And for this

7  particular sample, the reason why Brandy Odom is mentioned

8  in both of those hypothesis is because she was assumed as a

9  contributor as she was reasonably expected and her DNA

10  profile was also seen in the evidence, so they was assumed

11  as a contributor in order to better inform the calculation

12  of the remaining contributor.

13       MS. THIELE:  And Mr. Gover, if you could go to the

14  next page, just the -- I'm sorry, page 58.  Perfect.

15  Q    This sample that you see at the top reflects the

16  results of the Y-STR testing done on plastic bag Item 2 for

17  Cory Martin, correct?

18  A    Correct.

19  Q    And you testified that the Y-STR DNA profile of Male

20  Donor A from this item matched Cory Martin's Y-profile?

21  A    Correct.

22  Q    And safe to say this specific Y-profile is found in

23  other males, correct?

24  A    Other biological male paternal.  I do not know if they

25  exist, but the male biological male relatives could have the

1    same Y-profile.

2    Q    You testified about the Y-STR testing results on the

3    same item for an individual named Samuel Lemus, correct?

4    A    Correct.  Comparison was made.

5    Q    And the results of that Y-STR test could also support

6    the conclusion that he or a paternal male relative was a

7    contributor to this item, correct?

8    A    I believe he was included as one of the potential male

9    contributors.  The Y-profile of Samuel Lemus did not match

10   the Y-profile of Male Donor A.  So it would be the part of

11   the mixture not Male Donor A, that Samuel Lemus could be

12   included as a potential contributor.

13   Q    So it's true that both of them have Y-profile that

14   match Y-profile found in the mixture on this item, correct?

15   A    Yes.

16   Q    And you provided some numbers on direct regarding the

17   estimated frequency of Cory Martin's Y-profile in the

18   database.

19   A    Yes.

20   Q    Do you know how many men are included in the database?

21   A    I believe the overall is around 26,000 different males.

22   Q    Safe to say there are hundreds of men who share the

23   same Y-STR profile?

24   A    The biological male paternal relatives could have the

25   same Y-profile.

1  Q    And ultimately, you cannot make any conclusions about

2  whether Mr. Martin's DNA was ever actually on any of these

3  items tested by OCME, correct?

4  A    We can only speak to the results of the DNA that was

5  detected from the items while the results can provide

6  indications or explanations as to how DNA arrived there.

7  Again, we only speak to the DNA results detected.

8  Q    And you cannot make any conclusions as to whether he

9  ever came into contact with any of these items?

10  A    The DNA itself does not give yes or no answer to that.

11  While it is possible that contact could have been made and

12  that could explain the development of the male profile from

13  the evidence submitted to our laboratory.

14        MS. THIELE:  Nothing further, Your Honor.

15        THE COURT:  Any redirect?

16        MR. PALACIO:  Briefly, Your Honor.

17  REDIRECT EXAMINATION

18  BY MR. PALACIO:

19  Q    Mr. Lim, you concluded that, now, with respect to the

20  Y-DNA on the plastic bag Item 2, is it fair that you

21  concluded that the Y-STR DNA profile of Cory Martin matches

22  the Y-STR DNA profile of Male Donor A; is that correct?

23  A    Correct.  The Y-profiles do match.

24  Q    And you also concluded that he or his paternal male

25  relatives could have been the source of that DNA, correct?

1    A    Correct.

2    Q    So we're talking about Cory Martin's father?

3    A    It's possible.

4    Q    Cory Martin's grandfather?

5    A    It's possible.

6    Q    Cory Martin's great grandfather?

7    A    It's possible.

8    Q    Or Cory Martin's brothers?

9    A    Biological siblings.

10   Q    Now, with respect to Samuel Lemus, unlike Cory Martin,

11   you were not able to develop a complete profile for Samuel

12   Lemus; is that correct?

13   A    The Y-profile of Samuel Lemus was developed.  The

14   mixture that was best described to come from three

15   individuals, there was no additional profile developed

16   besides Male Donor A.

17   Q    So in other words, you were only able to develop an

18   identifiable complete profile for Male Donor A which later

19   matched Cory Martin; is that fair?

20   A    A Y-profile was developed, and it did match Y-profile

21   of Cory Martin.

22   Q    Now, would you expect a major male contributor such as

23   Male Donor A to have come from indirect transfer?

24   A    When we're talking about transfer, I have said

25   previously that a lot of circumstances do come into play.  I

1    would expect that the person who had come into contact with

2    them knows to leave behind more amount of DNA as opposed to

3    someone who has not, but again, that is dependent on a lot

4    of factors that I have mentioned.

5    Q    What's the significance of developing a complete DNA

6    profile with respect to the possibility of indirect

7    transfer?

8    A    Developing a complete DNA profile would essentially

9    generally mean that you are able to develop enough amount of

10   DNA, likely, the majority of the particular individual,

11   enough to be separated from the other contributors that make

12   up that particular sample.  So you are getting a lot of DNA

13   coming from one individual and I would say that could be the

14   likely source of the contact if it can solve who the contact

15   is suspected, but again, there are a lot of other factors

16   that do come into play.

17   Q    Now, you told us earlier that OCME is an independent

18   agency; is that right?

19   A    Correct.  We are the independent municipal agency for

20   the City of New York.

21   Q    And does that mean that you meet equally as much with

22   prosecutors and defense attorneys?

23   A    We will have the meetings with either side.  It depends

24   on how many requests we have received, it depends on the

25   severity of the case or how much volume there is to talk

1    about.

2    Q    And in this case, you've met with Mr. Cecutti and

3    Ms. Thiele, as well, to discuss this case, correct?

4    A    Correct, I have.

5    Q    And how recently did you speak with them?

6    A    I believe this week.

7            MR. PALACIO:  Nothing further, Your Honor.

8            THE COURT:  Any re-cross?

9            MS. THIELE:  Just one question, Your Honor.

10           THE COURT:  Okay.

11   RE-CROSS-EXAMINATION

12   BY MS. THIELE:

13   Q    Mr. Lim, in how many cases have you testified as an

14   expert, approximately?

15   A    Approximately in 25 trials and 35 grand juries.

16   Q    And out of those --

17           MS. THIELE:  Withdrawn.

18   Q    Have you ever testified for the defense?

19   A    I have not.

20           MS. THIELE:  Nothing further.

21           THE COURT:  Have you ever been asked to?

22           THE WITNESS:  I have not.

23           THE COURT:  Okay.

24           Any redirect?

25           MR. PALACIO:  No, Your Honor.

1        THE COURT:  Thank you so much.  You can step down.

2   Don't trip.

3        (Witness excused.)

4        THE COURT:  Do you want to get some of that stuff?

5   Is everybody doing okay?

6        Are you ready to call your next witness?

7        MS. DEAN:  Yes, Your Honor.  Your Honor, the

8   Government calls Dr. Angela Soler.

9        (Witness takes the stand.)

10       THE COURTROOM DEPUTY:  Please raise your right

11  hand.

12       (Witness sworn.)

13       THE WITNESS:  I swear.

14       THE COURTROOM DEPUTY:  Please state your name and

15  spell it.

16       THE WITNESS:  Angela Soler.  A-N-G-E-L-A, Soler,

17  S-O-L-E-R.

18       THE COURT:  Okay, Dr. Soler, I am going to ask you

19  just to speak slowly so the court reporter can take down

20  everything that you say.  Use the microphone.  If you need

21  to have a question clarified or repeated, just let me know,

22  okay?

