UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,    :    20-CR-0549(AMD)
                             :
                             :
                             :    United States Courthouse
      -against-              :    Brooklyn, New York
                             :
                             :
                             :    February 6, 2024
                             :    11:30 a.m.
CORY MARTIN,                 :
                             :
         Defendant.          :
- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR PRE TRIAL CONFERENCE
BEFORE THE HONORABLE ANN M. DONNELLY
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Government:      BREON PEACE, ESQ.
                         United States Attorney
                         Eastern District of New York
                             271 Cadman Plaza East
                             Brooklyn, New York 11201

                         BY:  EMILY DEAN, ESQ.
                              TANYA HAJJAR, ESQ.
                              ANDRES PALACIO, ESQ.

For the Defendant:       LAW OFFICE OF ANTHONY CECUTTI
                         217 Broadway, Suite 707
                         New York, New York 10007

                         BY:  ANTHONY CECUTTI, ESQ.
                              KESTINE THIELE, ESQ.

Court Reporter:          JAMIE ANN STANTON, RMR, CRR, RPR
                         225 Cadman Plaza East
                         Brooklyn, New York 11201
                         Telephone: (718) 613-2274
                         E-mail: JamieStanton.edny@gmail.com

Proceedings recorded by computerized stenography.  Transcript produced by
Computer-aided Transcription.

1           (In open court.)

2           THE COURTROOM DEPUTY:  This is criminal cause for

3    a pretrial conference, docket number 20-CR-549, USA versus

4    Cory Martin.

5           Counsel state your appearance, government first.

6           MS. DEAN:  Good morning, Your Honor.  For the

7    government, Emily Dean, Tanya Hajjar, Andy Palacio and

8    paralegal specialist, Theodore Rader.

9           THE COURT:  Good morning.

10          MR. CECUTTI:  Good morning, Your Honor.  For Cory

11   Martin, Anthony Cecutti, Kestine Thiele, and we're also

12   joined by paralegals Mayerlin Ulerio and Preston Gover.

13          THE COURT:  Good morning, everybody.

14          Good morning, Mr. Martin.

15          This is our final pretrial conference.  You all

16   are scheduled to pick a jury before Judge Kuo on Monday.

17          Can you just remind me how long you expect the

18   Government's case to be?

19          MS. DEAN:  We'd say approximately two-and-a-half

20   weeks, Your Honor.

21          THE COURT:  Two-and-a-half weeks, that's what I

22   thought.  And are you anticipating at this point,

23   Mr. Cecutti, a defense case?

24          MR. CECUTTI:  I think it's certainly possible.

25          THE COURT:  Okay.  Any way of predicting how long

1    it might be?  It's okay.  Don't worry about it.

2           And in terms of what Judge Kuo is telling the

3    jury, is she telling them three weeks?

4           MS. DEAN:  We will ask Judge Kuo to tell them

5    three weeks, yes.

6           THE COURT:  Do you think that will adequately

7    cover anything that you all might have?  I guess it's hard

8    for you to tell how long the Government's case is going to

9    be.

10          MR. CECUTTI:  Right.  I think -- I've had in my

11   mind three to four weeks, I think that might be best.

12          THE COURT:  It just occurs to me, I think, rather

13   than surprise anybody, I think it might not be a bad idea to

14   ask for three to four weeks and then think about how happy

15   they will be if it's not.

16          All right.  So the first thing I want to talk

17   about are these motions in Limine.  And the first request is

18   the request and I guess the objection by the defense is to

19   the photographic evidence of the crime scene and the

20   autopsy.

21          Do you have an idea of how many photos of each you

22   are seeking to introduce?

23          MR. PALACIO:  Yes, Your Honor, I can address that.

24   With respect to the autopsy pictures, we are seeking to

25   introduce 15 pictures that we have marked and sent to the

1  defense.  And that is out of approximately -- that is out of

2  approximately 358 autopsy photos that were taken at the time

3  of the autopsy.

4      THE COURT:  And I take it that is going to be in

5  conjunction with the testimony from the medical examiner?

6      MR. PALACIO:  Yes, together with the medical

7  examiner.

8      THE COURT:  All right.  Let me just ask

9  Mr. Cecutti, do you object to any autopsy photos?

10      MR. CECUTTI:  No.  We are objecting to the ones

11  that I think are obviously graphic and disturbing.

12      THE COURT:  Well, I think that's sort of hard to

13  miss in a case like this.  I don't think there are too many

14  that aren't.  I haven't seen them, so is the objection that

15  they are graphic and disturbing?

16      MR. CECUTTI:  They're graphic and disturbing.

17  They will certainly inflame the emotions of the jury.  We

18  don't believe that they are relevant because there is no

19  dispute that the victim here was dismembered.

20      THE COURT:  Any response to that?

21      MR. PALACIO:  Yes, Your Honor.

22      We have -- I brought the photographs here that the

23  Government has marked for trial and the government has made

24  an effort to choose the least graphic pictures.  Obviously,

25  this is a case in which the victim was dismembered.  It is

1   difficult to see that, but there is a very specific purpose

2   to use these photographs at trial.  The medical examiner

3   will rely on these photographs to be able to explain her

4   conclusions with respect to the victim's autopsy.

5           THE COURT:  Is it the case -- I know one of the

6   pieces of evidence is a reference at some point to the use

7   of a particular kind of saw.  I take it that the photos are

8   relevant to that question?

9           MR. PALACIO:  It is relevant to that question

10  because the medical examiner will discuss the appearance of

11  the margins of the injuries at the location where those

12  limbs were severed and that is relevant to this case with

13  respect to the instrumentalities that were used to

14  dismember.

15          THE COURT:  All right.  Let me start with the

16  autopsy photos, those are obviously relevant.  And the

17  question is really whether it's unduly prejudicial.  I find

18  that it is not.  Any homicide involves typically graphic

19  testimony, but it's relevant to the cause of death and to

20  the way the homicide was committed.  So I will permit those,

21  and the defense has an objection.

