

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

TH/EJD/AP                                        *271 Cadman Plaza East*
F. #2020R00708                                   *Brooklyn, New York 11201*

October 15, 2024

<u>By ECF</u>

The Honorable Ann M. Donnelly
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Cory Martin
            <u>Criminal Docket No. 20-549 (S-1)(AMD)</u>

Dear Judge Donnelly:

        The government respectfully submits this letter in response to defendant Cory Martin's sentencing submission (ECF Dkt. No. 158, hereinafter "Def. Mem.") and in advance of sentencing in the above-captioned case, which is scheduled for October 24, 2024, at 11:00 a.m. The defendant was convicted on March 4, 2024, following a two-week jury trial, of murder-for-hire and conspiracy to commit murder-for-hire resulting in the death of Brandy Odom, as well as wire fraud conspiracy, aggravated identity theft and fraudulent use of identification. For the reasons set forth below, the government recommends that the Court impose a sentence of mandatory life imprisonment.

I.     <u>Facts</u>

      A.    <u>The Defendant's Year-Long Plan to Murder Brandy Odom</u>

        This case was part of a long-term investigation by the Federal Bureau of Investigation ("FBI") and the New York City Police Department ("NYPD") into the murder of Brandy Odom, a former resident of Rosedale, Queens. On April 9, 2018, the NYPD responded to a 911 call reporting a body inside of Canarsie Park in Brooklyn, New York. Upon arriving at the scene of the crime, NYPD officers discovered the dismembered corpse of a 26-year-old woman subsequently identified as Brandy Odom. Presentence Investigation Report ("PSR") ¶ 9. Odom had been asphyxiated and posthumously dismembered—her arms had been severed at the elbow and both legs had been severed at the hips and knees. <u>Id.</u> ¶ 9. The following day, Odom's arms, legs, hands and feet were discovered in garbage bags placed in a wooded area within the same park. <u>Id.</u>

At the time of her murder, Brandy Odom resided with the defendant and a cooperating witness who testified at trial ("Witness-1") at 249-45 148th Road, Queens, New York ("the Residence"). PSR ¶ 10. During the time Odom lived with the defendant, he acted as her pimp and controlled every aspect of her life, using the income from her commercial sex work to pay his bills and finance his lifestyle. See id. ¶ 10. The defendant then plotted to profit further off Odom by taking out life insurance policies in her name and murdering her to collect the proceeds. See id. ¶¶ 11-16. Starting in approximately March 2017, over a year prior to Odom's homicide, the defendant and Witness-1 fraudulently obtained two life insurance policies in Odom's name. Id. ¶¶ 11-16. The defendant and Witness-1 arranged for premium payments to the life insurance companies to be made, in part, by using a debit card in Odom's name. Id. ¶ 14. In April 2018, the defendant murdered Odom by strangulation and, over the course of several days, severed her corpse into numerous pieces with multiple cutting instruments, including a motorized reciprocating saw. Id. ¶ 18. In the early morning of April 8 and April 9, 2018, the defendant and Witness-1 disposed of Odom's body parts in Canarsie Park. Id. ¶ 19. After Odom's homicide, Witness-1, the beneficiary of Odom's life insurance policies, made several unsuccessful attempts to claim benefits under the life insurance policies at the defendant's direction. Id. ¶¶ 21-23.

The defendant has shown no remorse for this crime.

1.    The Defendant's Abusive Relationship with Witness-1 and Odom

The defendant and Witness-1 met in high school and were romantically and sexually involved on and off throughout the course of their lives. Trial Tr. 238-239, 241-242. The defendant met Odom when Witness-1 introduced them in approximately 2016. Trial Tr. 270-271, 275. Odom and Witness-1 were both engaged in commercial sex work at the time and the defendant allowed them to use his home in Queens to engage in sexual activity with customers. See PSR ¶ 10. In late 2016, both Witness-1 and Odom moved in with the defendant at the Residence and the defendant took over their commercial sex work. See id. At the time, Witness-1 had two young sons who spent time at the Residence after Witness-1 and Odom moved in. The defendant had frequent violent outbursts over Witness-1 having children that were not his own. As Witness-1 testified at trial, "[the defendant] couldn't stand looking at my children because they were not his . . . he wanted to make my son disappear or have a really bad accident that resulted in his death." Trial Tr. 291-292.