23       THE WITNESS:  Thank you.

24       THE COURT:  Go ahead.

25       MR. PALACIO:  Thank you, Your Honor.

1  **ANGELA SOLER**,

2           called as a witness, having been first duly

3           sworn/affirmed, was examined and testified as

4           follows:

5  DIRECT EXAMINATION

6  BY MR. PALACIO:

7  Q    Good afternoon, Dr. Soler.

8  A    Good afternoon.

9  Q    Can you tell us who you work for?

10 A    I work for the New York City Office of Chief Medical

11 Examiner.

12 Q    And what position do you hold with OCME?

13 A    I am the assistant director of forensic anthropology.

14 Q    How long have you worked at OCME?

15 A    Since 2015.

16 Q    And where is your office located?

17 A    The office where I am is located at 520 First Avenue in

18 Midtown Manhattan.

19 Q    How many forensic anthropologists are employed by OCME

20 in New York City?

21 A    Including myself, there are four.

22 Q    And can you tell the jury about your educational

23 experience and what degrees you attained?

24 A    Sure.  So I have a Bachelor of Science from George

25 Washington University, which I earned in 2003.  I have a

1  Masters in biological anthropology from Michigan State,

2  which I earned in 2009.  And I have a PhD from Michigan

3  State University, which I earned in 2012.

4  Q    Can you tell us about your training and experience?

5  A    Prior to working here at OCME, I finished a postdoc at

6  the Pima County Office of the Medical Examiner in Tucson,

7  Arizona, and then another postdoc with the defense POW-MIA

8  accounting command in Omaha, Nebraska.  I have also served

9  as an expert witness in Mexico.  And I assisted with work in

10  Puerto Rico after a hurricane.

11

12              (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. PALACIO:

2  Q    Can you tell us what you did in those locations and with

3  those agencies?

4  A    At the Pima County Office of the Medical Examiner, I was

5  a forensic anthropologist working on case work at the Defense

6  POW-MIA accounting command.  I was assisting with a chest

7  radiograph identification project assisting the identification

8  of soldiers who died in previous wars.  With the expert

9  witness testimony in Mexico, I was assisting with assessing

10  skeletal remains for trauma, sharp force trauma, blunt force

11  trauma, in individuals who had been killed by drug cartel

12  members.  And then in Puerto Rico I was assisting with keeping

13  up with the forensic anthropology work and identification post

14  Hurricane Maria.

15  Q    Are you board certified?

16  A    Yes.

17  Q    What does that mean?

18  A    I am board certified by the American Board -- excuse me,

19  American Board of Forensic Anthropology which means that I

20  have passed an application process where I submitted case

21  reports to be reviewed by other board certified forensic

22  anthropologists and I passed an exhibition which was a

23  combination of a written examination and a practical hands-on

24  examination.

25  Q    Do you belong to any professional associations?

1  A    Yes.  I am a fellow of the American Academy of Forensic

2  Sciences?

3  Q    Do you lecture as well in the field of forensic

4  anthropology?

5  A    Yes.  I lecture through my position with the Office of

6  Chief Medical Examiner.  I lecture to detectives, special

7  agents in the FBI, college students, medical students,

8  graduate students.

9  Q    Can you tell us what anthropology is and then what

10  forensic anthropology is?

11  A    So anthropology is basically the study of humans and

12  there's four different branches of anthropology.  Linguistic

13  anthropology studies human language.  Archeology studies the

14  human path through our physical evidence we leave behind.

15  Cultural anthropology studies human culture and physical

16  anthropology or biological anthropology studies the human

17  body.

18       So forensic anthropology is just taking our

19  understanding of the human body, specifically the human

20  skeleton, and cartilaginous structures and applying that to a

21  medicolegal context.

22  Q    Can you describe some of your case work?

23  A    Sure.  So I've worked on over 600 cases in my career.

24  Just here in New York City I worked on over 300.  About 250 of

25  those have been specifically traumatic analysis, trauma

1   analyses, and the others are associated with identifications

2   or seeing search and recovery for human remains.

3   Q    Can you tell us how you go about identifying people from

4   unknown remains?

5   A    Sure.  So if someone is truly unidentified, we don't know

6   who they are, forensic anthropologists will look at different

7   features of the skeleton to establish something called a

8   biological profile which is basically a snapshot of who

9   somebody may have been.  We're looking at the biological sex

10  or sex assigned at birth, we're looking at the population

11  affinity or geographic background of the individual;

12  approximately how old they were, approximately how tall they

13  were and if there's anything unusual about their skeletal

14  remains, like prior trauma, like broken bones, any sort of

15  evidence of nutritional deficiencies or disease and we take

16  that and we look at missing persons cases for comparison to

17  see if we can narrow down who somebody might be and then

18  compare them scientifically to missing persons.

19  Q    Are you able to approximate age from skeletal remains?

20  A    Yes.

21  Q    How so?

22  A    In kids we're looking at growth and development.  So

23  anybody who has kids here recognizes that they have teeth that

24  grow and come out at the same average age.  And it's the same

25  thing with the bones.  Your bones grow at a predictable rate

1    and in adults we're looking more at bony degeneration or

2    changes over time based on aging.

3    Q    And are you able to determine biological sex from

4    skeletal remains?

5    A    Yes.  We are looking specifically at metric or

6    measurements as well as morphological or physical features of

7    the bones to assess whether they may be biological male or

8    biological female.  The most helpful would be the pelvis

9    because you have obvious differences in the ability to have a

10   child versus the inability to have a child.

11   Q    Now, you mentioned skeletal trauma a moment ago.  What is

12   that?

13   A    So skeletal trauma is essentially any damage to the

14   skeleton from an external force.  So, this could be blunt

15   force trauma where you're getting hit by something that causes

16   a fracture to one of your bones.  It could be sharp force

17   trauma, which is essentially a cut to one of the bones with a

18   sharp implement or projectile trauma which is essentially a

19   gunshot wound.

20   Q    Do you also work with the forensic biology department of

21   OCME?

22   A    Yes.

23   Q    How so?

24   A    We'll work with the forensic biology unit typically on

25   identification of unknown remains.

1   Q    Can you give us an example of that?

2   A    The forensic anthropology unit is very involved with

3   identification of World Trade Center victims.  So we work very

4   closely with the forensic biology unit in making those

5   identifications.

6   Q    Approximately how many cases have you worked on?

7   A    About -- over 600.

8   Q    And of those, how many have been trauma related?

9   A    About 250.

10  Q    As a forensic anthropologist have you ever testified in

11  courts of law?

12  A    Yes.

13  Q    How many times?

14  A    Twice.

15  Q    In what jurisdictions?

16  A    Queens County and Richmond County.

17  Q    And both of those times were you qualified as an expert?

18  A    Yes.

19  Q    In what field?

20  A    Forensic anthropology.

21  Q    Have you ever been denied expertise?

22  A    No.

23       MR. PALACIO:  Your Honor, at this time I offer

24  Dr. Soler as an expert in the field of forensic anthropology

25  pursuant to Rule 702.

1           THE COURT:  Any objection?

2           MS. THIELE:  No objection.

3           THE COURT:  All right.  She is an expert in those

4    fields.