22          On a related note is the application to admit a

23  limited number of photographs of the victim's body parts at

24  two locations in Canarsie Park.

25          And how many of those photographs are you

1  proposing?

2          MR. PALACIO:  We have proposed 13 photographs that

3  depict the manner in which the victim's torso and limbs were

4  recovered from the park.  And that's out of approximately 67

5  photographs that were taken by the Crime Scene Unit.

6          THE COURT:  All right.

7          MR. PALACIO:  And, again, the government has made

8  an effort to choose the least graphic of these pictures.

9          THE COURT:  And I know before Mr. Cecutti gives

10  the defense position, I think the argument is that these are

11  unfairly prejudicial and that they're graphic and

12  disturbing.

13          Is there anything else you want to add to that?

14          MR. CECUTTI:  No, Your Honor, that's exactly our

15  position.

16          THE COURT:  And what's your response to that?

17          MR. PALACIO:  Your Honor, the photographs of the

18  manner in which the torso and the limbs were recovered in

19  the park is relevant in this case.  It corroborates the

20  testimony of witnesses in this case who will testify about

21  the manner in which the body was discovered, the manner in

22  which the torso was concealed, the location where the torso

23  was placed.  It's the Government's theory that the defendant

24  left the torso in a location where it could be found by

25  passersby.  And, again, it reflects the nature of the injury

1   and the dismemberment to the victim in this case.

2          THE COURT:  For largely the same reasons, I will

3   permit limited -- well, the government is proposing what I

4   think is a fair number of photographs.  To the extent -- I'm

5   sure this will be covered in jury selection, but it's a

6   disturbing and violent crime.  And these photographs, like

7   the photograph of the autopsy, are relevant and not unduly

8   prejudicial.  And so the defense has an objection to that

9   ruling.

10          I don't think this is going to come up.  The

11  government has asked that the defense not mention any

12  possible consequences of a conviction.

13          I don't imagine you are planning to bring that

14  out, are you, Mr. Cecutti?

15          MR. CECUTTI:  We don't intend to inform or alert

16  the jury that Mr. Martin is facing a mandatory life

17  sentence.

18          THE COURT:  Okay, so I think that takes care of

19  that.

20          I think I've already ruled on the production of

21  Rule 16(b) discovery from the defense.

22          So then the next thing is the -- I just want to

23  make sure I understand.  I don't believe the defense is

24  objecting to the witness's testimony about the relationship

25  between the defendant, Ms. Odom, and the witness, including

1    his role in commercial sex work, managing both the victim

2    and the witness, and the details of that aspect of the

3    relationship between and among the three people.  That

4    includes the government's assertion that Mr. Martin

5    controlled all aspects of the victim and the witness's life

6    and business, including having access to their cell phones

7    and other electronic devices and controlling their money.

8            Just a couple of other factual aspects to this is

9    that at one point, it's alleged that Mr. Martin took a

10   thousand dollars from the witness's bank account and

11   directed her to report it as bank fraud, to the bank as

12   fraud.  That he encouraged the witness to recruit other

13   women to be sex workers.  There's an allegation that

14   Mr. Martin sold narcotics and used narcotics and required

15   the witness and the deceased to use narcotics also.  And

16   then there's text messages among the defendant, the witness

17   and the victim about commercial sexual activity.  This is

18   all background of their relationship, and maybe I've read

19   the submissions wrong.

20           Are you objecting to any of that?

21           MR. CECUTTI:  Yes.

22           So in terms of basic facts that Mr. Martin lived

23   at the Rosedale house with the victim and the witness, we

24   don't dispute that.  They did live together.  We do have a

25   different view in terms of how those relationships

1   functioned, but in terms of Your Honor's specifics as to

2   certain acts, for example, the thousand dollars from the --

3   from the account, the recruitment of other women, the

4   references to narcotics, we are objecting to those.

5           THE COURT:  All right.

6           Can I hear your position on that?

7           MS. DEAN:  Yes, Your Honor.

8           The nature of the relationship between the

9   defendant and CW1 in this case, as well as CW1's testimony,

10  will be central to this case.  And so each of these items

11  that Your Honor just recited, along with the -- what I am

12  sure we are about to talk about -- the nature of the

13  physical and the sexual abuse in the house from the

14  defendant to CW1, these are intrinsic to their relationship

15  and they go to the fundamental understanding of why CW1

16  engaged in certain things and made certain decisions to

17  participate in the actions she participated with respect to

18  this homicide and the larger conspiracy.

19          Now, I am kind of broadening the question, Your

20  Honor, but I think it's important to touch on the abuse, as

21  well, in answering the question.

22          THE COURT:  Well, we can do that.  I was trying to

23  figure out -- I like to figure out what's not in dispute.

24  And so it turns out that I was wrong about what was in

25  dispute, so we might as well open it up to the entire nature

1   of the relationship then.  And just to sort of set the

2   conversation, you know, the general rule is, at least under

3   404(b), that evidence of other crimes is not admissible to

4   prove character, but it may be admissible for other reasons,

5   like motive, opportunity, preparation, plan, knowledge, or

6   absence of mistake.  And certainly the nature of the

7   relationship between and among the three people in the house

8   is relevant to some of those things.

9          What I am trying to figure out is whether every

10  single act or -- every single act that you have described

11  fits in that category.  And then with the added question of

12  even if it does, is it unfairly prejudicial so that the

13  prejudicial effect outweighs the value of the evidence.  So

14  it's just with an eye toward that question, also keeping in

15  mind that courts follow the inclusionary rule with evidence

16  like this, if it's for a purpose other than to show

17  propensity.