The defendant was physically, sexually and emotionally abusive towards Witness-1 throughout their relationship, dating back to high school. See PSR ¶ 10; Trial Tr. 240-241. This abuse continued when Witness-1 and Odom moved into the Residence and the defendant took on the role of their pimp. Witness-1 and Odom were not permitted to wear clothing inside the house, and were required to call the defendant "daddy," a common term used by those involved in prostitution and related crimes reflecting the disproportionate power dynamic between the individuals performing commercial sexual services and the individual profiting from those services. See Trial Tr. 239, 310. Witness-1 and Odom were required to obtain permission from the defendant to shower, eat or make any purchases. Trial Tr. 231, 310, 347-348. The defendant

kept all of the money earned by Odom and Witness-1 through commercial sexual services.  See PSR ¶ 10; Trial Tr. 307.

During 2017, Witness-1 went to the hospital twice as a result of injuries inflicted upon her by the defendant.  The first time, the defendant punched her in the eye; the second time, the defendant slammed Witness-1 into a refrigerator, fracturing her shin.  The defendant frequently raped Witness-1, including with objects, and appeared to enjoy causing her pain.  As Witness-1 testified at trial, "[the defendant] would rape me with [] random objects, brooms, hammers, liquor bottles . . . I was sore and sometimes I would be bleeding."  Trial Tr. 261.  The defendant also struck Witness-1 with a firearm and repeatedly threatened Witness-1 by pointing a gun at her.  Trial Tr. 250, 392.  On one occasion in approximately January 2018, the defendant came home drunk and attacked Witness-1, putting a knife to her throat and pinning her to a door.  Trial Tr. 255.  During this incident, the defendant threatened to murder her eldest son by slitting his throat.  Id.  Witness-1, pregnant with the defendant's child at the time, ran out of the house in her underwear and a robe and called 911, resulting in the defendant's arrest.  Id. at 255, 257; GX 326.  The defendant also physically assaulted Odom on more than one occasion.  Trial Tr. at 258.

The defendant's physical abuse extended to Witness-1's children.  Trial Tr. 247-249.  The defendant told Witness-1 that she should not have had children with other men and frequently spoke about wanting to kill her young sons.  Trial Tr. 281-282, 291-293.  He beat both children, who were approximately eight and two years old at the time and attempted to throw her two-year-old son ("Z") out a window.  Trial Tr. 247-248.  When the defendant believed that Witness-1's eight-year-old son ("T") was telling others about the abuse going on inside the Residence, the defendant put a gun in the child's mouth and threatened to "blow his fucking brains out if he kept running his mouth."  Trial Tr. 260.  Witness-1 ultimately sent Z out of state to protect him from the defendant.  Trial Tr. 292.

### 2.    The Defendant's Plan to Commit Murder-For-Hire

The defendant also frequently expressed hatred for and jealousy of Z's father ("Victim-2").  Trial Tr. 244, 276-277, 292.  When Witness-1 and the defendant began romantically reconnecting, Martin proposed a plan in which Witness-1 would take out life insurance policies on Victim-2 and the defendant would murder him for the proceeds of the policies.  Trial Tr. 277-280.  Witness-1 agreed to the plan, and she and the defendant took out a life insurance policy in Victim-2's name in August 2016.  Trial Tr. 282-286; GX 128A.  The defendant then came up with plans to kill Victim-2 and took steps to effectuate the murder, including going to Victim-2's home and attempting to surveil him.  Trial Tr. 290-291.

The defendant also called an insurance company and requested life insurance applications for children.  Trial Tr. 852-853; GX 115.  The defendant then instructed Witness-1 to take out life insurance policies on T and Z so that the defendant could kill them for the proceeds.  Trial Tr. 292-293.  In June 2017, Witness-1 filled out a life insurance application for Z after the defendant threatened to kill her.  Trial Tr. 299; GX 128E.  The defendant and Witness-1 fought frequently about the defendant's plans to kill Victim-2 and her children, and about Witness-1's resistance.  Trial Tr. 300-301.  As Witness-1 explained, the defendant came up with plans for how her children would die: "he wanted me to make my son disappear or have a really bad accident

that resulted in his death . . . [Z would get] hit by a car or just like real crazy things that I just, I was not okay with."  Trial Tr. 292-293.