5           Go ahead.

6    BY MR. PALACIO:

7    Q    Dr. Soler, did you prepare a forensic anthropology report

8    on the body that was of an individual subsequently identified

9    to OCME as Brandy Odom under ME case number K18-9095?

10   A    Yes.

11          MR. PALACIO:  If we could show the witness

12   Government Exhibit 216 and maybe there's no objection.

13          MS. THIELE:  That's correct.

14          THE COURT:  Okay.

15          (Exhibit published.)

16   Q    Dr. Soler, do you have a copy of your forensic

17   anthropology report in front of you?

18   A    I do.

19   Q    Will that help you testify today?

20   A    Yes.

21   Q    Now, I'm going to direct your attention to April 10th of

22   2018.  Did there come a point where you witnessed Ms. Odom's

23   autopsy?

24   A    Yes.

25   Q    Just to be clear, on that date had Ms. Odom's body been

1  identified yet?

2  A    No.

3  Q    Are you aware whether Ms. Odom's body was later

4  identified?

5  A    Yes.

6  Q    Who was the medical examiner who performed that autopsy?

7  A    Dr. Straub.

8  Q    What part of the victim's body was autopsied that day?

9  A    That day it was her torso and head that was autopsied.

10  Q    In what circumstances do forensic anthropologists witness

11  an autopsy?

12  A    Any time there might be a question of skeletal trauma

13  that the medical examiner would like assistance with or any

14  time there's a question of identification.

15  Q    Did you remove any bones that day to assist in

16  identifying the victim?

17  A    Yes.

18  Q    What did you remove?

19  A    In this instance we removed bones that would help us

20  assess age.  So we removed the medial clavicle which is

21  essentially your collarbone.  We removed some ribs and then we

22  removed what's called the pubic symphysis which is basically

23  the front of the pelvis.

24  Q    Did you remove any other portions of the victim's body

25  for your own analysis?

1  A    Yes.

2  Q    What parts of her body did you remove?

3  A    Can I refer to my report for the exact --

4       THE COURT:  Yes.

5  A    On that day we removed portions of the distal right

6  humerus which is essentially the elbow so the distal right

7  elbow.

8  Q    What does distal mean?

9  A    Distal means towards the end of the bone so closer to the

10 hand or the foot.  We removed a portion of the left elbow with

11 the upper arm bone and the lower arm bone at the elbow.  We

12 removed the tops of the right and left femur which is

13 basically your thighbone and I believe at that time that was

14 it.

15 Q    Why did you remove those specific bones?

16 A    These bones had evidence of dismemberment trauma.

17 Q    Aside from those bone segments, did Dr. Straub remove any

18 other bones in your presence?

19 A    Yes.

20 Q    What did she remove?

21 A    She removed the hyoid and the larynx.  The hyoid is the

22 small, free-floating bone just under your jaw bone and the

23 larynx is the cartilaginous tissue that's basically like your

24 windpipe.  So, in men, it's the Adam's apple essentially.

25 Q    Why were they removed?

1   A      For an analysis of cartilaginous trauma.

2   Q      Can you tell us what dismemberment trauma is?

3   A      Dismemberment trauma is essentially physically breaking

4   or cutting the skeleton into pieces so that you can separate

5   body parts.

6   Q      Where were all of those bone segments eventually

7   transferred to?

8   A      They were transferred to our laboratory, the forensic

9   anthropology unit laboratory, in the Manhattan office.

10  Q      Did there come a point later that day when you left the

11  ME's office to go somewhere else?

12  A      Yes.

13  Q      Where did you go?

14  A      While we were at the autopsy with Dr. Straub, we were

15  informed that additional remains were potentially found in

16  Canarsie Park.  So we left the morgue and we went out to

17  Canarsie Park to assess the remains at that site.

18  Q      Can you tell us what you saw there?

19  A      When we arrived, there were two black garbage bags and

20  when we were on site, the black garbage bags were carefully

21  opened to be able to see inside to see what was in them.  In

22  one black garbage bag was essentially two dismembered thighs

23  and in the other garbage bag were the dismembered forearms and

24  hands and then the dismembered lower limb from the knees down

25  on both the light and left sides.

1  Q    Were those body parts consistent with the female victim

2  that you saw at the ME's office earlier that day?

3  A    Yes.

4  Q    I direct your attention to April 12, 2018.  Did you

5  return to the ME's office?

6  A    Yes.

7  Q    For what purpose?

8  A    To assist Dr. Straub in reassociating the ends of the

9  bones that we had already collected to the newly recovered

10 remains of the limb bones.

11 Q    What is reassociation?

12 A    Reassociation is basically using anthropological

13 techniques and knowledge of anatomy to put the separated body

14 parts back together.

15 Q    Now, after the autopsy, did you remove additional

16 portions from Ms. Odom's body?

17 A    Yes.

18 Q    Which portions?

19 A    On that day and I'll refer to my report, we cut out

20 another portion of the right distal humerus or right upper arm

21 bone near the elbow.  Then we took out the top portions of the

22 left forearm right at the elbow.  We took out additional

23 portions of the right and left thighbones that aligned with

24 the cuts on the top of the thighs.  And then we also took out

25 the upper and lower skeletal bones associated with each knee.

1    Q    And why were those bone segments taken?

2    A    They also exhibited evidence of dismemberment trauma.

3    Q    Were they also taken to your office?

4    A    Yes.

5    Q    Now, you mentioned the hyoid bone and the larynx bone?

6    A    Yes.

7    Q    Did you examine them at your office?

8    A    Yes.

9    Q    And can you tell us what you did when you examined those

10   bones?

11   A    So when we're doing an anthropological analysis, we are

12   examining using three different techniques basically,

13   X-rays -- so we're looking at the X-rays to get a sense of

14   whether there's any trauma.  Then we look at the bone grossly,

15   with the naked eye, and then we look at the bone under

16   magnification to get a very close view so that you can see

17   things that are not as easily seen with the naked eye.

18   Q    Did you do that or a combination of that with respect to

19   the hyoid and the larynx bones?

20   A    I did all three of those.

21   Q    Can you tell us if you observed any fractures to any of

22   those bones?

23   A    I did not, no.

24   Q    Is a lack of fracture to those bones an unusual finding

25   in neck compression cases?

1  A    No.

2  Q    Why not?

3  A    The presence of fractures is diagnostic for having trauma

4  but the lack of fractures is not diagnostic for having trauma

5  into that area.  To be able to fracture the hyoid and the

6  larynx you need to apply pressure to those bones.  There's

7  many ways to have neck compression or homicidal asphyxia that

8  doesn't directly impact those bones.

9  Q    Now you mentioned that you examined those bones through

10 microscopic examination and other forms of examination.  What

11 does that allow you to see?

12 A    Microscopic examination?

13 Q    Yes.

14 A    When we're looking at things using magnification, it

15 allows us to see more subtle trauma, like a hairline fracture

16 or a small cut mark.

17 Q    Are you also able to observe the margins of the cuts and

18 shapes of cuts?

19 A    Yes.

20 Q    And are you also able to observe the depth of a cut?

21 A    Yes.

22 Q    What does the depth of a cut tell you?

23 A    So basically we have different -- let me back up a little

24 bit.  We have different kinds of cuts where you have a cut

25 that might be what we call an incomplete cut where it only

1  goes partially through the bone and then you might have a

2  complete cut that goes all the way through the bone.

3          So when you have an incomplete cut you can see how

4  far the tool went into the bone.  You can also look at an

5  incomplete cut to see how wide the cut is which will give you

6  a good sense of the size of the tool or the type of tool.