18         And so sort of with that framework, I would ask

19  you to address -- and just so there are no surprises, the

20  particular acts that I am concerned about, I think there is

21  a category of acts that relate to the murder-for-hire

22  scheme.  And those, I think, are clearly relevant and

23  admissible because they relate to the planning and to the

24  formulation of that scheme.  For those, I'm specifically

25  referring to an incident which occurred on January 27th of

1   2018, which was an argument about the scheme during which

2   the defendant is alleged to have choked CW1, pulled a knife

3   on her and threatened to kill her son.  This is also the

4   incident, if I'm recalling it correctly, in which the CW1

5   called the police who then arrested the defendant, but

6   released him.

7           Do I have that timing and incident correctly?

8           MS. DEAN:  You do, Your Honor.

9           THE COURT:  So that, I take it, you object to

10  that, Mr. Cecutti?

11          MR. CECUTTI:  Yes.

12          THE COURT:  All right.  That, in my view, is

13  admissible because it goes directly to the scheme, to the

14  planning of the murder-for-hire scheme, and it explains, as

15  the government said, why CW1 would participate.  But I will

16  tell you that the two incidents that the Government has

17  proposed I need a little more clarity on are the incident in

18  which the defendant is alleged to have punched CW1's

19  eight-year-old son and point a gun at him, unrelated to the

20  murder-for-hire scheme.  And then a second incident, which I

21  believe occurred in 2017, in which the defendant is alleged

22  to have punished CW1 for hiding money to buy a birthday

23  present for her son by handcuffing her and raping her with a

24  hammer.  Those two incidents I would like you to explain

25  why, in the context of a lot of other incidents, should be

1    admitted and aren't unduly prejudicial.

2              MS. DEAN:  Thank you, Your Honor.

3              I'll start with the punching the child and the

4    abuse against both of CW1's children in this case.

5              THE COURT:  When did that happen?

6              MS. DEAN:  It was pervasive from after CW1 moved

7    in, which is approximately the end of 2016, moved in with

8    the defendant.  The abuse became pervasive, so one thing

9    Your Honor mentioned was about just, you know, why these

10   particular incidents are relevant and also weighing the

11   probative value against the potential for prejudice.

12             The government does not seek to go through every

13   single violent act against CW1 and against the children.

14   What we propose doing and what we have proposed is

15   streamlining that to show that there was physical and sexual

16   abuse and to discuss several incidents which are

17   corroborated and also related to the scheme.

18             Let me touch on the abuse against the children

19   first, and, specifically, the incident where the eight year

20   old was punched.  There is another incident where the

21   defendant attempted to throw the two-year-old child out of a

22   window.  This scheme, the genesis of the scheme originated

23   because the defendant wanted to take out life insurance

24   policies on the two year old, the eight year old, and the

25   father of the two year old.  So the beginning of this, and

1    throughout the course of the scheme, the defendant was

2    proposing the murder of the children, the defendant was

3    proposing the murder of the two year old's biological

4    father.

5            As part of the scheme, the CW1 actually did fill

6    out life insurance policies on the father of the two year

7    old and on her two-year-old child.  CW1 has to be able to

8    explain this, Your Honor, and talk about --

9            THE COURT:  Well, I am just going to stop you

10   because I know that Mr. Cecutti objects to that.  But I

11   think that is relevant to the plan -- the proposal that

12   someone else be the intended victim or victims is relevant

13   to the planning and carrying out of the charged crime.  That

14   is admissible.  My question is whether it is -- I don't know

15   how many incidents of violence you have toward the child and

16   I don't -- I did not understand this particular one that I

17   asked you about to be connected to any planning or execution

18   of a murder-for-hire.

19           MS. DEAN:  Yes, Your Honor.  And so part of this

20   is -- I will separate it in two things.

21           Part of this is the fact that the defendant has

22   always proposed to CW1 that some of the targets in this

23   scheme be the children and the father of the two year old.

24   The abuse that was going on in the home towards the children

25   caused CW1 to take certain steps to either get her children

1    out of the home or to try to balance with the defendant, you

2    know, pleasing the defendant because of the abuse that she

3    was suffering and also trying, to the extent she could, to

4    figure out how to save her children.

5           Ultimately, this scheme becomes targeted at Brandy

6    Odom and leads to her ultimate homicide which CW1 and the

7    participant participated in fully.  The explanation of how

8    the scheme evolved and what was actually going on in the

9    home that caused this to have multiple targets over the

10   course of a lengthy period of time, settling on Brandy Odom,

11   why CW1 went along with the plan to kill Brandy Odom and

12   participated fully in the plan to kill Brandy Odom, that is

13   inextricably intertwined with the case.

14          And so Your Honor, I did want to clarify one

15   thing.  While we do believe that the evidence we proffered

16   in the motion, if it's in and comes in under 404(b), our

17   position is that this is direct evidence of the charged

18   crime, both the physical abuse that was going on in the home

19   toward CW1 and the children.  The genesis of the plan being

20   directed at both, one of the children's father and the

21   children, and over time ending up directed at Brandy Odom.

22   It all has to be explained to this jury.  There is simply no

23   way for CW1 to testify about this scheme without explaining

24   how this involved her own children and --

25          THE COURT:  But my question is, that may very well

1    be.  My question is whether the specific incidents are

2    necessary to affect what you want to affect.

3          So for example, if she testified that he was

4    physically abusive to the children without describing each

5    incident, is that sufficient?

6          MS. DEAN:  I think nearly, Your Honor, and what

7    the government proposes is somewhat similar, which is a

8    limited version where she's permitted to testify about that

9    with very limited examples.  And the government would

10   propose an example of physical abuse directed toward each

11   child.  And we would agree that rather than go through each

12   instance of physical abuse, of which there are many, we

13   could limit it so as not to go through every single day in

14   the life of CW1 and her children and every instance of

15   abuse.  And it is the government's position that that

16   strikes -- that strikes a balance and it gives context to

17   the jury without going through many, many, many, many

18   instances of abuse against the children.

19         The government's position is the fact that the

20   defendant was violent toward the children and just

21   explaining what that means by an example of his behavior

22   toward each child, that he physically assaulted the eight

23   year old and that he tried to throw the two year old out of

24   a window.