While the defendant, Witness-1 and Odom were living together, the defendant turned his attention to Odom as a potential victim in his murder-for-hire scheme.  Trial Tr. 318-319.  The defendant expressed that no one cared about or would miss Odom, and, therefore, she was the ideal victim for his life insurance scheme.  Trial Tr. 318-319, 333-334.  The defendant stated that Odom was "nothing but a whore, nobody loved her."  Trial Tr. 318.  Over time, the plan to murder Victim-2 and Witness-1's children was abandoned and the defendant and Witness-1 began plotting to kill Brandy Odom.  Id. at 334.  In March 2017, at the defendant's direction, Witness-1 took out a life insurance policy in Odom's name through Globe Life Insurance in the amount of $50,000 and made herself the beneficiary.  PSR ¶ 12; GX 128C.  In December of 2017, at the defendant's direction, Witness-1 took out a life insurance policy in Odom's name through American National Life Insurance in the amount of $150,000 and again made herself the beneficiary.  PSR ¶ 14; GX 128F.  The defendant and Witness-1 used Odom's personal identifying information, including Odom's name, date of birth and social security number, among other things, to obtain these life insurance policies.  PSR ¶ 12-14; Trial Tr. 321-323, 336-342.  Further, the defendant and Witness-1 arranged to pay the insurance premiums through money orders and Odom's own bank account.  See PSR ¶ 14; Trial Tr. 341.

### 3.    The Defendant's Attempt to Recruit Others

After the life insurance policies were secured, the defendant began to plan Odom's murder.  The defendant attempted to find someone that he could pay to carry out Odom's murder.  Id. ¶ 20.  As testified to at trial, the defendant wanted to distance himself from the crime: "the plan was for [Odom] to be having a date and the theory was it was supposed to be a date or a john that killed [Odom] and left her at the back door . . . [or a] robbery, everybody get[s] shot."  Trial Tr. 324-325.  The defendant described the details of the scheme to a friend ("Witness-2"), provided the identity of the victim, and asked Witness-2 to kill Odom in exchange for $25,000, which the defendant represented was half of the life insurance proceeds.  PSR ¶ 20; Trial Tr. 155-156.  At trial, Witness-2 explained that the defendant told Witness-2 he took out a life insurance policy on the woman who was living with him and he was waiting for the right time to kill her: "he wanted me to shoot the girl . . . [h]e's gonna text me to come over to the house, the door was gonna be open, she was gonna be in her room, just walk up, shoot her, make it seem like a robbery gone wrong."  Trial Tr. 155-156.  Witness-2 declined the defendant's offer.  PSR ¶ 20; Trial Tr. 157.  Ultimately, the defendant carried out Odom's murder alone.

### 4.    The Murder and Dismemberment of Brandy Odom

In April 2018, the defendant informed Witness-1 that he was ready to kill Odom and Witness-1 left the Residence to stay with her mother.  PSR ¶ 17; Trial Tr. 370.  At the time, Witness-1 had recently given birth to the defendant's child.  See PSR ¶ 17.  The defendant let Witness-1 know that Odom would be gone by the time she returned.  Trial Tr. 370.  Several days later, the defendant texted Witness-1 a coded sentence that Witness-1 understood to mean that the defendant had killed Odom.  PSR ¶ 17; Trial Tr. 373.  The defendant then picked up Witness-1 up at her mother's house and took her to get food and cleaning supplies.  PSR ¶ 17; Trial Tr. 375-377.

4

Upon arriving home, the defendant brought Witness-1 to Odom's bedroom, where Witness-1 saw Odom's naked corpse. At trial, Witness-1 described returning home with the defendant that evening: "[a]fter I ate and then fed my baby and I was comfortable, he said come here, and he directed me towards where Brandy['s] room was, and he opened the door and showed me her . . . on the floor, butt naked, laying there, and blood coming out her nose." Trial Tr. 379. The defendant informed Witness-1 that he had strangled Odom to death and then had penetrated Odom's body vaginally with an object in order to make it seem as though the crime were sexual in nature and the perpetrator was a client. PSR ¶ 17; Trial Tr. 380. The defendant also opened the windows to chill the room and make it more difficult for law enforcement to determine Odom's time of death. PSR ¶ 17; Trial Tr. 381. The defendant and Witness-1 then covered the bathroom, floor to ceiling, in black plastic garbage bags. PSR ¶ 18; Trial Tr. 382-383 ("he wanted to make sure there was gonna be no blood"). Once the bathroom was prepared, the defendant moved Odom's corpse into the bathtub and began the process of dismembering Odom's body over the course of days.[1] PSR ¶ 18; Trial Tr. 383-389. Witness-1 described walking into the bathroom while the defendant was dismembering Odom: "I woke up and stormed into the bathroom like what the fuck are you doing, you're making a lot of noise . . . I saw Brandy laid up in the tub and her arms were already cut off and [] sitting in a bag on the floor . . . he was telling me, this is, like, a meaty area and it's giving me some trouble." Trial Tr. 383-384. When the defendant was unable to successfully dismember Odom's corpse using a manual saw, the defendant went to Home Depot and purchased a motorized reciprocating saw, which he then used to complete the task. See PSR ¶ 18; Trial Tr. 384. After purchasing the motorized saw, the defendant conducted searches from his cell phone regarding how to insert blades into a reciprocating saw. PSR ¶ 26; Trial Tr. 1641. He then finished dismembering Odom, bagged up her arms, legs, hands and feet, and put her torso and head into a suitcase. See PSR ¶ 19; Trial Tr. 394-395, 399.