7  Q    Were you able to put all of Ms. Odom's bone segments back

8  together to make an overall evaluation?

9  A    Yes.

10 Q    Were you able to determine at how many locations

11 Ms. Odom's body was dismembered?

12 A    Yes.

13 Q    I would like to show you what I believe is in evidence on

14 consent as Government Exhibit 217?

15         THE COURT:  Okay.

16         (Exhibit published.)

17 Q    Can you tell us what we see here?

18 A    This is a skeletal diagram that I created to show

19 basically the different portions of the body.  So everything

20 in white is the torso that was recovered first and then

21 everything in gray are the limb bones that were recovered

22 second.  All the black lines that go across the bone are

23 showing you the location of dismemberment.  So you can see

24 there's a location of dismemberment on the right upper arm; a

25 location of dismemberment through the left elbow; a location

1  of dismemberment on the right and left upper thighs; and a

2  location of dismemberment near the right and left knees.

3  Q    And did you also take overview and microscopic photos of

4  Ms. Odom's body?

5  A    Of the sections that we retained at autopsy, yes.

6           MR. PALACIO:  Your Honor, I would like to offer into

7  evidence Government Exhibits 218 to 239.

8           THE COURT:  Any objection?

9           MS. THIELE:  No objection.

10          THE COURT:  Okay.

11          (Government Exhibits 218 to 239 received in

12  evidence.)

13  BY MR. PALACIO:

14  Q    Dr. Soler, can you tell us what a cast is?

15  A    A cast is essentially reproduction.  So we might cast

16  something to reproduce a bone that we looked at or we might

17  cast something to get a better reproduction of the trauma to

18  the bone.

19  Q    Are there different types of casts?

20  A    Yes.  So there's the reproduction cast which is basically

21  giving you an exact replica of the bone and then the trauma

22  cast which is basically looking at the cut margins so you can

23  get a better visualization of what the cut looks like.

24  Q    Did you create replica casts in this case?

25  A    Yes.

1    MR. PALACIO:  Your Honor, I would like to offer into

2 evidence Government Exhibits 356 to 359.

3         MS. THIELE:  No objection.

4         THE COURT:  Okay.

5         (Government Exhibits 356 to 359 received in

6 evidence.)

7         MR. PALACIO:  And I'm just handing these to the

8 witness.

9         THE COURT:  Sure.

10        (Counsel approaches.)

11 BY MR. PALACIO:

12 Q    Dr. Soler, we'll talk about those in a minute but can you

13 tell us what those are?

14 A    These are reproduction casts of some of the bones with

15 the cuts.  So we were able to reproduce the cuts to the elbows

16 and the cuts to the upper thighs.

17 Q    Dr. Soler, I would like to talk about each of those

18 locations and beginning with the right arm, can you describe

19 the dismemberment trauma that you observed there?

20        MR. PALACIO:  And if we can pull up Government

21 Exhibit 218?

22        (Exhibit published.)

23 A    Can you please repeat that?

24 Q    I want to talk first about the right arm.  Can you tell

25 us what we see here.  This is Government Exhibit 218.

1    A    So this is a photograph that I took of the two portions

2    of the right arm so the top portion was recovered from the

3    torso and the bottom portion was recovered from the

4    dismembered limbs.

5    Q    And, go ahead.

6    A    May I refer to my report as I --

7             THE COURT:  Yes.

8             THE WITNESS:  Thank you.

9    A    So there's multiple incomplete cut marks which is

10   essentially cut marks that were started and not finished and

11   then there's also what we call a transection which is where

12   the bone is broken into two portions that is showing a

13   fracture.  There's multiple cuts and then a fracture that's

14   essentially breaking the bone into two pieces.

15   Q    Dr. Soler, you should be able to use your finger to

16   indicate that on the screen.

17   A    Okay, thank you.  So these here are examples of -- this

18   is not working great -- of incomplete cuts where you see

19   there's lines in the bones where a cut was attempted.  And

20   then --

21             Is there a way to erase this?  Down here?  Nope.

22   Q    It should be on the bottom.

23             THE COURT:  It should say clear on the left.

24   A    Okay.  Thank you.

25             This is what we would call the complete transection

1  which is essentially where the bone was broken into two

2  different sections.

3  Q    I would like to show you Government Exhibit 219.

4       (Exhibit published.)

5  Q    What does this show us?

6  A    This is also a photograph that I took.  It is the same

7  bony portions just showing you how closely they fit together

8  to demonstrate that they do indeed come from the same person.

9  Q    And what types of cutting or chopping did you see on this

10 bone?

11 A    So, on the right, what we call distal humerus.  So this

12 right upper arm bone, there were multiple incomplete cuts on

13 the front and the sides.  Some of these cuts are more

14 indicative of a blade used in a reciprocating motion which is

15 essentially a back and forth motion.  And those are the cuts

16 that look a bit deeper, that you can see more noticeably, like

17 right here, and then this one on the side.  Sorry this is not

18 the best.  So these deeper cuts with the wider cut is more

19 consistent with a wider reciprocating motion.

20 Q    And when you say reciprocating motion, do you mean the

21 back and forth motion?

22 A    A back and forth motion.  And then there are also some

23 cuts -- there's one on the side here and then another one on

24 the side here that are more consistent with chopping which is

25 essentially taking a tool and chopping or hacking at the bone

1   and they're going to appear different.  Those cuts tend to be

2   narrower.  They tend to have fractures associated with them,

3   like breakage associated with them and they also tend to have

4   what we call a lifting of the bony margins where the bone

5   kind of separates a little bit when the tool is pulled back

6   out.

7   Q    I would like to show you Government Exhibit 220.

8        (Exhibit published.)

9   Q    What do we see here?

10  A    This is a macroscopic or an image under magnification of

11  the exact same bone and it's showing you the different kinds

12  of cuts on this bone.  So, we have these wider cuts which are

13  more consistent with the reciprocating motion.  That's going

14  to be these two here and then we have this narrower cut with

15  lifted margins that's going to be more consistent with

16  chopping.  And then this whole area is consistent with

17  chopping and then the rest of it is a fracture or a break in

18  the bone.

19  Q    How can you distinguish between the cutting and the

20  chopping?

21  A    So, when you have a reciprocating motion, you have cuts

22  on the sides of it that are more parallel with the face and

23  sometimes it helps if I physically show this.  If you think

24  about cutting into something, your blade is going back and

25  forth.  So all the markings on the bone which we call

1   striations are parallel to the cut surface because they're

2   going with the blade.

3         Whereas when you have a chop, you have the blade

4   entering the bone and the striations are perpendicular to the

5   cut surface.  So it's two different mechanisms and it's going

6   to create two different striations.

7   Q   And you said you also saw indications of fracturing?

8   A   Yes.

9   Q   What does that mean?

10  A   It's a breaking of the bone.  It's not caused by a sharp

11  implement.  The margins are irregular.  They don't have that

12  clean surface that you would expect with a cut.

13  Q   So would that be consistent with manually fracturing a

14  bone?

15  A   Yes.

16        MR. PALACIO:  Your Honor, with the Court's

17  permission can we have Dr. Soler show us the cast from the

18  right arm on the ELMO?

19        THE COURT:  Sure.  I want to make sure she has

20  access to the microphone.