25         And the government also --

1    THE COURT:  Was that in your submission about

2  throwing the two year old out of the window?

3           MS. DEAN:  I believe it was, Your Honor.

4           THE COURT:  I just don't remember it.

5           MS. DEAN:  I'm sorry, Your Honor.  The assault on

6  the eight year old is described in the motion.

7           THE COURT:  Right.

8           MS. DEAN:  The assault on the two year old -- I

9  apologize, the assault on the two year old is not described

10  in the motion.

11           THE COURT:  So here's another thing that -- we're

12  talking about a decent period of time in which at least the

13  three -- the CW1, Ms. Odom, and the defendant lived in one

14  house.  What is that period of time?

15           MS. DEAN:  That is approximately the end of 2016,

16  I'd say, late November to December of '16 through Ms. Odom's

17  murder in April of 2018.

18           THE COURT:  And how long were one or both children

19  living in the house?

20           MS. DEAN:  On and off during that time period,

21  there were multiple periods of time where CW1 had to send

22  the children away.  In fact, one of those periods of time

23  was almost immediately after moving in, having to send the

24  two year old away.  The children were in and out of the

25  house, though, during that period of time.  And so there

1  were a number of things that took place.

2          The government proposes limiting significantly the

3  descriptiveness of the abuse, but the jury must have some

4  context for this where CW1's credibility is going to be

5  central at this trial.

6          THE COURT:  I guess -- I think one other thing I

7  was going to ask you to do is, is there more that is not

8  laid out in your letter?  There's the incident -- when does

9  the incident with the two year old take place?

10          MS. DEAN:  The exact date, I don't know, Your

11  Honor.  Sometime between after the two year old is back from

12  being sent away and Ms. Odom's death.  It's during that time

13  period.

14          THE COURT:  And what is the relationship of the

15  specific acts against the eight year old and the two year

16  old?  What is the relationship of that to the -- to the plan

17  to take out the life insurance policy on Ms. Odom and to

18  murder her?  Is it an alternative?  Is it a -- I think, as I

19  said before, over the defense objection, I would admit prior

20  proposals of similar conduct, but what I'm trying to get at

21  is whether the incidents against the children, whether there

22  have to be descriptions of those incidents in order to -- I

23  am just not sure I see what the connection is, other than,

24  you know, showing that he is an abusive person.  I mean, it

25  does have certain relevance in terms of the control that he

1 exercises over her because, I mean, I think that it's a

2 reasonable inference that somebody who would permit someone

3 to do this to her children is -- is somebody who is under

4 somebody's control. That's one interpretation. There are

5 other interpretations of it, as well.

6        But I am trying to see what the connection is to

7 the murder-for-hire scheme.

8        MS. DEAN: I think two things, Your Honor. And,

9 again, I emphasize that in a limited sense, the descriptions

10 of the violent incidents do connect and they do need --

11 there needs to be some context and in a limited sense they

12 should come in.

13        The first is as corroboration for CW1. It's going

14 to be very difficult for a jury to understand when a witness

15 is on the stand explaining that a person wanted to take out

16 life insurance policies and kill children. That is -- that

17 is beyond what the average person is capable of

18 understanding.

19        And so in a limited sense to show that there were

20 specific incidences of inexplicable violence against these

21 children, it helps to understand what CW1 will be testifying

22 about when she says he hated my children, he was angry that

23 I had these children with other men, he was abusive to my

24 children, he wanted to actually take out life insurance

25 policies and profit from the death of my children. To hear

1   that in a vacuum is just hard to comprehend, so as

2   corroboration for CW1, it is highly relevant in a limited

3   capacity.

4           The second is Your Honor touched on exactly --

5   exactly the issue as it relates to the murder-for-hire

6   scheme against Brandy Odom.  CW1 is going to explain that as

7   this plan emerged and Brandy Odom became a potential target,

8   sadly, Your Honor, there was a relief in a sense because it

9   was Brandy Odom and not her children, after specifically

10  watching her children suffer at the hands of the defendant

11  and getting to the place where she, herself, filled out

12  policy information on one of her children because of the

13  defendant's control, because of what the defendant was doing

14  in that household on a day-to-day basis.

15          This is -- it's hard for a jury to access when you

16  are talking about murdering children for money, and so to

17  briefly explain to them a couple of instances of violence

18  against the children, it adds color to why to CW1 even

19  Brandy Odom was a better option.

20          THE COURT:  All right.

21          Mr. Cecutti, I will hear from you.

22          MR. CECUTTI:  Your Honor, our position is that

23  this is not direct evidence.  And the government's basis or

24  purposes by which it may be falls way short.  I think we are

25  in the category of 404(b) and what -- what to me speaks

1   loudly is propensity.  This is simply intended to paint

2   Mr. Martin as a violent dangerous person.

3           THE COURT:  You are talking about the specific

4   incidents of violence?

5           MR. CECUTTI:  Correct.

6           THE COURT:  And I am talking just toward the

7   children right now.

8           MR. CECUTTI:  All of the above, but also since we

9   have been talking about the children, specifically that.

10          THE COURT:  Do you agree that evidence -- I think

11  you are objecting to it, but the evidence of prior schemes

12  or plans to do something similar to somebody else, while you

13  may object to it, it's in a different category than the

14  specific incidents of violence?

15          MR. CECUTTI:  Agreed.

16          THE COURT:  So the question is if -- then the next

17  question is:  If the explanation is going to be that the CW1

18  agreed to participate in the crime against Ms. Odom as a way

19  to deflect the defendant from doing the same thing to her

20  own children, that is something that is different than

21  propensity, correct?

22          MR. CECUTTI:  I think --

23          THE COURT:  It speaks to her motivations.

24          MR. CECUTTI:  Yes.  I still think that the element

25  of propensity is very much alive in terms of the danger of

1    unfair prejudice against Mr. Martin.