In the early morning hours of April 8 and April 9, 2018, the defendant and Witness-1 disposed of Odom's body parts. PSR ¶ 19. First, on April 8, the defendant instructed Witness-1 to drive them to Canarsie Park in Brooklyn. PSR ¶ 19; Trial Tr. 392-393. The defendant removed black garbage bags from the car, containing Odom's limbs, and deposited them in a wooded area by baseball fields. PSR ¶ 19; Trial Tr. 394; GX 704-711. Next, on April 9, the defendant instructed Witness-1 to drive them back to the park so that he could leave Odom's torso and head near a path. PSR ¶ 19; Trial Tr. 397-398. The defendant wanted Odom's corpse to be discovered so that he would be able to promptly collect on the life insurance policies. Trial Tr. 391. The defendant and Witness-1 disposed of additional evidence of the crime, such as garbage bags, the motorized saw, and the clothes that the defendant wore during the dismemberment at various locations in Queens. PSR ¶¶ 18-19; Trial Tr. 403-404, 407-408. After the murder, the defendant directed Witness-1 to call the life insurance companies and attempt to collect. Witness-

---

[1] The defendant directed Witness-1 to watch the television show "Dexter" with him in preparation for the murder. Trial Tr. 361. In "Dexter," a serial killer murders and dismembers his victims, concealing forensic evidence by covering his "kill room" from floor to ceiling with plastic.

1 began making attempts to collect on the policies beginning on April 26, 2018. PSR ¶ 21; Trial Tr. 419-423; GX 128G; GX 128H; GX 128I. These attempts were unsuccessful.

B.    The Defendant's Criminal History and Federal Arrest

In January 2009, the defendant was convicted in New York for driving while intoxicated, an unclassified misdemeanor. PSR ¶ 58. For this crime, the defendant was sentenced to complete an alcohol abuse program and pay a $1000 fine. Id. The defendant falls into Criminal History Category I. Id. ¶¶ 59-60.

The defendant was arrested in relation to the crimes against Odom on November 4, 2020, and has remained in custody since that date. PSR ¶ 27.

C.    Guidelines Calculation

The government concurs with the calculation set forth in the PSR finding that under the United States Sentencing Guidelines, the advisory sentence is life imprisonment. PSR ¶¶ 56, 95. Notably, the defendant faces a mandatory term of life imprisonment for his convictions on Counts One and Two. PSR ¶ 92. The term of imprisonment for Count Four of two years' incarceration must be imposed consecutively to any other count. PSR ¶¶ 112-113. The defendant also faces a maximum term of life imprisonment of 20 years on Counts Three and Five. See PSR ¶ 93.

II.    Sentencing Analysis

The mandatory life sentence required by law reflects the nature and circumstances of the offense, the history and characteristics of the defendant, avoids unwarranted sentencing disparities, and promotes general and specific deterrence. See 18 U.S.C. § 3553(a)(1), (a)(2) and (a)(6).

The defendant plotted to murder Brandy Odom for personal financial gain, one of the most cold-blooded and serious offenses punishable by law. Further, the defendant committed this murder in the most heinous of ways—strangling his victim, sexually assaulting her with an object, and dismembering her body to discard her body parts in a park like trash. While dismembering her, he hacked at her limbs using multiple cutting tools until finally purchasing a motorized saw that would accomplish his goal of gratuitously severing all of Odom's limbs from her body. Odom's family was present at trial and saw the photographs of what the defendant had done to the body of their loved one in the hopes of a $200,000 payout.

The defendant preyed on Brandy Odom. He took her into his home to profit off of her body, assuming the role of her pimp and dehumanizing her on a daily basis. The defendant controlled how she dressed, what she ate and when she bathed. The defendant required that Odom drop out of school so that she could work more hours to earn money through the commercial sex work that lined the defendant's pockets. The defendant controlled all of the money earned by Odom, even using it to pay for the life insurance policies that he and Witness-1 fraudulently took out in her name as part of the defendant's plan to kill her.