21  BY MR. PALACIO:

22  Q   Dr. Soler, can you show the jury the cast from the right

23  arm?

24  A   So, this is a cast of what we call the distal humerus or

25  the upper arm bone.  And this is showing you the two separated

1  portions, the two dismembered portions, and you can see them

2  separate and then how nicely they fit together at the fracture

3  margins.  You can also see very nicely a reproduction of the

4  incomplete cut marks.

5          So here is a reproduction of the cut mark that is

6  reciprocating on the front and then down low on the side which

7  looks very different.  As you can see, this is wider than this

8  thin-looking chop mark.  As you see here, there's a thin kind

9  of more V-shaped chop mark just above which looks very

10 different than this broader, wider reciprocating cut.  And

11 then we have a little bit of chop on the side which is most

12 obvious from the back.  You see there's a nice straight sharp

13 margin on one aspect right here and then the rest is fracture

14 or irregular margin.

15 Q    And, Dr. Soler, could this have been caused by a

16 mechanically powered blade?

17 A    The chop marks and the fracturing, no.  These wider

18 reciprocating cuts, potentially.

19         MR. PALACIO:  With the Court's permission, can we

20 have Dr. Soler stay here to do the pictures of the cast?

21         THE COURT:  That is fine.

22 Q    Dr. Soler, I'm going to move to the left arm and I'm

23 showing you Government Exhibit 221.

24         (Exhibit published.)

25         MR. PALACIO:  Could we have the pictures first and

1   then we'll do the casts?

2            (Exhibit published.)

3   BY MR. PALACIO:

4   Q    Dr. Soler, can you describe for us what you see there?

5   A    This is an image that I took of the left elbow area.  So

6   we have the humerus which is the upper arm bone and where it

7   fits in with the lower arm bones at the elbow joint.

8   Q    Look at Government Exhibit 222.

9            (Exhibit published.)

10  A    So this is the same -- this is the same elbow but this is

11  looking at it from the back of the elbow and when it is in

12  separate portions so you can see that there are what we call

13  complete cuts that go through the lower arm bone of the elbow.

14  Whereas on the previous photo we had incomplete cuts.  This is

15  where we can see the complete cuts.

16           MR. PALACIO:  Can we look at Government Exhibit

17  223?

18           (Exhibit published.)

19  Q    Can you describe what you see here?

20  A    This is a microscopic image under magnification of the

21  same elbow showing you incomplete cuts.  Most likely these are

22  reciprocating cuts so the blade is used in a reciprocating

23  motion and then you can see a lot of superficial scratches on

24  the margins of the bone as well.

25  Q    What is that consistent with?

1   A    So these are consistent with a blade used in a

2   reciprocating motion and it could potentially be a mechanical

3   blade because there's a lot of extra cuts marks to the bone

4   around it.

5   Q    I'm showing you Government Exhibit 224.

6        (Exhibit published.)

7   A    This is an image of the same elbow, just a little bit

8   higher up on the arm and this is an example of a chop mark

9   which looks very different from those reciprocating cuts.  You

10  can see it's much narrower.  There's a very thin line on the

11  bottom which is consistent with the bevel, the blade

12  impacting, and then you can see around it there's a lot of

13  breakage or fractures which is more consistent with a blade

14  used in a chopping motion.

15  Q    Did the left arm have a lot of cuts from multiple angles?

16  A    I believe so, yes.

17  Q    Is that consistent with manipulation of the arm?

18  A    Yes.

19       MR. PALACIO:  If we could look at Government Exhibit

20  357 -- 356.

21       (Exhibit published.)

22  A    This is reproduction cast of the upper arm bone on the

23  left side right at the elbow and it's just showing examples or

24  the incomplete cuts you can see on the front of the bone.  We

25  can see an incomplete cut here, an incomplete cut just above.

1   We can see an incomplete cut just down here.

2           These are all cuts that look like a blade was used

3   in a reciprocating motion so the blade is used back and

4   forth and it's creating those wider-cut margins and then up

5   here, you can see a thin cut that is more consistent with a

6   chop.

7   Q    Why is that more consistent with a chop?

8   A    It is thin, it has a V shape to it at the bottom which is

9   consistent with the bevel of the blade and it has a little bit

10  of fracturing and lifting of the margins around the cut.

11  Q    And could any of these cuts have been caused by a

12  mechanically powered blade?

13  A    The chop mark, no.  There's a different between a

14  mechanically powered blade and different kinds of blades.  So

15  I think this could be a mechanically powered blade in these

16  reciprocating cuts.

17  Q    Now, moving down to the right upper leg --

18          MR. PALACIO:  If we can show the witness Government

19  Exhibit 225, the photograph.

20          (Exhibit published.)

21  Q    Dr. Soler, can you discuss the skeletal trauma that you

22  see there?

23  A    So this is an image of the right upper thigh bone so the

24  round area is basically the portion of the femur that fits

25  into your hip and then this is the top of the femur right near

1    the shaft -- right near the proximal end or closest to the

2    hip.

3           You can see that the bone was transected into two

4    different portions so we have a portion on the top which is

5    part of the torso and the portion on the bottom that is part

6    of the dismembered leg bones.

7

8           (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      MR. PALACIO:  Showing you Government 226

2           (Exhibit published to the jury.)

3  BY MR. PALACIO (Continuing):

4  A    This is the same right proximal femur right by the hip,

5  but this is looking at it from the back.  So, we're looking at

6  what we call the posterior or back side of the bone and you

7  can see numerous cut marks.

8  Q    Did you see any chopping?

9  A    Yes.  On the portion on the back where you see a straight

10  line and an area of missing bone, that's consistent with a

11  chop mark.

12           And then just below it, it looks like there's

13  another chop mark with fracturing and loss of bone.

14  Q    And showing you Government 228.

15           (Exhibit published to the jury.)

16  Q    What do we see here?

17  A    This is a macroscopic image of the same bone.  These are

18  incomplete cuts on the inside of the bone, on the inner -- we

19  would call it the medial side, which is closest to the

20  midline.  And these are incomplete cuts consistent with a tool

21  being used in a reciprocating motion, so a back-and-forth

22  cutting.

23           MS. DEAN:  If we could turn to the Elmo, and this is

24  Government 359.

25           (Exhibit published to the jury.)

1  A     So, this is a reproduction of that same bone you just saw

2  in the photograph.  You can see we have the transection in

3  this area where we have two separate bony portions, but you

4  can see that they fit together very nicely at the cut margins

5  and at fractured margins.

6  Q     And can you show us where there was evidence of

7  fracturing?

8  A     So, areas where you have kind of an irregular pattern,

9  like right here, these are consistent with fractures, which

10  looks different from a margin that's very straight which would

11  be consistent with a cut.

12  Q     Do we see multiple attempts on this bone?

13  A     Yes.

14  Q     What does that mean?

15  A     There is multiple incomplete cuts which means that there

16  were multiple tries to transect the bone into two portions

17  that was unsuccessful until eventually there was a successful

18  chop mark with fracturing that ended up separating the bone

19  into two areas.

20  Q     And are you able to determine if this could have been

21  caused by a mechanically-powered blade or saw?

22  A     So, the chop marks and the fracturing I can exclude.

23  These portions here could be possible mechanically-powered,

24  but I'm not really sure what kind of tool might have caused

25  those.

1    MR. PALACIO:  Now if we could show the witness

2  Government 229.

3        (Exhibit published to the jury.)