2         THE COURT:  But the -- what I am trying to balance

3    here is that we're looking at a case which is -- there is no

4    way to describe anything other than an allegation of an

5    extraordinarily violent vicious murder and the allegation is

6    that the planning of it extended some period of time.  And

7    that's just -- that's the fact of the allegations.  Plans to

8    do other similar things I think are clearly relevant.  And

9    what I am trying to balance here is the detail about the

10   incidents of violence to the children.  If there has to be a

11   description of each incident or -- that's the problem that I

12   am having.  I take it that your view is that evidence of

13   violence against the children, even if they're the targets

14   of a scheme to get insurance in the same way the allegation

15   is that Ms. Odom was a target, that the specific incidents

16   are simply too graphic or too prejudicial to permit.

17        MR. CECUTTI:  Yes.  And additionally, we are going

18   to run into the concept of a trial within a trial.  If the

19   witness is permitted to, for instance, testify about

20   Mr. Martin allegedly trying to throw her eight year old out

21   the window, we don't even know what timeframe.  The

22   government has, I think, conceded that they don't even know

23   what timeframe.  And so there's going to be a trial,

24   essentially, on that act and other acts.

25        Child abuse allegations are incredibly

1   inflammatory.  This is already a very sensitive case where

2   the allegations are extremely inflammatory.  To then layer

3   on allegations of child abuse, I think, definitely unfairly

4   prejudices Mr. Martin.

5          THE COURT:  What about the extent to which it

6   shows Mr. Martin's control over CW1?

7          MR. CECUTTI:  I think it falls short.  These

8   are -- these are limited instances.  I don't see how that is

9   connecting to the allegation that he controlled CW1 or the

10  victim.

11         THE COURT:  Well, putting aside the victim, I

12  think the argument is, although I might have it wrong, is

13  that he controlled her sufficiently that she apparently

14  stood by while he abused her children.  That could either be

15  because she's a terrible person or because she lived in fear

16  of the defendant.

17         MR. CECUTTI:  Your Honor, I think the other issue

18  here is all of these specific instances that we're talking

19  about in terms of child abuse are all coming from one person

20  and one person only.  This is different than the

21  January 27th incident, where I expect the government to

22  elicit or admit other evidence, whether it's a 911 call or

23  law enforcement.  I will leave it obviously to them to seek

24  to prove out that incident.  But this is very different.

25  These child abuse instances are very different than that

1  one, for example.  This is solely coming from this

2  individual who -- who has credibility issues.  And so for

3  her to testify about these specific instances that are

4  uncorroborated, unsubstantiated, and we don't even know a

5  timeframe for any of these things, again, brings us to the

6  point that this is propensity evidence designed to paint a

7  picture of Mr. Martin as a dangerous violent person.

8          MS. DEAN:  Your Honor, first, when CW1 is

9  testifying, her credibility is certainly going to be

10 challenged regarding the abuse globally which is going to

11 open the door in any case for her to be able to describe the

12 abuse further.  There is not even a way to cross-examine

13 WC 1 in this case without calling her credibility into

14 issue.

15         But as to Mr. Cecutti's point regarding the lack

16 of corroboration regarding the child abuse, there are text

17 messages in this case from the defendant to CW1 that

18 demonstrate his anger toward the children and specifically

19 toward the two year old where he refers to the child in a

20 couple of different rants, excuse my language, as "that

21 fucking baby," and he describes his anger toward CW1 because

22 of the fact that she had a baby with this other man which

23 CW1 was going to be explaining was the root of a lot of his

24 anger and their fights.  That is --

25         THE COURT:  I am just going to stop you because,

1   you know, I don't need to know about your whole case, but

2   it's hard for me to make a decision on some of these things

3   without a more full picture of what we're talking about.

4   And I don't think that I had evidence about the text

5   messages.  Maybe I did and I missed it.  But it's -- let me

6   say this about all of this.  It's hard for me to decide with

7   regard to the specific allegations, and now I am just

8   limiting myself to the question of abuse of the children,

9   without a picture of what the context is.  If it's just that

10  he -- I think that the submission to me was that CW1 saw

11  Mr. Martin punch the eight year old and point a gun at him.

12  As I said, I wasn't aware of the behavior toward the two

13  year old.

14          And so what I am going to ask the government to do

15  is do a submission that includes when these things happened,

16  what the relation is to the crime that's charged.

17          As I said, I think it is relevant that there are

18  other plans afoot to do the same thing.  I think the

19  defendant's antipathy toward the children is relevant to

20  that, but in terms of just specific acts of violence, I need

21  to know how they connect to the plan.  So if you can get me

22  that, I want to make a decision about that, you know, by

23  Thursday or so.

24          So if I can get letters back and forth, maybe we

25  can wait -- today's Tuesday?  If you can get me the letter

1    today, can you respond tomorrow?

2            MR. CECUTTI:  Yes.

3            THE COURT:  Okay.  And that's just, just so we can

4    limit this, as far as I can tell, on this issue, if I have

5    some more context for it, because, again, maybe I didn't

6    read it completely enough, but I didn't see what the

7    connection was.

8            And then the other separate prior bad act that the

9    government proposes is an incident in which CW1 hid money to

10   buy a birthday present and then that the defendant found the

11   money, handcuffed her and raped her with a hammer.  I think

12   I know what Mr. Cecutti's objection to that testimony is.  I

13   think it's a well-taken objection in terms of the detail.

14           Is it necessary to bring every detail about that

15   out?  Is it possible to bring out the incident and say that

16   he handcuffed her and sexually assaulted her rather than

17   having the description of how that happened?

18           MS. DEAN:  I think possibly, Your Honor.  And I'm

19   sure that this is our mistake as far as just not giving

20   sufficient detail in the motion, but what we had tried to do

21   and what we had thought, because of how pervasive the

22   physical and sexual abuse was, what we tried to do was put

23   forth our argument that the physical and sexual abuse is

24   intrinsically intertwined with the case and then give

25   certain examples that we thought illustrated the type of

1   testimony that would come out from CW1.