6

The depth of the premeditation involved in Odom's murder is seldom seen. The defendant planned and studied for this murder for over a year, taking out the first life insurance policy in March 2017, thirteen months before he killed Odom. During this time period, the defendant thought of numerous ways to avoid detection by law enforcement. He studied for the murder by watching the television shows "Dexter" and "The First 48," believing they could teach him how to conceal forensic evidence and other evidence that might connect him to the crime. He ensured that it was Witness-1's name, and not his own, as the beneficiary on Odom's insurance policies. During the week of the murder, the defendant isolated Odom within the Residence, in order to create a lengthy time period during which she could have been killed. Similarly, he controlled the temperature in the Residence after her murder to make it difficult for a medical examiner to pinpoint Odom's time of death. The defendant wallpapered his bathroom in garbage bags before he dismembered Odom, so that he could, in essence, remove the entire kill room from the house. He scrubbed and vacuumed the carpet in her bedroom to erase traces of blood. He was so thorough in his cleaning efforts that there was no forensic evidence demonstrating that Odom's murder occurred in the Residence. The defendant repaired the bumper on his car before he disposed of Odom so that the car would not stick out as he and Witness-1 drove back and forth between Queens and Brooklyn in the middle of the night. The defendant got rid of his and Witness-1's cell phones after the murder and purchased new devices, hoping to conceal their message history and the digital fingerprint connecting him to Odom's homicide.

Odom's murder alone would warrant a life sentence. But as the evidence detailed above shows, the defendant originally targeted Victim-2 and two children, who were only approximately eight and two years old at the time. The defendant asked Witness-1 to fill out an insurance application on Victim-2, so that he could murder the father of her second child for life insurance proceeds. After the policy was issued, the defendant took steps to effectuate the murder, including coming up with plans as to how he would kill Victim-2 and surveilling Victim-2 at his home. The defendant further sought to convince Witness-1 to go along with his plan to kill her children. The defendant requested juvenile life insurance applications and filled out applications in the names of T and Z. The defendant used his control over Witness-1 to compel her to fill out a life insurance application in Z's name in 2017. The defendant suggested plans for how he would kill Z, such as having Z "accidentally" run over by a car. The defendant thought nothing of taking these lives for his own financial and personal gain and, but for Witness-1's reluctance, may have carried out these plans.

The defendant's conduct after Odom's murder speaks to his complete lack of remorse. The defendant concerned himself only with the money that he believed to be coming his way, with which he planned to purchase real estate and move to Texas. The defendant repeatedly demanded that Witness-1 make attempts to collect the life insurance policy money, going so far as to attempt to get Witness-1 to reach out to Odom's mother to obtain Odom's mother's signature on an insurance document. At the time of the defendant's and Witness-1's apprehension in November of 2020, they still had the Odom life insurance documents in their shared apartment because the defendant wanted to continue to attempt to collect the money. Throughout every stage

of this case, this defendant has demonstrated a lack of remorse and a refusal to accept responsibility for his horrendous acts of violence.

The Court should also consider the history and characteristics of the defendant, which includes the extreme abuse that he inflicted upon Witness-1 and her children, as discussed above. The physical and sexual violence inflicted on Witness-1 by the defendant was nothing short of sadistic and did not cease even when Witness-1 became pregnant with the defendant's child.

Accordingly, the Court should impose a mandatory term of life imprisonment for his convictions on Counts One and Two. The Court should further impose a consecutive 2-year term of imprisonment on Count Four, consistent with the Guidelines. Finally, the Court should impose consecutive 20-year terms of imprisonment on Counts Three and Five. Such a sentence accounts for this defendant's role in the murder for hire conspiracy and the related crimes—indeed, the defendant was the driving force behind the plan to kill Odom for life insurance proceeds. Further, he committed the murder and dismemberment himself. The recommended sentence does not reflect "zeal for ever-harsher punishment driven by fear and a desire for retribution," as suggested by the defendant. Def. Mem. at 3. Rather, such a sentence takes into account the nature and circumstances of the offense, the grave need to protect the public from this defendant and the need for deterrence.

III.    Conclusion

For these reasons, the government respectfully requests that the Court sentence the defendant to life imprisonment.

Respectfully submitted,

BREON PEACE
United States Attorney

By:

Tanya Hajjar
Emily J. Dean
Andy Palacio
Assistant U.S. Attorneys
(718) 254-7000


cc:    Anthony Cecutti, Esq.
       Kestine Thiele, Esq.
       United States Probation Officer Ashtin Audain