4  Q    This is moving over to the left upper leg.

5  A    So, this is a photograph of the front of the left upper

6  leg, same area as the previous one, just showing you two

7  separate portions.  The top was attached to the torso and the

8  bottom was part of the separated limb bones.

9  Q    Showing you Government 230.

10        (Exhibit published to the jury.)

11  A    This is the same bone, the left upper thigh bone, left

12  femur, and this is looking at it from the back of the bone.

13  Q    Now 231.

14        (Exhibit published to the jury.)

15  Q    What do we see here?

16  A    This is a macroscopic image of the same bone and it's

17  showing chop mark at the top, where you can see there's kind

18  of fracture and a missing piece of bone.  And then just below

19  it, you can see a blade that was used in a reciprocating

20  motion.

21  Q    Now Government 232.

22        (Exhibit published to the jury.)

23  A    This is also the back of the bone and this is showing

24  evidence of a chop mark.  You can see that there's a clear cut

25  that has like a V-shaped look to it and there's a fracture

1   coming off of it.

2           This is a reproduction cast of the same area.  This

3   is an interesting one because we cannot directly reassociate

4   the portions.  So, unlike the other ones where we could

5   reconnect them based on the cut or fracture, we cannot do that

6   with this one.  There is an area of missing bone in between

7   the two margins.

8   Q    What does the missing bone suggest to you?

9   A    The missing bone is something we might more typically see

10  in a saw because when you have a saw, it's basically

11  destroying bone as it cuts.  And typically, you won't be able

12  to directly reassociate the margins of the two ends.

13  Q    Dr. Soler, the last two dismemberment locations were to

14  the knees; is that correct?

15  A    Yes.

16  Q    Starting with the right knee and looking at Government

17  233...

18           (Exhibit published to the jury.)

19  Q    Can you tell us what we see there?

20  A    So, this is looking at the front of the right knee.  And,

21  so, you can see the end of the femur bone or the upper thigh

22  bone, and then the joint area, and then you can see the lower

23  limb bone, which is the tibia, and just beside it the fibula.

24  Q    And what type of skeletal trauma did you see there?

25  A    There's evidence of dismemberment trauma through the

1   joint area in between the upper thigh bone or the thigh bone

2   and then the lower limb bones.

3           MR. PALACIO:  If we could turn to Government 234.

4           (Exhibit published to the jury.)

5   Q    What do we see here?

6   A    This is, once again, the same side, the same joint, it's

7   just looking at the surfaces of the joint as they would fit

8   together.  So, you can see that there are cut marks on the

9   femur or the thigh bone in that joint surface and also cut

10  marks on the tibia or lower limb bone in that joint surface.

11  Q    And you told us that the cut was through the joint

12  itself.

13          Did that go through cartilage?

14  A    Yes, it did.

15  Q    Is cartilage helpful in analyzing dismemberment trauma?

16  A    Yes.

17          So, cartilage is a little bit more pliable and

18  softer than bone, so it actually records sharp-force trauma

19  much better and it will prefer that trauma for us to be able

20  to assess under a microscope.

21  Q    Look at Government 235.

22          (Exhibit published to the jury.)

23  Q    Can you describe for the jury what we see there?

24  A    So, the white area is the cartilage and then the more

25  like yellow area is the bone.  So, you can see that there's a

1   very clean, clear cut through the bone and the cartilage.  And

2   there are very uniform striations which are essentially the

3   markings from the blade very clearly visible in the cartilage.

4              MR. PALACIO:  And Government 236.

5              (Exhibit published to the jury.)

6   Q     What do we see here?

7              And you can point to it on the screen as well.

8   A     This is a little dark, but this is the tibia or the lower

9   limb bone and this is looking at one side of it near the knee

10  joint.

11             And in this area, you can see these kind of linear

12  superficial cuts that kind of go very regularly.  And these

13  might be consistent -- these look consistent with a blade kind

14  of jumping over the surface of the bone.  They're kind of

15  leaving this mark as it jumps over the bone which looks very

16  different than this down here which looks more consistent with

17  like a knife or a beveled instrument used in a reciprocating

18  motion.

19             So, this is probably more consistent with a knife or

20  beveled instrument and this is more consistent with a probable

21  mechanically-powered tool.

22  Q     Can you tell us what "bone polish" is?

23  A     Bone polish is essentially like a rounding and a sheen of

24  the bone that can be caused by the friction of a blade, for

25  instance, passing over and over back and forth.  So, a bone

1  polish might be something you see in a mechanically-powered

2  saw because it is rounding the margins and it is creating,

3  like, a shine to the bone surface.

4  Q    Do you see any evidence of that here?

5  A    Not on this one.

6  Q    Did you see that in this location?

7  A    There might be a little -- I believe there's a little

8  bone polish on the complete cut through the joint surface on

9  the proximal tibia or lower limb bone.

10 Q    Let's see Government 239.

11       (Exhibit published to the jury.)

12 Q    Is this helpful?

13 A    Yes.

14       So, this you do see bone polish at the very top of

15 the cut bone.  So, this is essentially where the bone was

16 transected or cut all the way through and the margin is very

17 rounded.

18       And then when you're looking at it straight on from

19 the surface, it looks shiny because that is what basically --

20 the friction of the blade going back and forth is creating a

21 shine and a rounding to the margin.

22 Q    And did you notice any missing bone on the left knee?

23 A    On the left knee, yes.

24 Q    What is that consistent with?

25 A    When we cannot reassociate the two sections with the cut

1  and there's missing bone, it's more consistent with a probable

2  mechanically-powered saw or something.

3  Q    Dr. Soler, can you tell us how the cuts to the knees

4  compare to the cuts to the rest of the body?

5  A    So, the cuts to the arms, the elbows, and then the right

6  femur have the incomplete cuts with the reciprocating blade

7  that are very wide.  That's not seen on the left femur or on

8  either of the knees.  So, that incomplete cut that has like a

9  wide what we call kerf or wide cut is only seen on the upper

10  limbs and the right upper femur.

11         Then when you get down to the knees -- let me back

12  up.

13         There's also evidence of multiple types of cuts at

14  the elbows and both of the proximal or the upper thigh bones.

15  There's lots of different cuts; there's chopping, there's

16  cutting with reciprocating, there's knife.

17         Once you get to the knees, there's less of the

18  incomplete cutting, there's less chopping, there's less --

19  like I said, there's no reciprocating in terms of the wider

20  kerfs.  It's more very clean cuts.

21  Q    And how about evidence of fracturing from the upper body

22  with respect to the lower body?

23  A    So, there's more evidence of fracturing to the right

24  elbow, the right upper arm bone, and then the proximal ends of

25  the right and left femur.  But we don't see much fracturing to

1    the knees.

2    Q    And how about the number of attempts on the upper body as

3    opposed to the lower body?

4    A    There are more evidence -- there's evidence of more

5    attempts to the upper body, the upper thighs, than there are

6    to the knees.

7    Q    Is it fair to say the cuts to the knees are cleaner than

8    the rest of the body?

9    A    Yes.

10   Q    Now directing your attention to January 19, 2024, did

11   there come a point when you were asked to examine a set of saw

12   blades from the Government?

13   A    Yes.

14   Q    I'm showing you Government 362, with the Court's

15   permission.