2        THE COURT:  So for example, if this is a situation

3   where things like this are happening, you know, basically

4   every day, every week, that gives me a context that's

5   different than one isolated time this happened, another

6   isolated time this happened.  It appears to me, aside from

7   the question of the exercise of control, which is a

8   legitimate issue in the case and the government's entitled

9   to prove that.  What I am trying to avoid is incidents that

10  are unconnected.  I think all of these, by the way, are

11  relevant.  I think it's all relevant conduct.  The question

12  that I have is whether the unfair prejudice outweighs the

13  relevance.  And so that's what I am thinking about.

14       MS. DEAN:  And with respect to your question about

15  the specific facts of this rape, I think -- I think yes,

16  Your Honor, it is possible and -- and probably appropriate

17  for CW1 to testify somewhat more generally about the

18  pervasiveness of the sexual assaults that were going on, on,

19  you know, sometimes a near daily basis when -- it's hard to

20  put a data point on the specific rape because she was being

21  raped so frequently.

22       THE COURT:  Right.

23       MS. DEAN:  And I think that CW1 could testify

24  somewhat more generally about being forced to engage in sex

25  without her consent and also being sexually assaulted with

1  objects which did cause injury to her.  We do think there is

2  some level of detail because of what CW1 engaged in.  What

3  CW1 did in this case is so extreme that without being able

4  to understand the control and the way that she was living in

5  the house, it's just -- it's almost impossible for a jury to

6  access her testimony.

7          So we do want to balance, as I understand the

8  Court wants to balance, CW1 being able to give some

9  explanation and some color.  And we think perhaps the

10 Court's -- what the Court was suggesting is appropriate,

11 that she could give more of an overarching commentary on the

12 pervasiveness of the sexual assault and something more

13 general with regards to the way that she was suffering.

14         THE COURT:  All right.  Let me just -- that can be

15 included in your letter as well.

16         Let me just go through some of these other

17 specific questions.

18         The incident in which the defendant fractured her

19 leg and induced Ms. Anderson to lie about the cause of her

20 injuries at the hospital is relevant on the question of

21 control, and I will permit that.  I find that it is -- the

22 prejudicial value does not outweigh the relevance and, with

23 probative value, and that it explains why she participated

24 in the conspiracy.

25         The assault during an argument about the

1    murder-for-hire scheme is also admissible because it goes

2    directly to the scheme that the defendant is accused of

3    perpetrating.

4         There is also a proposal about the origins of the

5    life insurance fraud scheme which we've discussed, that the

6    initial proposal to murder the children and the father for

7    life insurance proceeds, I think that is admissible under

8    404(b).

9         And then there's also the evidence about the

10   approach -- there is another witness who the defendant is

11   alleged to have approached to participate in this scheme.  I

12   think the nature of their relationship and background is

13   relevant.  And I understand the defense objects to that, but

14   I think it explains the relationship between the two of them

15   and why the defendant would approach this witness.

16        Now, then there is the issue of -- I think that is

17   most of the evidentiary questions.  Have I missed anything?

18   I think I will get some clarity once I get the other

19   submissions.

20        MR. CECUTTI:  I think the -- another item that is

21   outstanding is violence towards the victim, obviously

22   outside of the murder, but the government's position, which

23   I understand it to be, is that there were instances of

24   violence against her.  And --

25        THE COURT:  I don't know that there are any

1    specified in the submission.  Are there specific?

2           MS. DEAN:  On -- during the January 27, 2018,

3    incident, when CW1 came back inside with the police and

4    observed the victim, the victim had a split lip and was

5    bleeding.

6           THE COURT:  Did I have that?  I don't think that

7    was in the submission that you gave me.

8           MS. DEAN:  It may not have been described in the

9    submission.  There are other instances generally where

10   the -- where the -- where the defendant grabbed and slapped

11   the victim in the presence of CW1.

12          THE COURT:  The evidence of the control that the

13   defendant exerted over the victim is relevant to the intent,

14   his motivation, and the violence toward both CW1 and the

15   victim also goes to why the defendant appeared to be

16   confident that CW1 would not report it.  It also, I think

17   violence toward the victim, explains why -- explains their

18   relationship and it's directly relevant to why -- not just

19   to his control, but to his attitude toward the victim, that

20   he was willing to participate in this scheme with her.  So I

21   think that's definitely relevant.

22          The other thing with some of this evidence, I

23   don't know to what extent the defense will be proposing

24   curative instructions.  Sometimes people want those.

25   Sometimes -- I mean, if I can give a general curative

1    instruction or explanatory instruction on the use to which

2    the jury can put some of that evidence, sometimes people

3    don't want that kind of an instruction.

4         MR. CECUTTI:  Not sure yet.

5         THE COURT:  Okay.  So you will think about that.

6    But I think that evidence is relevant.  I have to say some

7    of the difficulty I am having is that some of this I'm

8    hearing for the first time today.  So that's why I need a

9    little bit more clarity on the subject of these specific

10   incidents.

11        And I mean, obviously the Court has wide

12   discretion about this.  If some of these events are

13   inextricably intertwined with the scheme, they are

14   admissible, but I do want the government to explain with

15   regard to these specific fairly inflammatory claims how the

16   probative value is not outweighed by the prejudice, keeping

17   in mind that a lot of these are no more inflammatory than

18   the charged conduct.  So that's something that the

19   government is going to have to explain.

20        Now, there are a couple of other things.  Just in

21   terms of the requests that the Court, in its final

22   instruction, include an instruction on unconscious bias.

23   I'm not going to include that, but I have a thorough

24   instruction about bias in general, racial and otherwise,

25   that I think is sufficient for the charge.

1        The expert disclosures to which the defense

2    objects, I find, are sufficient.  They include notes and

3    reports from each anticipated expert.  And so I find that

4    the government fulfilled its responsibility.