16           MR. PALACIO:  Your Honor, may I approach the witness?

17           THE COURT:  Yes.

18   Q    Dr. Soler, did you examine those blades?

19   A    I did.

20   Q    And did you review the specifications for those blades?

21   A    I did.

22   Q    What did you do?

23   A    I took the item number that is on the blade and I looked

24   it up to see what the specifications for the specific blade was.

25   Q    And were you able to tell if an identical blade like that

1  could have caused some of the cuts that you observed?

2  A    I could not exclude it as causing some of the cuts that I

3  observed.

4  Q    And which ones?

5  A    The complete cuts that were evidenced most on the knees

6  and then on one of the proximal femoral, where basically there

7  was that area of missing bone.

8        I could not exclude the saw blades having caused that.

9  Q    Dr. Soler, based on a reasonable degree of medical and

10  scientific certainty, could you summarize what caused the

11  dismemberment of Ms. Odom?

12  A    There were multiple mechanisms and multiple tools that

13  caused the dismemberment; at least one beveled implement, like

14  a knife or something of that nature; and then at least one

15  mechanically-powered tool.

16        But I always say minimum because when you have so

17  many different cuts, you can't give an exact number.  You can

18  just say:  I at least see one of these and I at least see one

19  of these.

20        MS. DEAN:  Nothing further, your Honor.

21        THE COURT:  Cross-examination?

22        MS. THIELE:  Yes, your Honor.

23        THE COURT:  Everybody doing okay?

24  CROSS-EXAMINATION

25  BY MS. THIELE:

1   Q     Good afternoon, Dr. Soler.

2   A     Good afternoon.

3   Q     You prepared the forensic anthropology report for Brandy

4   Odom in this case?

5   A     Yes.

6   Q     Have you had dismemberment cases in the past?

7   A     Yes.

8   Q     In some of those cases, was it possible to tell what type

9   of tool was used?

10  A     Yes.

11  Q     This was not one of those cases, correct?

12  A     I was able to identify several or some of the tools, but

13  I was not able to identify all.

14  Q     In your report dated June 15, 2018, you concluded that at

15  minimum two tools were used in the dismemberment, correct?

16  A     Correct.

17  Q     And you observed a number of incomplete cuts at multiple

18  sites of dismemberment, correct?

19  A     Correct.

20  Q     And features of these cuts suggested a combination of

21  cutting, chopping, and a use of a reciprocating blade?

22  A     Yes.

23  Q     Okay.  I want to talk about the beveled instrument.

24        For the incomplete cuts made with cutting or

25  chopping motions, you concluded that a beveled instrument was

1  used?

2  A    Yes.

3  Q    Can you explain what a beveled instrument is?

4  A    A beveled instrument is basically a cutting instrument

5  with a thin margin.  So, when I say a "beveled instrument," it

6  could be a knife, it could be a cleaver, it could be anything

7  that has a sharp edge to it.

8  Q    And this kind of tool would result in a V-shaped kerf

9  floor, correct?

10 A    Correct.

11 Q    Could you explain to the jury what a kerf floor is?

12 A    A "kerf" is the cut in the bone.  The "floor" is the

13 bottom of the cut.  When you're looking at an incomplete cut

14 and you can see a bottom, that is a kerf floor.

15 Q    And there were also deeper incomplete cuts in the bone as

16 well, correct?

17 A    Correct.

18 Q    And these deeper cuts exhibited striations more

19 consistent with a blade used in a reciprocating manner.

20 A    Correct.

21 Q    And you testified that that just means the blade was

22 moving back and forth as it went through the bone.

23 A    Correct.

24 Q    Or attempted to go through the bone, correct?

25 A    Yes, correct.            (Continued on the following page.)

1  BY MS. THIELE:   (Continuing.)

2  Q    And you concluded in your report that these deeper

3  incomplete cuts exhibited more rounded kerf floors on one

4  end?

5  A    Yes.

6  Q    And more narrow tapered kerf floors on the other?

7  A    Correct.

8  Q    And you also concluded that this is atypical of kerf

9  floors produced by many types of saw blades, correct?

10  A    Those incomplete cuts, yes.

11  Q    And can you explain why these kerf floors are atypical

12  of many types of saw blades?

13  A    Incomplete cuts in saw blades depending on the type of

14  saw might leave a flat kerf floor or like a -- like a

15  squared-off kerf floor or sometimes, at the pending on the

16  saw, they might leave like a more W-shaped kerf floor.

17  These were more rounded.

18  Q    And so you ultimately concluded in your report that the

19  features of these deeper incomplete cuts made by the

20  reciprocating tool would be more consistent with the use of

21  a reciprocating knife?

22  A    That was a hypothesis.

23  Q    Do you know what kind of item that might be?

24  A    You know, I've never seen a reciprocating knife

25  leave --

1      THE COURT:  Is that mechanical or?

2      THE WITNESS:  A mechanically-operated

3  reciprocating knife.  Was a hypothesis for the incomplete

4  cuts, but I've never seen that in a dismemberment before, so

5  that's why it was a hypothesis.

6  Q    Okay.  And you did not observe any foreign material

7  inside the cuts of the bone, correct?

8  A    I did not, no.

9  Q    And your report did not conclude whether the tools used

10 were serrated or not, correct?

11 A    I did not comment on serration or non-serration, no.

12 Q    And you testified that at some point in January 2024,

13 you were asked to examine a set of Diablo saw blades?

14 A    Yes.

15 Q    And these are the serrated saw blades covered in red

16 paint in front of you?

17 A    Correct.

18 Q    Did you prepare any reports related to that

19 examination?

20 A    I did not, no.

21 Q    And you concluded that the Diablo saw blades could be

22 excluded as having caused the incomplete cuts in the bone,

23 correct?

24 A    Yes.

25 Q    Because the incomplete cuts came from either that

 1  beveled instrument or a reciprocating blade?

 2  A    Yes.

 3  Q    And these saw blades would not fit either of those

 4  categories, correct?

 5  A    That is correct.

 6  Q    At points where complete cuts or transections were

 7  observed, you do not observe a kerf floor, correct?

 8  A    Unfortunately, with a complete cut, you'll not see a

 9  kerf floor because it cuts all the way through the bone.

10  You can only see a kerf floor in an incomplete cut.

11  Q    But you were able to see striations and in some areas

12  of bone polish?

13  A    Yes.

14  Q    With limited information as far as these transections

15  are concerned, you could not conclude what size the blade

16  was that made the complete cuts, correct?

17  A    Correct, because there is no kerf floor, you cannot

18  measure the size of the blade of a complete cut.

19  Q    So is it possible that the complete cuts could have

20  been made by a saw with blades wider than the Diablo blades?

21  A    I cannot exclude that as a possibility.

22  Q    Or with a different serration pattern?

23  A    I cannot exclude that as a possibility.

24  Q    A different blade length?

25  A    Cannot exclude that either.

1    Q    Tooth height?

2    A    Since there were no markings of tooth height, I could

3    not comment on that either.

4    Q    Or with more or less teeth per inch?

5    A    Could not comment on that either.

6    Q    Would you agree there are a wide variety of saws on the

7    market?

8    A    Oh, absolutely.

9    Q    And you don't have any reason to believe that the

10   Diablo saw blades were more likely to have created the

11   complete cuts than any other saw, correct?

12   A    I just -- I cannot exclude them as having potentially

13   caused the complete cuts.

14   Q    And you made no conclusions in your report about what

15   tool may or may not have been used for the complete cuts,

16   correct?