5        Then there's this issue about the K-9 evidence.

6    The defense is requesting that the Court require the

7    government to qualify the detective as an expert.  In this

8    circuit and in this district, courts admit evidence and

9    testimony from the handlers, from the K-9 handlers without

10   qualifying them as experts as long as the government lays a

11   proper foundation.  So I'm assuming that the government has

12   provided materials about the dog's training, and then the

13   defense will have that in terms of cross-examining the

14   reliability of the evidence, so I am not requiring the

15   government to qualify the detective as an expert.

16       I think I've covered everything that's in the

17   submissions.

18       MS. DEAN:  Yes.  And Your Honor did just ask a

19   question -- I think I might have took us off course onto the

20   physical and sexual abuse issue.  You asked a question that

21   included issues of the fraud, the use and sale of narcotics

22   and recruiting others as sex workers.

23       Would you like the government to address those

24   things in the letter, as well?

25       THE COURT:  Yes, I would.

1          MS. DEAN:  Okay.

2          THE COURT:  Because -- and thanks for reminding me

3    of that.  The selling and buying of drugs seems to me a

4    little bit tangential.  And I am not sure that that needs to

5    come in, but you can address that in the letter.

6          I do want to just talk a little bit about just

7    general trial days.  So I know Mr. Cecutti has tried cases

8    in front of me and Ms. Thiele.  And I know Ms. Dean has

9    tried cases in front of me in State Court.  But generally,

10   we will start at 9:30, break once during the morning.  We

11   will break for lunch and then break once during the

12   afternoon.  I go to 5:30.  And if it's fine with the court

13   reporter and we have a witness -- and other staff, if we

14   have a witness that's on the stand that we can finish, I

15   like to do that so we don't needlessly call the witness

16   back.  I also do like to fill our trial days with as many

17   witnesses as we can so we respect the jury's time.

18   Obviously I understand if we fall short every once in

19   awhile, but I am going to ask the government to do its best

20   to have enough witnesses lined up so that we can have a full

21   day.

22          Obviously, and then, you know, if we are going to

23   be talking about four weeks, if any lawyer or anybody needs

24   to stop early one day or, you know, start late, just let me

25   know and we can accommodate that.  I don't know what else

1  there is to say.  I try to keep kind of low drama during a

2  trial, which I don't think is going to be a problem with

3  anybody.  So that's about all I've got to say about it.

4        Does anybody have any questions just about trial

5  procedure?

6        MS. DEAN:  No questions, Your Honor.  We just

7  wanted to flag, there is a week in our trial schedule, I

8  think it's the winter break week for children, 2/19 to 2/23,

9  where we have many, many, many, people about vacation.  I

10 think that there's enough witnesses here that won't present

11 a problem, but we did just want to flag that by the end of

12 that week we could be in a situation where we ask to end

13 early that one day, February 23rd.

14        THE COURT:  Oh, okay.

15        MS. DEAN:  But I think it might just sort itself

16 out, and it also depends on the length of jury selection.

17        THE COURT:  So just tell me the dates, again?  I

18 am mercifully at a stage in life where I don't have to think

19 about these things anymore.

20        MS. DEAN:  It's just the week of February 19th to

21 February 23rd.  So we have that Monday as a court holiday.

22        THE COURT:  Right.

23        MS. DEAN:  It's just that week that we have a lot

24 of witnesses who are away that week, but I still think we

25 are fine.

1      THE COURT:  Just tell me what you are asking me to

2  do.

3      MS. DEAN:  We just might end up asking you on

4  Friday that we have to end a little early if we run out of

5  people who can fill that Friday.

6      THE COURT:  And what day is that?

7      MS. DEAN:  2/23.

8      THE COURT:  Oh, that shouldn't be a problem.  I

9  don't think anybody will have a problem with that.

10      Anything from you, Mr. Cecutti or Ms. Thiele?

11      MR. CECUTTI:  Not on logistics.

12      THE COURT:  Okay.

13      MR. CECUTTI:  But I wanted to come back to other

14  issues that we were talking about.

15      So the government filed last night --

16      THE COURT:  Oh, yes.  Thank you for reminding me,

17  yes.

18      Let's just start with the -- is there anything in

19  there that you think you would want to be questioning

20  somebody about?  Most of it seemed to be very old or not

21  relevant to credibility, at least with respect to the law

22  enforcement.

23      MR. CECUTTI:  Oh, I was -- I am with you.  We --

24  okay, so with respect to that motion, which I don't have in

25  front of me, we are not intending to cross-examine any of

1    the witnesses based upon their unsubstantiated or

2    substantiated complaints.

3            THE COURT:  Okay.

4            MR. CECUTTI:  That is a nonissue for that.

5            THE COURT:  What was left?

6            MR. CECUTTI:  So last night, the government filed

7    a motion in Limine with respect to two issues.  I think

8    we've covered one of them.

9            THE COURT:  This is on me.  I think I missed that.

10   Hold on for one second.  What's the issue?

11           MR. CECUTTI:  It's probably best for them to

12   explain their motion.

13           THE COURT:  Okay.

14           MS. HAJJAR:  We filed a brief letter last night

15   outlining two additional basis for motions in Limine.  I

16   think we've covered one of them.

17           THE COURT:  Right.

18           MS. HAJJAR:  The other involves the individual

19   referred to as witness one which we've already gone over in

20   some substance, but the additional piece there is about

21   witness 1 and a firearm.

22           THE COURT:  And what's the relevance of that?

23           MS. HAJJAR:  So Your Honor, I expect witness 1 is

24   going to testify that at some point in the summer of 2017 or

25   shortly thereafter, he lent the defendant a firearm at the

1  defendant's request and then later requested in code that

2  the firearm be returned.  The defendant apparently

3  misunderstood that request and arrived at witness 1's home

4  with the victim.  Then that sort of ended that encounter,

5  but it also explains why victim -- why, excuse me, witness 1

6  was acquainted with the victim.  He will later state that he

7  understood when he recognized the photograph of the victim,

8  the murder victim, because he had met her after this

9  conversation with the defendant.

10        THE COURT:  But why does it have to -- I mean, you

11  could do that without bringing out the gun part.