17   A    I did not.

18   Q    Is it true that either party in this case could have

19   requested that you test other specific tools against the

20   markings in the bone?

21   A    Yes.

22   Q    Was the request by the Government to examine the red

23   Diablo saw blades and compare them to the markings the only

24   request you received?

25   A    The only formal request, yes.

1   Q   And you could not conclude definitively that those were

2   used at all in the dismemberment of Brandy Odom, correct?

3   A    No.   I could only not exclude them.

4          MS. THIELE:   Nothing further.

5          THE COURT:   Any redirect?

6          MR. PALACIO:   Very briefly, Your Honor.

7          THE COURT:   Okay.

8   REDIRECT EXAMINATION

9   BY MR. PALACIO:

10   Q   Dr. Soler, I just want to clarify, your conclusions

11   with respect to the use of a saw to cause some of these

12   cuts.

13          At what locations are you able to say that a saw

14   of that nature with that type of blade could have caused

15   these types of cuts?

16   A   So there is evidence of a mechanically-powered saw

17   potentially being used at the knees and at least the left

18   upper femur, I believe, and then potentially at one of the

19   elbows.   Basically, anything that had a complete cut and the

20   cuts were very clean, they had very regular striations, they

21   were very uniform.   Many of them had bone polish or evidence

22   of skipping of a blade over the bone.   I could not exclude a

23   mechanically-powered saw being used at those locations.

24   Q   And are those features consistent from your training

25   and experience of cuts that are caused by saws?

1   A    Yes.

2   Q    Now, for the incomplete cuts where you have what you

3   described as a kerf floor, would you need to have the actual

4   blade or instrument to be able to make any determinations

5   about size or the type of instrument that was actually used?

6   A    So we do something called tool mark classification.  We

7   don't -- do not match a specific tool to a specific cut.  We

8   look at characteristics to give a sense of what type of tool

9   was used.  So in those incomplete cuts, we were able to say

10  whatever it was, it was reciprocating and it created a cut

11  that was a millimeter wide.  So that would give you a sense

12  of how large the blade would have been on the incomplete

13  cuts.

14              MR. PALACIO:  Nothing further, Your Honor.

15              THE COURT:  All right, anything else?

16              MS. THIELE:  No, Your Honor.

17              THE COURT:  Thank you so much, Doctor.  You can

18  step down.

19              THE WITNESS:  Thank you.

20              (Witness excused.)

21              THE COURT:  All right.  I'm going to ask you to be

22  patient with me for one more minute.  I just want to check

23  our schedule here.  No need for the reporter.

24              (Pause in proceedings.)

25              THE COURT:  All right.  So again, I don't want to

1   jinx anything, but we are moving on very, very well.

2           So tomorrow we will see you at 9:30.  Please don't

3   talk about the case at all or look anything up.  Continue to

4   stay healthy.  And I will see you tomorrow.  And have a

5   great night.

6                   THE COURTROOM DEPUTY:  All rise.

7                   (Jury exits.)

8                   THE COURT:  All right.  Everybody can have a seat.

9                   Anything before we break for the night?

10                  MS. DEAN:  Judge, just one thing.

11                  MR. PALACIO:  Yes, Your Honor.  Tomorrow we

12  anticipate having Angie Wong from our office testify with

13  respect to the cell phone extractions.

14                  THE COURT:  Right.

15                  MR. PALACIO:  A lot of that will be reading

16  portions of text threads that are relevant.  The extractions

17  in total are hundreds and hundreds of pages, but we have

18  selected a small subset of that.

19                  THE COURT:  All right.

20                  MR. PALACIO:  And we intend to keep it as minimal

21  as possible, but there will be some reading.

22                  THE COURT:  I didn't mean to scare you by saying

23  that.  It's just that I have had a couple of occasions where

24  people come in and read the longest, most boring, somewhat

25  irrelevant things, and I just was just trying to suggest

1  that that not happen.  It hasn't happened yet.

2          MR. PALACIO:  I don't think it will be boring,

3  Your Honor.

4          THE COURT:  No.  I was just hoping that there

5  wouldn't be -- sometimes people are so afraid the jury is

6  not going to see what they want them to see that they do a

7  lot of reading.

8          MR. CECUTTI:  You saw me standing.

9          THE COURT:  Yes.

10          MR. CECUTTI:  It would be helpful if the

11  Government could let us know which excerpts they plan on

12  having read.

13          THE COURT:  You will do that, won't you?

14          MR. PALACIO:  We can do that, Your Honor.

15          THE COURT:  That would be excellent.

16          Anything else?

17          MR. CECUTTI:  Thank you.

18          THE COURT:  Anything?

19          MS. THIELE:  Just, Your Honor, on the charge Your

20  Honor requested?

21          THE COURT:  Oh.

22          MS. THIELE:  The Government may make or suggest a

23  proposed change at whatever section on cooperating witnesses

24  is in the draft charge.  Do you have a preference on how

25  we -- how we do that?  Do you want us to confer?

1        THE COURT:  Why don't you confer?  Because it is

2   different.  The cooperation charge at least, I think I used

3   Judge Dearie's charge, but it's -- but it's a different

4   situation than what you had.  So I envisioned putting it as

5   part of the same section, but the same features don't apply.

6        MS. THIELE:  Yes, we have different language, but

7   we thought it would be part of the same section.

8        THE COURT:  Yes, exactly so.  If you can agree on

9   it, that's even better.  And just make sure it's not in the

10  passive voice.

11       All right.  Anything else?

12       MS. THIELE:  No, Your Honor.  Thank you.

13       THE COURT:  All right, everybody.  Thanks so much.

14

15       (Matter adjourned to February 29, 2024, 9:30 a.m.)

16

17                         * * * * *

18

19

20

21

22

23

24

25

1                    I N D E X

2

3   <u>WITNESS</u>

4

5   **JAMES RICHARDSON**
        DIRECT EXAMINATION BY MR. PALACIO          1250
        CROSS-EXAMINATION BY MR. CECUTTI           1254
6
7   **JASPER MOULDER**
        DIRECT EXAMINATION BY MR. PALACIO          1256
        CROSS-EXAMINATION BY MR. CECUTTI           1269
8                                                  1271

    **ADAM VAN DUZER**
9       DIRECT EXAMINATION BY MS. HAJJAR           1271
        CROSS-EXAMINATION BY MS. THIELE            1281
10
    **SHANA STRAUB**
11      DIRECT EXAMINATION BY MR. PALACIO          1284
        CROSS-EXAMINATION BY MS. THIELE            1317
12      REDIRECT EXAMINATION BY MR. PALACIO        1327

13  **JAMIE BRUST**
        DIRECT EXAMINATION BY MS. HAJJAR           1334
14      CROSS-EXAMINATION BY MR. CECUTTI           1363

15  **BORAMCHAN LIM**
        DIRECT EXAMINATION BY MR. PALACIO          1366
16      CROSS-EXAMINATION BY MS. THIELE            1426
        REDIRECT EXAMINATION BY MR. PALACIO        1443
17      RE-CROSS-EXAMINATION BY MS. THIELE         1446

18  **ANGELA SOLER**
        DIRECT EXAMINATION  BY MR. PALACIO         1448
19      CROSS-EXAMINATION BY MS. THIELE            1483
        REDIRECT EXAMINATION BY MR. PALACIO        1490

20

21

22

23

24

25