12        MS. HAJJAR:  We could, Your Honor, but for the

13  same reason Your Honor understood that some of the evidence

14  as to the relationship of trust between co-conspirators is

15  relevant, or here, in this case, not co-conspirators, but

16  someone the defendant trusted sufficiently to solicit his

17  involvement in a murder-for-hire, the provision of a firearm

18  between those -- the fact that these two individuals were

19  close enough such that, one, lent other -- another a firearm

20  and then requested it back, demonstrates some basis of

21  mutual trust, some preexisting relationship, such that it

22  makes more credible the idea that the defendant would make

23  such an ask.

24        THE COURT:  I am really not inclined to permit

25  that.  I think -- well, let me hear from -- maybe you don't

1    want to snatch defeat from the jaws of victory, but I am

2    permitting the prior -- the approach to the witness with a

3    proposal of a murder-for-hire scheme, that's permissible.

4    And anything having to do with their discussions is surely

5    relevant.

6            I don't think giving him the providing of a

7    firearm advances that ball in any way.  So I am not inclined

8    to permit that.  I mean, there is going to be evidence that

9    he has a gun.

10           MS. HAJJAR:  Your Honor, I think that the -- I

11   think that the courts have recognized that generally, in a

12   limited, sense provision of firearms --

13           THE COURT:  I am letting you bring out the fact

14   that he asked to participate in a murder with him.

15           MS. HAJJAR:  That's direct evidence of a charged

16   crime.  The fact that the defendant solicited another person

17   to participate in the crime with which he is charged is, I

18   mean, respectfully, we would expect that that would come in

19   at a trial for a murder-for-hire.

20           The fact is that the jury is going to be left with

21   the confusion as to how the defendant would know this person

22   such to ask him to participate in this crime without even

23   that very limited discussion of his prior interaction where

24   I should say that this witness is one's own *Giglio* of his

25   own impeachment.  This will go to his own credibility, the

1  fact that he possessed guns and the fact that the defendant

2  knew that needs to come out in order to explain how this

3  conversation arose and how it is the defendant trusted him

4  sufficiently to make the ask that he participated in the

5  charged murder-for-hire scheme.  I don't know --

6             THE COURT:  Does the gun come before the --

7             MS. HAJJAR:  Yes.

8             THE COURT:  -- will you participate in a murder

9  with me?

10             MS. HAJJAR:  It does, Your Honor, yes.

11             THE COURT:  What is your?

12             MR. CECUTTI:  I think the government is missing a

13  big piece, which I am surprised by, is that we believe that

14  they are going to elicit from witness 1 a history of

15  scamming between Mr. Martin and witness 1.  And the

16  intention of that is to establish what they're seeking to

17  establish by way of this gun.  The gun is -- the gun is

18  irrelevant when it comes to this relationship.  What is

19  relevant is this witness expected to testify that he had a

20  history of scamming with Mr. Martin.  That is what

21  establishes mutual trust, not this gun.

22             THE COURT:  I have to say I really don't see how

23  that advances the ball.  I am not going to permit that.  I

24  take it you are not going to open the door on cross.  All of

25  this, by the way, is key -- anything that I preclude changes

1    if the door is opened, but I don't see that as a real

2    incentive to participate given their past relationship.

3           MS. HAJJAR:  Your Honor, I expect that the

4    government will file a *Giglio* motion precluding cross on

5    certain topics of witness 1.  If Your Honor would permit

6    reserving resolution of this until we understand what the

7    defense is going to seek to impeach witness 1 about,

8    because --

9           THE COURT:  All right, I can do that.

10          MS. HAJJAR:  That would be helpful.

11          I just wanted to make one other note --

12          THE COURT:  When is that going to happen, by the

13   way?

14          MS. HAJJAR:  This week, you know, tomorrow or at

15   the end of the leak at the latest, but there will be a

16   couple of pieces of --

17          THE COURT:  Slow down.

18          MS. HAJJAR:  I'm sorry, Judge.

19          The other thing I want to just note on this is

20   that it does explain how it is that -- that witness 1 met

21   the victim and understood who the victim was in this case

22   because in making this request, the defendant then brought

23   the murder victim to witness 1's home where witness 1 had an

24   opportunity to meet her.

25          It's not clear to me how -- it's not presently

1    clear to me how we could elicit that without understanding

2    the request and how the defendant misunderstood, apparently

3    misunderstood the request.  So I --

4              THE COURT:  I mean, I think you could.  I think

5    you could just say that he met her because the defendant

6    brought her over to his house.  I don't know that there has

7    to be a motivation.  But I will wait until you let me know

8    what the resolution of your discussions or -- is it

9    *"Giglio," "Giglio,"* whatever it is, I will wait until I have

10   that.

11             MS. HAJJAR:  Thank you, Your Honor.

12             THE COURT:  Anything else?

13             MR. CECUTTI:  Your Honor, we just have an

14   administrative issue with respect to electronic device

15   orders.

16             THE COURT:  Oh, yes.

17             MR. CECUTTI:  We can either file them, e-mail

18   them.  We also have hard copies.

19             THE COURT:  You just want them to be able to have

20   electronic devices during the trial?

21             MR. CECUTTI:  Right.

22             THE COURT:  Didn't we have this come up at our

23   last trial, too?  I don't remember.

24             THE COURTROOM DEPUTY:  Yes.

25             THE COURT:  It's not a problem, right?

1          THE COURTROOM DEPUTY:  No.

2          THE COURT:  It shouldn't be a problem.

3          Okay.  Anything else?

4          MS. DEAN:  Nothing further from the government,

5    thank you.

6          THE COURT:  All right, everybody.  Thanks so much.

7          (Matter adjourned.)

8

9                    *     *     *     *     *

10

11   I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

12

13      /s/ Jamie Ann Stanton                February 6, 2024
     _____        _____

14      JAMIE ANN STANTON                           DATE

15

16

17

18

19

20

21

22

23

24

25